**No. 23-2850**

# In the
# United States Court of Appeals
## for the Seventh Circuit

CHARLES CURRY, doing business as GET DIESEL NUTRITION,

*Plaintiff-Appellee,*

v.

REVOLUTION LABORATORIES, LLC, et al.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:17-cv-02283.
The Honorable **Matthew F. Kennelly**, Judge Presiding.

## BRIEF AND SHORT APPENDIX OF APPELLANTS BARRY NUSSBAUM, JOSHUA NUSSBAUM and REVOLUTION LABORATORIES, LLC

MATTHEW DE PRETER
AMY M. GIBSON
GARY HOLLANDER
ARONBERG GOLDGEHN DAVIS
& GARMISA
225 West Washington Street, Suite 1700
Chicago, Illinois 60606
(312) 755-3153

*Counsel for Appellants*

COUNSEL PRESS · (866) 703-9373        PRINTED ON RECYCLED PAPER 

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2850

Short Caption: CHARLES CURRY, d/b/a GET DIESEL NUTRITION v. REVOLUTION LABORATORIES, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Revolution Laboratories, LLC; Joshua Nussbaum; Barry Nussbaum

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Aronberg Goldgehn Davis & Garmisa; Levinson Stockton LLP; Cotsirilos, Tighe, Streicker, Poulos & Campbell, Ltd.

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: _____    Date: 02/ 1 /2024

Attorney's Printed Name: Matthew L. De Preter

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [✓] No [ ]

Address: 225 W. Washington St., Suite 2800

Chicago, IL 60606

Phone Number: 312-755-3153    Fax Number: 312-222-6364

E-Mail Address: cdepreter@agdglaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __23-2850__

Short Caption: __Charles Curry, d/b/a Get Diesel Nutrition v. Revolution Laboratories, LLC, et al.__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    __Revolution Laboratories, LLC; Joshua Nussbaum and Barry Nussbaum__

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    __Aronberg Goldgehn Davis & Garmisa__

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        __N/A__

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        __N/A__

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
    __N/A__

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
    __N/A__

Attorney's Signature: __/s/ Amy M. Gibson__    Date: __January 15, 2024__

Attorney's Printed Name: __Amy M. Gibson__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ]  No [✓]

Address: __Aronberg Goldgehn - 225 W. Washington St. - Suite 2800, Chicago, IL, 60606__

Phone Number: __312-828-9600__    Fax Number: __312-222-6391__

E-Mail Address: __agibson@agdglaw.com__

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2850

Short Caption: CHARLES CURRY, d/b/a GET DIESEL NUTRITION v. REVOLUTION LABORATORIES, LLC, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Revolution Laboratories, LLC; Joshua Nussbaum; Barry Nussbaum

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Aronberg Goldgehn Davis & Garmisa; Levinson Stockton LLP; Cotsirilos, Tighe, Streicker, Poulos & Campbell, Ltd.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Garry Phillip Hollander    Date: 02/05/2024

Attorney's Printed Name: Gary Phillip Hollander

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: 225 W. Washington St., Suite 2800

Chicago, IL 60606

Phone Number: 312-828-9600    Fax Number: 312-222-6364

E-Mail Address: ghollander@agdglaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ........................................................ i

TABLE OF AUTHORITIES ................................................................................... vi

JURISDICTIONAL STATEMENT ............................................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................................. 7

STATEMENT OF THE CASE ................................................................................... 8

    A.    Curry's Dietary Supplement Business ............................................. 8

    B.    Curry's Failure to Produce Any Records of Diesel Test Sales
           or Expenses ....................................................................................... 9

    C.    Revolution's Business and Joshua and Barry's Respective Roles ........... 11

    D.    Revolution Begins Selling Diesel Test in October 2016 ................. 12

    E.    Defendants Learn of Curry's Claim to the Diesel Test Mark
           and Immediately Conduct an Investigation ................................. 14

    F.    Revolution's Stipulation to Liability on Certain Claims, the
           District Court's Entry of Summary Judgment in Favor of
           Defendants on Curry's Sole Claim Seeking Punitive Damages,
           and the District Court's Expansion of the Stipulation ................. 20

    G.    The Jury's Verdict ........................................................................... 24

SUMMARY OF THE ARGUMENT ........................................................................ 25

ARGUMENT .......................................................................................................... 26

    I.    The Punitive Damages Award Is Excessive and Must Be
        Reversed or Significantly Reduced ................................................. 28

        A.    Defendants' Conduct Did Not Rise to the Level of
            Reprehensibility to Justify an Award of Punitive
            Damages ................................................................................. 28

            1.    The Harm to Curry Was Not Physical and
                Defendants' Conduct Did Not Impact the
                Health or Safety of Curry or Others ......................... 29

2.      There Was No Evidence Presented that Curry Was Financially Vulnerable ........................................................ 30

3.      Although Defendants' Infringement Occurred for Slightly More Than a Year, the Court Should Give Little Weight to the Fourth Factor Because the Defendants were not Recidivists ................................................ 32

4.      The Harm to Curry, if Any, Was Minor and Did Not Result from Intentional Malice, Trickery or Deceit ........................................................................... 34

B.      The Ratio Between Compensatory and Punitive Damages is 360 to 1, Which Far Exceeds Constitutionally Permissible Bounds .......................................................................... 38

1.      The District Court Erred in Including the Disgorgement Award in the Amount of Actual Damages Used in the Punitive Damages Ratio ..................... 39

2.      The Ratio of Compensatory to Punitive Damages Is Excessive at 360 to 1 ................................................................ 48

C.      The Final Guidepost Discussing the Difference Between the Award and Comparable Civil Penalties Favors Reversing or Significantly Reducing the Punitive Damages Award .......................................................................................... 51

II.      The Court Abused its Discretion by Denying Defendants' Motion to Strike Curry's Jury Demand on Count V (Common Law Infringement) ......................................................... 53

CONCLUSION .......................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adidas Am., Inc. v. Payless Shoesource, Inc.*,
   No. CV 01-1655-KI, 2008 WL 4279812 (D. Or. Sept. 12, 2008)...................................42, 43,

*Allied Van Lines, Inc. v. iMove, Inc.*,
   No. 1:17-CV-08021, 2018 WL 572510 (N.D.Ill. Jan. 25, 2018)............................................49

*Americold Realty Trust v. Conagra Foods, Inc.*,
   136 S. Ct. 1012 (2016)...................................................................................................3, 4

*Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*,
   425 F.3d 443 (7th Cir. 2005) .............................................................................................56

*Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*,
   705 F.2d 712 (4th Cir. 1983) .............................................................................................54

*Atturo Tire Corp. v. Toyo Tire Corp.*,
   No. 14-CV-0206, 2022 WL 1470362 (N.D.Ill. May 10, 2022) ............................................49

*BASF Corp. v. Old World Trading Co., Inc.*,
   41 F.3d 1081 (7th Cir. 1994) ........................................................................................41, 51

*BMW of N.A., Inc. v. Gore*,
   517 U.S. 559 (1996).............................................................................................28, 32, 51

*Bradley v. Village of Univ. Park, Ill.*,
   59 F.4th 887 (7th Cir. 2023).........................................................................................29, 48

*Call One Inc. v. Berkley Ins. Co.*,
   587 F. Supp. 3d 706 (N.D. Ill. 2022)..................................................................................40

*Cinezeta Internationale Filmproduktionsgesellschaft mbH & Co. 1 Beteiligungs KG v.*
   *Inferno Dist., LLC*,
   No. CV 10-9938-JFW, 2011 WL 13152064 (C.D. Cal. Nov. 17, 2011) ...............................57

*Cullen v. Saddler*,
   668 F. App'x. 656 (7th Cir. 2016) .................................................................................53, 56

*Doermer v. Oxford Fin. Group, Ltd.*,
   884 F.3d 643 (7th Cir. 2018) ...............................................................................................3

*E.E.O.C. v. AIC Sec. Inv., Ltd.,*
   55 F.3d 1276 (7th Cir. 1995) ............................................................48

*EEOC v. AutoZone, Inc.,*
   707 F.3d 824 (7th Cir. 2013) ............................................................51

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.,*
   980 F.3d 1117 (7th Cir. 2020) ................................................... *passim*

*Fednav Intern. Ltd. v. Cont'l Ins. Co.,*
   624 F.3d 834 (7th Cir. 2010) ..............................................................4

*Firestone Fin. Corp. v. Meyer,*
   796 F.3d 822 (7th Cir. 2015) ............................................................48

*Freeport-McMoRan, Inc. v. K N Energy, Inc.,*
   498 U.S. 426 (1991) ............................................................................1

*Gehrett v. Chrysler Corp.,*
   379 Ill. App. 3d 162 (2d Dist. 2008) ...............................................50

*Herman v. South Carolina Nat'l Bank,*
   140 F.3d 1413 (11th Cir. 1998) ......................................................40

*In re Frain,*
   230 F.3d 1014 (7th Cir. 2000) ........................................................56

*In re Yasmin and YAZ,*
   No. 3:09-md-02100-DRH, 2011 WL 6732819 (S.D.Ill. Dec. 16, 2011) ..............................47

*Int'l Union of Operating Engineers, Local 150 v. Lowe Excavating Co.,*
   225 Ill.2d 456 (Ill. 2006) ......................................................... *passim*

*JCW Invs., Inc. v. Novelty, Inc.,*
   482 F.3d 910 (7th Cir. 2007) ..........................................................49

*Kaszuk v. Bakery & Conf. Union & Indus. Int'l Pension Fund,*
   791 F.2d 548 (7th Cir. 1986) ..........................................................54

*Kokesh v. SEC,*
   137 S. Ct. 1635 (2017) .....................................................................40

*Lawlor v. N. Am. Corp. of Ill.,*
   2012 IL 112530 (Ill. 2012) ...............................................................27

*Lear Corp. v. Johnson Elec. Holdings, Ltd.*,
    353 F.3d 580 (7th Cir. 2003) ....................................................................4

*Loitz v. Remington Arms Co. Inc.*,
    138 Ill. 2d 404 (Ill. 1990) ......................................................................52

*Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*,
    299 F.3d 643 (7th Cir. 2002) ..................................................................53

*Mertens v. Hewitt Assoc.*,
    508 U.S. 248 (1993) ................................................................................40

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ................................................................................41

*Nike, Inc. v. "Just Did* It" Enter.,
    No. 91 C 4001, 1994 WL 258879 (N.D. Ill. June 9, 1994) ....................58

*Orius Corp. v. Qwest Corp.*,
    373 B.R. 555 (N.D. Ill. 2007) ................................................................56

*Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
    272 F.3d 1335 (Fed. Cir. 2001), *vacated*, 538 U.S. 974 (2003), *reinstated as modified*,
    345 F.3d 1366 (2003) .............................................................................46

*RTP LLC v. Orix Real Estate Capital, Inc.*,
    827 F.3d 689 (7th Cir. 2016) ...............................................................2, 4

*Saccameno v. U.S. Bank Nat'l Assoc.*,
    943 F.3d 1071 (7th Cir. 2019) ..................................................... *passim*

*Safety Socket LLC v. Relli Tech., Inc.*,
    No. 18-cv-6670, 2023 WL 3455117 (N.D.Ill. May 15, 2023) ................51

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
    978 F.2d 947 (7th Cir. 1992) ..................................................................40

*Slovinski v. Elliot*,
    237 Ill. 2d 51 (Ill. 2010) ........................................................................27

*State Farm Mut. Auto Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ................................................................. *passim*

*Superl Sequoia Ltd. v. Carlson Co., Inc.*,
    615 F.3d 831 (7th Cir. 2010) ....................................................................4

*TXO Prod. Corp. v. Alliance Res. Corp.,*
    509 U.S. 443 (1993).........................................................................................39, 47

*United States v. Segal,*
    938 F.3d 898 (7th Cir. 2019) .........................................................................41

*Whitlock v. FSL Mgmt., LLC,*
    No. 3:10CV-00562, 2012 WL 3109491 (W.D.Ky. July 31, 2012)...........................3

*Wilson v. City of Milwaukee,*
    138 F. Supp. 2d 1126 (E.D. Wis. 2001) .........................................................37

*Zazu Designs v. L'Oreal, S.A.,*
    979 F.2d 499 (7th Cir. 1992) .........................................................................49

## Statutes and Other Authorities

15 U.S.C. § 1117(a) ...........................................................................................42, 44, 51

15 U.S.C. § 1117(a)(1) ...................................................................................................40

15 U.S.C. § 1120 ..............................................................................................................1

15 U.S.C. § 1125 .........................................................................................................1, 24

15 U.S.C. § 1125(c) ......................................................................................................8, 22

15 U.S.C. § 1125(d) .......................................................................................................51

28 U.S.C. § 1331 ..............................................................................................................1

28 U.S.C. § 1332 ..............................................................................................................1

28 U.S.C. § 1332(c)(1) .....................................................................................................2, 4

28 U.S.C. § 1338 ..............................................................................................................1

Black's Law Dictionary (7th Ed. 1999) ..........................................................................37

Black's Law Dictionary (11th Ed. 2019) ........................................................................40

Companies Act 1955, 1955 S.N.Z. No. 63 (N.Z.) ........................................................3, 4

Fed. R. App. P. 3...............................................................................................................6

Fed. R. App. P. 4...............................................................................................................6

Fed. R. Civ. P. 39(a) ................................................................24, 55

Fed. R. Civ. P. 39(a)(2) ......................................................7, 25, 53, 58

Fed. R. Civ. P. 54(c) ............................................................53, 54

Fed. R. Civ. P. 59(e) ..............................................................6, 41

Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 *et seq.* ...................8

International Trusts Act 1984 No. 14 (Cook Is.)...................................2

Restatement (Second) of Trusts § 2 (1957) ..............................................3

## JURISDICTIONAL STATEMENT

Based on the allegations of Plaintiff/Appellee Charles Curry's ("Curry") Complaint (JA1),[1] the district court for the Northern District of Illinois had both federal question jurisdiction under 28 U.S.C. §§ 1331 and 1338, and diversity jurisdiction under 28 U.S.C. § 1332.  Federal question jurisdiction was based upon Curry's claims against Defendants/Appellants Revolution Laboratories, LLC ("Revolution"), Joshua Nussbaum ("Joshua"), and Barry Nussbaum ("Barry") (collectively the "Defendants") for violation of 15 U.S.C. §§ 1120 and 1125 (the "Lanham Act").[2]

Diversity jurisdiction was based on Curry's allegation that the amount in controversy exceeded $75,000.  JA1, ¶7.  Diversity jurisdiction was also based upon the citizenship of the parties at the time the action was commenced.  *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991).  Curry is an individual

---

[1] Defendants submitted a Short Appendix and a Joint Appendix with their brief. The Short Appendix will be referred to as "SA" and the Joint Appendix will be referred to as "JA."

[2] When Curry filed this lawsuit, he named one additional defendant – Rev Labs Management, Inc. ("Management").  In 2017, this lawsuit was dismissed against all Defendants, including Management, for lack of personal jurisdiction.  An appeal followed in this Court under Case Number 17-2900.  This Court reversed the dismissal against Revolution, vacated the dismissal as to the other three Defendants and remanded for further proceedings so the district court could properly determine whether it had personal jurisdiction.  *See* Case Number 17-2900, Dkt. 56.  On remand, the district court once again dismissed the claims against Management but denied dismissal of Barry and Joshua.  Dkt. 79, 84.

citizen of Illinois. Joshua is an individual citizen of California, and Barry is an individual citizen of Hawaii.

Revolution, is a limited liability company formed under the laws of Nevada with its principal place of business in California. The citizenship of a limited liability company is that of its members. *RTP LLC v. Orix Real Estate Capital, Inc.*, 827 F.3d 689, 691 (7th Cir. 2016). Revolution has three members, none of which are citizens of Illinois:

(1) NNE, LLC, a limited liability company formed under the laws of Wyoming. Joshua is the sole member of NNE, LLC. Since Joshua is a citizen of California, NNE, LLC is also a citizen of California;

(2) Management, a corporation formed under the laws of Nevada with its principal place of business in California. Management is a citizen of Nevada and California. *See* 28 U.S.C. § 1332(c)(1) (a corporation is deemed to be a citizen of both its state of incorporation and the state of its principal place of business); and

(3) LT Holdings, LLC, a limited liability company formed under the laws of the Cook Islands. LT Holdings, LLC has one member: BNC Woodside, LLC, a limited liability company formed under Delaware law. BNC Woodside, LLC has one member: Nussbaum Family Trust Settlement (the "Nussbaum Trust"), which is an irrevocable trust created by Barry and formed in accordance with the International Trusts Act 1984 (Cook Is.).

The Nussbaum Trust is a traditional trust, which the Supreme Court has defined as: (a) one of fiduciary relationships between various parties; (b) and without the capacity to sue and/or be sued in its own name. *Americold Realty Trust v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1016 (2016), *citing* Restatement (Second) of Trusts § 2 (1957).

As to the first element, the Nussbaum Trust created a fiduciary relationship between its two trustees, and the beneficiaries of the Nussbaum Trust (Barry's seven children, including Joshua). Joshua was the Managing Trustee as of the date of filing this lawsuit. Ora Fiduciary Limited ("Ora"), an institutional trustee (and the sole trustee of the Nussbaum Trust today), is a registered trustee company under the provisions of the Trustee Companies Act of 1981-82 of the Cook Islands. As to the second element, the Nussbaum Trust does not have capacity to sue or be sued in its own name as the Nussbaum Trust agreement expressly provides that all actions shall be brought or defended in the name of Ora.

For diversity purposes, the citizenship of a traditional trust is based upon the citizenship of its trustees. *Americold*, 136 S.Ct. at 1016; *Doermer v. Oxford Fin. Group, Ltd.*, 884 F.3d 643, 647 (7th Cir. 2018); *Whitlock v. FSL Mgmt., LLC*, No. 3:10CV-00562, 2012 WL 3109491, at *2-3 (W.D.Ky. July 31, 2012) (LLC's citizenship for purposes of diversity jurisdiction included the Cook Islands because certain members were trusts established in the Cook Islands, the sole trustee for which

was a Cook Islands corporation).[3]  Based on *Americold* and its progeny, the

Nussbaum Trust's citizenship is that of its two trustees at the time this lawsuit was

filed:  (1) Joshua, a California citizen; and (2) Ora.

Ora's citizenship can be determined by referencing Cook Islands law and

legal precedent from the federal courts of the United States. The last word of Ora's

name is "Limited," meaning that Ora is "limited by shares."  Companies Act 1955,

1955 S.N.Z. No. 63, s. 14(1)(a) (N.Z.).  A business organization "limited by shares"

is "equivalent in all legally material respects to a corporation under state law."

*Lear Corp. v. Johnson Elec. Holdings, Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003); *Superl*

*Sequoia Ltd. v. Carlson Co., Inc.*, 615 F.3d 831, 832 (7th Cir. 2010); *Cf. Fednav Intern.*

*Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 837-38 (7th Cir. 2010).  Therefore, the citizenship

of a corporation limited by shares is determined in the same manner as a

corporation under federal law – namely, by looking at its place of incorporation

and the location of its principal place of business.  28 U.S.C. § 1332(c)(1).  Ora was

---

[3] In the first appeal in this case (Case No. 17-2900), the Court questioned the citizenship of the Nussbaum Trust.  *See* Dkt. 22, *citing RTP*, 827 F.3d 689 (noting that a trust's members or beneficiaries may be relevant in determining the trust's citizenship).  *RTP* is not applicable based on the fact that the trusts were not traditional trusts, but business trusts (pension funds) that contracted and litigated in their own names.  *Id.* at 691-92.  Here, the Nussbaum Trust is a traditional trust that, in accordance with its trust agreement, cannot sue or be sued in its own name.  Accordingly, the citizenship of the Nussbaum Trust's trustees controls.  *See Doermer*, 884 F.3d at 647 (citizenship of traditional family trust is that of its trustee).

formed under the laws of the Cook Islands and its principal place of business is also located there.  Accordingly, Ora is a citizen of the Cook Islands.

A summary of the parties' citizenship is as follows:

- Curry is a citizen of Illinois;

- Joshua is a citizen of California;

- Barry is a citizen of Hawaii; and

- Revolution is a citizen of Nevada (Management's state of incorporation), California (Joshua's state of citizenship and Management's place of business), and the Cook Islands (Ora's place of citizenship).

Complete diversity, therefore, exists in this case.

Furthermore, this Court has jurisdiction over this appeal pursuant to Federal Rules of Appellate Procedure 3 and 4.  This matter proceeded to a jury trial starting on May 15, 2023 and concluding on May 22, 2023, with the jury issuing a verdict and the district court entering a judgment on May 22, 2023.  SA64; Dkt. 375, 377.  The parties filed several post-trial motions after the judgment was entered:

1. On May 30, 2023, Curry filed a motion to find liability in his favor on his claim for violation of the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), which was not decided by the jury.  Dkt. 378.

2. On June 19, 2023, Defendants filed a motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter the judgment. Dkt. 384-85.

3. On June 20, 2023, Curry filed three motions: (a) a motion to alter the judgment under Rule 59(e) and to determine the amount of infringing profits; (b) a motion pursuant to Rule 59(e) to alter the judgment to award pre- and post-judgment interest; and (c) a motion for permanent injunction. Dkt. 388-393.

On August 25, 2023, the district court granted Curry's Rule 59(e) motion to determine Defendants' infringing profits (Dkt. 388), denied Defendants' Rule 59(e) motion (Dkt. 384), granted Curry's motion for a finding of liability under the IUDTPA (Dkt. 378), granted, in part, Curry's motion for pre- and post-judgment interest (Dkt. 390), and granted, in part, Curry's motion for permanent injunction (Dkt. 392). SA00009. On August 29, 2023, the district court entered an amended judgment and a permanent injunction in accordance with its rulings on the post-judgment motions. SA000066; Dkt. 412-413. A second amended judgment was entered on September 1, 2023 to correct a clerical error. SA000068; Dkt. 416.

On September 22, 2023, Defendants filed their timely notice of appeal. SA000070. This is an appeal from a final judgment of the Federal District Court for the Northern District of Illinois that disposed of all of the parties' claims.[4]

## **STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.      Whether the jury's verdict awarding $900,000 in punitive damages ($300,000 against each Defendant), but only $2,500 in actual damages to Curry, is excessive and unconstitutional based on the evidence of Defendants' conduct, the ratio of punitive damages to actual damages, and the difference between the award and comparable civil penalties.

2.      Whether the district court erred in denying Defendants' Rule 39(a)(2) motion to strike the jury demand on Curry's claim for common law trademark infringement (Count V of the Complaint), and allowing Curry to amend his claim to seek compensatory and punitive damages after Revolution had stipulated to liability, thereby causing substantial prejudice to the Defendants through their inability to contest liability and the jury's significant punitive damages award that Curry could not have received based on the relief sought in Count V.

---

[4] Defendants note that there are outstanding post-trial issues pending before the district court relating to whether Curry is entitled to an award of his attorney's fees and costs. Dkt. 422-424.

## STATEMENT OF THE CASE

Curry sued the Defendants alleging that they infringed his trademark for a dietary supplement named Diesel Test, in violation of the Lanham Act, 15 U.S.C. §1125, and Illinois common law. JA1. Curry also alleged claims against Defendants for violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA"), the IUDTPA, and the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA").

### A.     Curry's Dietary Supplement Business

In 2002, Curry started a business called Get Diesel Nutrition through which he allegedly sold several dietary supplement products, including Diesel Test, NOS Ether, Ready4War, JP8 and Tsunami. Dkt. 458, Trial Transcript Vol. 1, 220:16-17, 316:15-317:6. Curry testified that he started selling Diesel Test in 2005 and sold it continuously through the date of trial. *Id.* at 220:16-17, 235:20-25, 316:18-317:6. Despite years of purported sales, Curry did not produce or seek to enter into evidence copies of a single invoice or of any payments received for any Diesel Test product sold on Amazon (where he purportedly sold products) or on any other sales platform, and Curry did not attempt to register his Diesel Test trademark until after filing this lawsuit. *Id.* at 236:11-18, 292:12-296:13; Dkt. 459, Trial Transcript, Vol. 2, 337:9-11.

Curry ran his business full-time until 2011, after which time he took a full-time job in Information Technology with the Department of Veteran's Affairs. Dkt. 458, 243:19-24, 287:23-288:8, 289:23-290:11. By 2011, and continuing thereafter, Curry's supplement business was just a "side gig." *Id.* at 288:19-289:5. By Curry's account, he only worked between 10 to 25 hours a week on the business. *Id.* at 290:1-11.

**B.     Curry's Failure to Produce Any Records of Diesel Test Sales or Expenses**

Curry testified that total sales of all his products (Diesel Test and non-Diesel Test products) from 2002 through 2023 were approximately $2 million. *Id.* at 317:14-19. For 2015, the year before Revolution's sales began, Curry testified that total sales for all his products were $132,340. *Id.* at 302:7-13. In 2016 and 2017, the years Revolution was actively marketing and selling its own product under the name Diesel Test, Curry testified that his sales were $229,569 and $220,096, respectively. *Id.* at 302:21-303:6. In 2018, the year that Revolution stopped marketing Diesel Test, Curry's sales diminished by $50,000. *Id.* at 303:16-18. In 2019, when Revolution did not market or sell Diesel Test products, Curry's sales dropped to $118,000, just below his sales in 2015. *Id.* at 303:19-24.

Despite Curry's claimed sales, at no point during this lawsuit did he ever produce a single record of any particular sale of Diesel Test. *Id.* at 296:5-13, 297:15-16, 299:2-14, 308:20-309:7. Curry claimed that he does not maintain records of sales

9

broken down by individual product sold. *Id.* at 232:10-12. Curry testified that he did not have records of sales of the various Diesel Test products, even though he alleged that he had those records at some point in time. *Id.* at 294:2-295:24, 296:5-13; 297:24-298:22; Dkt. 459, 346:13-15. This is despite the fact that Curry claimed to have sold his products on several websites, including Amazon and eBay. Dkt. 458, 236:11-18, 296:14-21; *Compare* Dkt. 461, Trial Transcript Vol. 4, 1033:10-16 (Revolution's accounting manager testifying that, if a seller sells a product on Amazon, the seller can easily download a report of sales) *with* Dkt. 458, 307:2-24 (Curry testifying that Amazon does not provide sellers with reports or tell its seller which of its products were sold). Curry also testified that he had records of his sales in 2017 that he used to prepare his 2018 tax returns after this lawsuit was filed, but he did not have any of those records to produce in the lawsuit. Dkt. 458, 296:25-297:16, 299:25-300:8.

Curry testified at trial that, since 2008, 75-80% of his sales came from the sale of Diesel Test, but again, he admitted that he did not have any records to substantiate this percentage. *Id.* at 236:7-9, 318:7-10. Curry also did not produce a single document as evidence of the cost of the Diesel Test products. *Id.* at 309:24-310:2. And, although he relied on advertising materials for Diesel Test at trial, none of those materials were identified by date and there was no indication as to

whether they were ever published.  Dkt. 459, 528:13-18; *See* Dkt. 427-15, Pl. Ex. 19 (Curry's undated advertisement for Diesel Test).

**C.    Revolution's Business and Joshua and Barry's Respective Roles**

Revolution was founded in 2012 by Joshua and Barry.  Dkt. 459, 354:22-24, 360:19-21, 542:21-25.  Joshua is Barry's son.  *Id.* at 354:6-7.  Around the same time, Barry, as settlor, formed the Nussbaum Trust.  Dkt. 460, 614:24-615:10.  Both Revolution and the Nussbaum Trust were formed years before Defendants had ever heard of Curry, as explained below.

In 2015, Joshua became the President of Revolution.  Dkt. 459, 361:25-362:5. At all times, Joshua managed the company on a day-to-day basis.  *Id.* at 362:12-20. Like many small business managers, Joshua's activities changed based on the needs of the company, but they primarily consisted of managing and supervising employees who were responsible for day-to-day tasks and for sales, creating systems, creating enthusiasm, and building relationships with brand ambassadors.  *Id.* at 362:15-363:6, 363:17-20; 417:24-418:4, 466:9-25.    At times, Joshua also managed Revolution's eBay and Amazon accounts through which Revolution often sold products.  *Id.* at 399:1-400:4, 406:18-25, 407:20-22.

Barry was the CEO of Revolution, but he was not an owner.  *Id.* at 363:7-10, 542:21-25; Dkt. 460, Trial Transcript Vol. 3, 630:8-12.  Despite his title, Barry's role with Revolution was mainly that of a mentor.  Dkt. 459, 363:13-23, 364:21-23; Dkt.

460, 654:16-655:2.  Barry's primary business is in real estate investments.  *Id.* 537:10-

13.  Barry registered and set up Revolution.  Dkt. 459, 361:8-10, 543:14-16.  Barry

also handled raising the initial money to start the company.  *Id.* at 361:14-16,

543:21-23.  Unlike Joshua, Barry was not involved in the day-to-day management

or operations of Revolution. Rather, Barry was involved in some of the big

decisions of the company, though not all of them.  *Id.* at 365:14-22.

### D.    Revolution Begins Selling Diesel Test in October 2016

When Revolution began developing its Diesel Test product in 2016, it ran

searches to determine if the name was being used.  *Id.* at 473:3-6, 473:15-474:4.  At

the time, Curry had not yet filed an application to register his trademark for Diesel

Test, even though he allegedly started selling his products 11 years earlier.  *See Id.*

341:19-342:1 (trademark application filed on December 9, 2016); 350:16-20 (Curry

conceded that "[Defendants] would not have found a registered trademark in

2016"); 351:22-352:2.  Finding nothing, Defendants believed that the name was

open for use.  *Id*.  Revolution began to market and sell its Diesel Test product in

October 2016.  *Id.* at 368:25-369:2; 471:24-474:14.  Revolution sold its Diesel Test

through its own website (revlabs.com), as well as Amazon, eBay, and various other

websites.  *Id.* at 371:12-17.

Joshua was involved in the creation and sale of Revolution's Diesel Test.  *Id.*

at 367:12-18, 399:11-23.  Joshua came up with the Diesel Test name (prior to any

knowledge of Curry or Curry's products) as he understood the term "Diesel" to refer to being "jacked" in terms of body building, with which Joshua had experience. *Id.* at 472:19-473:2; Dkt. 460, 657:12-14. Joshua also approved the design for the Diesel Test label around June 2016 (without knowledge of Curry or Curry's products), and he made decisions as to pricing. Dkt. 459, 367:19-368:6, 368:22-24; Dkt. 460, 749:1-11. Joshua supervised various employees who were responsible for the sale of Diesel Test. Dkt. 459, 417:24-2.

The domain name dieseltestbooster-red.com was registered in Joshua's name on June 7, 2016 (again, prior to any knowledge of Curry or Curry's products), but Joshua testified that he did not direct anyone to register that website, that his employees may have done so, and that Revolution never sold any products through that website. *Id.* at 433:16-24, 476:15-22, 477:7-13, 478:9-15, 516:23-517:2. Neither Joshua nor anyone else at Revolution registered, or directed anyone to register, any of the other websites that were the subject of Curry's lawsuit. *Id.* at 476:15. Joshua filed an application to register the Diesel Test trademark on November 28, 2016, which Barry approved. *Id.* at 418:24-419:2; Dkt. 460, 646:16-23; Dkt. 427-5, Pl. Ex. 5. Joshua testified that he filed the application because he did not want to be making what he perceived to be the same mistake Curry had made in having a product with a name that was not protected under the trademark laws. Dkt. 459, 493:16-21.

Barry's involvement in selling Diesel Test was passive.  Barry testified that he hated the name Diesel Test and did not want to use the name because he thought it was confusing and sounded like a fuel additive product.  *Id.* at 550:23-551:4, 552:23-553:6; Dkt. 460, 656:11-25.  Barry never "approved" of the name, but rather acquiesced.  Dkt. 459, 552:20-553:12; Dkt. 460, 656:22-25.  At the time Barry acquiesced to the name, he was not aware that there was another supplement product on the market named Diesel Test.  Dkt. 460, 657:1-5.  Had Barry known this, Revolution would not have used the name Diesel Test.  *Id.* at 657:6-8.

There was no evidence presented at trial that when Defendants made decisions concerning the sale of Diesel Test − namely, the decisions to call the product Diesel Test and to start selling the product in 2016 − anyone at Revolution had ever heard of Curry or his Diesel Test product.

### E.    Defendants Learn of Curry's Claim to the Diesel Test Mark and Immediately Conduct an Investigation

Defendants first learned of Curry's claim to the Diesel Test trademark when they received a Facebook message from Curry in mid-November 2016 stating as follows:

> Hey, you guys are responsible for Trademark Infringement, Trademark Dilution, and the sell (*sic*) of counterfeit goods just to name a few for naming that new product "Diesel Test." GET DIESEL NUTRITION has been using the Diesel Test mark since 2005.  All you have to do is google "Diesel Test" and see or go to getdiesel.com.  You need to stop the sell (*sic*),

14

> distribution and promotion of that "Diesel Test"
> product asap and recall and destroy or re-label all the
> units in circulation. trust me. Chuck Diesel CEO GET
> DIESEL NUTRITION.

Dkt. 427-19, Pl. Ex. 23; Dkt. 458, 249:15-18; Dkt. 459, 376:23-377:6, 478:22-24; 488:6-

12; Dkt. 460, 657:24-658:7. Curry sent one other similar communication in

November 2016, but Defendants did not hear anything further from him until this

lawsuit was filed in March 2017.  JA74, pp. 2-3; Dkt. 427-20, Pl. Ex. 24; Dkt. 459,

488:13-489:1.

At the time Revolution received Curry's Facebook message, both Barry and

Joshua thought Curry's claim was a scam.  Dkt. 459, 487:21-488:5; 557:22-24.

Indeed, the Facebook message had the characteristics of a scam email with

misspellings, grammatical issues, and threats. Barry received similarly styled

messages in the past and, in his experience, those messages have been scams.  Dkt.

460, 665:12-18.   Nevertheless, both Barry and Joshua took several steps to

investigate Curry's claim.

Joshua testified about how he searched on Google, checked Trademarks

411,[5] spoke with distributors (Perfect Nutrition and Lone Star), and asked an

employee to assist in researching Curry's claim.  Dkt. 459, 486:10-20, 488:2-5,

523:18-21; JA74, pp. 1-2.   Joshua also sent an email to other employees at

---

[5] Trademarks411.com is a website that, among other things, lists known registered
trademarks.

Revolution and to Barry soliciting their advice as to how to handle the cease and desist. JA74, p. 1; Dkt. 459, 389:10-17. Joshua and his team were unable to find anything as to Diesel Test. Dkt. 459, 486:10-20. Joshua did not click on links included in Curry's message, which Curry claimed to be links to Diesel Test, because Joshua thought the email was a scam and that the links might be phishing. Dkt. 459, 386:22-387:9, 485:21-486:9. Barry felt the same and did not click on the links. Dkt. 460, 639:11-25, 646:10-12.

Barry also took numerous steps to verify Curry's claim. *Id.* at 658:8-22. He searched Amazon because Curry stated in his email (JA74, p. 2) that he sold his products on Amazon. Dkt. 460, 659:19-660:19. Barry searched for testosterone booster, testosterone products, and testosterone enhancers and reviewed hundreds of pages of products while looking for Curry or Diesel Test, but he never found anything. *Id.* at 660:1-9. To Barry, this meant that, if Curry was selling on Amazon, there "would have been literally no sales" because products are ranked on Amazon by volume of sales. *Id.* at 659:22-660:18.[6]

Barry also instructed Joshua and all other Revolution employees (around 6 in total) to assist in determining whether Curry actually sold the Diesel Test

---

[6] At trial, Curry failed to present any documentary evidence indicating that his Diesel Test product was sold on Amazon prior to messaging Defendants in November 2016. The only evidence produced was a screenshot from a search Curry purportedly conducted on Amazon in February 2017. *See* Dkt. 427-12, Pl. Ex. 16; Dkt. 458, 254:17-18.

product.     Dkt. 459, 559:10-14; Dkt. 460, 658:23-659:18, 663:11-664:8.  Those

employees checked whether Curry registered or attempted to register the Diesel

Test name with the United States Patent and Trademark Office (USPTO), they

contacted supplement distributors (including national distributors, such as GNC,

Vitamin Shoppe, Vitamin World, and Health World, which would have known

about Curry's products had they been sold through normal distribution channels),

searched eBay, Amazon and other websites, and contacted affiliate marketer

networks. *Id.* at 663:11-664:8.

The employees reported to Barry that there was no application pending for

the Diesel Test name, there was never an application made, accepted or rejected,

and there was no trademark issued.  *Id.* at 664:22-665:3. Barry confirmed that no

one could find any sales or marketing for the product, and no one ever heard of

Curry or his product. *Id.* at 665:4-11.  Based on the results of the investigation, and

numerous telephone meetings with the Revolution team, Barry concluded that

Curry's claim was not credible.  *Id.* at 665:4-11, 725:16-18.

Barry understood that for Curry to have a common law trademark, Curry

was required to have sales of his product using the mark. *Id.* at 661:7-21. Based on

the investigation, Barry did not believe Curry had a trademark or a product, and

thus, he did not believe that Revolution's continued sales of its Diesel Test would

be infringing.  *Id.*  at 665:4-23.  Joshua believed that if someone had a registered

trademark, then use of the name was protected, but if someone did not have a registered trademark, then it was fair game. Dkt. 459, 385:8-13, 474:8-14, 487:21-488:5. Joshua now understands that this was a flawed understanding of the law. *Id.* at 474:8-9. At the time, though, neither Joshua nor Revolution had ever been sued for trademark infringement and they had never been involved in a trademark infringement dispute. *Id.* at 492:20-493:3.

Even though Defendants had immediate questions regarding the legitimacy of Curry's claims, they offered to work towards a resolution of the claims. *Id.* at 378:5-8. The day after Curry sent his Facebook message, a Revolution employee responded by stating: "Hi Chuck, can you please forward me the trademark information to support@revlabs so I can forward to the appropriate party and we can come to an amicable resolution? Thank you!" Dkt. 427-19, Pl. Ex. 23. Four days later, after sending another threatening e-mail, Curry directed Revolution to contact his attorney. Dkt. 427-20, Pl. Ex. 24.

Curry did not provide any sales evidence (much less sales evidence prior to Revolution's sales), trademark registration, trademark application, or anything that could substantiate that he owned a trademark. Despite Curry's contention that he sold on Amazon, he never sent Defendants an ASIN[7] for his product, never

---

[7] ASIN stands for Amazon Standard Identification Number. It's a unique identifier of 10 letters and/or numbers for a product that is assigned by Amazon. Joshua testified that,

sent a sample of the product, and never sent any records of actual sales. Dkt. 459, 486:21-487:17.  Even at trial, Curry never produced an actual, physical example of his product.  Because of Defendants' doubts regarding the legitimacy of Curry's trademark claim, Revolution continued to sell its Diesel Test product.  Dkt. 460, 652:7-10.  Defendants believed they had done nothing wrong. Dkt. 459, 393:19-21, 394:24-395:12, 487:18-488:5.

In February 2017, Curry filed a complaint with Amazon claiming that Revolution's Diesel Test was a counterfeit version of his product.  Dkt. 458, 255:8-24.  Amazon subsequently removed Revolution's listing from its website.  *Id.* at 255:17-20; Dkt. 459, 400:5-8, 405:1-8; Dkt. 460, 651:4-7, 667:23-25.  Revolution did not dispute the complaint with Amazon because the Diesel Test product was not a big seller on Amazon and, according to Joshua and Barry, it was not worth the fight at the time.  Dkt. 459, 404:23, 481:15-18; Dkt. 460,  651:12-18, 668:1-12; *Cf.* Dkt. 432-2, Def. Ex. 167 (profit and loss statement from Revolution for Diesel Test showing a loss on the sale of Diesel Test products); Dkt. 461, 997:5-999:3 (Revolution's accounting manager testifying as to the low sales of Diesel Test on Amazon); *Id.* at 943:6-19, 944:21-945:1 (Curry's expert acknowledging that the net income amount in Revolution's profit and loss statement showed a loss, and that

---

had Curry sent an ASIN, it would have given him the ability to search directly for Curry's product, but Curry never did that.  Dkt. 459, 486:21-487:17.

a small amount of sales came from Amazon).  Revolution continued to sell its Diesel Test product through other sales channels.  Dkt. 459, 405:22-25.

Curry filed suit on March 24, 2017.  JA1.  On August 15, 2017, the lawsuit was dismissed for lack of personal jurisdiction.  Dkt. 47.   In 2017, Revolution voluntarily stopped marketing Diesel Test.  Dkt. 459, 482:14-15, 485:2-13; Dkt. 460, 669:9-13;  *Cf.*  Dkt. 461, 1005:24-1006:10 (Revolution's accounting manager's testifying that, as of October 2017, Diesel Test was not a viable product for Revolution).  In early 2018, while Curry's appeal of the dismissal order was pending, Revolution voluntarily stopped selling the Diesel Test product. Dkt. 459, 398:12-25, 554:5-7.  Years later, on February 10, 2020, this Court reversed the dismissal as to Revolution, vacated the dismissal as to the other Defendants, and remanded the case to the district court. Dkt. 64.  But, during all that time, and including through the time of trial, Revolution never resumed either the marketing or the sale of Diesel Test products.

**F.   Revolution's Stipulation to Liability on Certain Claims, the District Court's Entry of Summary Judgment in Favor of Defendants on Curry's Sole Claim Seeking Punitive Damages, and the District Court's Expansion of the Stipulation.**

In his Complaint, Curry alleged claims for violation of the ICFA (Count I), violation of the IUDTPA (Count II), false designation of origin and false advertising (Count III), trademark dilution by tarnishment (Count IV), common

law trademark infringement (Count V), violation of the ACPA (Count VI), and fraudulent trademark application (Count VII).[8]  JA1.

In Count I of the Complaint alleging violation of the ICFA, Curry alleged that he should be entitled to, *inter alia*, punitive damages.  *Id.* at ¶49, Prayer For Relief ¶¶III.  Curry did <u>not</u> seek punitive damages in any of his other claims.  *See Id*. at ¶¶55-56, 66, 80, 89-90, Prayer For Relief ¶¶I, III-XI (seeking actual damages, Defendants' profits, statutory damages, and/or injunctive relief, but not punitive damages).  Further, Curry only sought injunctive relief in his claim for Illinois common law trademark infringement (Count V).

In the course of a discovery dispute in November 2020 relating to documents pertaining to the Defendants' net worth, Curry argued that such information was relevant to his claim for punitive damages in his ICFA claim.  *See* Dkt. 147-1, p. 5, n. 6.  Notably, Curry did not contend that the financial information was relevant to any other claim or that he sought punitive damages in any other pending claim.[9]

On December 22, 2020, Defendants stipulated to liability, in relevant part, as follows (the "Stipulation"):  "Revolution is liable for infringing [Curry's] Diesel

---

[8] On August 12, 2020, Curry voluntarily dismissed Counts IV and VII of the complaint. Dkt. No. 133.

[9] The district court deferred ruling on the discovery motion until after it ruled on motions for summary judgment.  Dkt. 153.

Test mark under Count III and Count V [common law trademark infringement] of [Curry's] Complaint". JA100, ¶2; Dkt. 459, 490:21-23, 555:23-25; Dkt. 460, 642:4-5, 643:9-10, 643:22-644:2. Defendants did <u>not</u> stipulate to liability under Count I (seeking punitive damages under the ICFA) or II, they did not stipulate to liability as to Joshua or Barry on any claims, and they did not stipulate to the amount of damages on Curry's claims seeking damages. JA100, ¶4.

One month later, the court entered summary judgment in Defendants' favor on Curry's ICFA claim in Count I. *See* Dkt. 195, pp. 16-17. This ruling eliminated the sole claim in which Curry sought punitive damages. The only remaining claims after this ruling were as follows: Count II (violation of the IUDTPA), Count III (§ 1125 of the Lanham Act), Count V (common law trademark infringement), and Count VI (violation of ACPA).

Several months before trial, Defendants filed a motion pursuant to Rule 39(a) of the Federal Rules of Civil Procedure to strike Curry's jury demand as to Count V for common law trademark infringement (among other claims) because Curry only sought injunctive relief in that claim and a jury cannot determine such relief. Dkt. 305, pp. 5-8. In response to the Rule 39(a) motion, Curry argued that he was seeking damages for loss of goodwill and punitive damages in Count V and that he should, therefore, be entitled to a jury trial on that claim.

Defendants argued that Curry's position was not supported by his pleading, noting that Curry never sought leave to file an amended complaint to seek punitive damages and that he conveniently attempted to revive his claim for punitive damages (i) after the court entered judgment for Defendants on Curry's sole claim in which he actually sought punitive damages (Count I – violation of the ICFA); and (ii) after Defendants and Curry stipulated to Revolution's liability on a claim seeking an injunction.  Defendants argued that Curry's damages claim was barred by the plain language of the Stipulation in which Revolution stipulated to liability for infringing on Curry's Diesel Test mark "**under**…Count V of [Curry's] Complaint," in which Curry solely alleged injunctive relief.  JA100, ¶2 (emphasis added).

The district court denied Defendants' motion as to Count V, concluding that Curry was seeking damages for loss of goodwill and punitive damages and, therefore, he was entitled to a jury on his claim.  SA2, 5:24-6:5; 8:7-10.  And, although the court noted that Defendants' "best point" was that they stipulated to liability on the common law trademark infringement claim believing that Curry was not seeking punitive damages, the court rejected that argument without engaging in any analysis as to the prejudice suffered by Defendants.  *Id.* at 8:20-9:5.

**G.     The Jury's Verdict**

On May 22, 2023, the jury returned a verdict as follows:

> (1) [I]n favor of [Curry] and against [Defendants] on Counts 3 [violation of §1125 of the Lanham Act] and 5 [common law trademark infringement] of [Curry's] amended complaint;
>
> (2) [F]inding willful infringement by each defendant on [Curry's] trademark;
>
> (3) In favor of [Curry] and against [Revolution and Joshua] on Count 6 [violation of the ACPA]…;
>
> (4) In favor of [Barry] and against [Curry] on Count 6 [violation of the ACPA]…; and
>
> (5) Awarding [Curry] damages as follows:  (a) against [Defendants] jointly and severally in the amount of $502,500; (b) against [Revolution and Joshua] jointly and severally in the amount of $1,000; (3) *sic* against [Revolution] for punitive damages in the amount of $300,000; (4) *sic* against [Joshua] for punitive damages in the amount of $300,000; and (5) *sic* against [Barry] for punitive damages in the amount of $300,000.

SA64.  The non-punitive damages award was determined as follows:  (a) Curry's actual damages (loss of goodwill and reputational damages) - $2,500; and (b) Defendants' profits - $500,000.  Dkt. 462, Trial Transcript Vol. 5, 1108:22-1109:3, 1216:10-12.  Judgment was subsequently entered by the district court.  SA64.

An amended judgment was entered on August 29, 2023 reflecting that Defendants were also liable on Count 2 (violation of the IUDTPA), increasing the award of Defendants' profits from $500,000 to $547,095.44, and awarding

prejudgment interest.  SA66.  The district court also entered a permanent injunction on the same date.  Dkt. 413.

## SUMMARY OF THE ARGUMENT

There are two bases for this appeal:

(I) Defendants appeal the jury's verdict awarding $900,000 in punitive damages as such damages are excessive and unconstitutional for the following reasons:  (A) Defendants' conduct did not rise to the level to warrant such damages; (B) The ratio of punitive damages ($900,000) to actual damages ($2,500) of 360 to 1 is grossly excessive, contrary to binding legal authority, and constitutionally impermissible; and (C) The difference between the punitive damages award and comparable civil penalties justifies reversing or substantially reducing the award.

(II) Defendants also appeal the district court's order denying their Rule 39(a)(2) motion to strike Curry's jury demand on his claim in Count V for common law trademark infringement, and allowing that claim to be heard by the jury.  The district court erroneously allowed Curry to amend his claim to seek compensatory and punitive damages after liability had already been determined through the Stipulation, which was reached based strictly on the allegations of Curry's Complaint, in which Curry solely sought injunctive relief in Count V.  Defendants were prejudiced by the district court's ruling because the relief for Count V should

have been limited to injunctive relief, not damages, yet the district court allowed Curry to pursue damages in a trial where Defendants could no longer contest liability, and the jury awarded Curry significant punitive damages that he otherwise could not have recovered based on his pleading and the Stipulation.

For purposes of clarity, Defendants are not seeking a new trial as to actual or punitive damages, or damages awarded for Defendants' profits. Rather, Defendants request that the punitive damages award be reversed in its entirety, or for this Court to determine a reduced amount of punitive damages to be awarded to Curry that are constitutionally permissible.

## ARGUMENT

### I. The Punitive Damages Award Is Excessive and Must Be Reversed or Significantly Reduced.

Compensatory and punitive damages serve different purposes. *Saccameno v. U.S. Bank Nat'l Assoc.*, 943 F.3d 1071, 1086 (7th Cir. 2019). Compensatory damages seek to make the plaintiff whole, but punitive damages are retributive in nature and seek to deter wrongful acts. *Id.* When a federal jury awards compensatory damages based on a state-law claim, state law applies to a review of that damages award. *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1128 (7th Cir. 2020). Similarly, when state law provides the basis for liability, the punitive damages award must be consistent with state law. *Id.*

26

Under Illinois law (which applies here because punitive damages were awarded under Curry's common law trademark infringement claim), punitive damages may be awarded only if "the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence, or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.'" *Saccameno*, 943 F.3d at 1082, *quoting Slovinski v. Elliot*, 237 Ill. 2d 51, 58 (Ill. 2010).

"Because punitive damages are penal in nature, they are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530, ¶58 (Ill. 2012). Further, the Due Process Clause of the Fourteenth Amendment imposes constitutional limitations on punitive damages. *Epic*, 980 F.3d at 1140. The risk of grossly excessive or arbitrary punishment, well beyond that necessary to deter, requires close scrutiny of the amount of punitive damages awards. *Saccameno*, 943 F.3d at 1086.

A court conducts a *de novo* review of the jury's award of punitive damages and, in testing the award for compliance with due process, considers the following three guideposts: "[(A)] the degree of reprehensibility, [(B)] the disparity between the harm suffered and the damages awarded, and [(C)] the difference between the

27

award and comparable civil penalties." *Epic*, 980 F.3d at 1140-41. Illinois courts

analyze the same factors. *Int'l Union of Operating Engineers, Local 150 v. Lowe*

*Excavating Co.*, 225 Ill.2d 456, 470 (Ill. 2006). A court is empowered to decide the

maximum permissible amount without offering a new trial. *Saccameno*, 943 F.3d

at 1092.

### A. Defendants' Conduct Did Not Rise to the Level of Reprehensibility to Justify an Award of Punitive Damages.

The most important of the guideposts is the degree of reprehensibility.

*BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 575 (1996). The reprehensibility of the

defendant's conduct is judged based on the following five factors:

> [(1)] the harm caused was physical as opposed to
> economic; [(2)] the tortious conduct evidenced an
> indifference to or a reckless disregard of the health or
> safety of others; [(3)] the target of the conduct had
> financial vulnerability; [(4)] the conduct involved
> repeated actions or was an isolated incident; and [(5)]
> the harm was the result of intentional malice, trickery,
> or deceit, or mere accident.

*Saccameno*, 943 F.3d at 1086. "The existence of any one factor may not always be

enough to sustain a punitive damages award, but 'the absence of all of them

renders any award suspect.'" *Id. quoting State Farm Mut. Auto Ins. Co. v. Campbell*,

538 U.S. 408 (2003). Since a plaintiff is presumed to be made whole by

compensatory damages, punitive damages should be awarded only if the

defendant's conduct is "so reprehensible as to warrant the imposition of further

sanctions to achieve punishment or deterrence." *Epic*, 980 F.3d at 1141, *quoting*

*Campbell*, 538 U.S. at 419.

Here, although the jury determined that Defendants' conduct was willful,

the evidence established that Defendants' conduct was either not reprehensible or

that the degree of reprehensibility was not sufficient to warrant a $900,000 punitive

damages award.[10]

1. The Harm to Curry Was Not Physical and Defendants' Conduct
Did Not Impact the Health or Safety of Curry or Others.

There is no dispute that the harm to Curry was not physical, but rather

economic. It is also undisputed that Defendants' conduct in infringing on Curry's

trademark had no relation to, and did not impact, Curry's health or safety, or the

health or safety of others. For these reasons, the first two factors weigh against a

finding of reprehensibility. *See Saccameno*, 943 F.3d at 1086-87 (plaintiff did not

identify any evidence that she suffered physical symptoms or that the defendant

should have been aware of a risk to her health); *Epic,* 980 F.3d at 1141 (first and

---

[10] Although the district court stated that Defendants did not expressly address the five factors of the reprehensibility guidepost (SA9, pp. 35-36), this is not the case. *See* Dkt. 385, pp. 6-11; Dkt. 400, pp. 4-7. In any event, this Court should consider Defendants' arguments on the five factors because, at a minimum, they were addressed by the district court and there is no harm in addressing them in this Court's *de novo* review. *See Bradley v. Village of Univ. Park, Ill.*, 59 F.4th 887, 900-901 (7th Cir. 2023) (collecting cases) ("there is no hard-and-fast rule preventing [the court] from reaching [ ] an issue" not raised in the district court, and the matter is left to the Court's discretion; where the argument turns on pure issues of law, the parties have briefed and argued the merits, or where there is no harm in considering the argument, the Court may consider it).

second factors weighed against finding of reprehensibility where Epic did not

suffer physical harm as a result of the defendant's conduct and the defendant's

conduct did not evince an indifference or reckless disregard of the safety of others).

2. <u>There Was No Evidence Presented that Curry Was Financially Vulnerable.</u>

The third factor likewise disfavors a finding of reprehensibility.  Although

Curry operated a small business, there was no evidence presented that

Defendants' conduct ever impacted or risked Curry's livelihood, lifestyle or ability

to maintain his business.  To the contrary, Curry enjoyed his highest sales during

the brief period during which Revolution sold its Diesel Test, as further discussed

below.

As Curry testified, his business became a "side gig" when he became

employed full-time by the Department of Veteran's Affairs in 2011.  Dkt. 458,

243:19-24, 287:23-289:5, 289:23-290:11.  This was five years before Defendants even

began selling its Diesel Test.  Curry did not have any employees or sales

representatives to pay or support.  *See Id.* at 243: 9-14 ("[i]t was never like a two-,

three-, four-person team. It's just me").  He did not present any evidence that his

business was insolvent or otherwise in financial jeopardy, or that Defendants'

conduct created a risk that Curry would default on any ongoing financial

obligations related to his business.   And, the jury determined that the only actual

damage he suffered was $2,500 for loss of goodwill, a decision that Curry did not appeal or even contest in any post-trial motion. JA147, 1216: 1-11.

For these reasons, alone, the third factor weighs against a finding of reprehensibility. *See Lowe*, 225 Ill.2d at 471-72 (the fact that Lowe was a small business and its reputation was very important to its continued success did not, by itself, prove financial vulnerability; loss of one customer due to defendant's conduct and lost profits of only $4,680, without any other financial information to demonstrate its vulnerability, was insufficient).

Additionally, the evidence demonstrated that, in 2016 and 2017, when Revolution was selling its Diesel Test product, Curry's claimed sales <u>increased</u>, not decreased. *See* Dkt. 458, 302:7-13 (for 2015, the year before Revolution started selling Diesel Test, Curry testified that total sales for all his products were $132,340); *Id*. at 302:21-303:6 (in 2016 and 2017, total sales of all products were $229,569 and $220,096, respectively); *Id*. at 303:16-18 (in 2018, the year that Revolution stopped selling Diesel Test, Curry's sales diminished by $50,000); *Id*. at 303:19-20 (in 2019, sales went down even further to $118,000). In any event, Curry did not produce a single document substantiating his sales, profits, losses, or expenses related to Diesel Test. This is fatal to establishing the third factor of the reprehensibility analysis. *See Lowe, supra.*

3.   <u>Although Defendants' Infringement Occurred for Slightly More
Than a Year, the Court Should Give Little Weight to the Fourth
Factor Because the Defendants were not Recidivists.</u>

The question of whether Defendants' conduct was repeated or an isolated

event has been described as a relevant subfactor, "but with less force" (*Lowe*, 225

Ill. 2d at 480), particularly where, as here, the conduct was only directed at the

plaintiff, it was not part of a pattern of tortious conduct, and the defendant had a

good faith belief that its actions were not unlawful.  *See BMW*, 517 U.S. at 576-80

(BMW was not deemed a recidivist where it had a good-faith basis for believing

that it did not have a duty to disclose minor damage to vehicles based on its

interpretation of a state statute, it omitted a material fact (as opposed to making a

deliberate false statement), and there was no evidence that BMW persisted in a

course of conduct after it had been adjudged unlawful).

Defendants testified that Revolution named, created and designed its

Diesel Test product before it had any knowledge of Curry, his business, or his

products.  Dkt. 459, 368:25-369:2; 471:24-474:14; Dkt. 427-19, Pl. Ex. 23.  Although

Revolution continued to sell its Diesel Test after receiving Curry's cease and desist

sent through Facebook (not an avenue Defendants would have expected to receive

a legal demand), and after Amazon removed its product, it did so based on the

belief that Curry's message and claim were a scam.  Dkt. 459, 487:21-488:5; 557:22-

24.  Even after conducting an investigation, the Defendants still believed that

Curry's claim was a scam. *Id.* at 486:10-20, 559:10-14; Dkt. 460, 658:23-660:19, 663:11-664:8; JA74, pp. 1-2. The Revolution team was not able to find the Diesel Test product or sales of the product, they could not find a trademark registered in Curry's name, and they could not locate a trademark application for Diesel Test. Dkt. 459, 486:10-20; Dkt. 460, 664:22-665:11. All of this evidence was unrebutted at trial. Indeed, during trial, Curry could not identify a single invoice or payment received for any Diesel Test product. Dkt. 458, 292:12-296:13.

Barry and Joshua also testified to their good faith belief that Curry had not shown the existence of any trademark rights, which belief also drove the decision to continue selling Diesel Test. Dkt. 459, 385:8-13, 474:8-14, 487:21-488:5; Dkt. 460, 661:7-21, 665:4-23. At the time, Defendants had never been involved in a trademark dispute and they had never been adjudged liable on any such claim. Dkt. 459, 492:20-493:3. Although Defendants now understand that their belief was incorrect, they nevertheless, had a good faith belief at the time that Curry did not have a valid claim to the Diesel Test name.

While it may not be fair to characterize Defendants' sales as an isolated incident, it likewise would be unfair to characterize Defendants as recidivists, particularly when there was no evidence that Defendants have engaged in similar conduct with others, or that they had ever been involved in a trademark dispute prior to this lawsuit, and Revolution admitted to liability in the Stipulation once

33

information was provided in discovery.  *See BMW, supra*; *Cf. Saccameno*, 943 F.3d at 1087-88 (evidence that defendant was a recidivist where it treated other customers as it did the plaintiff, and continued its ways despite repeated warnings from regulators); *Epic*, 980 F.3d at 1141 (fourth factor weighed in favor of reprehensibility where defendant falsely identified itself to access confidential information, and its employees accessed and downloaded plaintiff's confidential information for years, downloading over 1,600 documents and gaining access to information that plaintiff specifically forbade it from accessing).

> ### 4. The Harm to Curry, if Any, Was Minor and Did Not Result from Intentional Malice, Trickery or Deceit.

The last factor – whether the harm was the result of intentional malice, trickery, or deceit, or mere accident – weighs against a finding of reprehensibility.

Defendants presented evidence that, in 2016, Joshua came up with the Diesel Test name prior to any knowledge of Curry or his Diesel Test.  Joshua testified that, in the bodybuilding world, with which he had experience, the term "Diesel" referred to being "jacked."  Dkt. 459, 472:19-473:2; Dkt. 460, 657:12-14. Before Revolution started selling its Diesel Test product that year, the company ran searches to determine if the name was being used.  Dkt. 459, 473:3-6, 473:15-474:4.  Revolution found nothing, so it proceeded to develop and market its product.  *Id*. at 368:25-369:2; 471:24-474:14.

Once Defendants were contacted by Curry, they conducted a multi-step investigation involving all of Revolution's employees to determine the legitimacy of Curry's trademark infringement claim – they searched on Google, Amazon and eBay, searched the USPTO, searched Trademarks 411, spoke with national distributors, contacted affiliate marketers, and had team meetings to discuss the research results and how to address Curry's cease and desist message. Dkt. 459, 389:10-17, 486:10-20; Dkt. 460, 659:19-660:19, 663:11-664:8; JA74, pp. 1-2. Defendants found nothing. Dkt. 459, 486:10-20; Dkt. 460, 664:22-665:11. Defendants believed that Curry did not have sales and thus did not have a legitimate trademark on the name Diesel Test. Defendants tried to get additional information from Curry about his claim and product, but Curry never provided that information. Dkt. 427-19, Pl. Ex. 23; Dkt. 427-20, Pl. Ex. 24.

There was no malice, trickery or deceit about Defendants' decision to continue selling Diesel Test. Indeed, the record is devoid of any evidence to suggest that Defendants made misleading statements as to the origin of their Diesel Test, or that they made any false or derogatory assertions about Curry, his business, or his products in selling their Diesel Test. Further, Defendants testified that they did not have any ill will or malice towards Curry or his business, and that they did not have any desire to harm Curry or his business. *Id.* at 478:22-479:6.

Defendants' actions after Curry filed this lawsuit also contradict any finding that they acted maliciously. Revolution voluntarily stopped marketing Diesel Test in 2017 and stopped selling Diesel Test products in 2018, all while this case was dismissed and on appeal. *Id.* at 398:12-25, 482:14-15; Dkt. 460, 669:9-13; Dkt. 461, 1005:24-1006:10. Although the trial court prohibited Defendants from presenting evidence of this fact to the jury to avoid prejudice to Curry (*See* Dkt. 458, 138:6-142:4), there is no similar concern with this Court considering this evidence as part of its *de novo* review of the punitive damages award.

Revolution also stipulated to liability on several counts of Curry's Complaint shortly after Curry answered discovery. *See* JA100. And, Defendants also agreed to a preliminary injunction, which was the sole relief sought by Curry in his claim for common law trademark infringement. Dkt. 131. These actions are inconsistent with a finding that Defendants acted with intentional malice, trickery or deceit.[11]

Although the jury concluded that Defendants' infringement was willful, that is not necessarily the same as a finding that Defendants acted with intentional malice, trickery or deceit. *See* Dkt. 462, 1104:3-7 (the jury was instructed that

---

[11] Defendants have no doubt that Curry's brief will address the contentious discovery dispute between the parties relating to Defendants' net worth, but these issues are not relevant to this appeal, nor are they indicative of intentional malice or deceit relating to trademark infringement. Moreover, Defendants were sanctioned by the district court relating to the discovery dispute. *See* JA132.

willfulness meant as follows: "the defendant knew it was infringing [Curry's] trademark or acted with indifference to [Curry's] trademark rights" without any reference to malice, trickery or deceit); *Cf. Wilson v. City of Milwaukee*, 138 F. Supp. 2d 1126, 1133 (E.D. Wis. 2001) *quoting* Black's law Dictionary (7th Ed. 1999) ("'Malice' in the legal sense connotes 'wrongful intention,' as in '[t]he intent, without justification or excuse, to commit a wrongful act.'…'Reckless disregard of the law or of a person's legal rights'…'ill will' or 'wickedness of heart'"). Regardless of the specific basis for the jury's willfulness finding, there was no evidence that Defendants made the decision to sell or continue selling Diesel Test products due to malice, trickery or deceit.

In summary, even if Defendants' conduct is deemed reprehensible, it certainly was not to an "extreme degree" to warrant the substantial punitive damages awarded by the jury. Defendants did not cause physical injuries, their conduct did not reflect any indifference to Curry's health or safety, and there was no evidence of Curry's financial vulnerability. Further, Defendants' conduct was not malicious or deceitful. They sold a product using a name that they did not know was in use by Curry or anyone else, and once notified of Curry's claim, they investigated, still were not able to substantiate Curry's rights, sought to obtain a trademark registration for the name, and continued selling for about a year, until they voluntarily stopped, stipulated to liability on certain claims, and never

resumed marketing or selling Diesel Test products. And, there was no evidence that Defendants engaged in a pattern of misconduct as to the use of others' trademarks.

Based on this evidence, the applicable reprehensibility factors simply do not support a finding of reprehensibility, or at least not to the level to justify a significant punitive damages award. *See Saccameno*, 943 F.3d at 1088 (defendant's conduct was not "extreme" even where it was the subject of a consent decree for its treatment of customers, which was similar to how it treated plaintiff, and where it continued its behavior despite repeated warnings from regulators); *Epic*, 980 F.3d at 1142, 1144 (reducing punitive damages award where three of the five factors weighed against reprehensibility; although conduct was reprehensible, it was not to an extreme degree to justify awarding significant punitive damages); *Lowe*, 225 Ill. 2d at 483, 490 (despite reprehensible conduct, punitive damages award of $325,000 held to be unconstitutionally excessive in comparison to $4,680 in actual damages).

### B. The Ratio Between Compensatory and Punitive Damages is 360 to 1, Which Far Exceeds Constitutionally Permissible Bounds.

The disparity between the harm suffered and the damages awarded is often represented as a ratio between the compensatory and punitive damages awarded. *Saccameno*, 943 F.3d at 1088. The Supreme Court has offered some general guidance as to the ratio: (1) few awards exceeding a single-digit ratio "to a

significant degree" will satisfy due process; (2) the ratio is flexible – higher ratios may be appropriate in small damages cases, but where compensatory damages are substantial, then a lesser ratio perhaps only equal to compensatory damages, is permissible; and (3) the ratio should not be confined to actual harm, but also can consider potential harm. *Id. citing Campbell*, 538 U.S. at 425; *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460-61 (1993).

At a ratio of 360 to 1, the punitive damages award is grossly excessive and unconstitutional.

1. The District Court Erred in Including the Disgorgement Award in the Amount of Actual Damages Used in the Punitive Damages Ratio.

The district court erroneously considered the disgorgement award in determining the amount of actual damages to be used in assessing the appropriateness of the punitive damages awarded by the jury. In a case where a judgment is entered that includes a specific damages award for the economic harm to the plaintiff as well as an award based on statutory disgorgement, only the actual damages award should be compared to the punitive damages award in assessing the constitutionality of the punitive damages. This comparison is supported by (i) the different purposes of actual or compensatory damages, on the one hand, and disgorgement and similar equitable remedies on the other hand, (ii) specificity of the jury instructions and the judgment in this case, (iii) applicable

case law; and (iv) constitutional and statutory limitations on damage awards that are punitive in nature.

An award of Defendants' profits is an equitable remedy specifically provided by the Lanham Act, not actual damages afforded by Illinois common law. 15 U.S.C. § 1117(a)(1); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir. 1992) (awards of profits are limited by "equitable considerations"). On this basis, alone, Defendants' profits should not have been considered actual damages.

Disgorgement generally is understood as "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." *Call One Inc. v. Berkley Ins. Co.*, 587 F. Supp. 3d 706, 714 (N.D. Ill. 2022), *quoting Disgorgement*, Black's Law Dictionary (11th ed. 2019). The "primary purpose of disgorgement orders is to deter violations of the…laws by depriving violators of their ill-gotten gains." *Call One*, 587 F.Supp.3d at 714, *quoting Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017). In contrast, compensatory damages focus on the loss to the victim, not the profit to the violator. *Saccameno*, 943 F.3d at 1086. Equitable remedies, including disgorgement of profits, are not considered compensatory damages. *See Herman v. South Carolina Nat'l Bank*, 140 F.3d 1413, 1422 (11th Cir. 1998), *citing Mertens v. Hewitt Assoc.*, 508 U.S. 248, 256 (1993) ("[e]ven though disgorgement of profits may produce money, *Mertens* makes clear that

disgorgement of profits is a distinctly equitable remedy different from the legal remedy of compensatory damages").

Curry does not dispute that disgorgement of profits is an equitable remedy. Nor could he, considering that he made precisely that argument before the district court – in his motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to treat the jury's determination of Defendants' profits as advisory under Rule 39(c) and for the district court to determine the amount of profits. *See* SA9, p. 14.

The district court granted Curry's motion, agreeing that disgorgement was an equitable remedy that could not be decided by the jury and, therefore, ruling that the jury's verdict on disgorgement was advisory. *See Id.*, pp. 14, 16-17 (collecting cases), *citing, e.g. BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1095 (7th Cir. 1994) (labeling disgorgement of defendants' profits as an equitable remedy). The district court also rejected Curry's argument that Defendants' profits were a proxy for Curry's damages. [12] SA9, p. 17.

---

[12] Curry took opposite positions in his response to Defendants' motion to strike his jury demand before trial and his post-trial Rule 59(e) motion to treat the jury's disgorgement award as advisory. *Compare* Dkt. 311, pp. 7-11 *and* Dkt. 389, pp. 2-10. Based on Curry's latter position that disgorgement was an equitable remedy that had to be decided by the court, not the jury, and the district court's order granting Curry post-judgment relief (with the court finding that Revolution's profits on its Diesel Test product were $547,095.44, an *increase* over the jury's verdict on the disgorgement remedy), Curry should be estopped from now arguing on appeal that the disgorgement award was in any way a proxy for his compensatory damages. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase"); *United States v. Segal*, 938 F.3d 898, 906 (7th Cir. 2019) (internal citation omitted) (the

The language of the district court's instruction to the jury as to Defendants' profits further evidences the distinction between disgorgement of profits and Curry's actual compensatory damages. *See* Dkt. 462, 1109:4-9 ("If Mr. Curry prevails on his trademark infringement claims, he may also recover, **in addition to damages**, the profits that any defendant gained from the trademark infringement. **You may not include in any award of the defendants' profits any amount that you included in determining Mr. Curry's actual damages**") (emphasis added).

All this is to say that, although a defendant's profits may be awarded under the Lanham Act (15 U.S.C. §1117(a)), such a disgorgement remedy is not considered harm suffered by the mark owner and, therefore, cannot be used in assessing the punitive damages ratio. *adidas Am., Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 4279812, at *15 (D. Or. Sept. 12, 2008).

Adidas sued Payless Shoesource for trademark and trade dress infringement, dilution, and related federal and state law claims based on Payless' sale of footwear bearing two or four stripes. *Id.* at *1. At trial, adidas sought, and the jury awarded, a reasonable royalty of $30.6 million as a measure of the actual damage to the adidas marks. *Id.* at *12. Adidas also sought, and the jury awarded,

---

doctrine "protects courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories").

$137 million for disgorgement of Payless' profits on the infringing products (reduced by the court to $19.7 million). *Id.* at *13. Finally, the jury awarded adidas $137 million in punitive damages on its common law claim for trademark and trade dress infringement and statutory claims for unfair and deceptive trade practices. *Id.*

Payless argued that the amount of punitive damages awarded was unconstitutional. In assessing the second guidepost – the disparity between the harm suffered by adidas and the punitive damages award – the court analyzed whether the amount awarded for Payless' profits should be included in the amount of harm suffered by adidas for purposes of evaluating the punitive damages ratio. *Id*. at *15. The court explained that the $30.6 million royalty award was to compensate adidas for harm suffered to the marks. *Id.* On the other hand, although Payless' profits were part of the recovery allowed under the Lanham Act, the court concluded that such profits were <u>not</u> harm suffered by adidas and, therefore, they should not be counted in the punitive damages ratio. *Id.* Instead, the court compared only the $30.6 million royalty figure (adidas' actual damages) with the $137 million punitive damages award, which resulted in a ratio of 4.5 to 1. *Id.* Given the large compensatory damages award, the court concluded that punitive damages were excessive and it reduced them to $15 million. *Id.*

The district court here erred when it added Defendants' gross profits ($547,095.44, as determined by the court) to the actual damages awarded to Curry for loss of goodwill ($2,500) and compared that number ($549,595.44) to the punitive damages awarded against each defendant ($300,000). SA9, pp. 37-38. In the district court's opinion, this resulted in a ratio of less than 1 to 1, which it concluded was "easily permissible." *Id.* But for the reasons discussed by the *adidas* court, when the jury has assessed the economic harm suffered by the plaintiff and specifically awarded actual damages to compensate for that harm, the disgorgement remedy should have been excluded when evaluating the constitutional limits of a punitive damages award.

In addition, the practical effect of the district court's decision to add Defendants' profits to Curry's actual damages of $2,500 (totaling $549,595.44), and using that number (instead of just actual damages) to support a significantly larger punitive damages award ($900,000), is that the disgorged profits themselves became punitive in nature. In addition to the constitutional concerns, this is also contrary to the express provisions of the Lanham Act. *See* 15 U.S.C. § 1117(a) (any award of a defendant's profits by the court cannot be punitive).

The district court relied on several cases to support its holding, none of which are on point. SA9, p. 37. For example, *Epic* is inapposite for the simple reason that the defendant in that case waived the argument the Defendants make

here: that only the actual damages awarded for economic injury suffered by the plaintiff can be compared to the punitive damages awarded when assessing the constitutionality of the latter. 980 F.3d at 1143.

*Epic* did not involve a claim for trademark infringement, but rather a claim for misappropriation of trade secrets, fraudulent misrepresentation, unfair competition and other claims under Wisconsin common law. *Id.* at 1126. The jury awarded significant compensatory damages to Epic based not on harm to Epic, but on the benefit the defendant received from unlawfully accessing and using Epic's confidential information for years in the form of avoided research and development costs. *Id.* at 1143.

However, in discussing the ratio of punitive damages to the harm inflicted on a plaintiff, the Court noted that "[i]n most cases, the compensatory-damages award approximates the plaintiff's harm. In those cases, identifying the ratio is straightforward: we compare compensatory and punitive-damages awards." *Id.* at 1142. But, where "the jury's compensatory-damages award does not reflect the plaintiff's quantifiable harm…[the Court] may account for that harm in the harm-to-punitive damages ratio." *Id.* The circumstances of *Epic* presented an "unusual issue" in determining the amount of "harm" because the compensatory damages awarded to Epic were based on the benefits received by the defendant, not on any harm suffered by Epic. *Id.* at 1143. The Court stated that "**if Epic suffered**

45

**quantifiable economic harm**," that harm is smaller than the damages awarded, which would "drastically change the relevant ratio." *Id.* (emphasis added). And, if the Court had to quantify that harm to arrive at the appropriate ratio, that would "pose a challenging task." *Id.*

But, the Court did not need to reach that issue because Epic waived any argument that the Court should compare any number besides the compensatory damages to punitive damages as it never made the argument in the district court or the appellate court. *Id.* Here, Defendants objected to the district court's inclusion of the disgorgement award in the punitive damages ratio and argued that the proper denominator was $2,500, the actual damages awarded to Curry for harm to his goodwill. *See* Dkt. 400, p. 5. As a result, the argument has been preserved and the district court's reliance on *Epic* was misguided.

Also, unlike in *Epic* where the jury did not award any damages for harm sustained to Epic, here, the jury in this case awarded Curry $2,500 for damage to his goodwill and reputation.[13] JA147, 1216:10-12. The jury clearly spoke on the issue of economic harm sustained by Curry. That number should, therefore be

---

[13] *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1351 (Fed. Cir. 2001), *vacated*, 538 U.S. 974 (2003), *reinstated as modified*, 345 F.3d 1366 (2003), cited by the district court at SA9, p. 37, is inapplicable for the same reason. The plaintiff was not awarded actual damages, but rather unjust enrichment damages as a proxy for actual damages.

used in a "straightforward" comparison of compensatory to punitive damages ($900,000/$2,500).  *Epic*, 980 F.3d at 1142.  This would be consistent with *adidas*.[14]

The district court's reliance on *TXO*, 509 U.S. at 460-61 (SA9, p. 37), is also misplaced because, even though the jury awarded actual damages for the cost of defense, the Court used a different number representing potential harm to Alliance in the punitive damages ratio because there was specific evidence as to the amount of revenues Alliance would have received but for Epic's elaborate scheme in its development of oil and gas rights – Alliance would have lost 22% of revenues in royalties, which amounted to $5-$8.3 million.   This was not a disgorgement remedy at all (unlike the disgorgement remedy awarded here);

---

[14] Defendants are not challenging the amount of the disgorgement award, but solely the district court's consideration of the award in the punitive damages ratio.  However, if this Court were to decide that it is proper to consider Defendants' profits in the punitive damages ratio (which it should not), it would be improper to include the entire disgorged amount.  When the district court calculated Revolution's profits on its sales of Diesel Test (for purposes of the disgorgement remedy), it based that number on Revolution's nationwide sales of Diesel Test, not just sales in Illinois.  SA9, pp. 21-26.  Punitive damages can be awarded under Illinois common law only to deter a defendant from engaging in unlawful acts committed <u>within the state</u>; it is not constitutionally permissible to use Revolution's nationwide sales as a factor in setting punitive damages.  *See Campbell*, 538 U.S. at 421-44 (collecting cases) (under constitutional principles of federalism, a State does not "have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction"); *In re Yasmin and YAZ*, No. 3:09-md-02100-DRH, 2011 WL 6732819, at *4 (S.D.Ill. Dec. 16, 2011) (a jury may not consider evidence of a defendant's nationwide conduct to impose a larger award of punitive damages).  Based on this constitutional limitation, only Revolution's profits based on Illinois sales may be considered (if at all) when reviewing the ratio of punitive damages to Curry's actual damages.  *See* Dkt. 44-1, ¶6 (Revolution's sales of Diesel Test represented 4.3% of its total sales nationwide); Dkt. 459, 368:25-370:11.

rather, the lost revenues award in *TXO* were actual damages representing actual quantifiable harm to Alliance. Whereas, in this case, there was no evidence at trial as to revenues Curry would have received but for Defendants' conduct, or that Defendants' profits represented lost revenue to Curry.

      2.   <u>The Ratio of Compensatory to Punitive Damages Is Excessive at 360 to 1.</u>

Setting aside Defendants' disgorged profits, Curry is left with the compensatory damages awarded by the jury, which amounted to $2,500. The jury's award of $900,000 in punitive damages is 360 times the compensatory damages award. This is excessive and unconstitutional.

Contrary to the district court's opinion (SA9, p. 36), punitive damages should be assessed in total, and not on a per Defendant basis.[15] *See E.E.O.C. v. AIC Sec. Inv., Ltd.*, 55 F.3d 1276, 1287 (7th Cir. 1995) (assessing whether <u>total</u> punitive damages of $150,000 ($75,000 against each defendant) were excessive in light of compensatory damages award of $50,000). Even if the Court was to decline to

---

[15] Although a party generally forfeits an argument or issue not raised in response to a motion to dismiss, "it is well settled that [this] rule does not prevent a party from attacking in appeal the legal theory upon which the district court based its decision." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015); *See also Bradley*, 59 F.4th at 900-901 (collecting cases) (appellate court has discretion to consider issues not raised in the district court). Because the district court and Curry addressed this issue, it involves an issue of law, and there is no harm to the parties, this Court should not find a waiver, but should consider Defendants' argument that punitive damages should be analyzed in the aggregate and not on a per-Defendant basis.

conduct the analysis based on total punitive damages, an analysis based on punitive damages awarded against each Defendant ($300,000) still yields an excessive ratio of 120 to 1.

Neither the parties nor the district court were able to locate a single case from the Seventh Circuit where punitive damages were upheld solely on a common law trademark infringement claim. *Cf. Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 509 (7th Cir. 1992) (striking $100,000 in plaintiff's lost profits for trademark infringement and $1 million in punitive damages). Further, several cases involving other types of claims, either along with or without a trademark infringement claim, where punitive damages were awarded, did not exceed the single digit ratio. *See JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 913 (7th Cir. 2007) (affirming award of $116,000 in plaintiff's lost profits from copyright infringement, $125,000 in plaintiff's lost profits for trademark infringement, and $50,000 in punitive damages based on state unfair competition law); *Atturo Tire Corp. v. Toyo Tire Corp.*, No. 14-CV-0206, 2022 WL 1470362, at *10-11 (N.D.Ill. May 10, 2022) (affirming compensatory damages of $10 million in case involving tortious interference and unfair competition, but reducing punitive damages from $100 million to $100,000); *Allied Van Lines, Inc. v. iMove, Inc.*, No. 1:17-CV-08021, 2018 WL 572510, at *6 (N.D.Ill. Jan. 25, 2018) ($2 million in damages for Lanham Act violations and $100,000 in punitive damages for violation of IDTPA and CFA).

Even in cases with far more egregious conduct and low compensatory damages awards, like those awarded to Curry, the ratio in this case would not survive. *See, e.g. Lowe*, 225 Ill.2d at 482-484, 490 (punitive damages award of $325,000 and compensatory damages of $4,680, a ratio of 70 to 1, was "unconstitutionally excessive," even where conduct was repeated and was done with intentional malice; punitive damages reduced to $50,000, for a ratio of approximately 11 to 1); *Gehrett v. Chrysler Corp.*, 379 Ill. App. 3d 162, 183 (2d Dist. 2008) (reducing punitive damages awarded by jury from 10 to 1, to 7 to 1 (approx. $60,000 in punitive damages to $8,500 in actual damages), where defendants deceit and trickery caused plaintiff to unknowingly lease a vehicle without an automatic four-wheel-drive system, which exhibited a reckless disregard for plaintiffs' safety).

Even if the disgorged amount is included in the punitive damages ratio (which it should not be), only the portion of the disgorged amount attributable to Revolution's Illinois sales may be considered, and that amount is far less than the $547,095.44 awarded by the court. *See* n. 16. Also, for the reasons explained in Section I(A) above and Section I(C) below, the punitive damages remain grossly excessive and unconstitutional in light of the other guideposts.

### C. The Final Guidepost Discussing the Difference Between the Award and Comparable Civil Penalties Favors Reversing or Significantly Reducing the Punitive Damages Award.

The final guidepost is the disparity between the punitive damages award and "civil penalties authorized or imposed in comparable cases." *Saccameno*, 943 F.3d at 1091, *quoting Campbell*, 538 U.S. at 428. Although "this guidepost generally deserves less weight than the other two, it serves an important purpose: to "allow[] courts to show 'substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.'" *Epic*, 980 F.3d at 1144 (internal citation omitted), *citing EEOC v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013), *quoting BMW*, 517 U.S. at 568.

The only comparable legislative enactment to Curry's Illinois common law trademark infringement claim is the Lanham Act. Indeed, Illinois common law standards for trademark infringement are identical to the standards for trademark infringement under the Lanham Act. *Safety Socket LLC v. Relli Tech., Inc.*, No. 18-cv-6670, 2023 WL 3455117, at *4 (N.D.Ill. May 15, 2023).

Although the Lanham Act specifically states that amounts awarded for a willful violation under Section 1125(c) of the Lanham Act shall not constitute a penalty (*See* 15 U.S.C. §1117(a)), one of the purposes of a disgorgement award under the Lanham Act is deterrence. *See BASF*, 41 F.3d at 1096 (disgorgement may be awarded to deter the wrongdoer from continuing his violations, and it is "most

appropriate if damages are otherwise nominal").  This is also the ultimate purpose of a punitive damages award under Illinois law.  *See Saccameno*, 943 F.3d at 1086 (punitive damages seek to deter wrongful acts); *Loitz v. Remington Arms Co. Inc.* 138 Ill. 2d 404, 415 (Ill. 1990) (purpose of punitive damages is deterrence).

Here, the deterrence objective has certainly been accomplished by the disgorgement award of almost $550,000, especially when Curry's actual harm was merely $2,500.  For this additional reason, the $900,000 punitive damages award violates Defendants' due process rights and should be vacated or significantly reduced.

In summary, based on all three guideposts, the jury's punitive damages award is unconstitutionally excessive.  The degree of reprehensibility is low based on an assessment of the relevant factors; the disparity between the harm suffered and the punitive damages award is grossly excessive at 360 to 1; and the Lanham Act suggests that a disgorgement award shares the same deterrent effect as punitive damages, making any recovery of punitive damages excessive.  In light of the evidence and due process concerns, the punitive damages award should be reversed or, at a minimum, significantly reduced by this Court to no more than a single digit ratio.

**II.    The Court Abused its Discretion by Denying Defendants' Motion to Strike Curry's Jury Demand on Count V (Common Law Infringement).**

Rule 39(a)(2) of the Federal Rules of Civil Procedure provides that "[w]hen a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action.  The trial on all issues so demanded must be by jury unless…(2) the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial."  Fed. R. Civ. P. Rule 39(a)(2).  This rule specifically gives the court discretion to strike a jury demand upon "motion or on its own" initiative.  *Id.*

In ruling on Defendants' Rule 39(a) motion (Dkt. 305), the district court concluded that, even though Count V of Curry's Complaint only sought injunctive relief, and Revolution stipulated to liability based on Curry's pleading, that Curry, nevertheless, sought actual and punitive damages (presumably under a different count) and that his claim for common law trademark infringement should be heard by the jury.  SA2, 4:24-6:15, 8:7-9:9.  This ruling was, respectfully, erroneous.

District courts generally should "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings, but they shouldn't award a plaintiff more relief than he's requested when doing so would unfairly prejudice the defendants."  *Cullen v. Saddler*, 668 F. App'x. 656, 658 (7th Cir. 2016), *quoting* Fed. R. Civ. P. 54(c); *See also Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 648 (7th Cir. 2002) (collecting cases).  "In

53

particular, a substantial increase in the defendant's potential ultimate liability can constitute specific prejudice barring additional relief under Rule 54(c)." *Cullen*, 668 F. App'x. 658, *quoting* Fed. R. Civ. P. 54(c); *Kaszuk v. Bakery & Conf. Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 559 (7th Cir. 1986), *citing Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716-17 (4th Cir. 1983) (district court's refusal to treble the jury award where plaintiff did not seek such damages in its pleadings was not abuse of discretion). The standard of review is whether the district court abused its discretion. *Kaszuk*, 791 F.2d at 559.

Although Defendants recognize that the district court here did not directly rule upon a request to amend the Complaint to add a claim for damages in Count V, that was, in effect, what the district court did when it concluded that Curry sought compensatory and punitive damages in his claim for common law trademark infringement (even though his Complaint only expressly sought injunctive relief) and denied Defendants' motion to strike Curry's jury demand. For this reason, *Cullen* is instructive.

In *Cullen*, the plaintiff pled in his complaint that he was seeking only $350 in compensatory damages. 668 F. App'x. 658. Only after the parties completed discovery and the court ruled against the defendants on liability did the plaintiff seek relief for $2 million in punitive damages. *Id.* This Court held that, because plaintiff's belated proposal would have radically transformed the case after

54

liability had been determined, the district court did not abuse its discretion in refusing to allow plaintiff to seek punitive damages.  *Id.*

Similarly, here, at the time Defendants stipulated to liability, Curry only sought injunctive relief in Count V.  JA1, ¶80, Prayer for Relief, I, V.   Curry confirmed this in a discovery motion filed with the court a month before the Defendants stipulated to liability.  *See* Dkt. No. 147-1, p. 5, n. 6 (arguing that information as to Defendants' net worth was relevant to his claim for punitive damages in his **ICFA claim**, without any mention of his common law trademark claim).  Curry did not plead compensatory or punitive damages in his common law trademark infringement claim, as he did in several of his other claims, or give any indication that he was seeking such damages in that count before the parties entered into the Stipulation.  JA1, ¶¶48-49, 55, 66, 71, 90, Prayer for Relief, II-III, VI-VIII, X.

Defendants relied on Curry's pleading and the relief sought when Revolution stipulated to liability for infringing on Curry's Diesel Test mark "**under**… Count V of [Curry's] Complaint," in which Curry solely sought injunctive relief.  JA100 (emphasis added).  Notably, the Stipulation does not state that Revolution was stipulating to liability generally on Curry's common law trademark infringement claim; rather, Revolution stipulated specifically to liability "under" Count V of the Complaint.  Curry did not seek damages under

Count V.  *See Orius Corp. v. Qwest Corp.*, 373 B.R. 555, 566 (N.D. Ill. 2007), *citing Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 453 (7th Cir. 2005), and *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000) (stipulations by parties are contracts subject to well-accepted rules of contract interpretation; the lower court's interpretation of a stipulation is subject to *de novo* review).

Defendants were prejudiced by the district court's expansion of the scope of the Stipulation through its ruling that Curry sought damages in Count V, even though the Complaint only sought injunctive relief.  There is no dispute that, at the time Revolution stipulated to liability, the only relief sought by Curry for common law trademark infringement was injunctive relief.  Also, at that time, all Defendants had stipulated to a preliminary injunction. [16] Dkt. 131.  Thus, through the entry of the Stipulation on liability and stipulation for preliminary injunction, every issue pled in Count V of Curry's Complaint was resolved.

Despite the plain language of the Stipulation, Curry attempted to add a post hoc claim for damages after Defendants successfully moved the district court for summary judgment on his only claim in which he actually sought punitive damages (Count I). *See* Dkt. 195, p. 16-17.  Just like in *Cullen*, the Defendants' liability was already determined at the point when Curry tried to expand his

---

[16] The preliminary injunction was substantially broader than Curry was ultimately entitled to, and the Court entered a narrower permanent injunction after trial. *Compare* Dkt. 131 and Dkt. 413.

remedies.  That expansion of remedies seriously prejudiced the Defendants.  *Cf. Cinezeta Internationale Filmproduktionsgesellschaft mbH & Co. 1 Beteiligungs KG v. Inferno Dist., LLC,* No. CV 10-9938-JFW, 2011 WL 13152064, at *2 (C.D. Cal. Nov. 17, 2011), *citing Kaszuk,* 791 F.2d at 559 (if plaintiff was allowed to seek punitive damages, despite its failure to request such relief in its complaint, the defendants would suffer prejudice).

The district court's ruling impermissibly expanded Defendants' liability under the Stipulation.  Defendants went from admitting liability on a claim for injunctive relief at a time when they had already stopped selling the accused product and stipulated to a preliminary injunction, to having to defend against potentially millions of dollars in actual and punitive damages without any ability to contest liability.  The prejudice Defendants suffered is a result of the fact that they did not stipulate, and would not have stipulated, to liability for a claim seeking punitive damages.  The result was a jury verdict awarding punitive damages, in the aggregate amount of $900,000.

The district court erred in disregarding the prejudice to Defendants by the court's expansion of the scope of the Stipulation and Curry's potential relief in Count V, and allowing the common law trademark infringement claim to go to the jury when Curry only sought injunctive relief.  *See Marseilles*, 299 F.3d at 648 ("If the only relief sought is equitable, such as an injunction or specific performance (a

type of affirmative injunction), neither the party seeking that relief nor the party opposing it is entitled to a jury trial"); *Nike, Inc. v. "Just Did It" Enter.*, No. 91 C 4001, 1994 WL 258879, at *2 (N.D. Ill. June 9, 1994) (granting motion to strike jury demand pursuant to Rule 39(a)(2) where trademark infringement claim only sought equitable relief).

Based on the district court's error in allowing the common law trademark infringement claim to go to the jury, Defendants respectfully request an order reversing the jury's verdict awarding Curry punitive damages on his common law trademark infringement claim in Count V.

## <u>CONCLUSION</u>

Defendants/Appellants, Barry Nussbaum, Joshua Nussbaum, and Revolution Laboratories, LLC, respectfully request an order from this Court reversing the punitive damages awarded on Count V (common law trademark infringement), or for an order determining a reduced amount of punitive damages to be awarded to Curry consistent with the purpose for punitive damages awards and Defendants' due process rights, and for an order granting any other or further relief that this Court deems appropriate.

Respectfully Submitted,

BARRY NUSSBAUM, JOSHUA
NUSSBAUM and REVOLUTION
LABORATORIES, LLC


By: /s/  Amy M. Gibson
        One of their attorneys

<u>Counsel for Defendants-Appellants</u>
Matthew De Preter (ARDC# 6291503)
cdepreter@agdglaw.com
Amy M. Gibson (ARDC #6293612)
agibson@agdglaw.com
Gary Hollander (ARDC #6181915)
ghollander@agdglaw.com
Aronberg Goldgehn Davis & Garmisa
225 W. Washington, Suite 2800
Chicago, Illinois 60606
p: (312) 828-9600
f: (312) 828-9635

<u>**CERTIFICATE OF COMPLIANCE**</u>

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 13,980 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Palatino Linotype style font.

Dated:  February 6, 2024

/s/  *Amy M. Gibson*
Amy M. Gibson
One of the Attorneys for Appellants

## CIRCUIT RULE 30(D) STATEMENT

This short appendix comply with Circuit Rule 30(d) because all materials

required by Cir. R. 30(a) and (b) are included in the short appendix.


/s/  *Amy M. Gibson*
Amy M. Gibson

**CERTIFICATE OF SERVICE**

I, counsel for Defendants-Appellants and a member of the Bar of this Court, certify that, on February 6, 2024, a copy of the foregoing Brief and Short Appendix of Defendants-Appellants Revolution Laboratories, LLC, Joshua Nussbaum, and Barry Nussbaum was filed electronically.  Service of the Brief and Short Appendix will be made on all ECF-registered parties by operation of the court's electronic filing system thereby effecting service on the parties who are registered for electronic filing under Cir. R. 25.  Parties may access this filing through the court's system.

*/s/ Amy M. Gibson*
Amy M. Gibson

# APPENDIX

**TABLE OF CONTENTS**

| ECF No. | Date | Document | Page |
|---------|------|----------|------|
| 356 | 4/6/23 | Minute Order | SA000001 |
| 469 | 4/6/23 | Transcript of Proceedings held on April 6, 2023 [pp. 4-9] | SA00002 |
| 410 | 8/25/23 | Memorandum Opinion and Order | SA000009 |
| 376 | 5/22/23 | Judgment in a Civil Case | SA000064 |
| 414 | 8/29/23 | Amended Judgment in a Civil Case | SA000066 |
| 417 | 9/1/23 | Second Amended Judgment in Civil Case | SA000068 |
| 418 | 9/22/23 | Notice of Appeal | SA000070 |

**INDEX OF PORTION OF TRANSCRIPT IN SHORT APPENDIX**
**PURSUANT TO CIR. R. 30(F) AND 10(E)**

| ECF No. | Date | Document | Page | Witnesses | Exhibits | Significant Portions of the Proceeding |
|---------|------|----------|------|-----------|----------|----------------------------------------|
| 469 | 4/6/23 | Transcript of Proceedings held on April 6, 2023 [pp. 4-9] | SA00002 | Not applicable | Not applicable | District court's oral ruling on Defendants' Motion to Strike Jury Demand (Dkt. 305) |

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF NextGen 1.7.1.1
### Eastern Division

Charles Curry

                                      Plaintiff,

v.                                               Case No.: 1:17−cv−02283
                                                 Honorable Matthew F. Kennelly

Revolution Laboratories, LLC, et al.

                                      Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, April 6, 2023:

      MINUTE entry before the Honorable Matthew F. Kennelly: In person pretrial conference held on 4/6/2023. Oral rulings made on the motions to strike the jury demand [305], defendants' motion in limine [350], and plaintiff's motion to preclude QuickBooks documents [351]. Defendant's motions in limine [350] and to strike the jury trial demand [305] are denied as to the reasons stated more fully on the record. The plaintiff's motion to preclude QuickBooks documents [351] is granted as to the reasons stated more fully on the record. Plaintiff's motions in limine 1 and 7, and the defendants' motion in limine 3 are taken under advisement. Mailed notice. (mma, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

1          IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3
    CHARLES CURRY                    )   Docket No. 17 C 2283
4   Doing business as               )
    Get Diesel Nutrition,           )
5                                   )
                      Plaintiff,    )
6                                   )   Chicago, Illinois
                 vs.                )   April 6, 2023
7                                   )   1:30 o'clock p.m.
    REVOLUTION LABORATORIES, LLC, et )
8   al.,                            )
                                    )
9                     Defendants.   )


10            TRANSCRIPT OF PROCEEDINGS - STATUS
11      BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
    APPEARANCES:
13

14  For the Plaintiff:     OPPENHEIM + ZEBRAK, LLP
                           BY:  MR. JEFFREY KANE
15                              MR. NICHOLAS COOPER HAILEY
                           4530 Wisconsin Avenue, NW, 5th Floor
16                         Washington, DC 20016
                           (202) 480-2174
17

18

19  For the Defendants:    ARONBERG GOLDGEHN DAVIS & GARMISA
                           BY:  MR. MATTHEW L. DE PRETER
20                              MR. GARY PHILLIP HOLLANDER
                           330 N. Wabash Ave, Suite 1700
21                         Chicago, IL 60611
                           312-755-3161
22

23
    Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                         Official Court Reporter
                           219 S. Dearborn Street, Suite 2102
25                         Chicago, Illinois  60604
                           (312) 435-5639

SA000002

1    it to have been designated in a final pretrial order, even

2    produced during discovery necessarily.  But those things do

3    matter, and I'm really focusing on the question about whether

4    it was designated in the pretrial order at this point.  That

5    does matter in terms of it being a trial exhibit.

6            So I mean, obviously, there's no mystery that the

7    QuickBooks data is out there.  Everybody's known it's been out

8    there for quite a while.  So it's not in the final pretrial

9    order.  Why can't I just stop right there and say, you didn't

10   designate it; it doesn't come in?

11           MR. DE PRETER:  We designated all of our exhibits

12   prior to the issue of the QuickBooks --

13           THE COURT:  Prior to the Rule 1006 issue regarding

14   the admissibility of the profit and loss statement, but

15   certainly not prior to when you knew that there was QuickBooks

16   data out there, right?

17           MR. DE PRETER:  Correct.

18           THE COURT:  Okay.  Thanks.  You've answered my

19   question.

20           So this is mostly going to be me talking on these two

21   motions because they've kind of been briefed to death, and I

22   had one question which has now been answered.  And then we're

23   going to have a discussion about the trial after that.

24           So I'm going to start -- I'm just going to make oral

25   rulings on all of these motions, starting with the motion to

1    strike the jury demand.

2         As I understand it, there are four claims that remain

3    from the plaintiff's complaint following the summary judgment

4    rulings:

5         A claim under the Illinois version of the Uniform

6    Deceptive Trade Practices Act, claim of trademark infringement

7    under the Lanham Act, claim of trademark infringement under

8    Illinois common law, and a claim under the federal

9    Anti-Cybersquatting Act.  It has a longer title than that, but

10   that's close enough.

11        The defendants argue that the plaintiff doesn't have

12   a right to a jury trial on any of these claims.  I think the

13   first three claims in the order I mentioned them, the

14   Deceptive Trade Practices, the Lanham Act and common law

15   trademark infringement, all basically rely on the same facts

16   and are overlapping at least to that extent.  The legal

17   requirements are somewhat different obviously, as are the

18   available remedies.

19        On the Deceptive Trade Practices Act claim, the

20   defendants argue and the plaintiff doesn't really dispute that

21   there's no right to damages under that statute.  It's just a

22   request for an injunction.  And obviously, a judge determines

23   whether an injunction is issued.

24        The other two of those first three are the two

25   trademark infringement claims, one under Illinois common law

1   and one under the Lanham Act.  On both of those, the plaintiff

2   is seeking damages for loss of goodwill or what is sometimes

3   referred to as loss of reputation.  Those are roughly similar

4   terms as it relates to an individual.  That's clearly relief

5   at law, not relief at equity.

6        The defendants' argument on that is that the

7   plaintiff can't sustain goodwill damages from a proof

8   standpoint.  However, the claim insufficiency of evidence

9   isn't a basis for denying a jury trial.  Rather, it's a basis

10  for arguing to a jury that it shouldn't find in the party's

11  favor or it's a basis for summary judgment, which the

12  defendants did not seek, and it's really too late to do that

13  now.  And so that by itself entitles the plaintiff to a jury

14  trial on the Lanham Act and the common law trademark

15  infringement claims.

16       Even if that wasn't the case, on the Lanham Act

17  claim, the plaintiff is seeking statutory damages, and there's

18  a right to a jury trial on the Lanham Act claim for that

19  reason too.  I think the law says that statutory damages under

20  the Lanham Act is legal relief, not equitable relief.

21       The plaintiff is also seeking the defendants' -- and

22  I'm not sure on this one whether it's defendant singular or

23  defendants plural; it doesn't really matter for the moment --

24  the defendants' profits on the Lanham Act claim.

25       I have in at least two other cases -- one called

1    Ariel, A-r-i-e-l, and the other is called Chicago Mercantile
2    Exchange, and in those cases, I found that that that type of
3    request -- in other words, obtaining the defendants' profits
4    for infringement, although I think it was trademark in one of
5    them and maybe copyright in the other one; I'm not sure of
6    that -- that amounts to a request for disgorgement which the
7    Supreme Court has characterized as an equitable remedy.  But
8    one of those cases, namely, Ariel, was a case in which that
9    was the only relief that the plaintiff sought.  And the other
10   case, Chicago Mercantile Exchange, was a case in which the
11   plaintiff expressly gave up its right to a jury trial relating
12   to its request for statutory damages under the Lanham Act in
13   the event that I concluded, as I did, that the defendants'
14   profits -- recovery of the defendants' profits was an
15   equitable remedy that didn't give rise to a jury trial right.

16          So in this case, the plaintiff is seeking additional
17   relief and it includes statutory damages under the Lanham Act,
18   and as I said, he's entitled to a jury trial on that.  So
19   that's enough to require a jury trial on the two trademark
20   claims, the Lanham Act and the common law claims, without
21   having to directly address at this point the plaintiff's
22   contention that my decisions in those two cases either were
23   wrong or they don't really quite say it that way because
24   people don't want to say that or at least that they don't
25   apply here.

SA000006

1    The jury will in this case be given the question of

2 determining the recoverability and the amount of defendants'

3 profits, and if I conclude that there's no right to a jury

4 trial for that remedy, the jury will effectively be acting as

5 an advisory jury on the particular point of the amount of the

6 profits.

7    Additionally, on the state law trademark infringement

8 claim, which is a common law claim, the plaintiff is seeking

9 punitive damages.  That's an additional basis not to strike

10 the jury demand.  On that particular point, the defendants

11 argue that the plaintiff gave up on that claim recoverability

12 of punitive damages.  I don't find that persuasive.

13    A party -- first of all, a party does not have to

14 specifically request relief in a particular form to seek it at

15 trial.  Rule 54(c) has said that basically forever since the

16 rules were adopted back in the '30s or '40s or whenever it

17 was.

18    I don't see anything in the materials cited by

19 defendants that amounts to a disavowal of punitive damages on

20 the state law trademark infringement claim.  The best point

21 the defendants have is that they stipulated to liability on

22 that claim believing that the plaintiff was not seeking

23 punitive damages.

24    My view and I think what the record shows is that was

25 a unilateral belief on the defendants' part, and that's not

1    sufficient.   There's no agreement or stipulation, expressly or
2    impliedly, giving up a recovery of punitive damages, and the
3    defendants can't force their unilateral and unexpressed
4    intention or belief retroactively on the plaintiff on that
5    point.

6            So for those reasons, there's a right to a jury.   And
7    each of them would be independently enough.   There's a right
8    to a jury trial on the two trademark claims, the state law and
9    Lanham Act claim.

10           Finally, I also think there's a right to a jury trial
11   on the anti-cybersquatting claim.   I agree with the cases that
12   say that that's -- that that statute is analogous to a common
13   law action for trademark infringement which is an action at
14   law and therefore there's a right to a jury trial.   And it
15   will be up to the jury to decide liability on that claim as
16   well as the amount of statutory damages.   That's obviously
17   subject to review by me, but I think that's the way it should
18   work and will work.

19           On this particular claim, the defendants also argue
20   that there's an insufficient evidentiary basis to support an
21   award of statutory damages.   As with the argument that they
22   made on goodwill, I don't think that's sufficient.   An
23   insufficiency of the evidence argument that could have and
24   should have been made on summary judgment isn't a basis to
25   deny a jury trial.   It might be a basis for a summary

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES CURRY, d/b/a** | ) | |
| **Get Diesel Nutrition,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 2283** |
| | ) | |
| **REVOLUTION LABORATORIES, LLC,** | ) | |
| **REV LABS MANAGEMENT, INC.,** | ) | |
| **JOSHUA NUSSBAUM, and BARRY** | ) | |
| **NUSSBAUM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Charles Curry sued Revolution Laboratories, LLC, Rev Labs Management, Inc.,

Joshua Nussbaum, and Barry Nussbaum, alleging that they infringed his trademark and

violated the Illinois Consumer Fraud and Deceptive Practices Act (ICFA), the Illinois

Uniform Deceptive Trade Practices Act (IUDTPA), and the Anti-Cybersquatting

Consumer Protection Act (ACPA).  The parties stipulated that Revolution is liable for

infringing Curry's Diesel Test mark and violating ACPA with respect to one domain

name.  The Court granted summary judgment in favor of the defendants on Curry's

ICFA claim.  The remaining claims proceeded to a jury trial in May 2022, except for the

IUDTPA claim, which the parties agreed before trial would be decided by the Court.

The jury found that Joshua and Barry Nussbaum are individually liable for

trademark infringement.  The jury also found that each defendant's infringement was

willful.  The jury awarded Curry actual damages and defendants' profits and assessed punitive damages against each of the defendants.

Both sides have filed motions regarding the judgment.  The defendants have moved under Federal Rule of Civil Procedure 59(e) to alter the judgment by striking the punitive damages and reducing the award of profits.  Curry has moved under Rule 59(e) to amend the judgment to include pre- and post-judgment interest and for entry of a permanent injunction.  Curry has also moved to find the defendants liable on his IUDTPA claim.  Lastly, Curry has moved for a ruling that the jury's award of defendants' profits should be considered as advisory and that the Court should determine the amount of defendants' profits itself.

For the reasons below, the Court (1) denies the defendants' motion to alter the judgment; (2) grants in part Curry's motions for pre- and post-judgment interest and entry of a permanent injunction; (3) finds the defendants liable for violating IUDTPA; and (4) grants Curry's motion to consider the jury's award of defendants' profits advisory and awards $547,095.44 in defendants' profits.

## Background

The Court assumes familiarity with this case's factual and procedural background, which this Court has discussed in prior written opinions.  *See, e.g.*, *Curry v. Revolution Lab'ys, LLC*, No. 17 C 2283, 2022 WL 225877 (N.D. Ill. Jan. 26, 2022).  The following background is relevant to the post-trial motions and largely is taken from the Court's summary judgment decision and the trial record.

### A.    The parties

Curry resides in Chicago and sells nutritional supplements through his business,

SA000010

Get Diesel Nutrition.  He began selling Diesel Test branded products in 2005.  He has spent thousands of dollars advertising Diesel Test online and in weightlifting publications, such as Planet Muscle Magazine.  He filed a trademark application for the mark Diesel Test in December 2016.

Revolution Laboratories is a limited liability company that sells nutritional supplements and apparel.  Joshua Nussbaum is the President of Revolution, and his father, Barry Nussbaum, is the CEO.  (For the sake of clarity, the Court will refer to each of the Nussbaums by his first name.)  Revolution sells its products directly and through affiliate networks.  In October 2016, Revolution began marketing and selling a product called Diesel Test.  The following month, Curry sent Revolution a cease-and-desist request stating that he had common law rights to the Diesel Test mark.

**B.    Trial testimony**

Because the parties stipulated that Revolution was liable for infringement, the trial focused on whether Joshua or Barry are individually liable, whether any defendants had willfully infringed, and damages.[1]  At trial, Curry, Joshua, and Barry testified, along with Curry's damages expert and various Revolution employees.

Both Curry and Joshua testified regarding how they came up with the name Diesel Test.  Curry testified that "Diesel" came from his nickname "Chuck Diesel," which he said came from his past work with diesel fuel.  His first product was called Diesel Fuel, and then he began using the name Get Diesel Nutrition for his business.  He testified that he chose the name Diesel Test for his testosterone boosting product

---

[1] The trial also concerned Curry's ACPA claims, but because neither party has raised any issues with the jury's verdict on that claim, the Court will not discuss that aspect of the trial.

SA000011

because he wanted to continue using the name Diesel.  As noted above, he began selling Diesel Test in 2005.  In 2015 and 2016, Diesel Test received Planet Muscle magazine's Best of the Best award.

Regarding Revolution's use of Diesel Test, Joshua testified that it was his decision to use the Diesel Test name and that he was involved in creating the product label.  He explained that "Diesel" was a common slang word in the body building community.  Barry testified that he did not like the name at first and repeatedly rejected it but that he eventually acquiesced due to Joshua's enthusiasm for the name.  Joshua testified that he performed a search for the name on Google and on a website called Trademarks 411, though he did not have any records of performing this search.  Joshua explained that because he did not see the Diesel Test mark on the trademark website he searched, he thought "it was fair game."  Tr. Vol. 2 at 474:5–11.  As noted above, Revolution began selling its Diesel Test product in October 2016.  In closing argument, Curry's counsel contended that Revolution and Curry's Diesel Test labels, including the name, color, and font, were too similar for it to be plausible that Joshua independently created it.

Joshua and Barry both testified that they control Revolution.  Joshua testified that he managed the company on a day-to-day basis and that he asked Barry for advice regarding Diesel Test.  He explained that when Revolution began selling Diesel Test, the company took another product called Rev Test and relabeled it as Diesel Test.  He testified that from October 2016 to June 2017, Revolution sold its Diesel Test product to 767 customers in Illinois.

Curry sent three cease-and-desist requests to Revolution in November 2016.  In

SA000012

these requests, he included links to his website where he was selling his Diesel Test products.  Joshua testified that he did not reply to these requests nor click the links because he thought it was a scam.  He forwarded Curry's cease-and-desist email to Barry and a couple of other Revolution employees.  In Joshua's email, he asked a Revolution employee to "do a search and see if Diesel Test is available for trademark or if this guy is telling the truth."  Dkt. no. 399-3 at 65:2–7.  In the same email, Joshua wrote:  "I personally vote we let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run."  *Id.* at 65:19–21.

Barry testified that he agreed with this decision.  He testified that after receiving Curry's cease-and-desist letter, a Revolution employee discovered that the trademark was available for purchase.  Another Revolution employee asked in the same email chain if Revolution should purchase the mark, to which Barry responded: "Yessssssssss."  Dkt. no. 399-10 at 6.  Joshua then prepared and filed an application to register the Diesel Test trademark under his own name.  That application was later denied by the U.S. Patent and Trademark Office.

Joshua testified that after he received Curry's cease-and-desist request, he searched again on Google and Trademarks 411 for the Diesel Test mark and did not find anything.  He also stated that he spoke with two of his distributors, and they told him that they had not heard of Diesel Test or Curry's company.  At trial, however, Joshua was confronted with evidence that one of those distributors was advertised as Curry's exclusive distributor of Diesel Test.  Barry testified that he searched on Amazon to investigate Curry's claim, but he conceded that he searched for products with the name testosterone in it, not Diesel Test specifically.  Barry also testified that he

SA000013

instructed Revolution employees to perform searches.  He explained that because he did not find evidence of sales or a registered trademark in his searches, he thought Curry's claim was scam.

In February 2017, Amazon banned Revolution's Diesel Test product due to Curry's complaint that it was counterfeit.  Joshua and Barry testified that Revolution decided not to contest the Amazon ban because their Diesel Test sales on Amazon were not significant enough.  Revolution sales manager Adam Knippel testified via deposition that Revolution continued selling Diesel Test on other channels after Amazon banned the product.

There was conflicting evidence at trial regarding when Revolution stopped selling Diesel Test.  Knippel testified that Revolution continued to sell Diesel Test after Curry filed suit in March 2017.  Revolution warehouse manager Donna Godwin, who also testified via deposition, explained that as of August 2018, Revolution still had Diesel Test product.  Curry testified that in May 2020, he saw a website advertising Revolution's Diesel Test.  Joshua testified, however, that Revolution had stopped selling or advertising Diesel Test in October 2017 because it began selling and advertising the product under a new name, RT 2.0.  But he also admitted that he had previously submitted an affidavit in this case stating that Revolution did not stop selling Diesel Test products until the first quarter of 2018.  *See* dkt. no. 88-1 at ¶ 3.  Barry testified that there were a small number of deliveries in 2018 but that Revolution had stopped marketing Diesel Test in 2017.

There was also testimony at trial regarding Revolution's products that it marketed and sold with Diesel Test.  Both Joshua and Knippel testified that Diesel Test and MRX

6

SA000014

were marketed together as complimentary products.  Knippel testified that Revolution's

sales team marketed Diesel Test and MRX as a two-step system.  Joshua similarly

testified that MRX and Rev Test had been advertised as a two-step system.  He

explained that this was a sales strategy to sell another product after a consumer

purchased MRX, and he stated that each step was recorded as an independent sale.

Knippel testified that some customers complained that when they purchased Diesel

Test online, they were automatically charged for MRX and did not have the option to

remove it from their order.  He also stated that Revolution sometimes sold Diesel Test in

a bundle called Champion Stack with other Revolution products.

Finally, Revolution's accounting manager, Trent Turner, and Curry's expert, Joel

Herman, testified regarding damages.  Turner testified that Revolution used

QuickBooks, an accounting software, to produce a profit-and-loss (P&L) report for

Diesel Test.  The P&L report covered the period from August 1, 2016 to October 20,

2017.  It reflected that Revolution made $1,580,000 in sales after chargebacks and

refunds, although Turner testified that this figure did not include sales made on Amazon

or eBay.  The report showed that after deducting expenses, Revolution experienced a

$45,723 loss on Diesel Test during the period covered by the report.

Herman, a certified public accountant, testified that Revolution made at least

$2,052,225 in net sales from Diesel Test and $2,131,669 in sales from related products.

He testified that ninety-six percent of customers who purchased MRX also purchased

Diesel Test at the same time or previously.  Herman also testified about Revolution's

expenses.  For Revolution's related products, he testified that he was not provided any

records of expenses.  For Diesel Test, he stated that he did receive some documents,

SA000015

but he concluded that he did not receive enough information to verify the expenses shown on Revolution's P&L report.  He explained that to conclude that the expenses were reported accurately, he would need supporting documentation for the expenses, such as receipts, leases, invoices, etc., which he was not provided.

There was also evidence introduced at trial regarding the Nussbaum Family Trust.  Barry testified that he formed the trust in 2012, and Joshua testified that he is a beneficiary of the trust.  Both Barry and Herman testified that the assets held by the trust are currently worth around $38 million.  Barry testified that the funding for Revolution came entirely from the trust.  He also testified that the trust owns the multimillion-dollar home in Maui where he resides and that the trust pays him consulting fees.  Herman testified that the trust made payments into Joshua and Barry's personal accounts and also paid some of Barry's personal expenses.  He did not render an opinion, however, regarding whether the assets held by the trust belonged to Joshua and/or Barry.  Joshua testified that his net worth was $172,572 in March 2022 and likely lessened since then.  Barry testified that his net worth in March 2022 was $23,780 (this, obviously, does not include the assets in the trust).

During closing argument, Curry asked the jury to award $4,183,894 in defendants' profits and $4,183,894 in reputational and loss of goodwill damages.  Curry also asked for punitive damages in the amount of the requested trademark damages, *i.e.*, $8.36 million.

## C.     Procedural history and jury instructions

Before trial, the defendants moved to strike Curry's jury demand, contending that Curry was not entitled to a jury on any of his claims.  The Court denied this motion,

8

explaining that Curry's request for actual damages on his trademark claims and punitive damages on his common law trademark claim entitled him to a jury trial.  Given this ruling, the Court declined to "directly address at this point [Curry]'s contention" that he was entitled to a jury trial on his request for the disgorgement of defendants' profits.  Dkt. no. 389-1 at 7:16–25.  The Court held that "[t]he jury will in this case be given the question of determining the recoverability and the amount of defendants' profits, and if I conclude that there's no right to a jury trial for that remedy, the jury will effectively be acting as an advisory jury on the particular point of the amount of the profits."  *Id.* at 8:1–6.

Several aspects of the jury instructions are also relevant to the parties' motions.

**1.    Common law trademark rights**

Before trial, Curry filed a motion *in limine* seeking to preclude the defendants from controverting their stipulation that Revolution is liable for infringement.  In response, the defendants contended that Curry "bears the burden of establishing where its trademark rights exist."  Dkt. no. 296 at 7.  They argued that Curry is entitled to trademark protection only in the geographic areas where he has established rights, which they contended was a "question of fact" that depended in part on the volume of Curry's sales.  *Id.* at 4.  The Court granted Curry's motion *in limine*, explaining that the defendants' stipulation regarding Revolution's liability "necessarily includes" an admission that Curry has "enforceable trademark rights" because "a trademark holder who has an invalid or unenforceable mark can't establish liability."  Dkt. no. 362 at 5.

During the trial, the morning after the instruction conference, the defendants stated that they "think an instruction on what constitutes a common law trademark and

SA000017

geographic scope should have been provided."  Dkt. no. 385-1 at 1095:3–5.  The

defendants did not propose an instruction regarding either a common law trademark or

geographic scope at the instruction conference.  The Court responded that "the

geographic scope thing I ruled on I think in a pretrial motion."  *Id.* at 1095:6–7.

### 2.     Personal liability

The jury instruction regarding personal liability of the Nussbaums is also relevant

to the current motions.  In moving for summary judgment, the defendants argued that to

be personally liable, the Nussbaums had to have acted beyond the scope of their duties

as officers of Revolution.  The Court rejected this contention, holding that "Seventh

Circuit caselaw indicates that officers can be held liable regardless of whether they act

within the scope of their duties."  *Curry*, 2022 WL 225877, at *4.  At trial, the Court

instructed the jury that "[t]o succeed on his trademark infringement claims against the

particular individual defendant you are considering, Mr. Curry must prove by a

preponderance of the evidence that the defendant personally participated in or directed

Revolution's infringing activity."  Dkt. no. 399-9 at 13:12–16.

During the jury's deliberations, the jury asked:  "If a leader is participating in or

directing activities in the best interests of the company, on behalf of the company, when

is it not considered performed for personal reasons under the law?  All actions are

performed by a person."  Dkt. no. 374 at 1.  The Court requested the parties' input on

how to respond.  The defendants reasserted their argument at summary judgment that

to be personally liable, they must act outside the scope of their employment as officers.

The Court declined to give this answer to the jury, noting that the defendants' comment

did not help the jury understand their instruction, but rather took issue with the

SA000018

instruction itself.  The Court instead provided the following answer to the jury, over the

defendants' objection:  "As the instruction states, it focuses on whether Mr. Curry has

proven that the defendant himself participated in or directed the infringing activity.  It

does not require Mr. Curry to prove that the defendant acted for personal reasons or

that the defendant did not act in the best interests of Revolution."  *Id.* at 2.

### 3.    The Nussbaum Family Trust

During the instruction conference, Curry proposed the following instruction about

the Nussbaum Family Trust:

> During the trial, you heard testimony and saw documents concerning the
> Nussbaum Family Trust which I will refer to as simply the trust.  You may
> consider the trust to be an asset of Joshua Nussbaum because Joshua
> Nussbaum is a beneficiary of the trust.  You may consider the trust to be
> an asset of Barry Nussbaum if you find any of the following to be true:
> that the trust has provided benefits to Barry Nussbaum; that Barry
> Nussbaum exercised authority over assets of the trust; that Barry
> Nussbaum created the trust in an attempt to shield assets from existing or
> future creditors; that profits from Revolution's infringement were paid to
> the trust.

Tr. Vol. 4 at 1071:16–1072:1.  The defendants opposed the instruction, arguing that it

would break the trust to allow the jury to consider the trust's assets as Joshua and

Barry's assets.  They did not propose an alternative instruction regarding the

circumstances under which the jury could consider the trust.  The Court declined to give

Curry's proposed instruction because it related to just one factor for the jury to consider

when awarding punitive damages.  The Court noted, however, that the jury could decide

to consider the trust when considering the defendants' financial condition.

Curry then proposed a simpler instruction on the trust as part of the punitive

damages instruction.  The Court adopted this proposal with minor modifications and

instructed the jury that "[w]hether and the extent to which you consider the Nussbaum

SA000019

Family Trust in assessing each defendants' financial condition are matters for you to decide."  Dkt. no. 399-9 at 22:12–14.  The defendants objected, arguing that the instruction would prejudice them by calling the jury's attention to the trust.  In their written objection, the defendants stated that the instruction was not necessary because "[b]oth sides may make whatever arguments they want in closing in an effort to persuade the jury how they should consider the Trust and for what purpose."  Dkt. no. 373 at 2.  (The Court notes that this is essentially what the instruction told the jury.)

The Court overruled the defendants' objection, noting that the defendants did not challenge the correctness of the instruction, but rather the fact that the instruction draws attention to the trust.  The Court reasoned that a significant amount of evidence admitted at trial related to the trust, and thus it was appropriate to tell the jury in a neutral way that they must decide whether to consider the trust.  The Court also noted that the jury instructions in other spots likewise made specific references to particular types of evidence.

### 4.     Defendants' profits

Finally, regarding defendants' profits, the Court instructed the jury that:

> Mr. Curry is required only to prove the defendants' gross revenue, by a preponderance of the evidence.  The defendant is required to prove by a preponderance of the evidence any expenses that it argues should be deducted in determining its profits.  Mr. Curry is entitled to recover the defendants' total profits from its use of the trademark, unless the defendant proves by a preponderance of the evidence that a portion of the profit is due to other factors.

Dkt. no. 399-9 at 19:13–21.  Neither party objected to this instruction.  The Court further instructed the jury that "[i]f Mr. Curry proves by a preponderance of the evidence that the defendants profited from their infringement by the sale of other products that were

SA000020

marketed, sold, or shipped with their Diesel Test product, then he's entitled to recover the defendants' profits from those sales." *Id.* at 20:4–10.

During the jury's deliberations, the jury asked the Court:  "If we believe there are other significant factors driving sales / profitability, can we conclude there are profits to be awarded or does that mean we should not determine profits because we can't conclude they are due to the benefit of the infringed trade name?"  Dkt. no. 374 at 3. The Court again sought the parties' input regarding the proper response.  After discussion, the Court formed a response to the jury that restated the burdens of proof from the original instruction and clarified that "[i]f the defendants prove that a portion of the profit is due to other factors, you should deduct that amount from the total profits in making any monetary award."  *Id.* at 4.  The Court overruled both sides' objections to the precise wording of this sentence; neither side objected to its substance.

Curry proposed to add to this response that "[t]here may be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark."  Dkt. no. 389-8 at 19:6–11.  The Court overruled this proposal, explaining that jurors are not typically told the policy reasons behind instructions.

After deliberating, as stated above, the jury found Joshua and Barry individually liable for trademark infringement and found that all three defendants' infringement was willful.  The jury awarded Curry $2,500 in actual damages, namely, loss of goodwill and reputational damages, and $500,000 in defendants' profits.  The jury also assessed

SA000021

$300,000 in punitive damages against each defendant.[2]

## Discussion

## A.     Curry's motion for the Court to determine infringing profits

Curry moves under Rule 59(e) for the Court to treat the jury's determination of

defendants' profits as advisory under Rule 39(c) and determine the proper award of

profits itself.[3]  In the alternative, Curry moves for an enhancement of the jury's award.

The defendants' Rule 59(e) motion to reduce the defendants' profits award is also

relevant to this issue.  The Court begins its discussion with Curry's motion, noting where

it also considers the defendants' contentions raised in their Rule 59(e) motion.

### 1.     Right to determination by a jury

Curry contends that the Court should treat the jury's disgorged profits award as

advisory because disgorgement is an equitable remedy.  As a preliminary matter, the

defendants argue that because Curry previously contended in his response to their

motion to strike his jury demand that he was entitled to a jury trial on this point, he

should be barred under the doctrine of judicial estoppel from now contradicting that

contention.

Judicial estoppel "prevents litigants from manipulating the judicial system by

---

[2] As noted above, the jury also made findings and awarded damages on Curry's ACPA
claim, which is not at issue on the present motions.

[3] The defendants argue in a footnote that Curry's brief should be stricken because it
exceeds the proper page limit.  The Court notes that the text of the brief itself (Dkt. no.
399) was within the fifteen-page limit; only the signature line carried over to the next
page.  For this reason, the defendants' argument is, quite honestly, rather ridiculous.
That aside, as both sides have at times engaged in this practice throughout this
litigation, the Court declines this request.  *See Stevo v. Frasor*, 662 F.3d 880, 887 (7th
Cir. 2011) ("[I]t is clear that the decision whether to apply [local rules] strictly or to
overlook any transgression is one left to the district court's discretion.") (internal
quotation marks omitted).

SA000022

prevailing in different cases or phases of a case by adopting inconsistent positions."

*Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 547 (7th Cir. 2014). To invoke judicial

estoppel, the invoking party typically must show: (1) the earlier and the later positions

are inconsistent; (2) the party prevailed in the earlier proceeding based on the court's

acceptance of the earlier position; and (3) allowing the party to assert an inconsistent

position would provide it with an unfair advantage if not estopped. *See In re Knight-*

*Celotex, LLC*, 695 F.3d 714, 721–22 (7th Cir. 2012).

      Judicial estoppel does not apply in this case because the defendants have not

shown the second element. That element requires that "the party must have prevailed

on the basis of its earlier position so that judicial acceptance of an inconsistent position

in a later proceeding would create the perception that either the first or the second court

was misled." *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 914 (7th Cir.

2005) (internal quotation marks omitted). Curry did not prevail on his previous

contention that he was entitled to a jury trial on disgorgement. Rather, the Court held

that Curry was entitled to a jury trial based on his other claims and expressly reserved

ruling on the disgorgement point until after trial. The Court specifically noted that

although the jury would be asked to determine the amount of defendants' profits, that

award could be treated as advisory depending on the Court's ultimate conclusion.

Moreover, by expressly reserving the issue, the Court was in no way misled by Curry's

prior position. Thus, judicial estoppel does not bar Curry's contention that the jury's

disgorgement award should be treated as advisory. *See Kelly v. Herrell*, No. 21-2442,

2022 WL 17851675, at *4 (7th Cir. Dec. 22, 2022) (affirming the denial of a motion for

judicial estoppel where the party "did not prevail" on its earlier position, "which is a

necessary condition of judicial estoppel").

The Court therefore proceeds to consider whether the jury's disgorgement award should be treated as advisory. As the Court noted when ruling on the defendants' motion to strike Curry's jury demand, it has held in two other cases that "a request for disgorgement of profits in a Lanham Act case involves equitable relief on which plaintiff is not entitled to a jury trial." *Chicago Mercantile Exch. Inc. v. Ice Clear US, Inc.*, No. 18 C 1376, 2020 WL 5370625, at *1 (N.D. Ill. Aug. 10, 2020); *see also Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, No. 15 C 3717, 2017 WL 1049464, at *2 (N.D. Ill. Mar. 20, 2017) ("[T]he request for disgorgement of profits in a Lanham Act case is a claim for equitable relief that did not entitle Ariel Capital to a jury trial."). The Court adheres to its decisions in those cases.

Both the Supreme Court and the Seventh Circuit have characterized disgorgement as an equitable remedy. *See Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570 (1990) ("[W]e have characterized damages as equitable where they are restitutionary, such as in actions for disgorgement of improper profits.") (alteration accepted) (citation and internal quotation marks omitted); *Fuller Prod. Co. v. Fuller Brush Co.*, 299 F.2d 772, 777 (7th Cir. 1962) ("An accounting for profits, however, is an equitable remedy subject to the principles of equity."); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1095 (7th Cir. 1994) (labeling disgorgement of defendants' profits as an equitable remedy). The three circuits that have squarely addressed this issue have concluded that "[a] claim for disgorgement of profits under § 1117(a) is equitable, not legal" and therefore does not create a jury right. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015); *see also Hard*

SA000024

*Candy, LLC v. Anastasia Beverly Hills*, *Inc.*, 921 F.3d 1343, 1358 (11th Cir. 2019) ("[A] claim for an accounting and disgorgement of profits under the Lanham Act is equitable in nature and, therefore, [ ] the Seventh Amendment's guarantee of a jury trial does not apply."); *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1248 (6th Cir. 1991) (holding that the defendant was not entitled to a jury trial where the plaintiff's complaint "requested only equitable relief; an injunction and disgorgement of profits").

In Curry's response to the defendants' earlier motion to strike his jury demand, he contended that he was entitled to a jury trial on this remedy because he was seeking infringing profits as a proxy for his damages. The Eleventh Circuit rejected this argument in *Hard Candy*, noting that to adopt this proposition "would make the Seventh Amendment right fully depend on the rationale the plaintiff offered for seeking to recover the defendant's profits," which "is inconsistent with the longstanding interpretation of the Seventh Amendment set out by the Supreme Court." *Hard Candy*, 921 F.3d at 1352, 1360. Curry also argued that this request for relief was intertwined with his other claims and required credibility determinations, but he did not cite any authority for the proposition that this would entitle him to a jury trial on this claim. And, in any event, the defendants do not assert any of these arguments in contesting Curry's current motion.

In sum, the Court concludes that there is no right to a jury trial for Curry's requested remedy of defendants' profits. The jury's award of $500,000 in defendants' profits is therefore advisory under Rule 39(c)(1).

## 2.    Calculation of defendants' profits

Because the jury's award is advisory, the Court must determine the appropriate amount of defendants' profits to award under section 1117(a) of the Lanham Act. *See*

17

Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts . . . with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").[4]

To recover the defendants' profits under the Lanham Act, Curry's only burden is to prove the defendants' sales. *See* 15 U.S.C. § 1117(a). The burden then shifts to the defendants to "prove all elements of cost or deduction claimed." *Id.* "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id.*

First, the defendants contend in their Rule 59(e) motion that under *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992), the Court should award profits by using a reasonable royalty. But the Seventh Circuit's holding in *Sands* that the district court must use a reasonable royalty as a "starting point" for damages was unique to the facts of that case. *Id.* at 963 n.19. In *Sands*, the defendant ran an infringing advertising campaign without intending to trade on the plaintiff's goodwill or reputation, and the plaintiff had previously licensed its mark to a third party. *Id.* at 950, 961–963. Given these circumstances, the Seventh Circuit held that "[a] reasonable royalty, perhaps related in some way to the fee [the plaintiff] was paid by [the previous licensee], would more accurately reflect both the extent of [the defendant]'s unjust enrichment and the interest of [the plaintiff] that ha[d] been infringed." *Id.* at 963.

These circumstances are absent from this case. First, there is no evidence that Curry has previously licensed his trademark. The Seventh Circuit subsequently

---

[4] Because the Court grants Curry's motion to treat the jury's award as advisory and determines the proper amount of profits itself, it need not address Curry's contention that the jury was given an incomplete instruction on apportionment.

SA000026

emphasized in *Sands* that a reasonable royalty "could be said to reflect the actual loss of" the plaintiff, "*if* ascertained with reasonable certainty." *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1350 (7th Cir. 1994), *on reh'g in part*, 44 F.3d 579 (7th Cir. 1995). Although the defendants suggested factors that the Court could consider when determining a reasonable royalty, they conceded that there is no evidence in the record of the trial regarding most of those factors. The lack of evidence is unsurprising given that the defendants failed to raise this theory until their post-trial motion. Moreover, the defendants do not support their own proposed royalty rate of 1% to 3% of Revolution's gross sales of Diesel Test with any evidence, such as comparable licenses. The defendants note that Curry offered minimal evidence of sales, but they do not attempt to explain how that equates to a royalty rate of 1% to 3%. The Court concludes that the defendants' proposed rate is pure speculation and finds that a royalty rate in this case could not be ascertained with any reasonable certainty.

Second, this case does not involve an infringing advertising campaign, but rather an infringing product name. The Seventh Circuit explained that the district court's finding that "ten percent of [the defendant]'s profits from the sale of Gatorade could be attributed to the advertising campaign that infringed upon [the plaintiff]'s mark" was "methodologically flawed." *Sands*, 34 F.3d at 1350. Because the defendants in this case sold infringing Diesel Test products and never contended at trial that any portion of those sales were attributable to factors other than their infringement, an award of the defendants' profits from those infringing sales is methodologically sound. Indeed, the Seventh Circuit has held in subsequent cases that plaintiffs are entitled to the full amount of defendants' profits from infringing sales established at trial and that courts

need not make "sua sponte reductions" simply because profits awards are "subject to the principles of equity." *4SEMO.com Inc. v. S. Illinois Storm Shelters, Inc.*, 939 F.3d 905, 912 (7th Cir. 2019).

The defendants' contention that any award higher than "$15,000 to $45,000" would be an inequitable windfall under *Sands* lacks merit. Defs.' Rule 59(e) Mot., Opening Mem. at 5. The Seventh Circuit in *Sands* expressly stated its "discomfort with that award was grounded in a concern not so much with the amount of the award but with the approach of the district court." *Sands*, 34 F.3d at 1350. Indeed, the Seventh Circuit "expressed concern that the mere award of a royalty would not be an adequate measure of damages." *Id.* at 1352. Although the defendants contend that Curry did not prove a substantial amount of sales of his products, a plaintiff is not required to prove his sales to be entitled to a defendant's profits. *See Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989) ("[A]n award of profits was appropriate under either a deterrence or unjust enrichment theory even if plaintiff's actual sustained losses may have been less."); *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990) (noting that an award of defendants' profits "flow[s] not from the plaintiff's proof of its injury or damage, but from its proof of the defendant's unjust enrichment or the need for deterrence"). The defendants have not cited any authority to the contrary.

The defendants rely heavily on comparisons between the evidence of bad faith in this case and that in *Sands*. But as explained further below in discussing punitive damages, there was stronger evidence of bad faith in this case than in *Sands*. Unlike in *Sands*, the defendants here did not rely on advice of legal counsel. *See Sands*, 978 F.2d at 962. And in *Sands*, there was "no question that [the defendant] developed the

20

'Thirst Aid' campaign entirely independently, with no knowledge of [the plaintiff]'s marks." *Id.* at 963.  Here, the parties disputed at trial whether the defendants' knowingly copied Curry's mark.  And, in any event, *Sands* is inapplicable to this case for the reasons explained above.

In short, the Court declines to use a reasonable royalty to award defendants' profits.  The Court therefore turns to calculating the appropriate amount of defendants' profits using the burden-shifting test outlined in section 1117(a).

As a general matter, "[r]emedies are intended to make violations of the Act unprofitable, but not to act as a penalty."  *BASF Corp.*, 41 F.3d at 1092.  Disgorgement is appropriate where "damages are otherwise nominal," however, disgorgement in some cases "may overcompensate for a plaintiff's actual injury and create a windfall judgment."  *Id.* at 1096 (quoting *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992)); *see also Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 535 (7th Cir. 1989) ("[A]n automatic award of profits in a trademark infringement case could confer a windfall on the plaintiff.").  "Therefore, the monetary relief granted by the district court must be great enough to further the statute's goal of discouraging trademark infringement but must not be so large as to constitute a penalty."  *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985).

In Curry's motion, he seeks $4.18 million in defendants' profits—$2.05 million from sales of Diesel Test and $2.13 million from sales of Revolution's other products that he contends were marketed, sold, or shipped with Diesel Test.  The defendants contend that they experienced a loss on sales of Diesel Test and that the profits from Revolution's other products were not due to their infringement of the Diesel Test mark.

SA000029

The Court begins with the parties' contentions regarding Revolution's infringing Diesel Test sales.  Curry's damages expert, Herman, testified that Revolution's net proceeds from sales of Diesel Test were $2,052,225.  He explained that he arrived at that amount by totaling Revolution's sales from various sources, including Amazon, eBay, and Limelight.  Where the sales data indicated that certain sales were voided, refunded, or discounted, Herman subtracted those amounts from his gross sales figure to arrive at $2,052,225 in net sales.  The Court finds that this evidence was sufficient to establish that the defendants made $2,052,225 in net revenues from sales of Diesel Test.  Although Revolution's accountant, Turner, presented his own amount of net sales revenues, the defendants did not contest the accuracy of Herman's calculation of the amount of Diesel Test sales revenue either at trial or in response to Curry's motion.

Curry contends that he is entitled to the full $2.05 million because the defendants failed to prove any expenses related to their sales of Diesel Test products.  The Court disagrees.  Curry primarily relies on Herman's testimony that the P&L summary is insufficient to prove that "the expenses entered were actually incurred or were recorded accurately."  Pl.'s Mem. in Supp. of Pl.'s Mot. for Ct. to Determine Profits at 5.  But Turner testified regarding Revolution's process for recording expenses in QuickBooks, which generated the P&L report.  Turner explained that every financial transaction is tracked in QuickBooks and that QuickBooks is integrated with Revolution's bank accounts.  At the end of each month, Turner testified, Revolution reconciled its bank records with QuickBooks to ensure that the transactions matched.  Turner stated that the accounting manager would then double-check the reconciliation.  The Court finds this testimony credible, and it supports that the expenses reported on the P&L were

22

SA000030

actually incurred and were accurately recorded.  Indeed, although Herman testified that

he did not have sufficient information to verify Revolution's expenses, he also stated

that QuickBooks "is a good product" and that he did not believe anyone manipulated or

changed the information inputted into QuickBooks.  Tr. Vol. 4 at 940:24–941:18.

Furthermore, most of the expenses reported on the P&L summary are supported

elsewhere in the record.  For example, regarding Revolution's marketing expenses,

Barry testified that he was familiar with Revolution's use of affiliated marketing to sell

Diesel Test and that it cost approximately $45 to $50 per customer.  Herman also

agreed based on "listening to testimony" during trial that Revolution incurred marketing

expenses.  Tr. Vol. 4 at 937:25.

For various overhead expenses—chargeback services, computer expenses,

payroll expenses, and rent or lease expenses—Turner testified that these expenses

were allocated to Diesel Test based on percentage sales.  In other words, because

Diesel Test comprised 23% of Revolution's total sales, 23% of Revolution's overhead

expenses were allocated to Diesel Test's P&L.  Herman testified at trial that he "would

suspect" that Revolution did incur overhead expenses, such as payroll, in selling Diesel

Test.  Tr. Vol. 4 at 938:9–939:1.  The Court finds that the defendants presented a

reasonable formula for the allocation of overhead.  *See In Design v. K-Mart Apparel

Corp.*, 13 F.3d 559, 566 (2d Cir. 1994) (holding that a deduction for overhead expense

was proper where the defendant "met its burden of offering a reasonable formula,"

noting that "absolute certainty . . . is not required").

Curry contends that Turner's testimony that he worked for companies other than

Revolution shows that the payroll expenses relate to products other than Diesel Test.

SA000031

This contention does not alter the Court's conclusion.  First, as a factual matter, Turner credibly testified that during the period of the P&L report, he did not work for any companies not owned by Revolution.  And, in any event, overhead will necessarily include expenses that do not relate specifically to the infringing product, which is why the expenses must be allocated to the infringing sales using a reasonable formula. Curry does not argue that overhead expenses are not properly deductible or that the defendants' allocation formula is unreasonable.  Thus, the Court finds that the defendants have satisfied their burden of proof for those expenses.

Regarding Revolution's shipping expenses, Turner testified that Revolution incurred expenses for purchasing boxes to package its Diesel Test products and paid a vendor to ship Diesel Test.  Joshua also testified regarding Diesel Test shipments that were sent to supplement distributors.  Goodwin, Revolution's warehouse manager, testified about Revolution's fulfillment process, including shipping orders to customers. Even Herman testified that he "would think that there's a shipping cost to somebody when a product is shipped out."  Tr. Vol. 4 at 938:3–4.  The Court finds that the defendants have established that Revolution incurred shipping expenses and also finds that the amounts presented in the P&L summary for "Shipping & Delivery" and "Packaging Expense" are sufficiently accurate for the reasons explained above.

Similarly, for "Merchant Processing Fees," Turner testified that these fees were the charges imposed by credit card companies.  Curry did not present any contrary evidence to contest this expense.  He also has not challenged this amount beyond the general contention that the P&L summary is unsupported, a contention the Court has already rejected.  The Court finds that the defendants have proven this expense as well.

24

SA000032

The remaining expenses presented on the P&L are "Cost of Goods Sold" and "Product for Old Co." Dkt. no. 285-1. The Court finds that the defendants have not sufficiently proven these expenses. Turner's testimony about both categories was minimal. For cost of goods sold, Turner simply stated that it "would include what we paid for the Diesel Test product," without any further elaboration. Tr. Vol. 4 at 1002:22–23. Although in the typical case there would logically be some costs associated with manufacturing a physical product, Curry presented evidence at trial that Revolution had the unusual practice of "making" Diesel Test by relabeling its prior Rev Test product. Goodwin testified that at least some of Revolution's Diesel Test sales were actually fulfilled using returns of a prior product, Rev Test, that Revolution relabeled as Diesel Test. She explained that in August 2016, she had made five hundred bottles of Diesel Test this way. Joshua similarly testified that when Revolution began selling Diesel Test, it relabeled existing Rev Test products as Diesel Test. Thus, it is not clear from the record what amount Revolution paid, *if anything*, to manufacture its Diesel Test product specifically. The Court therefore declines to deduct the purported "Cost of Goods Sold" amount.

For the last expense category, "Products for Old Co," no explanation of this amount appears in the record. Turner unhelpfully described this expense as "product that was designated as given to old co." Tr. Vol. 4 at 1003:6–7. Without any further information, the Court cannot evaluate whether this expense is properly deductible as a cost of selling Diesel Test. Thus, the Court also declines to deduct "Products for Old Co."

In sum, the Court finds that Revolution had net sales of $2,052,225 and the

SA000033

following deductible expenses:  packaging of $25,152.67; chargeback services of $55,763.97; computer, software, and internet of $5,472.99; payroll of $288,576.43, rent or lease of $28,047.05; marketing of $789,290; merchant processing fees of $244,805.07; and shipping & delivery of $68,021.38.  This results in an award of defendants' profits in the amount $547,095.44.

This leaves Curry's request for $2.13 million in sales of Revolution's other products that he contends were marketed, sold, or shipped with Diesel Test.  The Court denies this request on multiple grounds.

First, as the Court instructed at trial, Curry is entitled to recover the defendants' profits from sales of "other products that were marketed, sold, or shipped with their Diesel Test product" only "*if* Mr. Curry proves by a preponderance of the evidence that the defendants profited from their infringement by the sale of [those] other products." Dkt. no. 399-9 at 20:4–10 (emphasis added); *see Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 933 (7th Cir. 2003)  (observing that because "the purpose of allowing suit for the infringer's lost profits is to make infringement worthless to the infringer," a proper award "will sometimes require tracing those profits into another product, as where it is bundled with the infringing product"); *Otis Clapp*, 754 F.2d at 745 ("[T]he plaintiff may not recover if he fails to prove that the defendant's actions caused the claimed harm.").

Although Curry emphasizes in his motion that he presented evidence that Revolution marketed, sold, or shipped other products with Diesel Test, he has not established that the defendants profited from those sales due to the defendants' infringement of Diesel Test.  Rather, Joshua testified that Revolution's other products

SA000034

were often marketed and sold independently and were established products in the

market before Revolution began selling Diesel Test.

Curry did present evidence at trial that Diesel Test products sometimes helped

with the sale of Revolution's other products because the products were

"complementary," dkt. no. 389-2 at 99:22–100:5.  The Seventh Circuit addressed a

similar theory of damages in *Bucklew*.  In that case, the plaintiff sought the defendant's

profits from a noninfringing product on the theory that the defendants' sales of its

infringing product attracted customers to purchase a noninfringing product through the

prospect of "one-stop shopping."  *Bucklew*, 329 F.3d at 933.  The Seventh Circuit held

that the plaintiff's evidence supporting this theory "was too speculative to sustain an

award of damages."  *Id.*  Although one of the defendant's "employees testified that the

infringing forms would indeed help with the sale of" the noninfringing product, "no

evidence was presented that would have enabled the market value of this 'help' to be

gauged."  *Id.*  The plaintiff's expert witness testified "that 10 percent of the profits on [the

defendant]'s sales of [the noninfringing product] were due to the buyers' being able to

buy the infringing forms from" the defendant, but the Seventh Circuit rejected this

damages calculation because it "had no factual basis whatsoever."  *Id.*

Similarly, in this case, Curry did not present evidence at trial that quantifies the

value of complementary products.  Although the evidence at trial established that at

least some sales of Revolution's other products were bundled with Diesel Test, such as

the MRX products that were automatically added to online orders of Diesel Test and

some iterations of the Champion Stack bundle, Curry made no attempt to quantify the

amount of those specific sales.  Instead, Curry seeks the full amount of all Revolution's

SA000035

sales of MRX and RevTest from August 1, 2016 through October 20, 2017.  But his

entitlement to all those sales is not supported by the record.  And because these are not

infringing sales, the usual assumption that "that the wrongdoer who makes profits from

the sales of goods bearing a mark belonging to another was enabled to do so because

he was drawing upon the good will generated by that mark" does not apply.  *WMS*

*Gaming Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 608 (7th Cir. 2008) (quoting *Mishawaka*

*Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07 (1942)), *as*

*amended* (Sept. 16, 2008).

Second, the Court concludes that an award of $2.13 million in sales of

Revolution's other products would not be equitable, which is an independent reason to

deny the relief Curry seeks.  *See* 15 U.S.C. § 1117(a) ("If the court shall find that the

amount of the recovery based on profits is either inadequate or excessive the court may

in its discretion enter judgment for such sum as the court shall find to be just, according

to the circumstances of the case.").  Curry's requested profits award for these products

is not required "merely because there has been an infringement."  *Champion Spark*

*Plug Co. v. Sanders*, 331 U.S. 125, 131 (1947).  Indeed, the Seventh Circuit has held

that disgorgement of profits is not required where, as in this case, it "might have

required the district court to engage in undue speculation as to the amount."  *BASF*

*Corp.*, 41 F.3d at 1096.  The Court finds that its award of $547,095.44 in defendants'

profits is "sufficient to render [the defendants'] violations unprofitable," *id.*, and that

considerations of "unjust enrichment or the need for deterrence" do not support

additional disgorgement of Revolution's other sales, *Web Printing*, 906 F.2d at 1205.

Indeed, further disgorgement likely would constitute an impermissible penalty.  *See*

28

*BASF Corp.*, 41 F.3d at 1092; *Otis Clapp*, 754 F.2d at 744 ("[Section] 1117 forbids the district court from allowing recoveries that are so excessive as to amount to a penalty.").

Curry also contends that the Court should use its equitable authority to enhance the profits award.[5]  First, he argues that an enhancement is necessary to ensure that the defendants "do not profit from their infringement."  Pl.'s Mem. in Supp. of Pl.'s Mot. for Ct. to Determine Profits at 11.  Because the Court has concluded that its award is sufficient to ensure that the defendants' infringement is not profitable, it overrules Curry's contention that the Court should enhance the award on that ground.

Second, Curry argues that the award should be enhanced because the defendants concealed their business records.  The defendants contest this characterization of their discovery responses.  The Court has already addressed this issue several times, including when granting Curry's motion *in limine* to exclude unproduced QuickBooks documents.  The Court need not address this issue again because any discovery failures would not justify enhancing the profits award to $4.18 million as Curry seeks.  Curry does not tie any proposed missing records to his request for $4.18 million.  Although he contends that supporting records of expenses were not produced, the Court has concluded that the evidence at trial was sufficient to support the defendants' expenses that it deducted.  Where the evidence was insufficient, the Court did resolve doubts in Curry's favor as he requests by declining to deduct those asserted expenses.  Curry also argues that sales records past October 2017 are

---

[5] In Curry's motion, he asked the Court to enhance the jury's profits award as an alternative to his motion that the Court treat the jury's award as advisory.  Although the Court grants Curry's motion to treat the jury's award as advisory, the Court nonetheless addresses his arguments for an enhancement of the award given that the amount the Court has awarded is similar to the jury's award.

SA000037

missing.  But given the undisputed evidence at trial that any sales past that date were minimal, enhancing the profits award to $4.18 million based on this asserted lack of evidence would improperly penalize the defendants.  The Court also notes that when it offered to order a protocol for inspection of the QuickBooks material, Curry expressly advised the Court that he sought "no further relief from the Court on this matter."  Dkt. no. 344 at 1.

In short, the Court concludes that an enhancement of the defendants' profits award is not warranted.

To summarize, the Court grants Curry's motion to treat the jury's award as advisory and awards Curry $547,095.44 in defendants' profits.  The Court overrules the defendants' contention that an award of this size constitutes an impermissible windfall to Curry.

## B.    The defendants' motion to alter the judgment

The defendants have moved under Rule 59(e) to alter or amend the judgment by reducing the profits award and striking the punitive damages award.  "Rule 59(e) allows a court to alter or amend a judgment only if the petitioner can demonstrate a manifest error of law or present newly discovered evidence."  *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008).  The defendants premise their motion on five arguments:  1) the jury's profits award provides an inequitable windfall to Curry; 2) the jury's punitive damages award was in error because the jury was not properly instructed on common law trademark rights; 3) the punitive damages award was excessive; 4) the Court erred in instructing the jury on the Nussbaum Family Trust; and 5) the jury was improperly instructed on personal liability.  The Court has already addressed the defendants' first

30

contention in the previous section of this decision. The Court addresses the remaining contentions in turn.

### 1.    Common law trademark rights instruction

The defendants contend that because the jury was not properly instructed regarding how common law trademark rights arise, the jury could not evaluate willfulness. But the defendants never made this argument at trial. When the Court addressed this issue in deciding Curry's motion *in limine*, the defendants contended that Curry must prove that he has enforceable common law trademark rights in certain geographic areas. The Court overruled this contention because they had already stipulated that Curry had enforceable common law trademark rights that were not limited to any particular geographic area. *See* Dkt. no. 362 at 4–5. At trial, the defendants sought an instruction on common law trademark rights and geographic scope, but they never suggested that these instructions were necessary for the jury to determine willfulness. They also did not object to the willfulness instructions at trial. Thus, the defendants' contention is forfeited. *See Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 730 (7th Cir. 2002) ("[T]o preserve the objection, the party must state the same grounds when objecting to the jury instruction as it does in its motion for a new trial or on appeal."); *Petkus v. Richland County*, 767 F.3d 647, 654 (7th Cir.2014) ("Although it submitted its own instructions, which the judge declined to give, it failed to object to the instructions that the judge did give. That was another forfeiture.").

Even if the issue were not forfeited, the Court is not persuaded that the absence of an instruction on common law trademark rights was a "manifest error of law." *Obriecht*, 517 F.3d at 494. The defendants have not cited any authority for the

SA000039

proposition that the jury had to be informed regarding how Curry's common law

trademark rights developed to properly determine whether the defendants willfully

infringed his mark.  Moreover, as previously discussed, the defendants' stipulation

admitted in substance that Curry had enforceable common law trademark rights

nationwide.  Thus, instructing the jury regarding "how common law trademark rights

arise" or that those rights "are limited to the geographic areas in which a plaintiff

establishes such rights through sales" as the defendants propose, Defs.' Rule 59(e)

Mot., Opening Mem. at 7, would have been unnecessary and confusing to the jury.

The defendants also contend that the Court erred by not permitted the jury "to

consider the effect of the dismissal of the case," *id.*, that is, the earlier dismissal for lack

of personal jurisdiction that the Seventh Circuit overturned.  When this issue was raised

at trial, the Court concluded that evidence that the case was dismissed for lack of

personal jurisdiction and then reinstated was inadmissible under Rule 403.  It would

have caused a significant diversion from the issues of the case to explain the procedural

history of the case to the jury, and it risked confusing the jury regarding the implications

of the Court's prior dismissal.  The defendants do not point to any new considerations

that affect the Court's prior ruling.  Rather, they simply continue to press their argument

that the evidence has substantial probative value.  The Court still disagrees.  The

defendants contend that the fact that the defendants did not sell Diesel Test products

while the case was dismissed shows a lack of malice, but the evidence at trial showed

that the defendants *did* continue selling Diesel Test during at least part of that time.

Thus, although the evidence may have some probative value, as the Court

acknowledged at trial, it is minimal and significantly outweighed by the other factors the

SA000040

Court noted.

Because the Court concludes that the jury was properly instructed, it denies the defendants' motion to overturn the jury's finding of willfulness and its award of punitive damages on this ground.

### 2. Punitive damages

In the alternative, the defendants renew, in a footnote, their motion for judgment as a matter of law in their favor on punitive damages because they contend that there was insufficient evidence of their reckless disregard for Curry's rights.

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis" to support a verdict for the nonmovant. Fed. R. Civ. P. 50(a)(1), (b). On a Rule 50(b) motion, a court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). "That includes drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe." *May v. Chrysler Group, LLC*, 716 F.3d 963, 971 (7th Cir. 2012). Courts are "obliged to review the record to ensure that sufficient evidence exists to support the verdict, but [courts] will not otherwise consider the weight of the evidence" or "reevaluate the credibility of witnesses." *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 515 (7th Cir. 1993). Consequently, a jury verdict will be overturned only if the court concludes that "no rational jury could have found for the prevailing party." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation

33

marks omitted).

As the jury was instructed, it could award punitive damages only if it found that "the defendants' acts were willful and malicious or were in reckless disregard of Mr. Curry's rights."   Dkt. no. 399–9 at 21:1–9.   The defendants do not contend that this instruction was improper, nor did they object to the instruction at trial.

There was ample evidence to support the jury's decision to impose punitive damages in this case.   For starters, the jury reasonably could have agreed with Curry that the similarities between his mark and the defendants were too significant to be a coincidence and that the defendants intentionally copied Curry's mark.   Moreover, in response to Curry's cease-and-desist request, the defendants decided to ignore it and "let him sue" while they continued to sell their infringing products.  Dkt. no. 399-3 at 65:19–21.  The defendants also continued selling Diesel Test even after it was banned on Amazon and Curry had filed suit.

In contending that the evidence reflected that they acted in good faith, the defendants point to their testimony that they engaged in "extensive searches" in response to Curry's cease-and-desist requests.   Defs.' Rule 59(e) Mot., Opening Mem. at 6.  But the defendants did not offer any records of these searches.  Curry argued at trial that had the defendants performed the searches as they contended, they would have discovered his product.  The credibility of the defendants' testimony on this point was for the jury to assess, not the Court.  *See Venson v. Altamirano*, 749 F.3d 641, 647 (7th Cir. 2014) ("[T]he credibility of the officers' testimony . . . was for the jury, not us, to assess."); *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) ("Since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a

34

new trial merely because the evidence was sharply in conflict.") (alteration accepted) (internal quotation marks omitted).

In short, the Court denies the defendants' motion in the alternative for judgment as a matter of law in their favor on punitive damages.

The defendants also contend that the jury's punitive damages award is "grossly excessive" and must be reduced. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). "The Supreme Court, in testing awards of punitive damages for compliance with due process, has established three guideposts: (1) the reprehensibility of the defendant's conduct; (2) the disparity between the actual harm suffered and the punitive award; and (3) the difference between the award authorized by the jury and the penalties imposed in comparable cases." *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1140 (7th Cir. 2020) (internal quotation marks omitted).

To determine the reprehensibility of the defendants conduct, the Court considers whether: (1) "the harm caused was physical as opposed to economic;" (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;" (3) "the target of the conduct had financial vulnerability;" (4) "the conduct involved repeated actions or was an isolated incident;" and (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 1141.

The defendants do not expressly address any of the five factors the Seventh Circuit has instructed courts to consider on the first guidepost. Instead, they assert that they "inadvertently ran afoul of another's trademark," which is "not a reprehensible act,"

SA000043

and they note in passing that their infringement did not cause any physical injury.[6]

Defs.' Rule 59(e) Mot., Opening Mem. at 9.  Contrary to the defendants' characterization

of their infringement as a "mistake," *id.*, the Court has already concluded above that the

evidence supports that their infringement was not a "mere accident," *Epic*, 980 F.3d at

1141.  For the remaining three factors, the defendants do not contest that each factor

weighs in favor of the jury's punitive damages award.

The parties primarily contest the second guidepost.  This requires the Court to

"analyze the ratio of punitive damages to the 'harm, or potential harm' inflicted on the

plaintiff."  *Id.* at 1142 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408,

424 (2003)).  The defendants contend that Curry's harm was $2,500 and the punitive

damages award is $900,000, making the ratio 360:1.

For starters, Curry contends that the ratio calculation must be calculated on a

per-defendant basis, in other words, based on the award against each defendant of

$300,000, not the aggregate total of $900,000.  *See Planned Parenthood of*

*Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 960 (9th Cir.

2005) ("[T]o compare the amount of compensatory damages awarded to one plaintiff

with the total amount of punitive damages awarded to that plaintiff from all defendants

shifts the focus away from a particular defendant's conduct to the defendants' conduct

*en grosse*.").  The defendants do not respond to this contention, thereby forfeiting the

issue.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to

---

[6] Curry contends that this factor still weighs in his favor because he experienced mental
and emotional distress.  Because the defendants do not contest that the other four
factors support the jury's award of punitive damages, the Court need not resolve the
parties' dispute on this point.

SA000044

respond to an argument . . . results in waiver.").

The more difficult issue is the proper amount of harm to include in the ratio. Curry contends that the ratio should include the defendants' profits award. The defendants argue that because that award is distinct from the award for his actual harm, it should not be included.

"In most cases, the compensatory-damages award approximates the plaintiff's harm." *Epic*, 980 F.3d at 1142. The Seventh Circuit has noted, however, that computing the appropriate ratio may "pose a challenging task" where damages are "based on the benefit to [the defendant], not because of any harm suffered by" the plaintiff. *Id.* at 1143. Although the Seventh Circuit did not have to reach the issue in *Epic*, it noted that "at least one other court has compared an unjust enrichment award to the punitive-damages award under this guidepost when state law allowed punitive damages to be imposed for the underlying claim." *Id.*; *see also Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1351 (Fed. Cir. 2001) ("[T]he unjust enrichment gained by DeKalb is logically related to the harm or potential harm caused RPA, and it was appropriate to base the award of punitive damages on the unjust enrichment award."), *vacated*, 538 U.S. 974 (2003), *reinstated as modified,* 345 F.3d 1366 (2003); *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993) ("It is appropriate to consider . . . the possible harm to other victims that might have resulted if similar future behavior were not deterred."). Because the defendants' profits award stems from considerations of unjust enrichment and deterrence, *Web Printing*, 906 F.2d at 1205, the Court concludes that it is properly included as potential harm in the ratio.

In sum, the proper ratio is $547,095.44 in defendants' profits plus $2,500 in

SA000045

actual damages, for a total of $549,595.44, to the per-defendant punitive damages award of $300,000.  Thus, the ratio is less than 1:1, which "is easily permissible." *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004).

The final guidepost is "the difference between the punitive award authorized by the jury and civil penalties imposed in comparable cases."  *Epic*, 980 F.3d at 1145.  The defendants cite a few cases with lower punitive damages awards.  "But even if the punitive award is higher than those in comparable cases, this guidepost generally deserves less weight than the other two."  *Rainey v. Taylor*, 941 F.3d 243, 255 (7th Cir. 2019).  Having found that the ratio is in the easily permissible range, the third guidepost does not alter the Court's conclusion that the jury's punitive damages award is not excessive.  *See id.* ("We are reluctant to overturn the punitive damages award on the basis of the third guidepost alone." (alterations accepted) (quoting *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 238 (3d Cir. 2005))).

In sum, the Court denies the defendants' motion to reduce the jury's punitive damages award.

### 3.    Nussbaum Family Trust instruction

Next, the defendants contend that the jury instruction that "[w]hether and the extent to which you consider the Nussbaum Family Trust in assessing each defendants' financial condition are matters for you to decide" was improper for two reasons.  Dkt. no. 399-9 at 22:12–14.

First, the defendants contend that it "effectively allowed the jury to pierce the corporate veil [sic] by considering the Trust's assets to be the assets of Defendants for purposes of determining the punitive damage award, without ever instructing the jury on

SA000046

the necessary standards to allow the corporate veil [sic] to be pierced."  Defs.' Rule 59(e) Mot., Opening Mem. at 12.  But any argument that the Court should have instructed the jury on the circumstances under which the jury could "pierce the corporate veil" is forfeited.  This objection was not made at trial.  *See* Dkt. no. 385-1 at 1094:3–5 ("And I think the issue that defendants raise is not that it's incorrect but rather that it's calling attention to it.").  Nor was it made in the defendants' filed written objections to the Court's instructions.  *See* Dkt. no. 373.  Indeed, Curry proposed an instruction at trial regarding the circumstances under which the jury could consider the trust, and the defendants objected.  Thus, the defendants' first contention regarding this instruction is forfeited.  *See Schobert*, 304 F.3d at 730.

The defendants' second reason is the same as the objection they made at trial, namely, that the instruction improperly brought attention to the trust.  As the Court explained at trial, the instruction was necessary because the parties disputed whether the jury should consider the trust and evidence regarding the trust comprised a substantial amount of the evidence introduced at trial.  And this was not the only place where the instructions addressed how the jury should consider particular evidence.  In particular, the jury instructions stated that the jury did not have to accept the testimony of Curry's expert witness, Herman.  In overruling the defendants' objection at trial, the Court also emphasized that the instruction was neutrally worded.

In their motion, the defendants do not contest any aspects of the Court's prior reasoning.  Rather, they argue that their failure to object to the instruction about expert testimony "does not waive or diminish" their objection to the trust instruction.  Defs.' Rule 59(e) Mot., Opening Mem. at 12.  But this does not engage with the logic of the

39

Court's reasoning.  The defendants also do not cite any authority for the proposition that instructing the jury in a neutral way that it had to decide whether and the extent to which it should consider a specific subject of evidence could constitute a manifest error of law. Thus, the Court concludes that the instruction regarding the Nussbaum Family Trust was not improper and that giving the instruction cannot be grounds for altering the judgment.

### 4. Personal liability instruction

Lastly, the defendants contend that the personal liability instruction was improper.  They continue to press the argument that to be individually liable, the officers must act outside the scope of their duties or misuse the corporate form.  As the Court held in denying their motion for summary judgment, this is not the law.  *See Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 994 (7th Cir. 2004) ("[T]here is some evidence that Warner may have been personally involved in the decision to use the name Niles on a Ty camel, and if so he may be . . . a joint tortfeasor and therefore suable."); *Weller Mfg. Co. v. Wen Prods., Inc.*, 231 F.2d 795, 801 (7th Cir. 1956) (finding individual liability where "[t]his individual admitted that he was at all times in control of the administrative and managerial policy of the corporation" and "had before him the Weller device when he designed his infringing gun, which he deliberately made identical with Weller").  "Indeed, courts in this district have rejected the argument that even if an officer personally participates in the manufacture or infringement, such acts cannot lead to liability unless they fall outside of the officer's job description." *UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.*, No. 15 C 9518, 2017 WL 3593117, at *4 (N.D. Ill. Aug. 21, 2017) (internal quotation marks omitted).  The Court concludes that the jury

SA000048

instruction on personal liability was proper and therefore denies the defendants' motion to alter the judgment on this ground.[7]

In sum, the Court denies the defendants' Rule 59(e) motion.

## C.  Curry's motion for a finding of IUDTPA liability

Curry has moved for the Court to find the defendants liable for violating the IUDTPA.  Curry's state unfair competition claim—which is what the IUDTPA claim is— "mirrors" the federal "infringement analysis."  *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir. 1993); *UL LLC v. Am. Energy Prod., LLC*, 358 F. Supp. 3d 753, 758 n.2 (N.D. Ill. 2019) (Kennelly, J.) (noting that IUDTPA claims "are subject to precisely the same standards as [ ] federal infringement claims").  Curry contends that because the defendants stipulated that Revolution is liable for infringement and the jury found that all the defendants willfully infringed Curry's mark, the Court should also find that the defendants willfully violated the IUDTPA.

As a preliminary matter, the defendants argue that they should not be found liable because Curry does not have common law trademark rights in Illinois.  Although the defendants concede that they stipulated that Revolution was liable for Counts III and

---

[7] At some points in their motion, the defendants appear to argue that the evidence at trial did not establish that Joshua and Barry were personally liable even under the proper standard.  But this argument, assuming it was clearly asserted, is forfeited because it was not raised as grounds for their Rule 50(a) motion made at trial.  Rule 59(e) "may not be used . . . to raise arguments or present evidence that could have been raised prior to the entry of judgment."  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008); *see also ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014) ("[W]e do not believe that the Rule permits a party to obtain judgment as a matter of law under Rule 59(e) after failing to comply with the carefully crafted structure and standards of Rules 50 and 51.").  In any event, the Court explains below in addressing Curry's IUDTPA claim that the evidence sufficiently established Joshua and Barry's personal liability.

SA000049

V, they argue that they refused to stipulate to liability on Curry's IUDTPA claim in order

to retain their right to contest that Curry had enforceable rights in Illinois.  This

contention cannot be reconciled with the stipulation.  The defendants stipulated that

"Revolution is liable for infringing Plaintiff's Diesel Test mark under Count III and Count

V of Plaintiff's Complaint."  Dkt. no. 156 at ¶ 2.  Count V of the complaint, in turn, states

that "Defendants' acts constitute trademark infringement in violation of the common law

of the State of Illinois."  Dkt. no. 1 at ¶ 76.  Given this context, the stipulation

straightforwardly admits that Curry has enforceable common law trademark rights in

Illinois.  As the Court explained in granting Curry's motion *in limine*, Revolution could not

conceivably be liable for violating the Illinois common law of trademark infringement if

Curry did not have enforceable common law trademark rights in Illinois.

That said, under "the long-standing rule of construction in Illinois," "a statute is

without extraterritorial effect unless a clear intent in this respect appears from the

express provisions of the statute."  *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d

100, 184–85, 835 N.E.2d 801, 852 (2005) (internal quotation marks omitted).  No such

intent is expressed in IUDTPA.  *See IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 191

F. Supp. 3d 790, 807 (N.D. Ill. 2016) (Kennelly, J.).  Curry is therefore required to show

that "the circumstances relating to [his] disputed transactions with [the defendants]

occurred primarily and substantially in Illinois."  *Avery*, 216 Ill. 2d at 187, 835 N.E.2d at

854.  To make this determination, courts consider the following factors:  "(1) the

plaintiff's residence, (2) where the misrepresentation was made, (3) where the damage

to the plaintiff occurred, and (4) whether the plaintiff communicated with the defendant

in Illinois."  *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009) (citing

SA000050

*Avery*, 216 Ill. 2d at 186–88, 835 N.E.2d at 853–54).

First, it is undisputed that Curry's residence is in Illinois. Because he resides in Illinois, the damage analyzed under the third factor occurred in Illinois. *See Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16 C 3401, 2022 WL 910862, at *3 (N.D. Ill. Mar. 29, 2022) ("Courts in this district have found that when the plaintiff resides in Illinois, damages are often suffered in Illinois.").

Second, the misrepresentation, namely, the defendants' use of Curry's mark, occurred in Illinois. Joshua testified at trial that Revolution sold its Diesel Test product to hundreds of customers in Illinois. Although the defendants sold their products in other states as well, there is no requirement that the sales be exclusively in Illinois. *See id.* (finding that this factor weighed in the plaintiff's favor where "the evidence showed[] that HBI's false advertising claims occurred nationwide, including in Illinois"); *Specht*, 660 F. Supp. 2d at 866 (holding that the plaintiff stated a IUDTPA claim where "[t]he alleged infringement took place on the Internet and was international in scope, presumably occurring in Illinois"). In contending that this factor weighs in their favor, the defendants argue that Curry failed to establish that he had trademark rights in Illinois or that he made sales in Illinois. But, as explained above, the defendants—despite their contention to the contrary—stipulated to this via their stipulation to liability on this claim. Given the stipulation, Curry was not required to provide evidence of his sales for this factor to weigh in his favor. The defendants do not cite any authority to the contrary.

Lastly, Curry communicated with the defendants via Facebook in Illinois. Although the defendants assert that they could not have known Curry's location through his Facebook message, they do not cite any authority for the proposition that their

43

SA000051

knowledge of Curry's location is relevant to the analysis.

In short, the Court finds that each factor weighs in favor of finding that the defendants' misconduct occurred "primarily and substantially" in Illinois.

The defendants assert two other arguments against liability, but the Court has already rejected both.  First, they again contend that neither Joshua nor Barry can be held individually liable because they did not act outside their scope of duties as officers. As stated earlier, to be held individually liable, the evidence need only show that Joshua and Barry "personally participate[d]" in the infringement.  *4SEMO.com*, 939 F.3d at 912–13 ("A corporate officer is individually liable if he 'personally participates in the manufacture or sale of the infringing article, uses the corporation as an instrument to carry out his own willful and deliberate infringements, or knowingly uses an irresponsible corporation with the purpose of avoiding personal liability.'" (alterations accepted) (quoting *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926))).

The evidence at trial established that Joshua personally participated in the infringement.  Joshua decided to use the Diesel Test name, was involved in creating the label, managed the sales of Diesel Test, made the decision to continue selling Diesel Test after Curry's cease-and-desist request, and attempted to register for a federal trademark on Diesel Test after learning of Curry's common law trademark.  The defendants' characterizations of Joshua's activities as "generic," Defs.' Opp. to Pl.'s IUDTPA Mot. at 11, is incorrect.

The evidence was also sufficient to establish Barry's personal liability.  He consulted with Joshua on the Diesel Test name, was involved in the decision to ignore Curry's cease-and-desist request, and encouraged Joshua's filing of Revolution's Diesel

SA000052

Test trademark application.  Contrary to the defendants' assertion, the evidence established Barry's involvement beyond merely failing to stop the infringing sales.

Next, the defendants contend that the Court should find that the defendants did not act willfully because the jury was improperly instructed.  The Court has already concluded that the jury was properly instructed on willfulness and that the evidence was sufficient to support the jury's finding.  The defendants' arguments for why the Court should nonetheless find that they did not act willfully are unpersuasive.  First, they again point to their decision to stop selling Diesel Test while the case was dismissed.  But this assertion is contrary to the evidence presented at trial that the defendants did continue making infringing sales for months after the case was dismissed.  Second, they also emphasize their searches that informed their claimed good-faith belief that Curry did not have any trademark rights.  But, as noted above, the defendants did not produce any evidence of these searches aside from their testimony.  The Court, like the jury, finds the testimony on this point to lack credibility.  In Joshua's email asking a Revolution employee to perform a search, he also "vote[d] to let [Curry] sue" while they sold their remaining Diesel Test products.  Dkt. no. 399-3 at 65:19–21.  This suggests that the defendants had already decided they would continue selling their infringing product regardless of the outcome of any searches performed.

The defendants contend that Curry's willfulness argument is predicated on their decision not to stop selling immediately after receiving his cease-and-desist request.  But this characterization is incorrect.  The record at trial contained further evidence of willfulness as previously described, including that the defendants did not perform adequate searches in response to Curry's cease-and-desist letters and continued to sell

45

their infringing products even after Amazon's ban.

Moreover, the defendants do not cite any authority for the proposition that deciding to continue infringing despite Curry's cease-and-desist requests cannot sustain a willfulness finding.  They contend that in the patent infringement context, "the mere fact that an accused infringer continues its infringing activity cannot support a finding of willfulness where the accused infringer presents legitimate defenses and did not know of the asserted patents until the filing of the suit."  Defs.' Opp. to Pl.'s IUDTPA Mot. at 14 (quoting *Civix-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 903 (N.D. Ill. 2005)).  But the defendants did know of Curry's mark before he filed suit.  Moreover, the Federal Circuit requires an accused infringer with notice to exercise "due care to avoid infringement" which, as stated above, the defendants failed to do in this case.  *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed. Cir. 2001).  The fact that the accused infringer "presents a non-frivolous defense to infringement" does not preclude a willfulness finding.  *Id.*

In sum, the Court concludes that the evidence at trial establishes by a preponderance of the evidence that the defendants willfully violated the IUDTPA.  *See Bingham v. Inter-Track Partners*, 234 Ill. App. 3d 615, 621, 600 N.E.2d 70, 75 (1992) (finding willfulness where "the defendant made a reasoned, deliberate business decision to proceed with [the trademark] despite plaintiffs' protest").

## D.    Curry's motion for pre- and post-judgment interest

Curry has also moved under Rule 59(e) to amend the judgment to include pre- and post-judgment interest.  The defendants do not object to Curry's request for post-judgment interest, and the Court notes that post-judgment interest applies by operation

46

of law.  *See* 28 U.S.C. § 1961(a).  Regarding Curry's motion for prejudgment interest, the defendants only contest the proper rate and the applicable period.

Curry contends that the defendants should pay prejudgment interest at the prime rate plus 2%.  The defendants contend that an increase above the prime rate is unwarranted.  The Court agrees.  The Seventh Circuit has repeatedly stated that the prime rate is the preferred rate for awarding prejudgment interest.  *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) ("[W]e suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate."); *First Nat. Bank of Chi. v. Standard Bank & Tr.*, 172 F.3d 472, 480 (7th Cir. 1999) ("We hold today that to . . . award something other than the prime rate is an abuse of discretion, unless the district court engages in such a refined calculation."); *Matter of Oil Spill by Amoco Cadiz Off Coast of France*, 954 F.2d 1279, 1332 (7th Cir. 1992) ("[U]nless it engages in such refined rate-setting, a court should use the 'prime rate' . . . .").

Curry contends that a prime rate-plus formula is necessary because the defendants are distressed borrowers.  But the Seventh Circuit has acknowledged that the prime rate, as "a market-based estimate," "may miss the mark for any particular party." *Matter of Oil Spill*, 954 F.2d at 1332.  Still, the Seventh Circuit has encouraged application of the prime rate because it "is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default." *Gorenstein*, 874 F.2d at 436.  The Court concludes that the prime rate is the appropriate rate of prejudgment interest in this case.

SA000055

Curry argues that district courts are permitted to engage in "refined rate-setting." *First Nat. Bank of Chi.*, 172 F.3d at 480. But even so, he acknowledges that the decision to award pre-judgment interest at a rate above the prime rate "is fully within the Court's discretion." Pl.'s Reply in Supp. of Mot. for Interest at 5. The Court declines to exercise its discretion to engage in such rate-setting, especially where Curry's proposed 2% increase itself does not appear to be the result of "refined rate-setting." Among other things, Curry does not point to any interest rates charged on the defendants' loans as evidence for his 2% adjustment. *See Matter of Oil Spill*, 954 F.2d at 1332 (noting that "a court could draw an interest rate directly from" the defendant's "publicly traded notes and debentures"). Rather, he asserts that it is his "conservative estimate." Pl.'s Mem. in Supp. of Mot. for Interest at 7.

Regarding the applicable time period, the defendants contend that it should exclude the time during which the case was dismissed and the period when the trial was rescheduled. But they do not cite any authority for their position. Rather, "prejudgment interest typically accrues from the date of the loss or from the date on which the claim accrued." *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 935 (7th Cir. 2003); *see also W. Virginia v. United States*, 479 U.S. 305, 311 n.2 (1987) ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress."). Because excluding the time as the defendants suggest would undercompensate Curry, the Court declines to do so. *See City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995) ("The essential rationale for

SA000056

awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss.").  The Court therefore awards prejudgment interest at the prime rate beginning with the date of the first known infringing sale, which the defendants do not dispute is October 19, 2016.

Curry contends that, in the event the Court later awards attorney's fees, the Court should also award prejudgment interest on the amount of attorney's fees.  Because no motion for attorney's fees has yet been filed, the Court declines to address this issue at this juncture.  Curry contends that "there is no doubt he will seek attorneys' fees."  Pl.'s Reply in Supp. of Mot. for Interest at 13.  If so, the Court will address the issue in connection with that motion.  The Court overrules Curry's contention that the defendants "have forfeited any substantive objection" to this by correctly arguing that the matter is not yet ripe.  *Id.*

The parties agree on the applicable formula for calculating interest.  Because the Court has modified the profits award, the parties are directed to calculate prejudgment interest using the prime rate from October 19, 2016 through September 1, 2023 and submit a joint status report with the calculation and figure by August 30, 2023.

## E.    Curry's motion for a permanent injunction

Lastly, Curry has moved under Rule 59(e) for the Court to enter a permanent injunction.

To be entitled to a permanent injunction, Curry must establish:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

SA000057

warranted; and (4) that the public interest would not be disserved by a permanent

injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Court

concludes that each factor is met in this case.

First, the Seventh Circuit has "clearly and repeatedly held that damage to a

trademark holder's goodwill can constitute irreparable injury for which the trademark

owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424,

432 (7th Cir. 2001). In this case, the defendants stipulated to actual confusion, and the

jury found that Curry's goodwill was damaged by the defendants' infringement.

Moreover, Curry's trademark and the defendants' "infringing use are identical, [ ] the

products are the same, and [ ] the markets are the same," which are factors "indicative

of irreparable injury." *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025

(7th Cir. 1979). The Court concludes that Curry has established irreparable injury and

that "[m]onetary damages are likely to be inadequate compensation for such harm." *Id.*

at 1026. Given the Court's conclusion, it need not address the parties' dispute

regarding whether there is a presumption of rebuttable harm in trademark actions. *See

Chi. Mercantile Exch. Inc. v. Ice Clear US, Inc.*, No. 18 C 1376, 2021 WL 3630091, at

*29 (N.D. Ill. Aug. 17, 2021) (Kennelly, J.) (concluding that "there does not appear to be

a basis for applying a one-off rule regarding presumed harm in trademark cases").

The defendants contend that the first factor for issuance of an injunction is not

met because they have stopped infringing, relying on this Court's decision in *Chicago

Mercantile Exchange*. But in that case, the defendants had "stopped using the

[infringing] mark and there [wa]s no evidence in the record to suggest otherwise." *Id.* at

30. In this case, by contrast, there was evidence in the record contradicting the

50

SA000058

defendants' assertion that they voluntarily stopped using Curry's trademark in 2018.  For example, Curry testified to seeing advertisements for Revolution's Diesel Test as late as 2020.  Moreover, the evidence at trial established that the defendants created new products by simply relabeling old products, which suggests that it would be particularly easy for them to infringe again.  *See United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275 (7th Cir. 2009) ("The court may consider how easily former practices might be resumed at any time in determining the appropriateness of injunctive relief.").

Next, the Court concludes that the balance of hardships favors Curry.  If it is true, as the defendants contend, that they stopped selling Diesel Test in 2018, then it is unclear what hardship an injunction would impose on them.  Indeed, the defendants did not clearly articulate any hardship, contending instead that Curry's "trademark rights are not permanent" and are limited in geographic scope.  Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 4–5.  Though this contention arguably casts doubt on the believability of their assertion that they have no "intention of utilizing the Diesel Test mark in any capacity whatsoever," *id.* at 5, it does not establish any hardship.

Lastly, a permanent injunction would serve the public interest.  "[T]he public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion."  *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *see also Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 19 (7th Cir. 1992) ("[Injunctive] relief would serve, rather than disserve, the public interest in truthful advertising, an interest that lies at the heart of the Lanham Act.").  In contending that the public interest would be disserved, the defendants argue that "any injunction would need to account for the scenario of [Curry]'s loss of rights."  Defs.' Opp. to Pl.'s Mot. for

SA000059

Permanent Inj. at 5.  But the defendants do not cite any authority for this proposition.

Nor do the defendants explain how an injunction might take Curry's potential "loss of

rights" into account.  Rather, the defendants contend that an injunction is not necessary

because "[i]f Curry has trademark rights, that is sufficient to prevent Defendants from

using the mark." *Id.*  This contention is unpersuasive given the jury's finding of willful

infringement.  Moreover, adopting the defendants' position essentially would mean that

an injunction never serves the public interest in a trademark case, which is not the law.

In sum, the Court concludes that Curry is entitled to a permanent injunction.

Curry requests that the Court enter an injunction incorporating the terms of the

preliminary injunction and including a few additional terms.  The defendants object to

several of the proposed terms.

First, Curry's proposed injunction would cover trademarks that were not asserted

at trial.  The defendants contend that the injunction should be limited to Diesel Test.

Neither party provides any authority on the issue of whether, or under what

circumstances, related marks not asserted at trial can be included in an injunction.

Curry cites *Ariel Investments, LLC V. Ariel Capital Advisors LLC*, No. 15 C 3717, Dkt.

199-1 ¶ 2(a) (N.D. Ill. Mar. 9, 2017), but the related marks in that case were raised at

trial.

Although the preliminary injunction in this case included related marks, Curry did

not litigate a theory of a family of marks after that point.  Curry contends that the

defendants should not be able to infringe Curry's "other marks in the 'Diesel' family."

Pl.'s Reply in Supp. of Mot. for Permanent Inj. at 12.  But he never attempted to

establish that he had a family of "Diesel" marks.  *See AM Gen. Corp. v. DaimlerChrysler*

SA000060

*Corp.*, 311 F.3d 796, 819 (7th Cir. 2002) ("[T]he proponent of a family of marks must prove that, prior to the junior user's entry, all or many of the marks in the alleged family were used and promoted in such a way as to create public perception of the family mark as an indicator of source.") (internal quotation marks omitted).  Given Curry's decision to pursue only the Diesel Test mark at trial, the permanent injunction will be limited to Diesel Test accordingly.

Next, Curry contends that the injunction should require the defendants to withdraw their pending opposition to Curry's federal trademark application for Diesel Test.  The defendants' objection to this proposal is hard to follow.  They contend that their opposition to Curry's federal trademark application is warranted because it is "solely focused" on Curry's attempt to trademark the word "Test" apart from "Diesel Test."  Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 10.  But Curry's application is for the phrase "Diesel Test," not simply "Test."  The opposition that the defendants attach to their motion also plainly asserts further objections to Curry's application.  *See* Dkt. no. 398-2.  The Court therefore grants Curry's request to include this in the injunction.

Without citing relevant authority, the defendants raise various other objections, none of which have merit.  First, the defendants contend that the proposed injunction is too broad because it is not limited to "testosterone boosting nutritional supplement" goods specifically.  Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 7.  Limiting the injunction in this manner is unwarranted, however, given the evidence at trial that the defendants sold other kinds of goods displaying their brand names to develop their brand.

Second, the defendants argue that Curry's "requests for certifications and

SA000061

delivery of labels and signs are unnecessary." *Id.* at 7. But the defendants concede that Curry's requests for certifications and materials bearing Curry's mark is permitted by 15 U.S.C. § 1116(a). Moreover, their assertion that this proposed term is "nothing but busy work" because Revolution stopped selling infringing products years ago, *id.* at 8, is unpersuasive given the dispute at trial regarding when the defendants stopped infringing Curry's mark. The defendants do not cite any authority for the proposition that they must retain all such materials as litigation documents.

Finally, the defendants contend that the proposed injunction is not sufficiently definitive in part because it precludes any trademark that is "confusingly similar" to Curry's mark. Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 9. But the defendants themselves state that this requirement "is just a reiteration that [they] are prohibited from violating trademark law." *Id.* at 9. The Court concludes that this language is not impermissibly vague. *See Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384 (7th Cir. 2018) ("The Lanham Act's prohibition on implied falsehoods makes the use of somewhat inexact language unavoidable.").

The defendants also object on vagueness grounds to Curry's proposed term prohibiting the defendants from "doing any other act likely to induce the mistaken belief that Curry is the source of products that are not actually manufactured or sold by Curry." Defs.' Opp. to Pl.'s Mot. for Permanent Inj. at 9. Curry does not respond to this objection, thereby forfeiting the point. *See Bonte*, 624 F.3d at 466. The Court therefore will exclude this term from the injunction.

In sum, the Court grants Curry's motion to enter a permanent injunction in accordance with this decision.

SA000062

**Conclusion**

For the foregoing reasons, the Court (1) grants plaintiff Curry's motion to

determine infringing profits and awards $547,095.44 in defendants' profits [dkt. no. 388];

(2) denies the defendants' motion to amend or alter the judgment [dkt. no. 384]; (3)

grants plaintiff Curry's motion for a finding of IUDTPA liability [dkt. no. 378]; (4) grants in

part plaintiff Curry's motion for pre- and post-judgment interest [dkt. no. 390]; and (5)

grants in part plaintiff Curry's motion for a permanent injunction [dkt. no. 392].  The

parties are directed to calculate prejudgment interest in accordance with this decision

through September 1, 2023 and submit a joint status report with the calculation and

amount by August 30, 2023.  Finally, plaintiff is directed to provide a Word version of the

proposed injunction, modified as indicated in this decision, to the undersigned judge's

proposed order e-mail address by August 30, 2023.

MATTHEW F. KENNELLY
United States District Judge

Date:  August 23, 2023

SA000063

ILND 450 (Rev. 10/13) Judgment in a Civil Action

Case: 1:17-cv-02283 Document #: 376 Filed: 05/22/23 Page 1 of 2 PageID #:12486
Case: 23-2850     Document: 23     Filed: 02/06/2024     Pages: 148

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

Charles Curry,

Plaintiff(s),

v.

Revolution Laboratories, LLC et al,

Defendant(s).

Case No.  17 C 2283
Judge Matthew F. Kennelly

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $         ,

        which ☐ includes         pre–judgment interest.
        ☐ does not include pre–judgment interest.

    Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

    Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

.

    Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: The Clerk is directed to enter judgment as follows:  (1) in favor of plaintiff Charles Curry and against defendants Revolution Laboratories LLC; Joshua Nussbaum; and Barry Nussbaum on Counts 3 and 5 of plaintiff's amended complaint; (2) finding willful infringement by each defendant of plaintiff's trademark; (3) in favor of plaintiff Charles Curry and against defendants Revolution Laboratories LLC and Joshua Nussbaum on Count 6 of plaintiff's amended complaint; (4) in favor of defendant Barry Nussbaum and against plaintiff Charles Curry on Count 6 of plaintiff's amended complaint; and (5) awarding plaintiff Charles Curry damages as follows: (a) against Revolution Laboratories LLC; Joshua Nussbaum and Barry Nussbaum jointly and severally in the amount of $502,500.00; (b) against Revolution Laboratories LLC and Joshua Nussbaum jointly and severally in the amount of $1,000; (3) against Revolution Laboratories LLC for punitive damages in the amount of $300,000.00; (4) against Joshua Nussbaum for punitive damages in the amount of $300,000.00; and (5) against Barry Nussbaum for punitive damages in the amount of $300,000.00.

---

This action was *(check one)*:

☒ tried by a jury with Judge Matthew F. Kennelly presiding, and the jury has rendered a verdict.

SA000064

ILND 450 (Rev. 10/13) Judgment in a Civil Action

☐ tried by Judge _____ without a jury and the above decision was reached.

☐ decided by Judge Matthew F. Kennelly on a motion

Date:    5/22/2023                              Thomas G. Bruton, Clerk of Court

                                               Melissa Astell , Deputy Clerk

SA000065

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Charles Curry,

Plaintiff(s),

v.

Revolution Laboratories, LLC et al,

Defendant(s).

Case No.  17 C 2283
Judge Matthew F. Kennelly

## AMENDED JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: (1) In favor of plaintiff Charles Curry and against defendants Revolution Laboratories LLC; Joshua Nussbaum; and Barry Nussbaum on Counts 2; 3; and 5 of plaintiff's amended complaint; (2) finding willful infringement by each defendant of plaintiff's trademark; (3) in favor of plaintiff Charles Curry and against defendants Revolution Laboratories LLC and Joshua Nussbaum on Count 6 of plaintiff's amended complaint; (4) in favor of defendant Barry Nussbaum and against plaintiff Charles Curry on Count 6 of plaintiff's amended complaint; and (5) awarding plaintiff Charles Curry damages as follows: (a) against Revolution Laboratories LLC; Joshua Nussbaum and Barry Nussbaum jointly and severally in the amount of $547,095.44, plus prejudgment interest in the amount of $201,723.65, for a total of $748,819.09; (b) against Revolution Laboratories LLC and Joshua Nussbaum jointly and severally in the amount of $1,000; (3) against Revolution Laboratories LLC for punitive damages in the amount of $300,000.00; (4) against Joshua Nussbaum for punitive damages in the amount of $300,000.00; (5) against Barry Nussbaum for punitive damages in the amount of $300,000.00; and (6) for entry of a permanent injunction as set forth separately.

This action was *(check one)*:

☐ tried by a jury with Judge Matthew F. Kennelly presiding, and the jury has rendered a verdict.

SA000066

ILND 450 (Rev. 10/13) Judgment in a Civil Action

☐ tried by Judge      without a jury and the above decision was reached.
☒ decided by Judge Matthew F. Kennelly on a motion

Date:  **8/29**/2023                    Thomas G. Bruton, Clerk of Court

                                        Melissa Astell , Deputy Clerk

SA000067

ILND 450 (Rev. 10/13) Judgment in a Civil Action

Case: 1:17-cv-02283 Document #: 417 Filed: 09/01/23 Page 1 of 2 PageID #:13668
Case: 23-2850     Document: 23     Filed: 02/06/2024     Pages: 148

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Charles Curry,

Plaintiff(s),

v.

Revolution Laboratories, LLC et al,

Defendant(s).

Case No.  17 C 2283
Judge Matthew F. Kennelly

## <u>SECOND AMENDED JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $     ,

which ☐ includes     pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒     other: (1) In favor of plaintiff Charles Curry and against defendants Revolution Laboratories LLC; Joshua Nussbaum; and Barry Nussbaum on Counts 2; 3; and 5 of plaintiff's complaint; (2) finding willful infringement by each defendant of plaintiff's trademark; (3) in favor of plaintiff Charles Curry and against defendants Revolution Laboratories LLC and Joshua Nussbaum on Count 6 of plaintiff's complaint; (4) in favor of defendant Barry Nussbaum and against plaintiff Charles Curry on Count 6 of plaintiff's complaint; and (5) awarding plaintiff Charles Curry damages as follows: (a) against Revolution Laboratories LLC; Joshua Nussbaum and Barry Nussbaum jointly and severally in the amount of $549,595.44, plus prejudgment interest in the amount of $201,723.65, for a total of $751,319.09; (b) against Revolution Laboratories LLC and Joshua Nussbaum jointly and severally in the amount of $1,000; (3) against Revolution Laboratories LLC for punitive damages in the amount of $300,000.00; (4) against Joshua Nussbaum for punitive damages in the amount of $300,000.00; (5) against Barry Nussbaum for punitive damages in the amount of $300,000.00; and (6) for entry of a permanent injunction as set forth separately.

This action was *(check one)*:

☐ tried by a jury with Judge Matthew F. Kennelly presiding, and the jury has rendered a verdict.

SA000068

ILND 450 (Rev. 10/13) Judgment in a Civil Action

☐ tried by Judge       without a jury and the above decision was reached.

☒ decided by Judge Matthew F. Kennelly on a motion

Date:  **9/1**/2023                          Thomas G. Bruton, Clerk of Court

                                            Melissa Astell , Deputy Clerk

SA000069

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, | ) | Case No. 1:17-cv-02283 |
| | ) | |
| Plaintiff, | ) | Honorable Matthew F. Kennelly |
| | ) | |
| v. | ) | Magistrate Judge Kim |
| | ) | |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM | ) ) ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANTS' NOTICE OF APPEAL**</u>

Pursuant to Fed. R. App. P. 3 and 4, Defendants, Revolution Laboratories, LLC ("Revolution"), Joshua Nussbaum ("Joshua"), and Barry Nussbaum ("Barry") (collectively "Defendants"), appeal to the United States Court of Appeals for the Seventh Circuit from (i) the final Memorandum Opinion and Order on Defendants' Motion to Alter or Amend Judgement under Rules 59(e) and 50(b) and Plaintiff's motion under Rule 59(e) (Dkt. 410) entered by the Court on August 23, 2023; (ii) the judgment entered in this action on May 22, 2023 (Dkt. 376) as amended on August 29, 2023 (Dkt. 414) and September 1, 2023 (Dkt. 417); and (iii) all interlocutory orders entered in this action preceding this notice or the final judgment (as amended), including but not limited to, the order on summary judgment (Dkt. 195), the District Court's orders regarding motions *in limine* and Defendants' motion to strike plaintiff's jury demand (Dkt. 292, 356, 362), and the order on Defendants' request to take judicial notice (order entered on the record during trial).

Dated: September 22, 2023                    Respectfully submitted,

                                             **DEFENDANTS REVOLUTION**
                                             **LABORATORIES, LLC, JOSHUA**
                                             **NUSSBAUM AND BARRY NUSSBAUM**

                                             By:    */s/Matthew De Preter*
                                                    Gary P. Hollander
                                                    Amy R. Gibson
                                                    Matthew De Preter
                                                    Chidinma O. Ahukanna
                                                    ARONBERG GOLDGEHN DAVIS & GARMISA
                                                    225 W. Washington St., Suite 2800
                                                    Chicago, IL 60611
                                                    (p) 312.828.9600
                                                    (f) 312.828.9635
                                                    ghollander@agdglaw.com
                                                    agibson@agdglaw.com
                                                    cdepreter@agdglaw.com
                                                    cahukanna@agdglaw.com

                                                    *Attorneys for Defendants*

SA000071

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 22, 2023 a true and correct copy of the foregoing was filed through the ECF filing system which will provide notice to counsel of record.

*/s/ Matthew De Preter*
*Attorney for Defendants*

4855-7731-4689, v. 1

SA000072