## No. 23-2850

# In the
# United States Court of Appeals
## for the Seventh Circuit

CHARLES CURRY, doing business as GET DIESEL NUTRITION,

*Plaintiff-Appellee,*

v.

REVOLUTION LABORATORIES, LLC, et al.,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:17-cv-02283.
The Honorable **Matthew F. Kennelly**, Judge Presiding.

## JOINT APPENDIX

NICHOLAS C. HAILEY
MATTHEW J. OPPENHEIM
JEFFREY KANE
OPPENHEIM & ZEBRAK, LLP
4530 Wisconsin Avenue, N.W.
Fifth Floor
Washington, DC 20016
(202) 480-2174


*Counsel for Appellee*
*Charles Curry, Jr. d/b/a*
*Get Diesel Nutrition*

MATTHEW DE PRETER
AMY M. GIBSON
GARY P. HOLLANDER
ARONBERG GOLDGEHN DAVIS
& GARMISA
225 West Washington Street
Suite 1700
Chicago, Illinois 60606
(312) 755-3153


*Counsel for Appellants*
*Revolution Laboratories, LLC, Joshua*
*Nussbaum* and *Barry Nussbaum*

 

## TABLE OF CONTENTS

| ECF No. | Date | Document | Page |
|---|---|---|---|
| 1 | 3/24/17 | Complaint | JA000001 |
| 427-1 | 7/26/17 | Plaintiff's Trial Exhibit 1 | JA000074 |
| 311-4 | 9/3/20 | Plaintiff's Amended Responses to Defendants' First Set of Interrogatories (excerpt) | JA000090 |
| 311-5 | 9/25/20 | Plaintiff's Second Amended Responses to Defendants' First Set of Interrogatories (excerpt) | JA000092 |
| 143-23 | 10/15/20 | Letter from Plaintiff's Counsel to Defendants' Counsel (excerpt) | JA000096 |
| 147-1 | 11/23/20 | Memorandum of Law in Support of Plaintiff's Third Motion to Compel Discovery (excerpt) | JA000098 |
| 156 | 12/22/20 | Stipulation of Liability of Revolution Laboratories, LLC | JA000100 |
| 197-1 | 2/14/22 | Memorandum of Law om Support of Plaintiff's Fourth Motion to Compel Discovery (excerpt) | JA000102 |
| 199 | 2/22/22 | Defendants' Response to Plaintiff's Fourth Motion to Compel Discovery (excerpt) | JA000104 |
| 217 | 3/1/22 | Transcript of Proceedings Held on Mar. 1, 2022 [p. 8] | JA000108 |

| ECF No. | Date | Document | Page |
|---|---|---|---|
| 216 | 4/15/22 | Transcript of Proceedings Held on Apr. 15, 2022 [pp. 2, 4, 5] | JA000110 |
| 260 | 5/18/22 | Transcript of Proceedings Held on May 18, 2022 [pp. 3, 4, 13] | JA000114 |
| 243 | 6/10/22 | Minute Order | JA000118 |
| 265 | 7/12/22 | Barry Nussbaum's Declaration of Compliance Regarding The Court's Award of Certain Fees and Costs in the June 10, 2022 Minute Order | JA000120 |
| 280 | 8/22/22 | Proposed Pretrial Order (excerpt) | JA000123 |
| 467 | 9/7/22 | Transcript of Proceedings Held on Sep. 7, 2022 [pp. 21, 22, 30, 44, 45, 47] | JA000125 |
| 319 | 1/23/23 | Memorandum Opinion and Order | JA000132 |
| 462 | 5/22/23 | Transcript of Proceedings held on May 22, 2023, Vol. 5-B (1216:10-12) | JA000147 |
| N/A | 9/12/08 | *adidas America, Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 4279812 (D. Or. Sept. 12, 2008). | JA000149 |

**INDEX OF PORTION OF TRANSCRIPT IN JOINT APPENDIX**
**PURSUANT TO CIR. R. 30(F) AND 10(E)**

| ECF No. | Date | Document | Page | Witnesses | Exhibits | Significant Portions of the Proceeding |
|---|---|---|---|---|---|---|
| 217 | 3/1/22 | Transcript of Proceedings Held on Mar. 1, 2022 [p. 8] | JA000108 | Not applicable | Not applicable | Hearing on Plaintiff's Fourth Motion to Compel (Dkt. 197) |
| 216 | 4/15/22 | Transcript of Proceedings Held on Apr. 15, 2022 [pp. 2, 4, 5] | JA000110 | Not applicable | Not applicable | Hearing Relating to Plaintiff's Motion for Sanctions (Dkt. 209) |
| 260 | 5/18/22 | Transcript of Proceedings Held on May 18, 2022 [pp. 3, 4, 13] | JA000114 | Not applicable | Not applicable | Transcript of a status hearing |
| 467 | 9/7/22 | Transcript of Proceedings Held on Sep. 7, 2022 [pp. 21, 22, 30, 44, 45, 47] | JA000125 | Not applicable | Not applicable | Hearing as to Motions in Limine |
| 462 | 5/22/23 | Transcript of Proceedings held on May 22, 2023, Vol. 5-B (1216:10-12) | JA000147 | Not applicable | Not applicable | Reading of portion of the verdict into the record at the conclusion of the trial |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

CHARLES CURRY, DBA GET DIESEL   )
NUTRITION,   )
   )
   )   17CV2283
Plaintiff,   )   JUDGE KENNELLY
   )   MAG. JUDGE KIM
vs.   )
   )
REVOLUTION LABORATORIES, LLC,   )
REV LABS MANAGEMENT, INC,.   )
JOSHUA NUSSBAUM AND BARRY   )
NUSSBAUM,   )
   )
Defendants.   )

**FILED**
*3-24-17*
MAR 24 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## COMPLAINT

Charles Curry doing business as GET DIESEL NUTRITION appearing pro se brings this

complaint, against Revolution Laboratories LLC., Joshua Nussbaum, Rev Labs Management

Inc., and Barry Nussbaum (collectively, "Defendants").

## NATURE OF THE ACTION

1.    This is an action against the named defendants for trademark infringement, trademark

dilution, trademark tanishment, false designation of origin, false advertising, unfair competition,

Cyberpiracy, fraud, unjust enrichment and violations of the Illinois Uniform Deceptive Trade

Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act.

JA000001

**PARTIES**

2.    Plaintiff, Charles Curry, is a resident of Olympia Fields, Illinois, located in Cook County within this judicial district.

3.    Defendant Revolution Laboratories L.L.C. ("Revolution Laboratories") is a domestic limited liability company organized under and pursuant to the laws of the State of Nevada with its principal place of business in Solana Beach, California.

4.    Upon information and belief, defendant Joshua Nussbaum is a resident of California, and is a cofounder, a partner, a member, and an executive officer of Revolution Laboratories Inc.

5.    Upon information and belief, defendant Barry Nussbaum is a resident of Nevada and is the co-founder and co-owner Revolution Laboratories. Barry Nussbaum is the Director of Rev Labs Management, overseeing all operations of Rev Labs Management.

6.    Defendant Rev Labs Management Inc. ("Rev Labs Management") is a domestic corporation organized under and pursuant to the laws of the State Nevada. Rev Labs Management is the Manager of Defendant Revolution Laboratories. At all times material to this Complaint, acting alone or in concert with others, Defendant Rev Labs Management formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this transacts business in the states of California and Nevada and throughout the United States, including in the state of Illinois.

**JURISDICTION AND VENUE**

7.    This Court has subject matter jurisdiction of the claims in this matter that relate to trademark counterfeiting and infringement and false designations of origin and false descriptions pursuant to the provisions of 15 U.S.C. §1121 28U.S.C. §1331 and 1338(a). This Court has

JA000002

subject matter jurisdiction over the claims for unfair competition asserted in this action pursuant to 28 U.S.C. § 1338(b). In addition, this Court has jurisdiction pursuant to 28 U.S.C. g 1332(a) because the parties' citizenship is diverse and the amount in controversy exceeds $75,000 exclusive of interest and cost. The court also has jurisdiction because the defendants are maliciously promoting, and using for commerce at least 15 interactive websites to sell their counterfeit DIESEL TEST and/or use the DIESEL TEST name to promote other products to Illinois residents satisfying the requirement for "something more" than just making a website(s) available to the general public.

8.    This Court has supplemental jurisdiction over the claims that arise under the statutory and common law of the State of Illinois pursuant to 28 U.S.C. §1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact.

9.    This Court has personal jurisdiction over the defendants because they have all, and each of them engaged in acts or omissions within the State of Illinois causing injury, have engaged in acts or omissions outside of Illinois causing injury within the State, has manufactured or distributed products used or consumed within this State in the ordinary course of trade, or has otherwise made or established contacts with this State sufficient to permit the exercise of personal jurisdiction. Upon information and belief, defendants engages in continuous and systematic contact with, and purposefully directs acts complained of herein toward, Illinois and this judicial district. Personal jurisdiction over all defendants is proper pursuant to Illinois Statutes, 735 ILCS 5/2-209(a)(1) and (a)(2).

10.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2), §1391(b)(3) and §1391(c)(2).

GET DIESEL v. Rev Labs et al.            Complaint                                3

JA000003

## FACTUAL BACKGROUND

11.     Charles Curry is the CEO and founder of GET DIESEL NUTRTION. Since at least as early as 2002, Charles Curry is well known in the dietary supplement industry as "Chuck Diesel" and the GET DIESEL family of dietary supplements are also known as "Chuck Diesel's Products." Charles Curry is known to be personally involved in every aspect of making sure the GET DIESEL brand produces quality products, with the utmost efficacy and integrity behind them. (Exhibit 1(a)).

      a.   Chuck Diesel is a Veteran of the United States Air Force.

      b.   During a 2001-2002 deployment, Chuck Diesel came up with the idea to name his first product "DIESEL FUEL." (Exhibit 1(a)).

12.     GET DIESEL NUTRITION first sold its first dietary supplement "DIESEL FUEL" in May 2002. Since at least as early as July 2002, GET DIESEL NUTRITION has manufactured a family of "DIESEL" dietary supplements.

13.     The domain name GETDIESEL.NET was registered 20 May 2002 by plaintiff Charles Curry. A copy of the web registration information is attached hereto as Exhibit 2(a). The domain name GETDIESEL.COM was registered 7 Dec 2002 by plaintiff. A copy of the web registration information is attached hereto as Exhibit 2(b).

14.     The dietary supplement DIESEL TEST was first manufactured by GET DIESEL NUTRITION in March 2005 and advertised summer 2005 as a natural testosterone boosting dietary supplement. GET DIESEL NUTRITION's DIESEL TEST was first advertised in the Lone Star Distribution catalog June 2005 and the Plant Muscle Magazine that same summer. In

GET DIESEL v. Rev Labs et al.          Complaint                                    4

JA000004

2005, upon information and belief, the Lone Star Distribution catalog was distributed to over 500 retail stores in the United States. (Exhibit 1(d)). Upon information and belief, in 2005 Planet Muscle magazine was sold in over 100 retail stores nationwide in the United States.

15.    Upon information and fact, GET DIESEL NUTRITION has placed over 100 print ads since June 2002 advertising its "Diesel" family of products in multiple dietary supplement and fitness magazines sold nationwide in the United States and worldwide to include Plant Muscle Magazine, Muscular Development Magazine, The Lone Star Distribution Catalog, Status Fitness Magazine, Power Magazine, Natural Muscle Magazine, Southern Muscle Magazine and Powerlifting USA Magazine. GET DIESEL NUTRITION's DIESEL TEST was awarded natural test booster in the years of 2015 and 2016 from Planet Muscle Magazine. (Exhibit 1(c)).

16.    Plaintiff's own a family of common law dietary supplement "DIESEL" trademarks that include but are not limited to: DIESEL FUEL, DIESEL TEST, ARE YOU DIESEL?, GET DIESEL OR DIE TRYIN', GET DIESEL NUTRITION, and COQ DIESEL dating back to 2002.

17.    On 9 June, 2016, Charles Curry filled a trademark application for the trademark DIESEL FUEL in class 005 (Dietary Supplements) (Serial number 87065657) with a first used in commerce date of June 2002. On November 1st, 2016 this trademark was approved for publication in the United States Patent and Trademark Office (USPTO) principal register. A copy of such publication notice is attached hereto as Exhibit 3.

18.    On 21 June, 2016, Charles Curry filled a trademark application for the trademark DIESEL in class 005 (Dietary Supplements) (Serial number 87078512), with a first used in commerce date of June 2002. On 18 February 2016, this trademark was approved for publication in the USPTO principal register. A copy of the confirmation of such publication is attached hereto as Exhibit 4.

JA000005

19.     On December 9, 2016, Charles Curry filed a 1(a) trademark for the mark "DIESEL

TEST" in class 005 (Serial number 87263678), with a first use date in commerce of April 2005.

20.     Plaintiff has used its marks as set forth above continuously in commerce since 2002. He

has consistently marketed his products under the trade names in whole or in part using the GET

DIESEL NUTRITION, DIESEL, DIESEL FUEL, and DIESEL TEST marks.

21.     Since plaintiff launched his company, its products have always have been associated with

the DIESEL, DIESEL FUEL and DIESEL TEST marks in connection with products. The

DIESEL, DIESLE FUEL and DIESLE TEST marks are highly distinctive with regard to

plaintiff's products, and customers of the same are accustomed to seeing and expecting to see the

GET DIESEL NUTRITION, DIESEL, DIESEL FUEL, and DIESEL TEST marks in connection

with said products.

22.     In addition to the registration of his marks and ownership vested thereby, plaintiff has

common law rights in the marks identified in the pending trademark applications.

23.     In Nov 2016, Plaintiff became aware that Defendants were manufacturing, selling and

distributing counterfeit DIESEL TEST from messages sent from consumers on Facebook

including a message from a GET DIESEL customer alerting Plaintiff of a fake espn-news.com

article selling the counterfeit DIESEL TEST. (Exhibit 5(a)).

24.     Shortly thereafter, plaintiff began receiving communications from confused consumers

asking for a free trial of DIESEL TEST and or a refund for the purchase of counterfeit "DIESEL

TEST." The confused consumers were under the impression that the counterfeit DIESEL TEST

they purchased from Revolution Laboratories was manufactured and sold by GET DIESEL

NUTRITION. Consumers were also requesting that the auto-billing and auto shipping be

GET DIESEL v. Rev Labs et al.                    Complaint                                        6

JA000006

immediately stopped for a product they thought was manufactured and sold by GET DIESEL

NUTRITION. (Exhibit 5(b)).

25.     Revolution Laboratories' counterfeit "DIESEL TEST" is or was sold at their direct sale

website (Exhibit 6(a)) and the websites of: DieselTest.org (Exhibit 6(b)), DieselTest.us (Exhibit

7) and dieseltest.net (Exhibit 8) as well as on Amazon.com, an internet marketing site  (Exhibit

9) and Ebay.com, another internet marketing site (Exhibit 10). In addition, defendants have

caused their "Diesel Test product to be marketed or promoted on other websites which

defendants own, control or profit from, including, but not limited to:

- http://dieseltesto.com/
- http://musclevillage.com/testosterone-booster/diesel-test/
- http://www.topwellnesspro.com/diesel-test-pro/
- http://musclebuildingreview.net/diesel-test-pro/
- http://musclebuildingreview.net/diesel-test/
- http://wellnesssaying.com/diesel-test-testosterone-booster/
- http://ragednareview.org/tag/diesel-test-pro-testosterone-booster/
- http://ragednareview.org/diesel-test/
- http://metaboostreview.com/tag/diesel-test-pro-testosteroen-booster/
- http://dieseltestpro.com/
- http://dieseltestpro.net/
- http://realcoloncleansingworks.com/diesel-test/
- http://dieseltestt.com/
- https://www.revlabs.com/supplements/dieseltest-testosterone-booster.html

26.     On or about November 13, 2017 plaintiff notified defendants in writing via Facebook

messenger in the form of a cease and desist message of the pending registration of plaintiff's

marks as well as the infringement thereof by defendants. (Exhibit 11).

27.     Thereafter by email on November 15, 2016, plaintiff again notified defendants by way of

a cease and desist notification that they were infringing upon plaintiff's trademark. In this email

plaintiff also put defendants on notice of their fraudulent representations regarding their

counterfeit products. (Exhibit 12).

JA000007

28.    The notifications to defendants of November 13, 2016 and November 15, 2016

constituted actual notice. Despite such notice defendants continued to market, advertise, promote

and sell their infringing, counterfeit products.

29.    Moreover, while continuing to infringe on plaintiff's trademark(s), defendants attempted

to defeat plaintiff's claim for trademark infringement by filing a fraudulent application for a

trademark of their counterfeit "DIESEL TEST" product (Serial number 87250405).

30.    On November 28, 2016, and after receiving actual notice of plaintiff's trademark,

defendant Joshua Nussbaum, together with the other defendants filed or caused to be filed a

fraudulent application for their counterfeit DIESEL TEST trademark with the United States

Patent and Trademark Office (USPTO), Serial number 87250405, (Exhibit 13) and fraudulently

committing the actions of:

     a.    Filing the application as an "intent to use" application, when in fact the

        defendants had already, by been attempting to use the mark by infringing upon

        plaintiff's mark.

     b.    Declaring under oath that Joshua Nussbaum is the owner of the DIESEL TEST

        mark, when in fact all of the defendants had been placed on notice that plaintiff is

        the owner of the DIESEL TEST trademark and that their use thereof constituted

        infringement.

     c.    Declaring under oath that Joshua Nussbaum is entitled to use the mark in

        commerce, when in fact he knew, based on actual notice that he was infringing

        upon the mark of plaintiff.

GET DIESEL v. Rev Labs et al.            Complaint                    8

JA000008

    d. Declaring under oath that to the best of his knowledge no other person is entitled

to use the mark in commerce when in fact he had received actual notice that

plaintiff claimed the mark, and was using the mark in commerce.

31.    Thereafter, apparently realizing the actual or potential problems with the attempted

registration, Joshua Nussbaum and the other defendants filed, or caused to be filed a second

application for trademark registration, Serial Number 87250413 using the term "DZL TEST"

(Exhibit 14).

32.    On February 13, 2017, in response to a complaint filed by plaintiff, Amazon removed

from its online (internet) store defendants' products, on the grounds that they were counterfeit

products. (Exhibit 15).

33.    Notwithstanding receiving actual notice of their infringement of plaintiff's trademarks

both registered and common law, and notwithstanding further notice that they were marketing

counterfeit goods, in the form of Amazon's removal of their products from its online store, and

notification by plaintiff, defendants continued thereafter, and as of March 5, 2017, still continue

to market the counterfeit DIESEL TEST  on their own infringing websites as well as on other

internet marketing sites. (Exhibit 16(a)).

34.    In addition to infringement of plaintiff's trademark(s), from November 2016 to the date

hereof and continuing, defendants engaged in a pattern and practice of deceptive advertising,

fraudulent statements and misrepresentation, and unfair and deceptive methods of doing business

and competition.

35.    More specifically defendants published or caused to be published a "fake" ESPN news

story in which they claimed that use of their counterfeit products by famous athletes resulted in

enhanced performance. A review of this exhibit demonstrates the fraudulent and deceptive

GET DIESEL v. Rev Labs et al.          Complaint          9

JA000009

techniques employed by defendants, whereby they use a variation of ESPN's URL and a website designed to be identical in appearance to the real website, to make web visitors believe they are in fact on the official website of ESPN. (Exhibit 16(b)).

36.     In addition to fake news websites, defendants have caused to be falsely stated, in advertisements and promotions that their products are medically approved, or approved by doctors. (Exhibit 18).

37.     By way of further example of defendants' fraudulent misrepresentations, they represent that their product, a counterfeit of plaintiff's products was ranked Best Product and Number 1 in category in 2015, when in fact they did not begin marketing the product until fall of 2016.

38.     Defendants have intentionally set out to cause customers to associate their new, untested and unseasoned products with those of plaintiff by designing containers and labels that are virtually identical to the containers and labels used by plaintiff since 2002. Exhibit 17 illustrates the near identical similarity of the bottles and labels.

39.     While continuing to misrepresent the origin of the DIESEL TEST dietary supplements, and continuing to attempt to pass their counterfeit products off as those of plaintiff, the USPTO has suspended processing of the defendants' trademark application (Serial number 87250405) for the DIESEL TEST mark because of the likelihood of confusion with Plaintiff's pending registration marks of DIESEL and DIESEL FUEL. (Exhibit 19). After this letter was sent to Defendants on 14 March 2017, defendant continued all forms of infringement of Plaintiff's DIESEL marks.

40.     As a direct result of defendant's malicious actions and fraudulent activities, on 16 March 2017 plaintiff's trademark application for DIESEL TEST (serial number 87263678) was

GET DIESEL v. Rev Labs et al.          Complaint                              10

JA000010

suspended due to the prior filling of defendant's unjust application for the DIESEL TEST

trademark.

## FOR A FIRST CAUSE OF ACTION
### Violations of the Illinois Consumer Fraud and Deceptive Practices Act

41.    Each and every allegation of paragraphs 1 through 40 are realleged as fully as if restated

verbatim.

42.    As herein set forth, defendants sold, and caused to be introduced into commerce, within

the State of Illinois and elsewhere, a product or products marketed to the general public.

43.    With respect to such products, marketed from October 2016 through the present and

continuing, defendants made representations in the form of advertisements, promotional

descriptions and specific representations as to the origin and nature of the product. These

representations, advertisements and misrepresentations were are continue to be directed to Illinois

consumers.

44.    More specifically, defendants by infringing on plaintiff's trademark, intentionally set out

to deceive by representing that their product, marketed only for a few months, and of unproven

origin and manufacture were in fact the product of plaintiff, which products have been

successfully marketed since 2002 and are manufactured to pharmaceutical standard quality.

45.    The misrepresentations and false advertising have resulted in consumers being misled

into believing that defendants' products are in fact the same as plaintiff's products.[1]

---

[1] See Exhibit 5 – email from consumer complaining to plaintiff on the belief that products she purchased from
defendants were sold by plaintiff.

JA000011

46.     The misrepresentations were made with the intent that they be relied on by consumers, including the general public as well as citizens and residents of the State of Illinois, in order to induce members of the public to purchase their counterfeit products.

47.     Plaintiff is informed and believes that the actions and conduct of defendants as herein set forth constitute a violation of the Illinois Consumer Fraud and Deceptive Practices Act: 815 ILCS 505/1 et seq.

48.     Plaintiff has been damaged as a direct and proximate result of defendant's actions and conduct as herein described in that he has had his sales damaged, has had present and future potential customers deterred, has had his reputation and that of his products damaged, and has incurred attorney's fees and costs in defending his product and the integrity thereof and in protecting his trademark.

49.     Plaintiff is informed and believes that he should be entitled to judgment against defendants for their intentional violation of the Illinois Consumer Fraud and Deceptive Practices Act, such judgment to include not only actual damages, but also injunctive relief, punitive damages and an award of costs and attorney's fees as provided by §815 ILCS 505/10a.


### FOR A SECOND CAUSE OF ACTION
### Violation of Illinois Uniform Deceptive Trade Practices Act: 815 ILCS 510/2

50.     Each and every allegation of paragraph 1 through 49 is realleged as fully as if restated herein verbatim.

51.     Defendant's false and misleading statements as described above represent deceptive trade practices in that Defendants falsely represent that their products possess certain characteristics that they do not have; falsely misrepresents the standard, quality or grade of their products; create confusion and misunderstanding by use of  names substantially similar to that of plaintiff's

GET DIESEL v. Rev Labs et al.                    Complaint                                        12

products; and otherwise engages in conduct which creates a likelihood of confusion or misunderstanding in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

52.    Defendants' false and misleading advertising claims are willful and intentional, with deceptive intent, making this an exceptional case.

53.    Defendants' false and misleading advertising claims have caused, and will continue to cause, great, immediate, and irreparable harm to Plaintiff's business reputation, injury to its good will, loss of competitive advantage, and pecuniary damages.

54.    Defendant's above described conduct constitutes unfair competition under the common law and the statutory laws of the State of Illinois pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §510, et. seq.

55.    Plaintiff is informed and believes that he should be entitled to judgment against the defendants for his actual damages as well as for costs and attorney's fees incurred in this proceeding.

56.    In addition, plaintiff is informed and believes that he should be entitled to injunctive relief as provided by § 815 ILCS 510/3, in that the actions and conduct of defendants giving rise to this claim are ongoing and continuing.

## FOR A THIRD CAUSE OF ACTION
### False Designation of Origin and False Advertising, 15 U.S.C. § 1125

57.    Each and every allegation of paragraphs 1 through 56 are realleged as fully as if restated verbatim.

58.    Plaintiff has used the names of its products, for which it has applied for trademark registration exclusively since 2002.

JA000013

59.     Defendants have deliberately and willfully attempted to trade on plaintiff's longstanding and hard-earned goodwill in its names and marks and the reputation established by plaintiff in connection with its products, as well as in order to confuse consumers as to the origin and sponsorship of Defendants' goods and to pass off their products in commerce as those of plaintiff.

60.     Defendants' promotion, advertising, distribution, sale, and/or offering for sale of the Infringing Products, together with Defendants' use of other indicia associated with those of plaintiff is intended, and is likely to confuse, mislead, or deceive consumers, the public, and the trade as to the origin, source, sponsorship, or affiliation of the Infringing Products, and is intended, and is likely to cause such parties to believe in error that the Infringing Products have been authorized,, manufactured or sold by plaintiff.

61.     Defendants' use in interstate commerce of the DIESEL TEST and similar product names in connection with the promotion, advertisement and sales of its competing products constitutes a reproduction, counterfeit, copy and/or colorable imitation of the DIESEL, DIESEL FUEL, GET DIESEL NUTRITION, DIESEL TEST marks and therefore infringes upon the same.

62.     The use by defendants of their counterfeit mark DIESEL TEST and the potential use of their counterfeit mark DZL TEST have caused and are likely to cause ongoing confusion in that:

a.      The names are similar – DIESEL TEST (defendants' product) versus Plaintiff's trademarks: "GET DIESEL NUTRITION", "Diesel Fuel", "Diesel", "Coq Diesel", "Diesel Test" and "Are You Diesel?" These marks are either identical in appearance, sound, and meaning, "and have the potential to be used in exactly the same manner and create the same commercial impression in international trademark class 005 (Dietary Supplements).

b.      The appearance of the labels and trade dress is similar (Exhibit 17).

GET DIESEL v. Rev Labs et al.                    Complaint                                        14

c.      Both defendants' products and those of plaintiff are marketed in the same areas.

d.      The products are of the same kind, that is dietary supplements.

e.      As set forth herein there has in fact been actual confusion by consumers, with plaintiff

having received complaints concerning products marketed by defendants. (Exhibit 5).

> (1) Defendants' unfavorable standing with the Better Business Bureau and
> reckless acts of false advertising, in addition to the distribution and promotion of
> their counterfeit DIESEL TEST is the direct cause of 3[rd] party consumer
> defamatory statements on the GET DIESEL NUTRITION Facebook page, the
> GET DIESEL NUTRITION website and in emails to plaintiffs as seen in
> Exhibit 5.

63.     Defendants had and have both actual and constructive knowledge of plaintiff's ownership

of and rights in its marks both prior and subsequent to Defendants' infringing use of those marks.

64.     Defendants' continued use of the infringing marks will injure plaintiff by causing a

likelihood that the public will be confused or mistaken into believing that the goods or services

provided by Defendant are endorsed or sponsored by plaintiff.

65.     Defendants' acts constitute trademark infringement in violation of False Designation of

Origin and False Advertising, 15 U.S.C. § 1125(a)

66.     Plaintiff is informed and believes that he should be entitled to judgment against the

defendants in an amount equal to his actual damages and defendants' profits, or statutory

damages as well as costs to bring action, attorney fees, trebled, 15 U.S.C. § 1117(a)(b)(c)(d).

GET DIESEL v. Rev Labs et al.          Complaint          15

JA000015

## FOR A FOURTH CAUSE OF ACTION
### TRADEMARK DILUTION BY TARNISHMENT 15 U.S.C. 1125(c)

67.    Each and every allegation of paragraphs 1 through 66 is realleged as fully as if restated herein verbatim.

68.    Plaintiff's Trademarks are strong and distinctive marks that have been in use for many years and have achieved enormous and widespread public recognition.

69.    Defendants' use of the Infringing Products, is diluting the distinctive quality of the Plaintiff's Trademarks and decreasing the capacity of such marks to identify and distinguish Plaintiff's products.

70.    Defendant literally uses plaintiff's marks in trying to divert consumers to its website and thus is likely to cause an association between Defendant's website and products and the Plaintiff's Marks that impairs the distinctiveness of the Plaintiff's Marks and weakens the connection in consumers' minds between the Plaintiff's Marks and defendants' counterfeit products and infringing marks.  Defendant's wrongful use of the Plaintiff's Mark is likely to cause dilution by tarnishment and blurring based on a number of relevant considerations, including, but not limited to:

f.    Defendant's use of the Diesel Test mark is virtually identical to Plaintiff's marks.

g.    Plaintiff's Marks are inherently distinctive;

h.    Plaintiff is engaging in substantially exclusive use of his marks in connection with Get Diesel Nutritional Products.

i.    The plaintiff's marks are widely recognized by the general consuming public;

j.    Defendant's products may produce a negative result and damage the Plaintiff's marks as a result; and

JA000016

k.      Plaintiff, on information and belief, and based thereon alleges, that Defendants intend to

create an association with the his Marks.

71.     Defendant's wrongful use of the plaintiff's marks is deliberate, willful, fraudulent, and

without any extenuating circumstances, and constitutes a willful intent to trade on plaintiff's

reputation or to cause dilution of Plaintiff's marks and is an exceptional case within the meaning

of Lanham Act section 35, 15 U.S.C. § 1117. Plaintiff is therefore entitled to recover three times

the amount of its actual damages and the attorneys' fees and costs incurred in this action, and

prejudgment interest.

### FOR A FIFTH CAUSE OF ACTION
### COMMON LAW TRADEMARK INFRINGEMENT

72.     Each and every allegation of paragraphs 1 through 71 is realleged as fully as if restated

verbatim.

73.     Plaintiff owns all rights, title, and interest in and to the Diesel Trademarks,

including all common law rights in such marks.

73.     Defendants, without authorization from Plaintiff, have used and are continuing to

use spurious designations that are identical to, substantially indistinguishable from, or

confusingly similar to Plaintiff's Trademarks.

74.     The foregoing acts of Defendants are intended to cause, have caused, and are

likely to continue to cause confusion, mistake, and deception among consumers, the public, and

the trade as to whether Defendants' Infringing Products originate from, or are affiliated with,

sponsored by, or endorsed by Plaintiff.

75.     Upon information and belief, Defendants have acted with knowledge of Plaintiff's

ownership of the Trademarks and with deliberate intention or willful blindness to unfairly

benefit from the incalculable goodwill symbolized thereby.

GET DIESEL v. Rev Labs et al.              Complaint                                    17

76.    Defendants' acts constitute trademark infringement in violation of the common law of the State of Illinois.

77.    Upon information and belief, Defendants have made and will continue to make substantial profits and/or gains to which they are not in law or equity entitled.

78.    Upon information and belief, Defendants intend to continue their infringing acts, unless restrained by this Court.

79.    Defendants' acts have damaged and will continue to damage Plaintiff, and Plaintiff has no adequate remedy at law.

80.    Plaintiff is informed and believes that he should be entitled to an order from this Court enjoining, prohibiting and restraining defendants from continued infringement of his trademark(s).


## FOR A SIXTH CAUSE OF ACTION
### Violation of Anti-Cybersquatting Consumer Protection Act (Cyberpiracy)
### 15 U.S.C. § 1125(d)

81.    Each and every allegation of paragraphs 1 through 80 of the complaint is realleged as fully as if restated herein verbatim.

82.    The domain names used by defendants, as set forth in paragraph 25 all incorporated Plaintiff's DIESEL TEST trademark in the domain and/or URL names.

83.    Defendants registered and used the offending domain names set forth in paragraph 25 with the bad faith intent to do harm to plaintiff and his brands and of profiting illegally from Plaintiff by using Plaintiff's marks to call attention to Defendant's products.

GET DIESEL v. Rev Labs et al.            Complaint                                    18

JA000018

84.     Upon information and belief, Defendants have a bad faith intent to profit from the registration and use of the Internet domain names listed in paragraph 25 by creating an association with Plaintiff's trademarks as to source or ownership.

85.     Defendants registered the offending domain names with the intent to divert consumers from Plaintiff's website and products to their websites, accessible from the infringing domain names and with the bad faith intent to harm Plaintiff's goodwill and to profit from Plaintiff's mark by creating confusion as to source, sponsorship, affiliation or endorsement of Defendant's sites.

86. Defendants have concealed their identity in the registration of the domain names, making it hard to discover ownership of the infringing domains, evidencing their bad faith as set forth in 15 USC §1125(d)( (1)(B)(i)(VII).

87.     Defendants' actions constitute cyberpiracy in violation of 15 U.S.C. §1125(d).

88.     Plaintiff has been damaged by Defendants' unlawful use of the infringing domain names and will suffer irreparable harm.

89.     Pursuant to 15 U.S.C. § 1116, 15 U.S.C. § 1117 and 15 U.S.C. § 1125 (d) (1) (C), Plaintiff is entitled to recover equitable relief in the form of an injunction, forfeiture or cancellation of the domain names being used by Defendants.

90.     In the alternative to actual damages, Plaintiff may elect to receive statutory damages from Defendants  as calculated and allowed by the Anticybersquatting Consumer Protection Act (ACPA).

JA000019

## FOR A SEVENTH CAUSE OF ACTION
## FRAUDULENT TRADEMARK APPLICATION

90.    Each and every allegation of paragraphs 1 through 90 is realleged as fully as if restated verbatim.

91.    Defendant Joshua Nussbaum executed an application for registration of a trademark with the USPTO for the name Diesel Test, serial number 87250405.

92.    In order to support such application, Nussbaum executed a written declaration, that stated among other things that he was the owner of the mark, that he was entitled to use the mark in commerce, and that he believes to the best of his knowledge that no other person is entitled to use the mark, as as more fully set forth in paragraph 30 above.

93.    The declarations, statements and representations made by Nussbaum were false and known to be false when made.

94.    The application made by Nussbaum was in direct violation of 15 U.S.C. § 1120.

95.    Plaintiff has been damaged as a direct and proximate result of the fraudulent trademark registration application filed by Nussbaum in that plaintiff's own application for the DIESE TEST trademark in use since 2005, filed for registration after that of Nussbaum has been suspended by the USPTO as a result of Nussbaum's filing seeking registration of a mark, Diesel Test, actually belonging to plaintiff.

JA000020

## Prayer for Relief

WHEREFORE, having set forth his complaint, Plaintiff prays that this Court enter judgment as follows:

I.       Granting a preliminary and permanent injunction restraining Defendants, their officers, directors, principals, agents, servants, employees, successors and assigns, and all individuals acting in concert or participation with them, from using, on or in connection with any product or service, or the manufacture, importation, exportation, sale, offering for sale, distribution, advertising, promotion, labeling or packaging of any product or service, or using for any commercial purpose whatsoever:

      (1) the designation Diesel Test or similar terms.

      (2) any internet name containing "diesel test", "diesel", or "diesel fuel".

      (3) any other designation that is likely to cause dilution of the distinctiveness of the Plaintiff's mark(s) or injury to plaintiff's business reputation; or

      (4) any other name, mark or term likely to cause mistake in the mind of the public or to deceive the public into the belief that defendant's business and/or products and/or services are in any way associated with or related to plaintiff or its products and/or services;

II.      Judgment against defendants for plaintiff's actual damages, punitive damages and attorney's fees for violation of the Illinois Consumer Fraud and Deceptive Practices Act.

III.     Judgment against the defendants for his actual damages for violation of the Illinois Uniform Deceptive Trade Practices Act, together with costs and attorney's fees.

JA000021

IV.    An order enjoining and prohibiting defendants from engaging in further violation of the

Illinois Uniform Deceptive Trade Practices Act or the Illinois Consumer Fraud and Deceptive

Practices Act.

V.    An order enjoining and prohibiting defendants from manufacturing, importing,

advertising, marketing, promoting, supplying, distributing, offering for sale, or selling any

products which bear the Plaintiff's mark or any other mark or design element substantially

similar or confusing thereto.

VI. Judgment against defendants for their willful and wanton acts of

infringement pursuant to 15 U.S.C. § 1117(a). Trebled pursuant to 15 U.S.C. § 1117(b).

VII.    The option to recover statutory damages Pursuant to § 35 of the Federal Trademark Act,

15 U.S.C. § 1117(c)(2), for defendants' willful and wanton acts of infringement.

VIII.    Pursuant to § 35 of the Federal Trademark Act, 15 U.S.C. § 1117(d), judgment against

defendants for the maximum statutory damages allowed for each infringing domain name or

URL for defendant's use of the domain name(s) and URL(s) in violation of the Anti-

Cybersquatting Consumer Protection Act.

IX.    An Order of Judgment against the defendants in accordance with 15 USC §1125(d), with

such Order to provide:

   a. forfeiture and cancellation of any domain names which infringe those of plaintiff, or in

the alternative, transfer of those domain names to plaintiff.

   b. that defendants not transfer, suspend, or otherwise modify the domain names during

the pendency of the action, except upon order of the court.

   c. specify that such order shall be in addition and not in lieu of any other remedies

available to plaintiff.

GET DIESEL v. Rev Labs et al.          Complaint          22

JA000022

X.      For judgment against defendant Joshua Nussbaum for violation of 15 USC §1120 in an

amount of actual damages to be determined at the trial of this case.

XI.     For such other and further relief as the Court may deem just and proper.


### Request for Jury Trial

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff requests a jury trial of

all issues that may be tried to a jury in this action.


Dated: March 24th, 2016                              Respectfully submitted,

                                                     Charles Curry, MBA
                                                     DBA GET DIESEL NUTRITION
                                                     Pro Se
                                                     PO BOX 962
                                                     Lansing, IL 60438
                                                     Tel: (888)509-5087
                                                     Email: getdiesel@gmail.com

GET DIESEL v. Rev Labs et al.              Complaint                              23

                                                                          JA000023

## COMPLAINT EXHIBIT LIST

| Exhibit | Description |
|---|---|
| 1 | Chuck Diesel |
| 2 | getdiesel.com whois \| getdiesel.net whois |
| 3 | Diesel Fuel Trademark Publication Notification |
| 4 | Diesel Notice of Publication |
| 5 | Email Tina Stewart - confusion because of counterfeit product |
| 6 | dieseltest.org website screenshot |
| 7 | dieseltest.us website screenshot |
| 8 | dieseltest.net website screenshot |
| 9 | dieseltest listing on Amazon |
| 10 | dieseltest on Ebay |
| 11 | facebook screenshot - notice of infringement |
| 12 | email cease and desist |
| 13 | Nussbaum Trademark Application - Diesel Test |
| 14 | USPTO data page - application for DZL TEST |
| 15 | Amazon removal of Diesel Test on basis of infringement |
| 16 | ESPN fake news story |
| 17 | Photo showing Diesel Nutrition vs. Diesel Test containers |
| 18 | Adding stating that Diesel Test is approved by physician |
| 19 | Def Diesel Test application suspended |

JA000024

**Exhibit 1(a) Chuck Diesel**



JA000025

**Exhibit 2(a) (getdiesel.net)**

Whois Server Version 2.0

Domain names in the .com and .net domains can now be registered
with many different competing registrars. Go to http://www.internic.net
for detailed information.

Domain Name: GETDIESEL.NET
Registrar: TIERRANET INC. D/B/A DOMAINDISCOVER
Sponsoring Registrar IANA ID: 86
Whois Server: whois.domaindiscover.com
Referral URL: http://www.domaindiscover.com
Name Server: NS1.DOMAINDISCOVER.COM
Name Server: NS2.DOMAINDISCOVER.COM
Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited
Updated Date: 04-mar-2016
Creation Date: 20-may-2002
Expiration Date: 20-may-2017

**Exhibit 2(b) (getdiesel.net)**

Whois Server Version 2.0

Domain names in the .com and .net domains can now be registered
with many different competing registrars. Go to http://www.internic.net
for detailed information.

Domain Name: GETDIESEL.COM
Registrar: DNC HOLDINGS, INC.
Sponsoring Registrar IANA ID: 291
Whois Server: whois.directnic.com
Referral URL: http://www.directnic.com
Name Server: NS1.WIX.COM
Name Server: NS2.WIX.COM
Status: clientDeleteProhibited https://icann.org/epp#clientDeleteProhibited
Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited
Status: clientUpdateProhibited https://icann.org/epp#clientUpdateProhibited
Updated Date: 05-dec-2016
Creation Date: 07-dec-2002
Expiration Date: 07-dec-2017

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Tuesday, November 1, 2016 01:02 AM |
| **To:** | getdiesel@gmail.com |
| **Cc:** | fefifonutrition@gmail.com |
| **Subject:** | Official USPTO Notice of Publication Confirmation: U.S. Trademark SN 87065657: DIESEL FUEL |

### *TRADEMARK OFFICIAL GAZETTE* PUBLICATION CONFIRMATION

**U.S. Serial Number:** 87065657
**Mark:** DIESEL FUEL
**International Class(es):** 005
**Owner:** Curry, Charles A
**Docket/Reference Number:**

The mark identified above has been published in the Trademark Official Gazette (TMOG) on Nov 01, 2016.

**To Review the Mark in the TMOG:**

Click on the following link or paste the URL into an internet browser: https://tmog.uspto.gov/#issueDate=2016-11-01&serialNumber=87065657

On the publication date or shortly thereafter, the applicant should carefully review the information that appears in the TMOG for accuracy. If any information is incorrect due to USPTO error, the applicant should immediately email the requested correction to TMPostPubQuery@uspto.gov. For applicant corrections or amendments after publication, please file a post publication amendment using the form available at http://teasroa.uspto.gov/ppa/. For general information about this notice, please contact the Trademark Assistance Center at 1-800-786-9199.

**Significance of Publication for Opposition:**

*   Any party who believes it will be damaged by the registration of the mark may file a notice of opposition (or extension of time therefor) with the Trademark Trial and Appeal Board. If no party files an opposition or extension request within thirty (30) days after the publication date, then eleven (11) weeks after the publication date a certificate of registration should issue.

To check the status of the application, go to http://tsdr.uspto.gov/#caseNumber=87065657&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199. Please check the status of the application at least every three (3) months after the application filing date.

To view this notice and other documents for this application on-line, go to http://tsdr.uspto.gov/#caseNumber=87065657&caseType=SERIAL_NO&searchType=documentSearch. NOTE: This notice will only become available on-line the next business day after receipt of this e-mail.

GET DIESEL v. Rev Labs

Exhibit 4

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA  22313-1451
www.uspto.gov

Mar 8, 2017

## NOTICE OF PUBLICATION

1.  Serial No.:
    87-070,512

2.  Mark:
    DIESEL
    (STANDARD CHARACTER MARK)

3.  International Class(es):
    5

4.  Publication Date:
    Mar 28, 2017

5.  Applicant:
    Curry, Charles

The mark of the application identified appears to be entitled to registration. The mark will, in accordance with Section 12(a) of the Trademark Act of 1946, as amended, be published in the *Official Gazette* on the date indicated above for the purpose of opposition by any person who believes he will be damaged by the registration of the mark. If no opposition is filed within the time specified by Section 13(a) of the Statute or by rules 2.101 or 2.102 of the Trademark Rules, the Commissioner of Patents and Trademarks may issue a certificate of registration.

Copies of the trademark portion of the *Official Gazette* containing the publication of the mark may be obtained from:
                    The Superintendent of Documents
                    U.S. Government Printing Office
                    PO Box 371954
                    Pittsburgh, PA 15250-7954
                    Phone: 202-512-1800

By direction of the Commissioner.

**Email Address(es):**

getdiesel@gmail.com
fefifonutrition@gmail.com

GET DIESEL v Rev Labs

JA000028

**Exhibit 5(a)**



http://espn-weekly.com/us-hotline/jon-jones-transformation-

pro2/?voluumdata=BASE64dmlkLi4wMDAwMDAwMy0yNmU0LTQ2MjUtODAwMC0wMDAwMDAwMDAwMDBfX3ZwaWQuLjUwZjNlMDAwLWE3YzMtMTFlNi04MTc3LTQxNjg5ODNDM0M19fY2FpZC4uNzk1O

TViOTUtNTM5MS00YmE5LTliNDAtZDZmNzQ3MzM2YmJiX19ydC4uREpfX2xpZC4uOTliMjY4NjUtZDM0MC00YjViLWJiMmQtMDRlYTRlOGI3ZWE3X19vaWQxLi5kMzkwYTAwNC1lZTgwLTRjRjNWMtOTdlNS1kOTY1ODk

2OTkwNTJfX29pZDIuLjlmODMyNjkkLTRmZWQtNDI5Yi1iMTFmLTA1ODFiYzM1NmJkZl9fdmFyMS4ue2FnZX1fX2ZhcmZmZjJ1dmFyMS4ue2FnZX1fX2FmdmFyMi4ue2FnZX1fX2FmdmFyMy4ue2FnZX1fX2FmdmFyNC4ue2FnZX1fX2FmdmFyNS4ue2FnZX1fX2FmdmFyNi4ue2FnZX1fX2FmdmFyNy4ue2FnZX1fX2FmdmFyOC4ue2FnZX1fX2FmdmFyOS4ue2FnZX1fX2FmdmFyMTAuLntheftmVhZ2Uf&age={age}&gender={gender}&country={country}&ad={ad}&account={account}

## Exhibit 5(b)



**Michael Lovett**
View Profile

Actions ▼



**Michael Lovett**
View Profile

Actions ▼

of the bottle to me on here or to
getdiesel@gmail.com



What he your bank account this
company will steal from you and
they claim to be be veteran
owned...!!!! I am a vet so you will
steal from anyone..!!!!

What are you talking about. You
didnt order anything from get
diesel. You probably ordered from
Rev Labs who are making a
counterfit Diesel Test. Did you
order Diesel Test from
someehere? Can you send a pic
of the bottle to me on here or to
getdiesel@gmail.com





**Michael Lovett**
View Profile

Actions ▼



The phone number is associated
with your company....!!!!

What number? Go 2 revlabs.com.
those are not my products. My
products are at getdiesel.com.
those bottles actually say Rev
Labs on them

emails from customers

**no-reply@parastorage.com**
to me ▾

**You have a new message:**
Via: http://www.getdiesel.com/

**Message Details:**
    **Name** Karen Kelso
    **Subject** Free offer
    **Message** We are interested in the free trail offer. Please send a link.
    **Email** karenkelso@ymail.com

**Sent on:** 3 November, 2016

Thank you!

**no-reply@parastorage.com**
to me ▾

**You have a new message:**
Via: http://www.getdiesel.com/

**Message Details:**
    **Name** Jim
    **Subject** Testosterone Builder
    **Message** Supplement to Cialis?
    **Email** jmm3559@msn.com

**Sent on:** 3 November, 2016

Thank you!





JA000033

no-reply@parastorage.com
to me ~

**You have a new message:**
Via: http://www.getdiesel.com/

**Message Details:**
   **Name** Gerald brink
   **Subject** Cancel
   **Message** Cancel payment cause I didn't want the product
   **Email** chevyman57576@yahoo.com

Sent on: 6 January 2017

Thank you!



You have a new message:
Via: https://www.getdiesel.com/

Message Details:
  **Name** Don
  **Subject** What is considered a best practice "cycle" of diesel test
  **Message** 56 years old. Got back in gym a few months ago. 25 years ago I was a big gym rat. Anyhow -- ordered diesel test trial with the "red" stack So is a "cycle" a month or 3 or? Thx Don
  **Email** Don.wapenski@gmail.com

Sent on: 19 January 2017.

Thank you!

**GetDiesel Nutrition** <getdiesel@gmail.com>
to Don ~

We don't do trials. You ordered a counterfeit diesel test from rev labs. Was it this one at the top?

GET DIESEL

**Don Wapenski** <don.wapenski@gmail.com>
to me ~

I ordered and paid for 1 bottle of diesel test hardcore from amazon. logging into my amazon account and ordering from there

I also -- from a Facebook post ordered diesel test hardcore -- free bottle for 4.95 shipping. then added on another product test for 4.95 shipping

I will forward the confirmation emails asap

done



Derrick Ashby Customer

JA000035



no-reply@parastorage.com                                                                 11/12/16
to me

**You have a new message:**
Via http://www.getdiesel.com/

**Message Details:**
    **Name** Derrick Ashby
    **Subject** Order # 3010912
    **Message** I had placed an order for the free trial of Diesel Test and MRX but my address and name were not in the client info. This is my info
    in case it isn't in your system. Derrick Ashby 52 Narwood Drive Louisville, KY 40299 Thank you. Sincerely, Derrick Ashby
    **Email** d0ashb02@cardmail.louisville.edu

Sent on: 12 November, 2016

Thank you!

---

**GetDiesel Nutrition** <getdiesel@gmail.com>                                             11/12/16
to Derrick

What free trial???

GET DIESEL

---

derrick.ashby@louisville.edu                                                              11/12/16
to me

I went to this link. http://www.testoboosterpro.com/ . I have been charged $4.90 S&H under MUSCLE BOOST RED. Is this not
your product? Should I be concerned for any fraud from a third party? Thank you.

Derrick Ashby

Get Outlook for Android

---

**From:** GetDiesel Nutrition <getdiesel@gmail.com>
**Sent:** Saturday, November 12, 2016 9:37:13 PM
**To:** Ashby,Derrick
**Subject:** Re: New message via your website, from d0ashb02@cardmail.louisville.edu

**GetDiesel Nutrition** <getdiesel@gmail.com>                                              11/12/16
to derrick ashby

Yes bc thats not my product. Does it say "get diesel nutrition??"

GET DIESEL

---

JA000036



**GetDiesel Nutrition** <getdiesel@gmail.com>
to derrick ashby

11/12/16

Just went to the site. Wow. Thats 100% fake. I'd report to better business Bureau

-Chuck

GET DIESEL

**GetDiesel Nutrition** <getdiesel@gmail.com>
to derrick ashby

11/12/16

I'd call them monday. Thats 100% bootleg

GET DIESEL

**derrick.ashby@louisville.edu**
to me

11/12/16

Thank you. I'll sort it out. Have a good one.

Derrick Ashby

Get Outlook for Android

**From:** GetDiesel Nutrition <getdiesel@gmail.com>
**Sent:** Saturday, November 12, 2016 9:50:24 PM
**To:** derrick.ashby@louisville.edu

**no-reply@parastorage.com**
to me

Mar 2 (1 day ago)

**You have a new message:**
Via: https://www.getdiesel.com/

**Message Details:**
  **Name** David Freeman
  **Subject** Stop Auto Ship
  **Message** Please stop the auto ship of the Diesel Test My Customer # 141 My previous Order number dated Feb 10 2017 is 5552414 My reference # 3152163 Thank you in advance for stopping this auto ship promptly
  **Email** dmfreeman1@bellsouth.net

**Sent on:** 2 March. 2017

Thank you!

GET DIESEL v. Rev Labs                    Exhibit 5                    9

**Exhibit 6(a)**



**Exhibit 6(b) (Dieseltest.org)**



**Exhibit 7 (Dieseltest.us)**



**Exhibit 8 (dieseltest.net)**



GET DIESEL v Rev Labs

**Exhibit 9 (diesel test on amazon.com)**



**(Listed first, Rev Labs Counterfeit DIESEL TEST)**
**(Listed 2nd, GET DIESEL authentic DIESEL TEST)**

GET DIESEL v. Rev Labs

Exhibit 10



## Exhibit 11



Message(s) to and from RevLabs on Facebook

GET DIESEL v. Rev Labs

JA000043

**Exhibit 12**

---------- Forwarded message ---------

From: GetDiesel Nutrition <getdiesel@gmail.com>

Date: Fri, Nov 18, 2016 at 10:54 AM

Subject: Fwd: Cease and desist notice for use of Diesel Test mark

To: <support@revlabs.com>

Cc: Fefifo Nutraceuticals <fefifonutrition@gmail.com>, Manotti Jenkins <mj@mljlawoffices.com>

I am following up on a Facebook message to email you information on your trademark violation of "diesel test."

Please contact my attorney, Manotti Jenkins at:

Manotti L Jenkins, LTD

mj@mljlawoffices.com

1-844-655-5291

Chicago - Washington DC

Also as a note, your product was just released in October 2016, there is no way it won an award in 2015 for best test booster. This is

false advertising. My original Diesel Test product(s) are multiple award winning in 2015 and 2016.

http://www.testoboosterpro.com/dieseltest/mobile/   (Rev Labs Diesel Test)

---------- Forwarded message ----------

From: GetDiesel Nutrition <getdiesel@gmail.com>

Date: Tue, Nov 15, 2016 at 9:22 AM

Subject: Cease and desist notice for use of Diesel Test mark

To: support@revlabs.com

This is an official  cease and desist notice, you are in violation of my first use and common law rights to "Diesel Test" in trademark international class 005.

GET DIESEL v. Rev Labs                    Exhibit 12                              1

Not really sure how its possible you guys didn't know, but we have been in use of our Diesel trademark and brand name since 2002, when we first released "Diesel Fuel" and Diesel Test since 2005. We have advertised Diesel Test, Diesel Test Hardcore, Diesel Test 2010, Diesel Test 2040 and Diesel Test Procycle V3 in several magazines since 2002 in the US, Canada and Europe. We have advertised in Muscular Development, Planet Muscle, Powerlifitng USA, Power Magazine, DXL (Canada), Status Fitness (Canada, Europe, US), Natural Muscle and Southern Muscle just to name a few. Are products have been sold on Amazon.com for years.

You are advised to stop the production, distribution and sale of any item using the "Diesel Test" mark immediately.

The " Diesel Test" Product you just released makes your company guilty of trademark infringement, trademark dilution, trade dress infringement and you are in volition of the Trademark Counterfeit Act of 1984. You also are putting your retailers in jeopardy of violating the Trademark Counterfeit  Act also.

Your Diesel Test product is the exact same as that other test booster you make. I am advising you to pull all online promotion of your new "diesel test" and destroy it or relabel it. I have already received emails from consumers asking if your  product is mine, or questions about a free trial they saw on your product which further proves an obvious likelihood of confusion.

You are instructed to discontinue all sale and distribution of "Diesel Test" by Rev Labs and Rev Labs' retailers in the next 72 hours (by 9am central 18 Nov 2016) or you will incur legal action.

http://www.getdiesel.com/diesel-test-hardcore\

http://www.getdiesel.com/diesel-test-procycle-v3

https://static.wixstatic.com/media/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg/v1/fill/w _391,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg

https://static.wixstatic.com/media/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_25 13_3263_s_4_2.jpg/v1/fill/w_389,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_5dc7dc4aa89 54af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg


Thanks

-Charles "Chuck Diesel" Curry

Getdiesel.com

GET DIESEL

--

GET DIESEL

GET DIESEL v. Rev Labs                    Exhibit 12                         2

FB_to_RevLabs.jpg


rev_Labs_onamazon_Diesel_Test.JPg

DieselTest_search_Amazon_16_Nov_2016.jpg

fake_Rev_Labs_Diesel_Test.jpg

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# Trademark/Service Mark Application, Principal Register

**Serial Number: 87250405**
**Filing Date: 11/29/2016**

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 87250405 |
| **MARK INFORMATION** | |
| *MARK | Diesel Test |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | Diesel Test |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Joshua Nussbaum |
| *STREET | 990 Highland Drive Suite #203 |
| *CITY | Solana Beach |
| *STATE (Required for U.S. applicants) | California |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants) | 92075 |
| **EMAIL ADDRESS** | uspto@trademarks411.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **LEGAL ENTITY INFORMATION** | |
| TYPE | individual |
| **COUNTRY OF CITIZENSHIP** | United States |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 005 |
| *IDENTIFICATION | Dietary supplements; nutritional supplements |
| **FILING BASIS** | SECTION 1(b) |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Joshua Nussbaum |
| **STREET** | 990 Highland Drive Suite #203 |
| CITY | Solana Beach |

| STATE | California |
|---|---|
| COUNTRY | United States |
| ZIP/POSTAL CODE | 92075 |
| *EMAIL ADDRESS | uspto@trademarks411.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| FEE INFORMATION | |
| APPLICATION FILING OPTION | TEAS RF |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 275 |
| *TOTAL FEE DUE | 275 |
| *TOTAL FEE PAID | 275 |
| SIGNATURE INFORMATION | |
| SIGNATURE | /Joshua Nussbaum/ |
| SIGNATORY'S NAME | Joshua Nussbaum |
| SIGNATORY'S POSITION | Owner |
| DATE SIGNED | 11/28/2016 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Trademark/Service Mark Application, Principal Register

**Serial Number: 87250405**
**Filing Date: 11/29/2016**

### To the Commissioner for Trademarks:

**MARK:** Diesel Test (Standard Characters, see mark)
The literal element of the mark consists of Diesel Test.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Joshua Nussbaum, a citizen of United States, having an address of
    990 Highland Drive Suite #203
    Solana Beach, California 92075
    United States
    uspto@trademarks411.com

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 005:  Dietary supplements; nutritional supplements
Intent to Use: The applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the identified goods/services.

The applicant's current Correspondence Information:
    Joshua Nussbaum

    990 Highland Drive Suite #203

    Solana Beach, California 92075

    uspto@trademarks411.com (authorized)
**E-mail Authorization:** I authorize the USPTO to send e-mail correspondence concerning the application to the applicant or applicant's attorney at the e-mail address provided above. I understand that a valid e-mail address must be maintained and that the applicant or the applicant's attorney must file the relevant subsequent application-related submissions via the Trademark Electronic Application System (TEAS). Failure to do so will result in an additional processing fee of $50 per international class of goods/services.

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

### Declaration

The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant is using the mark in commerce on or in connection with the goods/services in the application; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e), the applicant is entitled to use the mark in commerce; the applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

### Declaration Signature

Signature: /Joshua Nussbaum/  Date: 11/28/2016
Signatory's Name: Joshua Nussbaum
Signatory's Position: Owner

RAM Sale Number: 87250405
RAM Accounting Date: 11/29/2016

Serial Number: 87250405
Internet Transmission Date: Tue Nov 29 12:27:03 EST 2016
TEAS Stamp: USPTO/BAS-XX.XXX.XX.XXX-2016112912270323
7313-87250405-570d3e91e8957dadb6c32a52cc
ac133e946f168a5b9eb4e72ac2f93876f71526fe
-CC-12590-20161128123120836344

JA000050

# Diesel Test

JA000051

Exhibit 14

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Trademark/Service Mark Application, Principal Register

**Serial Number: 87250413**
**Filing Date: 11/29/2016**

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 87250413 |
| **MARK INFORMATION** | |
| **\*MARK** | DZL Test |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | DZL Test |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| **\*OWNER OF MARK** | Joshua Nussbaum |
| **\*STREET** | 990 Highland Drive Suite #203 |
| **\*CITY** | Solana Beach |
| **\*STATE** (Required for U.S. applicants) | California |
| **\*COUNTRY** | United States |
| **\*ZIP/POSTAL CODE** (Required for U.S. applicants) | 92075 |
| **EMAIL ADDRESS** | uspto@trademarks411.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | individual |
| **COUNTRY OF CITIZENSHIP** | United States |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 005 |
| **\*IDENTIFICATION** | Dietary supplements; nutritional supplements |
| **FILING BASIS** | SECTION 1(b) |
| **CORRESPONDENCE INFORMATION** | |
| **NAME** | Joshua Nussbaum |
| **STREET** | 990 Highland Drive Suite #203 |
| **CITY** | Solana Beach |

| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 92075 |
| *EMAIL ADDRESS | uspto@trademarks411.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| APPLICATION FILING OPTION | TEAS RF |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 275 |
| *TOTAL FEE DUE | 275 |
| *TOTAL FEE PAID | 275 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /Joshua Nussbaum/ |
| SIGNATORY'S NAME | Joshua Nussbaum |
| SIGNATORY'S POSITION | Owner |
| DATE SIGNED | 11/28/2016 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Trademark/Service Mark Application, Principal Register

**Serial Number: 87250413**
**Filing Date: 11/29/2016**

## To the Commissioner for Trademarks:

**MARK:** DZL Test (Standard Characters, see mark)
The literal element of the mark consists of DZL Test.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Joshua Nussbaum, a citizen of United States, having an address of
  990 Highland Drive Suite #203
  Solana Beach, California 92075
  United States
  uspto@trademarks411.com

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

   International Class 005:  Dietary supplements; nutritional supplements
Intent to Use: The applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the identified goods/services.

The applicant's current Correspondence Information:
  Joshua Nussbaum
  990 Highland Drive Suite #203
  Solana Beach, California 92075
  uspto@trademarks411.com (authorized)
**E-mail Authorization:** I authorize the USPTO to send e-mail correspondence concerning the application to the applicant or applicant's attorney at the e-mail address provided above. I understand that a valid e-mail address must be maintained and that the applicant or the applicant's attorney must file the relevant subsequent application-related submissions via the Trademark Electronic Application System (TEAS). Failure to do so will result in an additional processing fee of $50 per international class of goods/services.

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

### Declaration

The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant is using the mark in commerce on or in connection with the goods/services in the application; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e), the applicant is entitled to use the mark in commerce; the applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

### Declaration Signature

Signature: /Joshua Nussbaum/   Date: 11/28/2016
Signatory's Name: Joshua Nussbaum
Signatory's Position: Owner

RAM Sale Number: 87250413
RAM Accounting Date: 11/29/2016

Serial Number: 87250413
Internet Transmission Date: Tue Nov 29 12:29:08 EST 2016
TEAS Stamp: USPTO/BAS-XX.XXX.XX.XXX-2016112912290897
3903-87250413-570ce3b302d2f5c78ffde427ee
25ef86116c44de4f845e8c256a1d7c3ea5352-CC
-12617-20161128123638583923

# DZL Test

GET DIESEL v. Rev Labs                    Exhibit 14                    4

**Exhibit 15**

---------- Forwarded message ---------
From: <notice-request@amazon.com>
Date: Mon, Feb 13, 2017 at 1:33 AM
Subject: Your Report of Rights Infringement On Amazon.com
To: <fefifonutrition@gmail.com>


Hello,

We reviewed your report and removed the following content based on the information you provided.

ASIN: B01L7WNOGG (DIESEL TEST by Rev Labs)
B00HNZOVXW
B00GGFAIGE
B004OG5HDG
B004OG8O40
B018MSRAFO

Complaint ID: 851103651

Sincerely,
Amazon.com

We received a report from a rights owner that you are listing counterfeit products. Sellers on
Amazon.com are not allowed to create listings or detail pages for counterfeit goods.

We removed the content listed at the end of this email. We may let you list this product again if we
receive a retraction from the rights owner. Their contact information can be found below.

fefifonutrition@gmail.com

If the rights owner agrees to retract their complaint, they must send the retraction to us at notice-
dispute@amazon.com.

If you believe that the reported content is not counterfeit, you may email notice-dispute@amazon.
com with supporting information.
If the rights owner does not retract their complaint, or you do not provide supporting information, we
may provide your contact information to the rights owner upon their request.

We consider allegations of counterfeit a serious matter and your account is under review. If we receive
more complaints about your listings, we may not allow you to sell on Amazon.com.

To learn more about this policy, search for "Intellectual Property Violations" in Seller Central Help.

ASIN:
B004OG5HDG
B00HNZOVXW
B00GGFAIGE
B004OG8O40
Infringement type: Counterfeit
Complaint ID: 851103651

**Exhibit 16(a)**

http://dieseltesto.com/



http://dieseltestpro.com/



Exhibit 16(b)





In our interview, Jon stated "My doctors approved my supplement stack "Diesel Test®", the UFC is just trying to keep me from the title."





2. These supplements don't require you to spend hours in the gym. Users experience muscle growth, fat loss without lifting a single weight in an overcrowded gym. All of the national leagues are deeming this a "cheat" as it requires hardly any effort on the user's part.



(Fake consumer comments on a fake Instagram page that consumers are referencing to in emails in B-20)

Ever since Jon Jones's secret went viral, ESPN has received thousands of emails from our readers asking about Diesel Test® and MRX®. In an attempt to answer our reader's questions and to discover just how much Diesel Test® and MRX® has benefited John Cena we decided to test it ourselves in an exclusive ESPN case study!

This wouldn't be the first muscle building system we put to the test. Over the years ESPN has evaluated numerous celebrity workout programs and diets but all too frequent the results are just shy of being painfully disappointing or require dramatic changes in both a person's lifestyle and diet to see any real changes. As we began researching Diesel Test® and MRX® we were shocked to discover countless success stories reported by real individuals from all over the world. It gets even better, there was even a clinical case study performed on both Diesel Test® and MRX® that proved the following:

### Diesel Test® has been clinically proven to:

1. Boost testosterone production by over 65%
2. Boost Energy Levels and Endurance by 52%
3. Reduce Muscle repair time by over 40%

### MRX® has been clinically proven to:

1. Increase the speed of Metabolism by 70%
2. Tone Muscle Appearance without jeopardizing Muscle Mass!
3. Suppress the Appetite, while providing nutrion to muscles.
4. Provides a Thermogenic like effect that burns body fat

## PUTTING THE METHOD TO THE TEST

For the ESPN Test, a free sample bottle of Diesel Test & MRX# were delivered in a few days and only charged us for shipping (see bottom for links). Diesel Test# is one of the most concentrated and purest products on the market. It was our shared opinion that this would give me the most accurate results for my test. Below you can see my results and testimonial.



### WEEK ONE

It's Day 7 of taking Diesel Test# and MRX#. I feel physically stronger. I actually did 65 push-ups today before bed and I still feel as if I could do another 100. I actually feel like I've lost weight instead of muscle so far, but it's hard to say. I'll wait a bit more before I come to my conclusion.

### WEEK TWO

It's Day 14 and I think I see some muscle growth, but it's hard to tell. After looking in the mirror I was positive I had lost weight, but when I checked the scale I had actually gained 5lbs. Interesting enough, I'm starting to see abs for the first time in years. I remember being told abs are made in the kitchen, but I haven't exactly been eating healthy.

### WEEK THREE

It's Day 21 and I've gained over 10 pounds, it might be more, it's hard to tell because I'm losing fat and gaining muscle at the same time, it's CRAZY! I also feel a lot stronger than I ever have. In ten days my experiment will be over I can't wait for the final results...

### WEEK FOUR

It's day 31 and my experiment is over. After 31 days of using Diesel Test# and MRX#, I've gained 16 pounds of muscle and it shows. Even girls are starting to notice. My confidence has skyrocketed! A few days ago I bumped into a friend I hadn't seen in years, he asked me if I've been working out. He was shocked when I told him I wasn't! I've definitely put on muscle mass while burning fat at the same time. I feel and look like a new person!





(this fake DIESEL TEST didn't win or wasn't nominated for any bodybuilding.com award and wasn't even for sale in 2015 to be nominated early 2016)





(fake comments)



Fake consumer reviews

**Exhibit 17**



**Exhibit 18**

**Rev Labs DIESEL TEST fake ESPN article parts**



# Diesel Test® has been clinically proven to:

1. Boost testosterone production by over 65%

2. Boost Energy Levels and Endurance by 52%

3. Reduce Muscle repair time by over 40%

GET DIESEL v. Rev Labs

| To: | Joshua Nussbaum (uspto@trademarks411.com) |
|---|---|
| Subject: | U.S. TRADEMARK APPLICATION NO. 87250405 - DIESEL TEST - N/A |
| Sent: | 3/14/2017 11:45:08 AM |
| Sent As: | ECOM125@USPTO.GOV |
| Attachments: | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |

### UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)
### OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION

**U.S. APPLICATION SERIAL NO.** 87250405

**MARK:** DIESEL TEST

**CORRESPONDENT ADDRESS:**
JOSHUA NUSSBAUM
990 HIGHLAND DRIVE SUITE #203
SOLANA BEACH, CA 92075

**APPLICANT:** Joshua Nussbaum

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
N/A
**CORRESPONDENT E-MAIL ADDRESS:**
uspto@trademarks411.com

# *87250405*

**GENERAL TRADEMARK INFORMATION:**
http://www.uspto.gov/trademarks/index.jsp

VIEW YOUR APPLICATION FILE

### SUSPENSION NOTICE: NO RESPONSE NEEDED

**ISSUE/MAILING DATE:** 3/14/2017

The trademark examining attorney is suspending action on the application for the reason stated below. *See* 37 C.F.R. §2.67; TMEP §§716 *et seq.*

**PRIOR-FILED PENDING APPLICATIONS FOUND:** The trademark examining attorney has searched the USPTO's database of registered and pending marks and has found no similar registered marks that would bar registration under Trademark Act Section 2(d). TMEP §704.02; *see* 15 U.S.C. §1052(d). However, marks in a prior-filed pending applications may present a bar to registration of applicant's mark.

The effective filing date of the pending applications identified below precedes the filing date of applicant's application. If the mark in the referenced applications registers, applicant's mark may be refused registration under Section 2(d) because of a likelihood of confusion with that registered marks. *See* 15 U.S.C. §1052(d); 37 C.F.R. §2.83; TMEP §§1208 *et seq.* Therefore, action on this application is suspended until the earlier-filed referenced applications is either registered or abandoned. 37 C.F.R. §2.83(c). A copy of information relevant to this referenced applications is attached.

    - Application Serial Nos. 87078512 and 87065657

The USPTO will periodically conduct a status check of the application to determine whether suspension remains appropriate, and the trademark examining attorney will issue as needed an inquiry letter to applicant regarding the status of the matter on which suspension is based. TMEP §§716.04, 716.05. Applicant will be notified when suspension is no longer appropriate. *See* TMEP §716.04.

No response to this notice is necessary; however, if applicant wants to respond, applicant should use the "Response to Suspension Inquiry or Letter of Suspension" form online at http://teasroa.uspto.gov/rsi/rsi.

Caroline L. Moran
/Caroline L. Moran/
Trademark Examining Attorney
Law Office 125
(571) 272-3255
caroline.moran@uspto.gov

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:** To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/. Please keep a copy of the TSDR status screen. If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199. For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:** Use the Trademark Electronic Application System (TEAS) form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

**Print: Mar 14, 2017**                    **87065657**

**DESIGN MARK**

**Serial Number**
87065657

**Status**
OPPOSITION PENDING

**Word Mark**
DIESEL FUEL

**Standard Character Mark**
Yes

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Curry, Charles A INDIVIDUAL UNITED STATES 2835 Paris Road Olympia
Fields ILLINOIS 60461

**Goods/Services**
Class Status -- ACTIVE.  IC 005.  US  006 018 044 046 051 052.  G & S:
Dietary and nutritional supplements.  First Use: 2002/05/10.  First
Use In Commerce: 2002/06/01.

**Filing Date**
2016/06/09

**Examining Attorney**
STOIDES, KATHERINE

-1-

# DIESEL FUEL

**Print: Mar 14, 2017**                    **87078512**                    **Issue: Mar 28, 2017**

**DESIGN MARK**

**Serial Number**
87078512

**Status**
PUBLICATION/ISSUE REVIEW COMPLETE

**Word Mark**
DIESEL

**Standard Character Mark**
Yes

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Curry, Charles DBA DIESEL NUTRITION INDIVIDUAL UNITED STATES PO BOX
962 Lansing ILLINOIS 60438

**Goods/Services**
Class Status -- ACTIVE.  IC 005.  US  006 018 044 046 051 052.  G & S:
Dietary and nutritional supplements for endurance sports.  First Use:
2002/05/01.  First Use In Commerce: 2002/06/01.

**Filing Date**
2016/06/21

**Examining Attorney**
RICHARDSON, JENNIFER

-1-

JA000071

# DIESEL

| To: | Joshua Nussbaum (uspto@trademarks411.com) |
|---|---|
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 87250405 - DIESEL TEST - N/A |
| **Sent:** | 3/14/2017 11:45:08 AM |
| **Sent As:** | ECOM125@USPTO.GOV |
| **Attachments:** | |

### UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)

## IMPORTANT NOTICE REGARDING YOUR
## U.S. TRADEMARK APPLICATION

### USPTO OFFICE ACTION (OFFICIAL LETTER) HAS ISSUED
### ON 3/14/2017 FOR U.S. APPLICATION SERIAL NO.87250405

Please follow the instructions below:

**(1) TO READ THE LETTER:** Click on this link or go to http://tsdr.uspto.gov/, enter the U.S. application serial number, and click on "Documents."

The Office action may not be immediately viewable, to allow for necessary system updates of the application, but will be available within 24 hours of this e-mail notification.

**(2) QUESTIONS:** For questions about the contents of the Office action itself, please contact the assigned trademark examining attorney. For *technical* assistance in accessing or viewing the Office action in the Trademark Status and Document Retrieval (TSDR) system, please e-mail TSDR@uspto.gov.

## WARNING

**PRIVATE COMPANY SOLICITATIONS REGARDING YOUR APPLICATION:** Private companies **not** associated with the USPTO are using information provided in trademark applications to mail or e-mail trademark-related solicitations. These companies often use names that closely resemble the USPTO and their solicitations may look like an official government document. Many solicitations require that you pay "fees."

Please carefully review all correspondence you receive regarding this application to make sure that you are responding to an official document from the USPTO rather than a private company solicitation. All official USPTO correspondence will be mailed only from the "United States Patent and Trademark Office" in Alexandria, VA; or sent by e-mail from the domain "@uspto.gov." For more information on how to handle private company solicitations, see http://www.uspto.gov/trademarks/solicitation_warnings.jsp.

GET DIESEL v. Rev Labs        Exhibit 19        7

From: **Barry** bn100@aol.com
Subject: FW: Cease and desist notice for use of Diesel Test mark
Date: July 26, 2017 at 3:32 PM
To: Amy Rapoport Gibson agibson@agdglaw.com, joshua@revlabs.com



Barry Nussbaum
C.E.O.
Revolution Laboratories LLC
990 Highland Drive, Suite 203
Solana Beach, California 92075
858 481 3000

**From:** Galina Polyakova <galina@revlabs.com>
**Date:** Thursday, November 17, 2016 at 6:57 AM
**To:** russell lambe <rlambe.lrs@gmail.com>
**Cc:** elizabeth corvino <lizcorvinolrs@gmail.com>, "joshua@revlabs.com"
<joshua@revlabs.com>, barry nussbaum <bn100@aol.com>
**Subject:** Re: Cease and desist notice for use of Diesel Test mark

PLOT TWIST!! Should we purchase the trade marK ?

Sent from my iPhone

On Nov 17, 2016, at 8:47 AM, Russell Lambe <rlambe.lrs@gmail.com> wrote:

> I went to the website trademarks411, where we register
> our trademarks and did a search for "diesel test" and it is available
> for purchase.
>
> On Wed, Nov 16, 2016 at 1:18 PM, elizabeth corvino
> <lizcorvinolrs@gmail.com> wrote:
>
>> Russ was not CC'd I am CCing him now
>> :)
>>
>> On Tue, Nov 15, 2016 at 12:25 PM, Joshua Nussbaum
>> <joshua@revlabs.com> wrote:
>>
>>> FYI guys. Does anybody have any information if Jeff checked the
>>> trademarks on these? Russ can you please do a search and see if "diesel
>>> test" is available for trademark or if this guy is telling the truth. I
>>> personally vote we let him sue us to get through the remainder of our
>>> labels and then change the name to DZL Test on our next run.

PLAINTIFF'S
EXHIBIT
JA000074
**1**

RL_000458

Joshua Nussbaum
President
Revolution Laboratories, LLC

Cell: (619) 992-0810
Skype: Jnussbaum86
www.RevLabs.com


Begin forwarded message:

**From:** GetDiesel Nutrition <getdiesel@gmail.com>
**Subject: Cease and desist notice for use of Diesel Test mark**
**Date:** November 15, 2016 at 7:22:06 AM PST
**To:** support@revlabs.com

This is an official cease and desist notice, you are in violation of my first use and common law rights to "Diesel Test" in trademark international class 005.

Not really sure how its possible you guys didn't know, but we have been in use of our Diesel trademark and brand name since 2002, when we first released "Diesel Fuel" and Diesel Test since 2005. We have advertised Diesel Test, Diesel Test Hardcore, Diesel Test 2010, Diesel Test 2040 and Diesel Test Procycle V3 in several magazines since 2002 in the US, Canada and Europe. We have advertised in Muscular Development, Planet Muscle, Powerlifitng USA, Power Magazine, DXL (Canada), Status Fitness (Canada, Europe, US), Natural Muscle and Southern Muscle just to name a few. Are products have been sold on Amazon.com for years.

You are advised to stop the production, distribution and sale of any item using the "Diesel Test" mark immediately.

**The " Diesel Test" Product you just released makes your company guilty of trademark infringement, trademark dilution, trade dress infringement and you are in volition of the Trademark Counterfeit Act of 1984. You also are putting your retailers in jeopardy of violating the Trademark Counterfeit Act also.**

Your Diesel Test product is the exact same as that other test booster you make. I am advising you to pull all online promotion of your new "diesel test" and destroy it or relabel it.

JA000075

RL_000459

I have already received emails from consumers asking if your product is mine, or questions about a free trial they saw on your product which further proves an obvious likelihood of confusion.

You are instructed to discontinue all sale and distribution of "Diesel Test" by Rev Labs and Rev Labs' retailers in the next 72 hours (by 9am central 18 Nov 2016) or you will incur legal action.

http://www.getdiesel.com/diesel-test-hardcore

http://www.getdiesel.com/diesel-test-procycle-v3

https://static.wixstatic.com/media/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg/v1/fill/w_391,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg

https://static.wixstatic.com/media/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg/v1/fill/w_389,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg

Thanks
-Charles "Chuck Diesel" Curry
Getdiesel.com

GET DIESEL

--
*Elizabeth Corvino*
*Assets & Accounts Payable Manager*
*LRNI LLC & RevLabs LLC*
*990 Highland Dr., Suite 203*
*Solana Beach, CA 92075*
*(858) 481-3000*

--
**Russell Lambe**
Office Manager
Loss Recovery Services, LLC

JA000076

RL_000460

990 Highland Drive, Suite 203
Solana Beach, CA 92075
**PH:** 858.481.0801
**FAX:** 858.481.3373

JA000077

RL_000461

From: **Barry** bn100@aol.com
Subject: Re: Cease and desist notice for use of Diesel Test mark
Date: November 17, 2016 at 6:23 PM
To: Galina Polyakova galina@revlabs.com, Russell Lambe rlambe.lrs@gmail.com
Cc: elizabeth corvino lizcorvinolrs@gmail.com, Joshua Nussbaum joshua@revlabs.com



Yesssssssssss

Barry Nussbaum
C.E.O.
Revolution Laboratories LLC
990 Highland Drive, Suite 203
Solana Beach, California 92075
858 481 3000

---

**From:** Galina Polyakova <galina@revlabs.com>
**Date:** Thursday, November 17, 2016 at 6:57 AM
**To:** russell lambe <rlambe.lrs@gmail.com>
**Cc:** elizabeth corvino <lizcorvinolrs@gmail.com>, "joshua@revlabs.com"
<joshua@revlabs.com>, barry nussbaum <bn100@aol.com>
**Subject:** Re: Cease and desist notice for use of Diesel Test mark

PLOT TWIST!! Should we purchase the trade marK ?

Sent from my iPhone

On Nov 17, 2016, at 8:47 AM, Russell Lambe <rlambe.lrs@gmail.com> wrote:

> I went to the website trademarks411, where we register
> our trademarks and did a search for "diesel test" and it is available
> for purchase.
>
> On Wed, Nov 16, 2016 at 1:18 PM, elizabeth corvino
> <lizcorvinolrs@gmail.com> wrote:
>
>> Russ was not CC'd I am CCing him now
>> :)
>>
>> On Tue, Nov 15, 2016 at 12:25 PM, Joshua Nussbaum
>> <joshua@revlabs.com> wrote:
>>
>>> FYI guys. Does anybody have any information if Jeff checked the
>>> trademarks on these? Russ can you please do a search and see if "diesel
>>> test" is available for trademark or if this guy is telling the truth. I
>>> personally vote we let him sue us to get through the remainder of our
>>> labels and then change the name to DZL Test on our next run.
>>>
>>> Joshua Nussbaum

Joshua Nussbaum
President
Revolution Laboratories, LLC

Cell: (619) 992-0810
Skype: Jnussbaum86
www.RevLabs.com


Begin forwarded message:

**From:** GetDiesel Nutrition <getdiesel@gmail.com>
**Subject: Cease and desist notice for use of Diesel Test mark**
**Date:** November 15, 2016 at 7:22:06 AM PST
**To:** support@revlabs.com

This is an official  cease and desist notice, you are in violation of my first use and common law rights to "Diesel Test" in trademark international class 005.

Not really sure how its possible you guys didn't know, but we have been in use of our Diesel trademark and brand name since 2002, when we first released "Diesel Fuel" and Diesel Test since 2005. We have advertised Diesel Test, Diesel Test Hardcore, Diesel Test 2010, Diesel Test 2040 and Diesel Test Procycle V3 in several magazines since 2002 in the US, Canada and Europe.  We have advertised in Muscular Development, Planet Muscle, Powerlifitng USA, Power Magazine, DXL (Canada), Status Fitness (Canada, Europe, US), Natural Muscle and Southern Muscle just to name a few. Are products have been sold on Amazon.com for years.

You are advised to stop the production, distribution and sale of any item using the "Diesel Test" mark immediately.

**The " Diesel Test" Product you just released makes your company guilty of trademark infringement, trademark dilution, trade dress infringement and you are in volition of the Trademark Counterfeit Act of 1984. You also are putting your retailers in jeopardy of violating the Trademark Counterfeit  Act also.**

Your Diesel Test product is the exact same as that other test booster you make. I am advising you to pull all online promotion of your new "diesel test" and destroy it or relabel it. I have already received emails from consumers asking if your

RL_000463

product is mine, or questions about a free trial they saw on
your product which further proves an obvious likelihood of
confusion.

You are instructed to discontinue all sale and distribution of
"Diesel Test" by Rev Labs and Rev Labs' retailers in the next
72 hours (by 9am central 18 Nov 2016) or you will incur legal
action.

http://www.getdiesel.com/diesel-test-hardcore

http://www.getdiesel.com/diesel-test-procycle-v3

https://static.wixstatic.com/media/a7a348_56c1910e01bc4a2c
91becbd433f6606f.jpg/v1/fill/w_391,h_505,al_c,q_80,usm_0.
66_1.00_0.01/a7a348_56c1910e01bc4a2c91becbd433f6606f.j
pg

https://static.wixstatic.com/media/a7a348_5dc7dc4aa8954af0b
2be317283821037~mv2_d_2513_3263_s_4_2.jpg/v1/fill/w_3
89,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_5dc7dc4aa8
954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg

Thanks
-Charles "Chuck Diesel" Curry
Getdiesel.com

GET DIESEL

--
*Elizabeth Corvino*
*Assets & Accounts Payable Manager*
*LRNI LLC & RevLabs LLC*
*990 Highland Dr., Suite 203*
*Solana Beach, CA 92075*
*(858) 481-3000*

--
**Russell Lambe**
Office Manager
Loss Recovery Services, LLC
990 Highland Drive, Suite 203

JA000080

RL_000464

Solana Beach, CA 92075
**PH:** 858.481.0801
**FAX:** 858.481.3373

JA000081

RL_000465

From: **Galina Polyakova** galina@revlabs.com
Subject: Re: Cease and desist notice for use of Diesel Test mark
Date: November 17, 2016 at 8:57 AM
To: Russell Lambe rlambe.lrs@gmail.com
Cc: elizabeth corvino lizcorvinolrs@gmail.com, **Joshua Nussbaum** joshua@revlabs.com, **Abba Nussbaum** bn100@aol.com



PLOT TWIST!! Should we purchase the trade marK ?

Sent from my iPhone

On Nov 17, 2016, at 8:47 AM, Russell Lambe <rlambe.lrs@gmail.com> wrote:

> I went to the website trademarks411, where we register our trademarks and did a search for **"diesel test"** and it is available for purchase.

> On Wed, Nov 16, 2016 at 1:18 PM, elizabeth corvino <lizcorvinolrs@gmail.com> wrote:
>
>> Russ was not CC'd I am CCing him now :)
>>
>>> On Tue, Nov 15, 2016 at 12:25 PM, Joshua Nussbaum <joshua@revlabs.com> wrote:
>>> FYI guys. Does anybody have any information if Jeff checked the trademarks on these? Russ can you please do a search and see if "diesel test" is available for trademark or if this guy is telling the truth. I personally vote we let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run.
>>>
>>> Joshua Nussbaum
>>> President
>>> Revolution Laboratories, LLC
>>>
>>> Cell: (619) 992-0810
>>> Skype: Jnussbaum86
>>> www.RevLabs.com
>>>
>>>
>>> Begin forwarded message:
>>>
>>> From: GetDiesel Nutrition <getdiesel@gmail.com>
>>> Subject: Cease and desist notice for use of Diesel Test mark
>>> Date: November 15, 2016 at 7:22:06 AM PST
>>> To: support@revlabs.com
>>>
>>> This is an official cease and desist notice, you are in violation of my first use and common law rights to "Diesel Test" in trademark international class 005.
>>>
>>> Not really sure how its possible you guys didn't know, but we have been in use of our Diesel trademark and brand name since 2002, when we first released "Diesel Fuel" and Diesel Test since 2005. We have advertised Diesel Test, Diesel Test Hardcore, Diesel Test 2010, Diesel Test 2040 and Diesel Test Procycle V3 in several magazines since 2002 in the US, Canada and Europe. We have advertised in Muscular Development, Planet Muscle, Powerlifitng USA, Power Magazine, DXL (Canada), Status Fitness (Canada, Europe, US), Natural Muscle and Southern Muscle just to name a few. Are products have been sold on Amazon.com for years.
>>>
>>> You are advised to stop the production, distribution and sale of any item using the "Diesel Test" mark immediately.
>>>
>>> **The " Diesel Test" Product you just released makes your company guilty of trademark infringement, trademark dilution, trade dress infringement and you are in volition of the Trademark Counterfeit Act of 1984. You also are putting your retailers in jeopardy of violating the Trademark Counterfeit Act also.**
>>>
>>> Your Diesel Test product is the exact same as that other test booster you make. I am advising you to pull all online promotion of your new "diesel test" and destroy it or relabel it. I have already received emails from consumers asking if your product is mine, or questions about a free trial they saw on your product which further proves an obvious likelihood of confusion.
>>>
>>> You are instructed to discontinue all sale and distribution of "Diesel Test" by Rev Labs and Rev Labs' retailers in the next 72 hours (by 9am central 18 Nov 2016) or you will incur legal action.
>>>
>>> http://www.getdiesel.com/diesel-test-hardcore
>>>
>>> http://www.getdiesel.com/diesel-test-procycle-v3
>>>
>>> https://static.wixstatic.com/media/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg/v1/fill/w_391,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg
>>>
>>> https://static.wixstatic.com/media/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg/v1/fill/w_389,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg

JA000082

RL_000466

Thanks
-Charles "Chuck Diesel" Curry
Getdiesel.com

GET DIESEL

--
*Elizabeth Corvino*
*Assets & Accounts Payable Manager*
*LRNI LLC & RevLabs LLC*
*990 Highland Dr., Suite 203*
*Solana Beach, CA 92075*
*(858) 481-3000*

--
**Russell Lambe**
Office Manager
Loss Recovery Services, LLC
990 Highland Drive, Suite 203
Solana Beach, CA 92075
**PH:** 858.481.0801
**FAX:** 858.481.3373

JA000083

RL_000467



From: **Russell Lambe** rlambe.lrs@gmail.com
Subject: Re: Cease and desist notice for use of Diesel Test mark
Date: November 17, 2016 at 8:47 AM
To: elizabeth corvino lizcorvinolrs@gmail.com
Cc: Joshua Nussbaum joshua@revlabs.com, Abba Nussbaum bn100@aol.com, Galina Polyakova galina@revlabs.com

I went to the website trademarks411, where we register our trademarks and did a search for **"diesel test"** and it is available for purchase.

On Wed, Nov 16, 2016 at 1:18 PM, elizabeth corvino <lizcorvinolrs@gmail.com> wrote:

## Russ was not CC'd I am CCing him now :)

On Tue, Nov 15, 2016 at 12:25 PM, Joshua Nussbaum <joshua@revlabs.com> wrote:
FYI guys. Does anybody have any information if Jeff checked the trademarks on these? Russ can you please do a search and see if "diesel test" is available for trademark or if this guy is telling the truth. I personally vote we let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run.

Joshua Nussbaum
President
Revolution Laboratories, LLC

Cell: (619) 992-0810
Skype: Jnussbaum86
www.RevLabs.com

Begin forwarded message:

**From:** GetDiesel Nutrition <getdiesel@gmail.com>
**Subject: Cease and desist notice for use of Diesel Test mark**
**Date:** November 15, 2016 at 7:22:06 AM PST
**To:** support@revlabs.com

This is an official  cease and desist notice, you are in violation of my first use and common law rights to "Diesel Test" in trademark international class 005.

Not really sure how its possible you guys didn't know, but we have been in use of our Diesel trademark and brand name since 2002, when we first released "Diesel Fuel" and Diesel Test since 2005. We have advertised Diesel Test, Diesel Test Hardcore, Diesel Test 2010, Diesel Test 2040 and Diesel Test Procycle V3 in several magazines since 2002 in the US, Canada and Europe.  We have advertised in Muscular Development, Planet Muscle, Powerlifitng USA, Power Magazine, DXL (Canada), Status Fitness (Canada, Europe, US), Natural Muscle and Southern Muscle just to name a few.  Are products have been sold on Amazon.com for years.

You are advised to stop the production, distribution and sale of any item using the "Diesel Test" mark immediately.

**The " Diesel Test" Product you just released made your company guilty of trademark infringement, trademark dilution, trade dress infringement and you are in volition of the Trademark Counterfeit Act of 1984. You also are putting your retailers in jeopardy of violating the Trademark Counterfeit  Act also.**

Your Diesel Test product is the exact same as that other test booster you make. I am advising you to pull all online promotion of your new "diesel test" and destroy it or relabel it. I have already received emails from consumers asking if your  product is mine, or questions about a free trial they saw on your product which further proves an obvious likelihood of confusion.

You are instructed to discontinue all sale and distribution of "Diesel Test" by Rev Labs and Rev Labs' retailers in the next 72 hours (by 9am central 18 Nov 2016) or you will incur legal action.

http://www.getdiesel.com/diesel-test-hardcore

http://www.getdiesel.com/diesel-test-procycle-v3

https://static.wixstatic.com/media/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg/v1/fill/w_391,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg

https://static.wixstatic.com/media/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg/v1/fill/w_389,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg

Thanks
-Charles "Chuck Diesel" Curry
Getdiesel.com

GET DIESEL

--
*Elizabeth Corvino*
*Assets & Accounts Payable Manager*
*LRNI LLC & RevLabs LLC*
*990 Highland Dr., Suite 203*
*Solana Beach, CA 92075*
*(858) 481-3000*

--
**Russell Lambe**
Office Manager
Loss Recovery Services, LLC
990 Highland Drive, Suite 203
Solana Beach, CA 92075
**PH:** 858.481.0801
**FAX:** 858.481.3373

JA000085

RL_000469

From: **elizabeth corvino** lizcorvinolrs@gmail.com
Subject: Re: Cease and desist notice for use of Diesel Test mark
Date: November 16, 2016 at 1:18 PM
To: Joshua Nussbaum joshua@revlabs.com
Cc: Abba Nussbaum bn100@aol.com, Galina Polyakova galina@revlabs.com, Russell Lambe rlambe.lrs@gmail.com



## Russ was not CC'd I am CCing him now :)

On Tue, Nov 15, 2016 at 12:25 PM, Joshua Nussbaum <joshua@revlabs.com> wrote:
FYI guys. Does anybody have any information if Jeff checked the trademarks on these? Russ can you please do a search and see if "diesel test" is available for trademark or if this guy is telling the truth. I personally vote we let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run.

Joshua Nussbaum
President
Revolution Laboratories, LLC

Cell: (619) 992-0810
Skype: Jnussbaum86
www.RevLabs.com

> Begin forwarded message:
>
> **From:** GetDiesel Nutrition <getdiesel@gmail.com>
> **Subject: Cease and desist notice for use of Diesel Test mark**
> **Date:** November 15, 2016 at 7:22:06 AM PST
> **To:** support@revlabs.com
>
> This is an official  cease and desist notice, you are in violation of my first use and common law rights to "Diesel Test" in trademark international class 005.
>
> Not really sure how its possible you guys didn't know, but we have been in use of our Diesel trademark and brand name since 2002, when we first released "Diesel Fuel" and Diesel Test since 2005. We have advertised Diesel Test, Diesel Test Hardcore, Diesel Test 2010, Diesel Test 2040 and Diesel Test Procycle V3 in several magazines since 2002 in the US, Canada and Europe. We have advertised in Muscular Development, Planet Muscle, Powerlifitng USA, Power Magazine, DXL (Canada), Status Fitness (Canada, Europe, US), Natural Muscle and Southern Muscle just to name a few.  Are products have been sold on Amazon.com for years.
>
> You are advised to stop the production, distribution and sale of any item using the "Diesel Test" mark immediately.
>
> **The " Diesel Test" Product you just released makes your company guilty of trademark infringement, trademark dilution, trade dress infringement and you are in volition of the Trademark Counterfeit Act of 1984. You also are putting your retailers in jeopardy of violating the Trademark Counterfeit  Act also.**
>
> Your Diesel Test product is the exact same as that other test booster you make. I am advising you to pull all online promotion of your new "diesel test" and destroy it or relabel it. I have already received emails from consumers asking if your  product is mine, or questions about a free trial they saw on your product which further proves an obvious likelihood of confusion.
>
> You are instructed to discontinue all sale and distribution of "Diesel Test" by Rev Labs and Rev Labs' retailers in the next 72 hours (by 9am central 18 Nov 2016) or you will incur legal action.
>
> http://www.getdiesel.com/diesel-test-hardcore
>
> http://www.getdiesel.com/diesel-test-procycle-v3
>
> https://static.wixstatic.com/media/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg/v1/fill/w_391,h_505,al_c,q_80.usm_0.66_1.00_0.01/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg
>
> https://static.wixstatic.com/media/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg/v1/fill/w_389,h_505,al_c,q_80.usm_0.66_1.00_0.01/a7a348_5dc7dc4aa8954af0b2be3172838210 37~mv2_d_2513_3263_s_4_2.jpg
>
> Thanks
> -Charles "Chuck Diesel" Curry
> Getdiesel.com
>
> GET DIESEL

--

*Elizabeth Corvino*
*Assets & Accounts Payable Manager*
*LRNI LLC & RevLabs LLC*
*990 Highland Dr., Suite 203*
*Solana Beach, CA 92075*
*(858) 481-3000*

RL_000471

**From:** **Joshua Nussbaum** Joshua@revlabs.com
**Subject:** Fwd: Cease and desist notice for use of Diesel Test mark
**Date:** November 15, 2016 at 12:25 PM
**To:** Abba Nussbaum bn100@aol.com, elizabeth corvino lizcorvinolrs@gmail.com, Galina Polyakova galina@revlabs.com



FYI guys. Does anybody have any information if Jeff checked the trademarks on these? Russ can you please do a search and see if "diesel test" is available for trademark or if this guy is telling the truth. I personally vote we let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run.

Joshua Nussbaum
President
Revolution Laboratories, LLC

Cell: (619) 992-0810
Skype: Jnussbaum86
www.RevLabs.com

> Begin forwarded message:
>
> **From:** GetDiesel Nutrition <getdiesel@gmail.com>
> **Subject: Cease and desist notice for use of Diesel Test mark**
> **Date:** November 15, 2016 at 7:22:06 AM PST
> **To:** support@revlabs.com
>
> This is an official cease and desist notice, you are in violation of my first use and common law rights to "Diesel Test" in trademark international class 005.
>
> Not really sure how its possible you guys didn't know, but we have been in use of our Diesel trademark and brand name since 2002, when we first released "Diesel Fuel" and Diesel Test since 2005. We have advertised Diesel Test, Diesel Test Hardcore, Diesel Test 2010, Diesel Test 2040 and Diesel Test Procycle V3 in several magazines since 2002 in the US, Canada and Europe. We have advertised in Muscular Development, Planet Muscle, Powerlifting USA, Power Magazine, DXL (Canada), Status Fitness (Canada, Europe, US), Natural Muscle and Southern Muscle just to name a few. Are products have been sold on Amazon.com for years.
>
> You are advised to stop the production, distribution and sale of any item using the "Diesel Test" mark immediately.
>
> **The " Diesel Test" Product you just released makes your company guilty of trademark infringement, trademark dilution, trade dress infringement and you are in volition of the Trademark Counterfeit Act of 1984. You also are putting your retailers in jeopardy of violating the Trademark Counterfeit Act also.**
>
> Your Diesel Test product is the exact same as that other test booster you make. I am advising you to pull all online promotion of your new "diesel test" and destroy it or relabel it. I have already received emails from consumers asking if your product is mine, or questions about a free trial they saw on your product which further proves an obvious likelihood of confusion.
>
> You are instructed to discontinue all sale and distribution of "Diesel Test" by Rev Labs and Rev Labs' retailers in the next 72 hours (by 9am central 18 Nov 2016) or you will incur legal action.
>
> http://www.getdiesel.com/diesel-test-hardcore
>
> http://www.getdiesel.com/diesel-test-procycle-v3
>
> https://static.wixstatic.com/media/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg/v1/fill/w_391,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_56c1910e01bc4a2c91becbd433f6606f.jpg
>
> https://static.wixstatic.com/media/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg/v1/fill/w_389,h_505,al_c,q_80,usm_0.66_1.00_0.01/a7a348_5dc7dc4aa8954af0b2be317283821037~mv2_d_2513_3263_s_4_2.jpg
>
> Thanks
> -Charles "Chuck Diesel" Curry
> Getdiesel.com
>
> GET DIESEL

JA000088

RL_000472

JA000089

RL_000473

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, | ) | Case No. 1:17-cv-02283 |
| | ) | |
| Plaintiff, | ) | Honorable Matthew F. Kennelly |
| | ) | |
| v. | ) | |
| | ) | |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S AMENDED RESPONSES TO
## DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff Charles Curry, through his undersigned counsel and pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby amends his objections and responses to Defendants Revolution Laboratories, LLC, Joshua Nussbaum, and Barry Nussbaum's (collectively "Defendants") First Set of Interrogatories upon Plaintiff as follows.[1]  Plaintiff's investigation into the facts of this case is ongoing and is not yet completed, and Plaintiff therefore reserves the right to supplement or amend his objections and responses to the extent permitted by the Federal Rules of Civil Procedure, the Local Rules, and any applicable order of this Court.  The responses set forth herein are based solely on the information that is presently available and known to Plaintiff.

---

[1] Plaintiff served his initial interrogatory objections and responses on June 14, 2020, while representing himself *pro se* and prior to retaining the undersigned counsel.  After conferring with counsel regarding his interrogatory objections and responses, and as discussed during the parties' August 19, 2020 meet and confer, Plaintiff now serves these amended objections and responses to Defendants' interrogatories.

3.    Plaintiff objects to the interrogatory to the extent it seeks to obtain expert opinions prior to the period for expert discovery or improperly seeks anything other than Plaintiff's present contentions.

**RESPONSE TO INTERROGATORY NO. 14:**

Subject to and without waiving his objections, Plaintiff states that, as a result of Defendants' conduct, Plaintiff has suffered damages in the form of lost sales, lost customers, damage to his reputation and that of his products, and both time and costs incurred while researching and prosecuting this action for nearly four years. Plaintiff further states that he may elect to seek (1) Defendants' profits, any damages sustained by Plaintiff, and the costs of the action, pursuant to 15 U.S.C. § 1117(a)-(b); or (2) statutory damages, pursuant to 15 U.S.C. § 1117(c). Given the willful nature of Defendants' conduct that resulted in actual consumer confusion, Plaintiff intends to seek enhanced damages (up to three times actual damages) and an upward adjustment of the profits awarded. Additionally, regardless of a finding of willfulness, Plaintiff intends to seek an accounting of Defendants' profits and a profits award. Further, Plaintiff intends to seek the recovery of corrective advertising expenses incurred to counteract the public confusion resulting from Defendants' wrongful conduct. Plaintiff also intends to seek statutory damages, of up to $100,000 per infringing domain name, pursuant to 15 U.S.C. § 1117(d). Plaintiff also intends to seek punitive damages, attorneys' fees, prejudgment interest, and further injunctive relief, as appropriate. Pursuant to Fed. R. Civ. P. 33(d), Plaintiff directs Defendants to the Complaint, ECF No. 1, for a non-exhaustive, illustrative recitation of factual allegations upon which Plaintiff may rely to support his request for damages.

JA000091

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on September 3, 2020, a true and correct copy of the foregoing was served

on counsel for the parties of record.

*/s/ Nicholas C. Hailey*
Nicholas C. Hailey (admitted *pro hac vice*)

JA000092

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, | ) ) ) | Case No. 1:17-cv-02283 |
| Plaintiff, | ) ) | Honorable Matthew F. Kennelly |
| v. | ) ) | |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM, | ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S SECOND AMENDED RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff Charles Curry, through his undersigned counsel and pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby amends his objections and responses to Defendants Revolution Laboratories, LLC, Joshua Nussbaum, and Barry Nussbaum's (collectively "Defendants") First Set of Interrogatories upon Plaintiff as follows.[1]  Plaintiff's investigation into the facts of this case is ongoing and is not yet completed, and Plaintiff therefore reserves the right to supplement or amend his objections and responses to the extent permitted by the Federal Rules of Civil Procedure, the Local Rules, and any applicable order of this Court.  The responses

---

[1] Plaintiff served his initial interrogatory objections and responses on June 14, 2020, while representing himself *pro se* and prior to retaining the undersigned counsel.  After conferring with counsel regarding his interrogatory objections and responses, and as discussed during the parties' August 19, 2020 meet and confer, Plaintiff previously served amended objections and responses to Defendants' interrogatories on September 3, 2020.  Following the parties' September 21, 2020 meet and confer, Plaintiff serves these second amended objections and responses to Defendants' interrogatories.

profits awarded.  Additionally, regardless of a finding of willfulness, Plaintiff intends to seek an accounting of Defendants' profits and a profits award.  Further, Plaintiff intends to seek the recovery of corrective advertising expenses incurred to counteract the public confusion resulting from Defendants' wrongful conduct.  Plaintiff also intends to seek statutory damages, of up to $100,000 per infringing domain name, pursuant to 15 U.S.C. § 1117(d).  Plaintiff also intends to seek punitive damages, attorneys' fees, prejudgment interest, and further injunctive relief, as appropriate. Pursuant to Fed. R. Civ. P. 33(d), Plaintiff directs Defendants to the Complaint, ECF No. 1, for a non-exhaustive, illustrative recitation of factual allegations upon which Plaintiff may rely to support his request for damages.

**INTERROGATORY NO. 15:**

Describe and identify the basis for your allegation that the Curry Trademarks are widely recognized by the general consuming public.

**OBJECTIONS TO INTERROGATORY NO. 15:**

1.    Plaintiff objects to the interrogatory as vague, ambiguous, overbroad, unduly burdensome, and disproportionate to the needs of the case.  The interrogatory seeks information regarding recognition by the general consuming public of all of Plaintiff's trademarks, regardless of whether those trademarks are at issue in this litigation.

2.    Plaintiff objects to the interrogatory to the extent it seeks to obtain expert opinions prior to the period for expert discovery or improperly seeks anything other than Plaintiff's present contentions.

**RESPONSE TO INTERROGATORY NO. 15:**

Subject to and without waiving his objections, and pursuant to Fed. R. Civ. P. 33(d), Plaintiff refers Defendants to the Complaint, ECF No. 1, ¶¶ 11-24, and Declaration of Charles

JA000094

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on September 25, 2020, a true and correct copy of the foregoing was served

on counsel for the parties of record.

*/s/ Nicholas C. Hailey*
Nicholas C. Hailey (admitted *pro hac vice*)

JA000095



Nicholas C. Hailey
4530 Wisconsin Avenue, NW | 5th Floor
Washington, DC 20016
Office: (202) 480-2174
nick@oandzlaw.com

October 15, 2020

**VIA EMAIL**

Christopher Niro
Aronberg Goldgehn Davis & Garmisa
330 N. Wabash Ave, Suite 1700
Chicago, IL 60611
cniro@agdglaw.com

>   *Re:  Curry v. Revolution Laboratories, LLC et al. (N.D. Ill. Case No. 1:17-cv-02283)*
>   *Local Rule 37.2 Letter Regarding Defendants' Deficient Discovery Responses*

Mr. Niro:

We are writing regarding the significant deficiencies in Defendants' October 9, 2020 responses to Plaintiff's September 3, 2020 Interrogatories and Second Requests for Production of Documents to Revolution Laboratories, LLC ("Revolution"), Interrogatories and First Requests for Production of Documents to Joshua Nussbaum, and First Requests for Production of Documents to Barry Nussbaum.

Pursuant to Federal Rule of Civil Procedure 37 and N.D. Ill. Local Rule 37.2, we request a conference to address the issues outlined below immediately.  We are available to meet and confer on October 16, 19, or 20, 2020.  Please let us know your availability on those dates.

We note, as an initial matter, that Defendants' discovery responses were originally due on October 5, 2020.  Plaintiff accommodated Defendants' request for a four-day extension of that deadline until October 9, 2020, with the expectation that Defendants would use that additional time to fully investigate and respond to Plaintiff's requests.  Despite this extension, Defendants' responses are still plainly deficient, as detailed below.

<u>Deficiencies in Defendants' Responses to Plaintiff's Interrogatories</u>

Revolution and Joshua Nussbaum's answers to Plaintiff's interrogatories are clearly incomplete and defective in numerous respects:

- In response to Interrogatory 1 to Revolution, Revolution fails to identify the persons who played a role in the creation, development, formulation, design, manufacturing, sale, and

1

JA000096

- Joshua Nussbaum and Barry Nussbaum object to Requests for Production 13 and 12, respectively, on the grounds that the documents requested are not relevant. To the contrary, Joshua Nussbaum and Barry Nussbaum's total assets, debts, and net worth are directly relevant to damages in this case, including punitive damages. Indeed, you specifically state that you will produce information regarding Revolution's total assets, debts, and net worth—apparently conceding that this information is relevant to Plaintiff's claims—but decline to provide the same information for the other named Defendants. There is no basis for distinguishing among the Defendants in this manner.

- Barry Nussbaum objects to Request for Production 6 on the grounds that "it seeks documents not within Joshua's individual possession, custody, or control," and he responds to Request for Production 8 that "no responsive documents are in Joshua's individual possession, custody, and control." Please confirm that these references to "Joshua" are typos, and that Barry Nussbaum intended to refer to himself.

- Additionally, we note that Revolution, Joshua Nussbaum, and Barry Nussbaum each "object[] to Curry's relevant time frame as the Requests are through the present when Revolution Laboratories, LLC ceased the sale of its Diesel Test products on its website www.revlabs.com in October 2017 and Revolution Laboratories, LLC's Diesel Test product was removed from Amazon on February 13, 2017 and was not reinstated thereafter." That statement ignores that Defendants have previously admitted that they continued to sell Diesel-branded products until at least the first quarter of 2018. *See, e.g.*, Affidavit of Defendant Joshua Nussbaum (Apr. 22, 2020), ECF No. 88-1, ¶ 3.

- Revolution, Joshua Nussbaum, and Barry Nussbaum also each state that they "continue[] to search for responsible [sic] documents in [their] individual possession, custody, and control." Revolution, Joshua Nussbaum, and Barry Nussbaum should each specify the date by which those searches will be complete and the date by which they will provide full and complete responses to these requests for documents based on those searches.

- Finally, we note that various responses by Defendants attempt to draw an apparent distinction between Joshua Nussbaum's role as President of Revolution and his "individual" capacity, and between Barry Nussbaum's role as Chief Executive Officer of Revolution and his "individual" capacity. Plaintiff will not address the merits of Defendants' claimed distinctions here, apart from making clear that Plaintiff strongly disagrees that there is any basis for those claims. For purposes of these discovery requests, Defendants should confirm that, for any responsive documents or communications that Joshua Nussbaum and Barry Nussbaum contend are not within their "individual possession, custody, and control," such responsive documents and communications will be produced by Revolution, to the extent that they are within Revolution's possession, custody, or control. Defendants should also confirm that all responsive documents and communications within Joshua Nussbaum and Barry Nussbaum's possession, custody, or control in their claimed capacities as President and Chief Executive Officer of Revolution, respectively, will be produced by Revolution.

Accordingly, Defendants should supplement their October 9, 2020 responses to Plaintiff's written discovery to cure the deficiencies outlined above promptly, and by no later

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:17-cv-02283 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| REVOLUTION LABORATORIES, LLC, | ) | |
| REV LABS MANAGEMENT, INC., | ) | |
| JOSHUA NUSSBAUM, and BARRY | ) | |
| NUSSBAUM, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S THIRD MOTION TO COMPEL DISCOVERY**</u>

JA000098

II.    **Joshua Nussbaum and Barry Nussbaum Should Be Compelled to Respond to Discovery Regarding Their Total Assets, Debts, and Net Worth, and Financial Compensation Received From Revolution.**

A.    **Total Assets, Debts, and Net Worth.**

Plaintiff has requested that Joshua Nussbaum and Barry Nussbaum each produce documents sufficient to show their "total assets, debts, and net worth."[5] The Nussbaum Defendants have refused, objecting on relevance grounds. But they are wrong. Indeed, Revolution has already produced information regarding its total assets, debts, and net worth in response to Plaintiff's discovery requests—conceding that this information is relevant to Plaintiff's claims—but Joshua Nussbaum and Barry Nussbaum continue to refuse to provide this same information. There is no basis for distinguishing among the Defendants in this manner. Joshua Nussbaum and Barry Nussbaum are individual defendants, and they are not entitled to limit discovery to Revolution's finances.

The sought-after discovery is relevant to Plaintiff's claim for punitive damages[6] and damages under the Lanham Act. It is well-established that "[a] defendant's financial condition is relevant to the pursuit of punitive damages." *Platcher v. Health Professionals, Ltd.*, No. 04-1442, 2007 WL 2772855, at *2 (C.D. Ill. Sept. 18, 2007) (citing cases); *see also, e.g., Challenge Aspen v. King World Prods. Corp.*, No. 00 C 6868, 2001 WL 1403001, at *3 (N.D. Ill. Nov. 9, 2001) ("[T]here can be **no doubt** that net worth is discoverable under Rule 26(b)(1) of the Federal Rules of Civil Procedure, as it regards a matter 'that is relevant to the claim' of a party:

---

[5] *See* Ex. 5, Pl.'s First Requests for Production to Joshua Nussbaum (Sept. 3, 2020), at 7 (Request 13); Ex. 6, Pl.'s First Requests for Production to Barry Nussbaum (Sept. 3, 2020), at 7 (Request 12).

[6] Plaintiff seeks punitive damages in connection with his Illinois Consumer Fraud Act claim. *See* Compl. (Mar. 24, 2017), ECF No. 1, at 12, 21; *see also* 815 Ill. Comp. Stat. § 505/10a(a)) (providing for award of punitive damages under Illinois Consumer Fraud Act).

JA000099

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:17-cv-02283 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## **STIPULATION**

Plaintiff Charles Curry d/b/a Get Diesel Nutrition ("Plaintiff") and Defendants

Revolution Laboratories, LLC ("Revolution"), Joshua Nussbaum, and Barry Nussbaum

(collectively, "Defendants"), by and through their attorneys, hereby stipulate to the following:

1.     Actual confusion has occurred among consumers in the marketplace between

Plaintiff's common law Diesel Test mark and Revolution's Diesel Test branded product.

2.     Revolution is liable for infringing Plaintiff's Diesel Test mark under Count III and

Count V of Plaintiff's Complaint.

3.     Revolution is liable for violating the Anticybersquatting Consumer Protection Act

under Count VI of Plaintiff's Complaint, with respect to the internet domain

www.dieseltestbooster-red.com.

4.     It is disputed as to: (a) whether Revolution is liable under Count VI of Plaintiff's

Complaint with respect to any other internet domains; (b) whether Revolution is liable under

Counts I and II; (c) whether Joshua Nussbaum and Barry Nussbaum are liable on any Counts;

and (d) the amount of damages as to all Counts.

JA000100

Dated:  December 21, 2020        By: _____

Matthew J. Oppenheim (443698)
Scott A. Zebrak (452649)
Nicholas C. Hailey (admitted *pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Tel: 202-480-2999
matt@oandzlaw.com
scott@oandzlaw.com
nick@oandzlaw.com

*Attorneys for Plaintiff*

Dated:  December 21, 2020        By:  */s/ Christopher W. Niro*_____

Christopher W. Niro
Kristina D. Diesner
Amy R. Gibson
R. Timothy Novel
ARONBERG GOLDGEHN DAVIS &
GARMISA
330 N. Wabash Ave. Suite 1700
Chicago, IL 60611
(p) 312.828.9600
(f) 312.828.9635
cniro@agdglaw.com
kdiesner@agdglaw.com
agibson@agdglaw.com
tnovel@agdglaw.com

*Attorneys for Defendants*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:17-cv-02283 |
| v. | ) ) | Judge Matthew F. Kennelly |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM, | ) ) ) ) ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S FOURTH MOTION TO COMPEL DISCOVERY**</u>

Plaintiff has asserted claims for trademark infringement and ACPA violations against Joshua Nussbaum and Barry Nussbaum individually. The evidence against the Nussbaums demonstrates that they were aware they were infringing on Plaintiff's rights, but persisted nonetheless. Based on that record, Plaintiff's claims for individual liability against the Nussbaums survived Defendants' motion for summary judgment.[1] Plaintiff seeks both statutory damages and punitive damages against the Nussbaums to punish them for their wrongful conduct in the past and to deter them from misconduct in the future. It is well-established that Plaintiff is entitled to seek discovery into the Nussbaums' finances, both generally and with respect to the

---

[1] The Court denied Defendants' motion for summary judgment as to Joshua and Barry Nussbaum's individual liability. *See* Memorandum Opinion and Order at 6-8, 12-14, 18 (Jan. 26, 2022), Dkt. 195. The record supporting Joshua and Barry Nussbaum's individual liability is described in detail in Plaintiff's summary judgment briefing. *See, e.g.*, Pl.'s Memorandum of Law in Support of Cross-Motion for Summary Judgment and in Opposition to Defs.' Motion for Summary Judgment (June 30, 2021), Dkt. 177; Pl.'s Reply in Support of Cross-Motion for Summary Judgment (Aug. 25, 2021), Dkt. 194.

conduct in order to deter future violations of the ACPA." *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1204 (11th Cir. 2009) (emphasis added).[9]  Accordingly, information regarding the Nussbaums' financial resources is necessary to determining appropriate statutory damages under ACPA.

Third, the Nussbaums' financial information is also directly relevant to deciding the amount of punitive damages on Plaintiff's common law trademark infringement claim.[10] "[T]here is no dispute—nor could there be—that the [individual] defendants' financial information is relevant to the issue of punitive damages." *Breuder*, 2021 WL 229655, at *2 (citing cases); *see also, e.g., Challenge Aspen*, 2001 WL 1403001, at *3 ("[T]here can be no

---

[9] *See also, e.g., J. Taikwok Yung v. Trump*, No. CV 11-1413 DLI VVP, 2014 WL 819417, at *3, *6 (E.D.N.Y. Feb. 28, 2014), *report and recommendation adopted*, No. 11-CV-1413 DLI VVP, 2014 WL 1257761 (E.D.N.Y. Mar. 26, 2014), *aff'd sub nom. Yung v. Trump*, 648 F. App'x 24 (2d Cir. 2016) (stating that the "primary consideration here [in determining ACPA statutory damages] is the need for specific deterrence of the [infringing party] himself," and considering the infringing party's net worth in deciding such damages); *WasteCare Corp. v. Shredderhotline.com Co.*, No. 2:11-CV-297-WCO, 2014 WL 12495654, at *4 (N.D. Ga. Feb. 6, 2014), *aff'd sub nom. WasteCare Corp. v. Ward*, 586 F. App'x 577 (11th Cir. 2014) ("Statutory damages on an ACPA-cyberpiracy claim can serve to sanction or punish the defendant for his bad faith conduct in order to deter future violations of the ACPA by him." (citation and internal quotation marks omitted)); *RitLabs, S.R.L. v. RitLabs, Inc.*, No. 1:12-CV-215 AJT/IDD, 2012 WL 6021328, at *5 (E.D. Va. Nov. 30, 2012) ("[T]he primary purpose served by an award under the ACPA is to deter and punish [defendant] for his utilization of [p]laintiff's domain name in furtherance of his self-dealing.").

[10] *See, e.g., JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 919 (7th Cir. 2007) (affirming award of $50,000 in punitive damages on plaintiff's Illinois common law unfair competition claim alleging likelihood of confusion, and holding that the Lanham Act did not preempt common law punitive damages); *see also* Am. Compl. ¶¶ 33-35, *JCW Invs., Inc. v. Novelty, Inc.*, Case No. 1:02-cv-04950, Dkt. 22 (N.D. Ill. Oct. 8, 2002) (common law claims).

Plaintiff is entitled to punitive damages on his common law infringement claim, given that he has alleged conduct that would support punitive damages and the evidence presented supports that claim.  *See, e.g., Hostrop v. Bd. of Jr. Coll. Dist. No. 515*, 523 F.2d 569, 581 (7th Cir. 1975) ("Under Rule 8(a), Fed. R. Civ. P., the pleader need not allege the legal theory on which he relies, and under Rule 54(c) he is to be granted any relief to which he is entitled even though he has not demanded it." (internal citations omitted)).

JA000103

### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION | ) | Case No. 1:17-cv-02283 |
| | ) | |
| Plaintiff, | ) | Honorable Matthew F. Kennelly |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| REVOLUTION LABORATORIES, LLC, | ) | |
| REV LABS MANAGEMENT, INC., JOSHUA | ) | |
| NUSSBAUM, and BARRY NUSSBAUM | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' FOURTH MOTION TO COMPEL DISCOVERY

Defendants, Revolution Laboratories, LLC ("Revolution"), Barry Nussbaum ("Barry"), and Joshua Nussbaum ("Joshua") (collectively referred to as "Defendants"), by and through their attorneys, Aronberg Goldgehn, respectfully submits their Response in Opposition to Plaintiff's, Charles Curry d/b/a Get Diesel Nutrition ("Curry"), Fourth Motion to Compel Defendants ("Fourth Motion")

## I.     INTRODUCTION

Curry's Fourth Motion to Compel is, in reality, a second bite at the apple. Curry's Third Motion to Compel (Dkt. 147) sought the production of Barry and Joshua's personal financial information because, as he claimed there, it was relevant to punitive damages under the Illinois Consumer Fraud Act and as a deterrent under the Lanham Act 15 U.S.C. § 1117(a). (*See Id.*, pp. 5-8). Prior to bringing this Fourth Motion, Defendants provided Curry with several cases holding that § 1117(a) does not allow for punitive damages and cannot act as a penalty. (*See* Dkt. 197-7, p. 2). Undeterred, Curry's Fourth Motion is devoid of arguments that the requested discovery is

discovery. Documents demonstrating Defendants' individual, assets, debts and net worth does not even enter into the court's analysis of statutory damages for cybersquatting.

In *Oasis*, the court awarded plaintiff statutory damages of $100,000 based on the egregiousness of the cybersquatting and the contempt shown for plaintiff and the court (*i.e.*, disregarding the procedural rules governing summary judgment by failing to cite record evidence, ignoring the court's briefing schedules, filing oversized briefs without seeking leave to do so, and filing a cryptic affidavit that should have been a brief). *Id.* In *Sulda v. Shippingquest.com, LLC*, No. 17 CV 2350, 2018 WL 11197748, at *2 (N.D. Ill. Jan. 29, 2018), the court did not award the plaintiff the entire maximum of statutory award because there was no evidence of a larger pattern of cybersquatting or intellectual property violations, and the amount was sufficient to compensate the plaintiff for lost time and money spent.

Accordingly, it is clear that courts will take into consideration the defendant's overall conduct, not their financial worth. Again, Curry is already in possession of discovery related to the Defendants' conduct. Barry and Joshua's personal finances are not relevant to determining statutory damages under 15 U.S.C. § 1117(d).

   iii.    *Barry and Joshua's Personal Finances are not Relevant to Calculating Punitive Damages for Illinois Common Law Trademark Infringement.*

Curry contends that documents showing Barry and Joshua's assets, debts, and net worth is relevant to deciding the amount of punitive damages on his common law trademark infringement claim (Count V). "While Lanham Act § 35 does not authorize an additional award of punitive damages for willful infringement of a registered trademark or for a violation of § 43(a), punitive damages are still available for accompanying state, non-federal causes of action for trademark infringement." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

JA000105

*Competition*, 30:97 (4th ed. 2005).  However, the Court should deny Curry's request.

Under Illinois law, punitive damages are disfavored and are only recoverable "where the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others." *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 641 (7th Cir. 2003) quoting *Smith v. Prime Cable of Chicago,* 276 Ill. App. 3d 843, 858 (1st Dist. 1995). Ordinary negligence will not support an award of punitive damages, therefore, a plaintiff must prove more than "mere inadvertence, mistake, errors of judgment and the like." *Zelinski*, 335 F.3d at 641 quoting *Loitz v. Remington Arms Co.,* 138 Ill.2d 404, 415 (Ill. 1990). Curry can show no such malice or evil motive on the part of Barry or Joshua.

Much like the analysis of statutory damages, the focus of the Court's inquiry is on Barry and Joshua's **conduct**, not their financial status. In *Zelinski*, the plaintiff brought an action against a competitor asserting trademark infringement and unfair competition under the Lanham Act and Illinois state law. 335 F.3d at 638. The jury found in the plaintiff's favor and awarded actual damages and punitive damages, however, the district court *vacated* the award of punitive damages. *Id.* On appeal, the court upheld vacating punitive damages because the evidence submitted did not show the defendant's representatives were acting with a conscious disregard for the rights of others. *Id.* at 642. Neither the district court nor the appellate court in *Zelinski* examined the defendant's financial capabilities to award or vacate punitive damages.  This Court should follow the *Zelinski* holding.

Curry relies on *Breuder v. Board of Trustees of Community College District No. 502*, No. 15 CV 9323, 2021 WL 229655 (N.D. Ill. Jan. 22, 2021) as support for his argument that an individual defendant's financial information is relevant to the issue of punitive damages. However,

7

the court in *Breuder* examined punitive damages as it related to the plaintiff's defamation claim. *Id.* at *2. Plaintiff also relies on *Challenge Aspen v. King World Productions Corp.*, No. 00 C 6868, 2001 WL 1403001, at *1 (N.D. Ill. Nov. 9, 2001). There, the court reviewed punitive damages based on the plaintiff's fraud claim. *Id.* These cases have no relevance to the case at bar.

In a footnote, Curry continues at grasping at straws by claiming he is entitled to punitive damages under his common law infringement claim because even though he did not specifically request such relief in his Complaint, "he has alleged conduct that would support punitive damages and the evidence presented supports that claim." (Dkt. 197-1, p. 8). Curry relies on *Hostrop v. Board of Jr. College Dist. No. 515, Cook and Will Counties and State of Ill.*, 523 F.2d 569, 581 (7th Cir. 1975). However, there, the Seventh Circuit allowed the amended new legal theory of breach of contract because the "allegations of termination in violation of contract right appeared in the pleading before amendment were sufficient to raise the breach-of-contract issue, from which it follows that the amendment did not raise a new issue." *Id.* Distinguishably, Curry seeks a new theory of damages that is based on facts not in his Complaint. Curry has failed to meet his burden how he is entitled to punitive damages under common law trademark infringement.

          iv.       *Barry and Joshua's Personal Finances are not Relevant to a Determination of Willfulness.*

As a last resort, Curry argues Barry and Joshua's personal finances (*i.e.*, assets, debts, net worth) are relevant to willful infringement on the theory that they ignored Curry's cease-and-desist letter motivated by the "view that they could simply out-spend Plaintiff in any resulting litigation." (Dkt. 197-1, p. 9). Even if such a supposition were true, which it is not, this is clearly a fishing expedition that the Court should not permit. Despite completing discovery, Curry has provided no credible factual basis for this assertion.

Curry believes Barry and Joshua have "significant personal assets" because "[t]hey own

8

JA000107

Case: 1:17-cv-02283 Document #: 217 Filed: 04/25/22 Page 1 of 11 PageID #:8109
Case: 23-2850   Document: 24      Filed: 02/06/2024    Pages: 165

1

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 3   CHARLES CURRY                    )  Docket No. 17 C 2283
     Doing business as               )
 4   Get Diesel Nutrition,           )
                                      )
 5                      Plaintiff,    )
                                      )  Chicago, Illinois
 6              vs.                   )  March 1, 2022
                                      )  9:30 o'clock a.m.
 7   REVOLUTION LABORATORIES, LLC, et )
     al,                              )
 8                                    )
                        Defendants.   )
 9
                 TRANSCRIPT OF PROCEEDINGS - STATUS
10           BEFORE THE HONORABLE MATTHEW F. KENNELLY

11   APPEARANCES:

12   For the Plaintiff:     OPPENHEIM + ZEBRAK LLP
                            BY:  MR. MATTHEW JAN OPPENHEIM
13                          5225 Wisconsin Ave, NW, Suite 503
                            Washington, DC 20015
14                          202-450-3958

15
                            OPPENHEIM + ZEBRAK, LLP
16                          BY:  MR. NICHOLAS COOPER HAILEY
                            4530 Wisconsin Avenue, NW, 5th Floor
17                          Washington, DC 20016
                            (202) 480-2174
18

19   For the Defendant:     ARONBERG GOLDGEHN DAVIS & GARMISA
                            BY:  MR. CHRISTOPHER WILLIAM NIRO
20                               MS. KRISTINA DAWN DIESNER
                            330 N. Wabash Ave, Suite 1700
21                          Chicago, IL 60611
                            312-755-3161
22

23
     Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 2102
25                          Chicago, Illinois  60604
                            (312) 435-5639
```

Case: 1:17-cv-02283 Document #: 217 Filed: 04/25/22 Page 8 of 11 PageID #:8116
Case: 23-2850    Document: 24       Filed: 02/06/2024    Pages: 165

8

1        So the argument on the first part that the defendants

2    think that it's not relevant, I don't agree with that.  If

3    nothing else, the defendants' finances are relevant on the

4    question of punitive damages on the state law claim.  I think

5    they're also likely relevant on the -- I think it's referred

6    to as statutory damages on the federal claim, but I don't even

7    need to go there.

8        The proposition that financial condition information

9    regarding a defendant against whom punitive damages is not

10   relevant just doesn't hold water.  You know, part of the

11   standard jury instruction under Illinois law about punitive

12   damages is that one of the purposes is to deter, and if we can

13   imagine two people, one of whom has a net worth of $30 billion

14   and the other one has $30,000, that would be pretty

15   significant information for a fact-finder to know in order to

16   determine what amount is needed to deter the person.

17       So it's not just about their conduct.  The conduct is

18   what forms the basis for a punitive damages award.  The

19   person's financial condition is then relevant in determining

20   the amount of the award.  That's enough by itself to reach a

21   conclusion that the financial condition information that the

22   plaintiffs sought is relevant.

23       On the second issue, I guess I'm not quite persuaded

24   that the plaintiff, you know, bypassed an opportunity to get

25   this information earlier.  There's a decent amount of failure

Case: 1:17-cv-02283 Document #: 216 Filed: 04/25/22 Page 1 of 15 PageID #:8094
Case: 23-2850    Document: 24    Filed: 02/06/2024    Pages: 165

1

|    |    |    |
|----|----|----|
| 1  | IN THE UNITED STATES DISTRICT COURT | |
| 2  | NORTHERN DISTRICT OF ILLINOIS<br>EASTERN DIVISION | |
| 3  | | |
| 4  | CHARLES CURRY | ) | Docket No. 17 C 2283 |
|    | Doing business as | ) |
| 5  | Get Diesel Nutrition, | ) |
| 6  | | ) |
|    | Plaintiff, | ) |
| 7  | | ) | Chicago, Illinois |
|    | vs. | ) | April 15, 2022 |
|    | | ) | 9:15 o'clock a.m. |
| 8  | REVOLUTION LABORATORIES, LLC, et | ) |
|    | al, | ) |
| 9  | | ) |
|    | Defendants. | ) |
| 10 | | |

```
11          TRANSCRIPT OF PROCEEDINGS - STATUS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY
12

13   APPEARANCES:

14   For the Plaintiff:    OPPENHEIM + ZEBRAK LLP
                           BY:  MR. MATTHEW JAN OPPENHEIM
15                         5225 Wisconsin Ave, NW, Suite 503
                           Washington, DC 20015
16                         202-450-3958

17

18   For the Defendant:    ARONBERG GOLDGEHN DAVIS & GARMISA
                           BY:  MR. R. TIMOTHY NOVEL
19                         330 N. Wabash Ave, Suite 1700
                           Chicago, IL 60611
20                         312-755-3161

21

22

23   Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                           Official Court Reporter
24                         219 S. Dearborn Street, Suite 2102
                           Chicago, Illinois  60604
25                         (312) 435-5639
```

Case: 1:17-cv-02283 Document #: 216 Filed: 04/25/22 Page 2 of 15 PageID #:8095
Case: 23-2850    Document: 24       Filed: 02/06/2024    Pages: 165

2

1    (The following proceedings were had telephonically:)

2         THE CLERK:  Case 17 C 2283, Curry v. Revolution

3    Laboratories.

4         THE COURT:  Can plaintiff's counsel please give your

5    name for the record.

6         MR. OPPENHEIM:  Good morning, your Honor.  Matthew

7    Oppenheim on behalf of plaintiff.

8         THE COURT:  Defendants' counsel.

9         MR. NOVEL:  Judge, Tim Novel, N-o-v-e-l, on behalf of

10   defendants.

11        THE COURT:  Okay.  I have some questions, first for

12   Mr. Oppenheim.

13        When you get up in front of the jury at trial and you

14   ask them to award damages, what's the number going to be?

15        MR. OPPENHEIM:  I think for the different claims, it

16   may be different amounts, but without, you know, prejudice,

17   obviously, to seeing what information we get.

18        I commonly, your Honor, when statutory damages are

19   involved or punitive damages, I ask the jury to make the

20   decision about what to award, I tell them the range, I may

21   suggest a particular part of the range, but in the case of

22   statutory damages, it's unlikely that I would point to a

23   specific number.

24        THE COURT:  Fair enough.

25        What's the -- remind me what the range is for the

Case: 1:17-cv-02283 Document #: 216 Filed: 04/25/22 Page 4 of 15 PageID #:8097
Case: 23-2850    Document: 24        Filed: 02/06/2024    Pages: 165

4

 1    THE COURT:  All right.  So I've asked four questions,
 2  and I don't think I've gotten an answer yet.
 3    MR. OPPENHEIM:  So I prepared significantly for this
 4  hearing, your Honor, and I -- those are not things I prepared
 5  on because I thought we had already past those.  As you know,
 6  Mr. Hailey has handled most of these hearings.  He is out on a
 7  family vacation this week, so I'm handling --
 8    THE COURT:  Just assume I have a really good reason
 9  that is related to the stuff that I have to deal with today
10  for asking these questions.
11    MR. OPPENHEIM:  I understand that, your Honor.
12    THE COURT:  Is the number going to be a seven-figure
13  number?  Is it going to be a six-figure number?  Is it going
14  to be an eight-figure number?  Is it going to be a 15-figure
15  number?  Just give me some --
16    MR. OPPENHEIM:  I think we're -- I think likely an
17  eight-figure -- low eight-figure number is my guess --
18    THE COURT:  Eight figures to the left of the decimal
19  point, right?
20    MR. OPPENHEIM:  Yes.
21    THE COURT:  All right.  Fine.
22    All right.  Now, that's my first question.
23    My second question is is that in the discovery that
24  is being done now -- which is, if I'm understanding it
25  correctly, it's punitive damages-related discovery that I

Case: 1:17-cv-02283 Document #: 216 Filed: 04/25/22 Page 5 of 15 PageID #:8098
Case: 23-2850   Document: 24        Filed: 02/06/2024   Pages: 165

5

1   deferred, right?

2               MR. OPPENHEIM:  Yes.

3               THE COURT:  And so the number that you are looking

4   for, at least as I've always understood this, is a net

5   worth -- you're trying to figure out a net worth figure,

6   right?

7               MR. OPPENHEIM:  Well, there were two things that you

8   focused on at the last hearing which we had asked for, which

9   was, one, their -- the access of -- or assets, liabilities,

10  which is the net worth, your Honor, of the two individual

11  defendants, as well as the moneys paid out from Rev Labs,

12  right, to the two defendants.

13              And you might remember at the last hearing, you asked

14  Mr. Niro about that.  Mr. Niro said they hadn't been paid a

15  cent.  And then we went through and showed -- pointed to the

16  deposition, which said they actually had been paid, but we

17  didn't have complete information on that.  So you also

18  compelled that they produce information on that.

19              THE COURT:  So on the net worth thing, is what you're

20  telling me in the motion to compel, I don't know if it's the

21  first or the second motion to compel, is what you're telling

22  me that you don't have enough information right now in order

23  to be able to tell me to come up with a net worth figure?

24              MR. OPPENHEIM:  Not even remotely, no.

25              THE COURT:  It's a yes or it's a no.  Okay.

Case: 1:17-cv-02283 Document #: 260 Filed: 07/06/22 Page 1 of 19 PageID #:8851
Case: 23-2850   Document: 24       Filed: 02/06/2024    Pages: 165

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3

 4     CHARLES CURRY                      )  Docket No. 17 C 2283
       Doing business as                 )
 5     Get Diesel Nutrition,             )
                                          )
 6                                        )
                         Plaintiff,       )
 7                                        )  Chicago, Illinois
                    vs.                   )  May 18, 2022
 8                                        )  9:20 o'clock a.m.
       REVOLUTION LABORATORIES, LLC, et   )
 9     al.,                               )
                                          )
10                       Defendants.      )

11                  TRANSCRIPT OF PROCEEDINGS - STATUS
              BEFORE THE HONORABLE MATTHEW F. KENNELLY
12

13     APPEARANCES:

14
       For the Plaintiff:       OPPENHEIM + ZEBRAK, LLP
15                              BY:  MR. NICHOLAS COOPER HAILEY
                                4530 Wisconsin Avenue, NW, 5th Floor
16                              Washington, DC 20016
                                (202) 480-2174
17

18
       For the Defendants:      ARONBERG GOLDGEHN DAVIS & GARMISA
19                              BY:  MR. R. TIMOTHY NOVEL
                                330 N. Wabash Ave, Suite 1700
20                              Chicago, IL 60611
                                312-755-3161
21

22

23     Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                                Official Court Reporter
24                              219 S. Dearborn Street, Suite 2102
                                Chicago, Illinois  60604
25                              (312) 435-5639
```

JA000114

Case: 1:17-cv-02283 Document #: 260 Filed: 07/06/22 Page 3 of 19 PageID #:8853
Case: 23-2850   Document: 24        Filed: 02/06/2024   Pages: 165

3

1   to trial -- let's assume that, you know, there's no sanctions,

2   preclusion orders, anything like that.  The case is going to

3   trial on everything that wasn't the subject of summary

4   judgment, that wasn't the subject of a grant of summary

5   judgment.

6           What exactly is there that will go to trial?  What

7   claims against whom on damages -- on liability only, on

8   damages only, what?

9           So let me ask Mr. Hailey that first, and I'll ask Mr.

10  Novel second.

11          Go ahead, Mr. Hailey.

12          MR. HAILEY:  Good morning, your Honor.  The

13  defendant, Revolution, has already stipulated to liability

14  under -- for trademark infringement under the Lanham Act and

15  the common law trademark infringement claims.

16          And as to one specific domain name under the ACBA

17  claims, we will be -- at trial, we will be pursuing Lanham Act

18  and common law infringement claims against the individual

19  Nussbaum defendants.  We will be pursuing ACBA claims against

20  both the individual Nussbaum defendants and Revolution for the

21  remaining infringing domains at issue, which there are 12

22  total domains at issue.

23          We will also be seeking punitive damages.

24          Those -- those, I believe, cover the claims at issue.

25          THE COURT:  And do punitive damages -- I should know

Case: 1:17-cv-02283 Document #: 260 Filed: 07/06/22 Page 4 of 19 PageID #:8854
Case: 23-2850    Document: 24        Filed: 02/06/2024    Pages: 165

4

1   this, but I just don't recall -- do punitive damages

2   potentially apply to both the trademark and the counterfeiting

3   claims?

4           MR. HAILEY:  The punitive damages would be on the

5   common law trademark infringement claim.  Under the Lanham Act

6   infringement claim, we would have the option of electing

7   either statutory damages or actual damages --

8           THE COURT:  Right.

9           MR. HAILEY:  -- and the ACBA claim is for statutory

10  damages.

11          THE COURT:  Got it.

12          So the -- what we're calling "punitive" is really

13  just the state law trademark claim?

14          MR. HAILEY:  Correct.  Although the -- yeah -- yes,

15  your Honor.

16          THE COURT:  Well, there's an "although."  What's the

17  "although"?

18          MR. HAILEY:  I was anticipating a question, your

19  Honor.  The statutory damages claims under both the Lanham Act

20  and ACBA, those have punishment and deterrent --

21          THE COURT:  Oh, fair enough.  Got it.  No, no, I

22  get -- I get that.  No, I -- just punitive damages as such

23  called that or just apply to the common law claim.  Okay.

24          All right.  So, Mr. Novel, do you -- is what

25  Mr. Hailey said basically right, or is there something wrong

Case: 1:17-cv-02283 Document #: 260 Filed: 07/06/22 Page 13 of 19 PageID #:8863
Case: 23-2850    Document: 24        Filed: 02/06/2024    Pages: 165

13

1        So that's the message that I'm giving to you.  And

2   I'm not going to adjudicate any of this stuff today because

3   there's one aspect of it that I think I need more briefing on.

4        But we are going to have a conversation in about a

5   week that I'm going to order your clients to be on, and that's

6   going to be by video because I want them to look at me and see

7   how serious I am about all of this.

8        MR. NOVEL:  Understood.  May I --

9        THE COURT:  The one thing -- the one thing that's

10  going to -- that I need further briefing on has to do with

11  this trust.  I don't think I know quite enough about it at

12  this point.

13       The defendant -- the trust isn't a party to the case.

14  I will respectfully suggest that that's not necessarily the

15  complete answer.  Of course it's not a party to the case

16  because the only parties to the case are people who committed

17  or are alleged to have committed trademark infringement.

18       But if what is happening is that, basically, the

19  defendants' assets are all being socked away for them in a

20  trust that is -- the purpose of which is to be opaque to the

21  rest of the world, and if, as is the case, the defendants'

22  financial condition is relevant, which it is, at least for the

23  purposes of punitive damages, and perhaps for the issue of

24  willfulness --

25       MR. NOVEL:  Sure.

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3
### Eastern Division

Charles Curry

Plaintiff,

v.

Case No.: 1:17–cv–02283<br>Honorable Matthew F. Kennelly

Revolution Laboratories, LLC, et al.

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, June 10, 2022:

MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic hearing held pursuant to Court's order dated 6/9/2022. Defendants and their counsel are ordered to produce to plaintiffs' counsel the trust amendment and the 2021 K–1 forms referenced on the record by no later than 1:00 PM Central time today. Defendant Joshua Nussbaum and defendant's attorney Timothy Novel are ordered to show cause why they should not be held in contempt based on the failure to produce – pursuant to plaintiffs' requests and the Court's previous orders – records for Joshua Nussbaum's Wells Fargo Bank account(s). Defendant Barry Nussbaum and defendant's attorney Timothy Novel are ordered to show cause why they should not be held in contempt based on the failure to produce – pursuant to plaintiffs' requests and previous orders by the Court –records for Barry Nussbaum's Central Pacific Bank account(s) and records relating to the value and mortgage balance of the properties referenced in the 3rd bullet point on page 6 of docket entry 238 (status report). The hearing on each contempt citation will be held following the completion of the particular defendant's deposition on 6/13/2022. Attorney Timothy Novell is ordered to show cause in writing by 6/14/2022 why he should not be sanctioned pursuant to 28 USC 1927 for vexatiously multiplying the proceedings by his evasive and non–responsive answers during today's telephonic hearing. The depositions of Joshua and Barry Nussbaum to be held on 6/13/2022 under the Court's supervision will be limited to 90 minutes each with the caveats described on the record during today's hearing. The out of pocket expenses (court reporter and transcript fees) and the reasonable fee for one plaintiffs' lawyer's attendance during the depositions will be shifted to defendants based on their previous noncompliance with the Court's directives and the plaintiffs' discovery requests as this is what necessitated the reconvening of the depositions. Mailed notice. (mma, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and

JA000118

criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

JA000119

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:17-cv-02283 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**BARRY NUSSBAUM'S DECLARATION OF COMPLIANCE REGARDING THE
COURT'S AWARD OF CERTAIN FEES AND COSTS IN THE JUNE 10, 2022 MINUTE
ORDER (DOCKET 243)**

I, Barry Nussbaum, under penalty of perjury and pursuant to 28 U.S. Code § 1746, make

the following declaration:

1.  Pursuant to the Court's minute order entered on June 10, 2022 (docket 243) I have,

    via counsel, requested invoices from Plaintiff.

2.  On July 1, 2022 an invoice was tendered from Plaintiff's counsel from US Legal for

    court reporting fees for the June 13, 2022 depositions in the amount of $3,508.96

    (see Exhibit A).  I have reviewed and agreed to pay that invoice in full by July 21,

    2022.

3.   On July 11, 2022 an invoice was tendered from the office of Plaintiff's counsel for

    the amount of $17,289.50, also for the June 13, 2022 depositions (see Exhibit B).  I

    have reviewed and agreed to pay that invoice in full by July 21, 2022.

1

4. It is my understanding that my counsel has made arrangements with Plaintiff's

   counsel as outlined above and I have reviewed those communications and understand

   them.

5. The $20,798.46 draft will be submitted, via my counsel, to Plaintiff's counsel on or

   before July 21, 2022 in accordance with the June 10, 2022 order and pursuant to the

   agreement I directed my counsel to enter into with Plaintiff's counsel (See Exhibit

   C).


Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true

and correct. Executed by me on July 12, 2022.


By:  _____*/s/ Barry Nussbaum*_____    ____July 12, 2022_____
     Barry Nussbaum                        Date

2

JA000121

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk

of the Court using the CM/ECF system on July 12, 2022 which will send notification of such filing

to all counsel of record.


*/s/ R. Timothy Novel*

JA000122

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES CURRY, d/b/a GET DIESEL NUTRITION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:17-cv-02283 |
| REVOLUTION LABORATORIES, LLC, REV LABS MANAGEMENT, INC., JOSHUA NUSSBAUM, and BARRY NUSSBAUM, | ) ) ) ) ) | Judge Matthew F. Kennelly |
| Defendants. | ) | |

## PROPOSED PARTIAL FINAL PRETRIAL ORDER

Pursuant to the Court's June 30, 2022 order, Dkt. 257, the Court's guidance on the record during the July 26, 2022 hearing, and the Court's standing order regarding Preparation of the Final Pretrial Order, Plaintiff Charles Curry d/b/a Get Diesel Nutrition ("Plaintiff") and Defendants Revolution Laboratories, LLC, Joshua Nussbaum, and Barry Nussbaum (collectively, "Defendants"), have jointly prepared and now submit this proposed Partial Final Pretrial Order.

The parties hereby certify that each of the categories of information identified by the Court's standing order regarding Preparation of the Final Pretrial Order is included in the enclosed proposed Partial Final Pretrial Order, with the exception of deposition designations and proposed jury instructions, which will be submitted at a later date to be determined by the Court, pursuant to the Court's guidance at the July 26, 2022 hearing.

This Order will control the course of the trial and may not be amended except by consent of the parties, or by order of the Court to prevent manifest injustice.

1

that Defendant Revolution is liable for infringing Plaintiff Mr. Curry's Diesel Test trademark in violation of federal law and Illinois common law, and that Defendant Revolution is also liable for violating the Anticybersquatting Consumer Protection Act with respect to the website it created at www.dieseltestbooster-red.com.  Defendants otherwise deny liability.

Plaintiff alleges that Defendants Joshua Nussbaum and Barry Nussbaum are individually liable for infringement under federal law and Illinois common law; that the Nussbaums and Revolution's infringement was willful; that the Nussbaums and Revolution are liable for additional violations of the Anticybersquatting Consumer Protection Act in connection with the registration of a dozen Diesel Test domains, and that the Nussbaums and Revolution are liable for violating the Illinois Uniform Deceptive Trade Practices Act.  Defendants deny Plaintiff's contentions.

### 3.    <u>Relief Sought</u>

The precise amount of damages will be determined at trial, but Plaintiff intends to seek the following damages and other relief against all Defendants:

- Defendants' profits (totaling at least $4,779,045), Plaintiff's damages (damage to his reputation and loss of goodwill), and the costs of the action, pursuant to 15 U.S.C. § 1117(a), with such damages adjusted upward pursuant to § 1117(a) and/or trebled pursuant to § 1117(b), or statutory damages of up to $2,000,000 per counterfeit mark, pursuant to § 1117(c), to be elected by Plaintiff before final judgment is rendered by the trial court;

- Statutory damages of up to $1,200,000 (up to $100,000 per infringing domain name), pursuant to 15 U.S.C. § 1117(d);

- Punitive damages (of up to three times Defendants' profits and Plaintiff's damages, above);

- Permanent injunctive relief;

- Attorneys' fees and costs; and

- Prejudgment interest.

JA000124

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3
       CHARLES CURRY                        )    Docket No. 17 C 2283
 4     Doing business as                    )
       Get Diesel Nutrition,                )
 5                                          )
                            Plaintiff,      )
 6                                          )    Chicago, Illinois
                   vs.                      )    September 7, 2022
 7                                          )    3:00 o'clock p.m.
       REVOLUTION LABORATORIES, LLC, et     )
 8     al.,                                 )
                                            )
 9                          Defendants.     )

10
                     TRANSCRIPT OF PROCEEDINGS - STATUS
11             BEFORE THE HONORABLE MATTHEW F. KENNELLY

12
       APPEARANCES:
13

14     For the Plaintiff:    OPPENHEIM + ZEBRAK, LLP
                              BY:  MR. MATTHEW OPPENHEIM
15                                 MR. NICHOLAS COOPER HAILEY
                              4530 Wisconsin Avenue, NW, 5th Floor
16                            Washington, DC 20016
                              (202) 480-2174
17

18

19     For the Defendants:   ARONBERG GOLDGEHN DAVIS & GARMISA
                              BY:  MR. R. TIMOTHY NOVEL
20                                 MR. MATTHEW L. DE PRETER
                              330 N. Wabash Ave, Suite 1700
21                            Chicago, IL 60611
                              312-755-3161
22

23
       Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                           Official Court Reporter
                             219 S. Dearborn Street, Suite 2102
25                           Chicago, Illinois  60604
                             (312) 435-5639
```

1  his sales.  Am I getting that right?  That's kind of the

2  thrust of what I was reading between the lines.

3        MR. HAILEY:  Your Honor, he has records about his

4  sales.  But in terms of differentiating between products and

5  certain time periods, that's where we made the decision to

6  pursue -- to not pursue lost sales specifically because of the

7  difficulties of putting together that information.

8        THE COURT:  Okay.  All right.  So I don't know how

9  I'm going to deal with that one.  We're going to come back to

10  that one.

11        MR. OPPENHEIM:  Your Honor, may I add?  I'm sorry.

12        THE COURT:  No, you may not.

13        Defendants' motion number 4, bar evidence and

14  testimony regarding trusts.  Okay.

15        I have a question.  Is anything that could be called

16  punitive damages being sought by the plaintiff in this case?

17        MR. HAILEY:  Yes.

18        THE COURT:  I'm sorry?

19        MR. HAILEY:  Yes.

20        THE COURT:  Okay.  So motion number 4 is something

21  that I have already ruled on probably multiple times.  The

22  fact that the trusts are not named as parties to the case does

23  not matter.  The existence of the trusts and what they were

24  used for is relevant and admissible on a couple of issues, at

25  least.  Number one, the issue of intent and willfulness.

1  Basically the theory being they can't do anything to us
2  because our assets are all in Panama or whatever.  And,
3  secondly, they're relevant on the question of what the
4  defendants' financial condition is, which is pertinent on the
5  issue of punitive damages.  So those are -- those are --
6  elements about the trust is not irrelevant, and it's not
7  inadmissible.

8         Whether and the extent to which whatever is in the
9  trusts is appropriately considered an asset of the defendant
10  is something that a jury is going to have to decide.  So
11  motion in limine number 4 is denied.

12         On motion in limine number 5, I have a couple of
13  questions I think for the plaintiff.  This is the one about
14  Mr. Nussbaum, Barry Nussbaum's website.  I'm looking at the
15  response to the motions in limine, specifically at page 20.
16  There's three bullet points where you give examples of things
17  you might want to use something off the websites for.

18         The first bullet point says:  "Plaintiff may refer to
19  Mr. Nussbaum's social media posts to show Mr. Nussbaum's
20  financial condition in connection with punitive and statutory
21  damages."

22         So I need you to be specific.  What is there on the
23  social media posts that has --

24         MR. HAILEY:  Can you hear me, your Honor?
25         THE COURT:  Yes.

1  What's the claim or claims on which you're asking for punitive
2  damages?

3          MR. HAILEY:  Punitive damages are available under the
4  Illinois trademark infringement.

5          THE COURT:  Got it.  So probably the advice of
6  counsel issue would be pertinent -- potentially would be
7  pertinent to that too because depending upon how the punitive
8  instruction reads, there's something that would approach
9  willfulness that's required to show that or maliciousness or
10 something along those lines.  Okay.

11         All right.  So if I'm understanding it correctly --
12 and I need you to correct me if I'm wrong because this is
13 really important.  I have probably seen the cease-and-desist
14 letter at some point, but I don't recall what it says.
15 Basically, they gave him a letter.  They said -- they gave
16 Mr. Santos the letter.  They looked into this.  And Mr. Santos
17 came back and he said, couldn't find a registration for this,
18 and I couldn't find the product being sold.  You're okay.  Or
19 something along those lines, right?

20         MR. NOVEL:  That's the gist of it, yes, Judge.

21         THE COURT:  Okay.  All right.  So now that you have
22 that a little bit more clearly than before, if I can hear from
23 the plaintiff on this.

24         MR. HAILEY:  Yes, your Honor.  So I just want to
25 actually point to the specific deposition testimony because

1   don't, just to be clear, it's going to have to -- the data

2   file, whatever it is, is going to have to cover -- have

3   information within it that covers the period of time that the

4   P&L covers.  That's the whole thrust of the underlying

5   documents requirement of Rule 1006.

6           MR. OPPENHEIM:  Your Honor, can we reserve in the

7   event that there are questions that arise from it to come back

8   to the Court --

9           THE COURT:  I don't even need to answer that

10  question.

11          So we're now on to the next motion in limine, lack of

12  profits.  So what the plaintiff is arguing here, as I

13  understand it, is that what's relevant for purposes of, I

14  guess, damages is profits from the infringement.  And what's

15  irrelevant is the overall profitability of the company seeing

16  as how it dealt in other products and potentially services.

17  Is that a correct understanding of the plaintiff's motion?

18          MR. HAILEY:  Yes, your Honor.

19          THE COURT:  Okay.  So I guess what I would say is

20  that I don't really see the response as really dealing too

21  well with that issue.  Yes, Revolution's finances are relevant

22  in the case, I suppose, as it relates to punitive damages.

23  But in terms of -- in terms of its profitability, I'm not

24  understanding how its profitability overall bears on the

25  recovery of profits by the plaintiff.  So maybe you can try

1   giving it another try at explaining that to me.

2         MR. NOVEL:  Two things.  The first piece of it, your

3   Honor, is correct.  The overall profitability does go to

4   damages.

5         THE COURT:  But that's -- what's relevant -- what's

6   relevant on punitive damages is the financial condition now,

7   not at some past point in time.  So, I mean, if on punitive

8   damages as it relates to Revolution, you want to say the

9   company is belly up or it has a zero net worth, that's one

10  thing.  But that's not what's being asked to be excluded here.

11  It's the profitability from this past period when infringement

12  is alleged.

13        MR. NOVEL:  Profit on a whole or profitability just

14  based on this product?

15        THE COURT:  They're asking to exclude overall

16  profitability, and they're not asking to exclude the profits

17  that were made for these particular profit, obviously, because

18  they're asking to recover those.

19        MR. NOVEL:  I'll let my co-counsel respond to that.

20        MR. DE PRETER:  Your Honor, the motion wasn't

21  entirely clear on which profits the profitability was directed

22  to because this is broader than just Diesel Test, based on

23  what the defendants' expert was trying to opine upon.  We

24  talked about the defendants' expert earlier, and you seemed to

25  be inclined to allow him to testify about all these extra

1       Okay.  What more do defense counsel want to tell me
2   about this particular motion?

3       MR. DE PRETER:  Nothing, your Honor.  The overall
4   sales of the company go towards the profits and the profits
5   that the plaintiffs are trying to recover.  And our clients
6   are entitled to talk about how they operated the business.

7       THE COURT:  I don't agree with that.  The overall
8   profitability of the company is not relevant.  During the
9   period of infringement, the overall profitability of the
10  company is not relevant to any issue in the case.  What's
11  relevant is the profitability of the products, plural, for
12  which the plaintiff is asking to recover profits.  So you can
13  put in testimony about the profitability of those products,
14  but you cannot put in testimony about the company was always
15  losing money or never made a dime or whatever.  That's because
16  that doesn't bear on that issue.

17      As far as punitive damages, what's relevant is the
18  financial condition of the company now.  So, for example, a
19  company that was worth $2 billion at some point in time but at
20  trial was worth $5.58, because part of the punitive damages
21  calculation is deterrence, that relates to what it takes to
22  deter a company that has the financial wherewithal of the
23  particular company.  But that focuses on now, at the time the
24  award is made, not before.  So I don't agree that the overall
25  profitability of the company during the period of infringement

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES CURRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 2283** |
| | ) | |
| **REVOLUTION LABORATORIES, LLC,** | ) | |
| **REV LABS MANAGEMENT, INC.,** | ) | |
| **JOSHUA NUSSBAUM, and** | ) | |
| **BARRY NUSSBAUM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

This case is set for trial in mid-May 2023. There are sanctions-related matters

pending before the Court regarding defendants' delayed production and non-production

of financial information of various types. The Court rules on those matters via this

opinion and also addresses the motion to withdraw filed by one of defendants'

attorneys.

This is a lawsuit against an entity and two individual defendants, the Nussbaums,

for trademark infringement and related claims. Plaintiff Charles Curry seeks to recover,

among other things, the profits the defendants made from infringement. Plaintiff also

seeks punitive damages on his state-law claim and statutory damages under the

Lanham Act. On these latter points, the defendants' financial condition is a factor that is

considered.

Starting about a year ago, plaintiff sought financial records that would assist in

showing the profits the defendants made from infringing sales and their financial status generally. The information plaintiff requested is relevant on, if nothing ese, the points just discussed relating to damages. Plaintiff's discovery requests led to the sanctions issues that are now before the Court.

The Court's involvement in disputes regarding plaintiff's financial discovery requests extends back to early March 2022. By September 2022, most of the information plaintiff sought had been produced but, perhaps, not all of it. And what defendants *did* produce essentially had to be dragged out of them bit by bit. Plaintiff had to invoke the Court's authority repeatedly, in ways that would not have been necessary had the defendants and their counsel not engaged in dilatory and, in some instances, obstructive tactics.

The Court starts with a brief history of the relevant events. On March 1, 2022, the Court granted plaintiff's motion to compel, which covered plaintiff's request for information within the Nussbaums' possession, custody, or control regarding their assets, net worth, income, and compensation. The Court ordered production in full by March 15. The Court also authorized and directed time-limited depositions of both Nussbaums regarding financial issues, to be completed by the end of March.

Following the Court's order, defendants produced some of the information ordered but not all of it. Among other things, they did not produce a significant quantity of bank records and tax returns. In addition, they produced no information regarding a trust established by Barry Nussbaum—into which, it appears, significant revenues from the defendant corporation have been funneled, and which apparently pays at least some of Barry Nussbaum's living expenses. And in late March, without any advance

2

notice, the Nussbaums failed to appear for their court-ordered depositions.

Plaintiff filed two motions for sanctions, one concerning the missing records and one concerning the depositions. On April 15, 2022, the Court ordered defendants to produce the missing financial discovery by April 29, ordered the Nussbaums to appear for their depositions by May 6, and continued the motions for sanctions.

No new documents were produced by the April 29 deadline despite the plain deficiencies in defendants' compliance with the Court's March 1 order. And at the May 6 depositions, Barry Nussbaum refused to answer questions regarding the assets in or value of the trust, and Joshua Nussbaum (claimed at the time to be a beneficiary of the trust and its "managing trustee") disclaimed any knowledge about the trust or its assets.

At a video hearing on May 24, 2022, at which the Court ordered the Nussbaums to appear personally, the Court admonished them—not the first time defendants (via counsel) had been admonished regarding discovery non-compliance—and ordered them to produce copies of the trust agreement and resume their depositions on June 13 under the Court's direct supervision.

On June 10, the Court noted defendants' continued noncompliance with the Court's production orders in various respects and ordered them and their counsel to show cause why they should not be held in contempt. During this hearing, defendant's counsel represented that the records of a particular bank account had been produced in their entirety—so the Court did not include that in its show cause order—but it later turned out this was false. In addition, the defendants did not produce until two days later complete records from Barry Nussbaum's Central Pacific Bank account, despite having told the Court on June 10 that they had produced those records in their entirety.

JA000134

Also at the June 10 hearing, the Court ordered the Nussbaums to pay the attorney's fees and costs associated with their resumed deposition. The Nussbaums complied with this in July 2022, paying a little over $20,000. *See* Dkt. nos. 265, 266.

As of June 24, 2022, all of the relevant tax returns had been produced, but defendants had not yet produced the following records covered by the Court's earlier production orders: complete records of Barry Nussbaum's First Hawaiian Bank account, or any records for his California Bank and Trust account, the existence of which had not even been disclosed until his June 13 continued deposition. In addition, defendants and their counsel had continued to misrepresent information regarding the trust and their access to information about it. More information about the trust came out at the June 13 deposition. Based on the testimony, it appears that Barry Nussbaum, despite claiming not to have access to information about the trust (which he set up in the Cook Islands) or even the ability to obtain such information, regularly received money from the trust based partly on his "personal needs." It also appears that the trust owns Barry Nussbaum's home in Hawaii as well as significant other real estate. All of this had taken months, and repeated motions and court directives, to be disclosed. Even then, the Nussbaums continued to resist producing further information or documents concerning the trust. There also remained other relevant financial information either belatedly disclosed or not yet disclosed at all. *See* Dkt. no. 252 (Pl.'s Mem. in Further Support of Mot. for Sanctions) at 12-13.

Plaintiff sought in his June 24 submission the following relief:

- an instruction to the jury that the Nussbaums disobeyed multiple court orders to produce documents and information regarding their finances and allowing the

4

jury can infer that the information they failed to produce was unfavorable to them and favorable to plaintiff;

- an instruction to the jury that the net worth of each Nussbaum may be presumed significant for purposes of punitive and statutory damages;

- an order barring the Nussbaums from testifying about their finances;

- an order precluding the Nussbaums from relying on the trust to minimize their net worth or their compensation from the corporate defendant; and

- attorney's fees and costs incurred by plaintiff relating to the financial discovery and compliance efforts.

*See* Dkt. no. 252 at 14; *see also* Dkt. no. 284.

At a hearing on July 13, 2022, plaintiff's counsel reported that certain documents within the scope of the Court's production order(s) remained unproduced by defendants. These included certain records relating to assets of the trust; documents relating to a supposed amendment of the trust that purportedly removed Barry Nussbaum as "trust protector"; documents relating to Joshua Nussbaum's claimed resignation (post-lawsuit, in November 2020) as the trust's managing trustee; documents relating to a claimed restructuring of the trust—which was contended to have the effect of putting the trust's assets out of reach; documents relating to the value of certain real estate holdings; documents regarding certain business ventures reflected in the defendants' tax returns; and complete documents relating to two other trusts disclosed for the first time during Barry Nussbaum's continued deposition on June 13.  During the July 13 hearing, defendants' counsel denied that any further documents existed.  The Court ordered the parties to confer further on the document production issues.

JA000136

On June 29, 2022, the Nussbaums filed affidavits stating that they had produced what amounted to the remaining records ordered by the Court that were in their possession, custody, or control. *See* Dkt. nos. 255, 256. The defendants then filed a memorandum stating that they had complied in full and that no preclusive or inference-type sanctions should be imposed. *See* Dkt. no. 264.

The Court also stated, during the July 13 hearing, that the preclusive and inferential sanctions sought by plaintiff should be addressed in a motion *in limine* to be filed later. Plaintiff subsequently filed a motion *in limine* on this topic. At a hearing on September 7, 2022, the Court overruled one aspect of plaintiff's requested relief, denying his to request bar defendants from testifying or making arguments about their assets. The Court tabled until closer to trial plaintiff's request for preclusive and inferential sanctions. The Court took under advisement plaintiff's request for monetary relief. The parties then filed further briefs regarding the amount of monetary sanctions the Court should award.

What remains for the Court's determination, aside from the remaining preclusive/inferential sanctions sought by plaintiff, is plaintiff's request for an award of attorney's fees and costs. Plaintiff requests fees in the amount of $238,005 and expenses of $1,460.45. Defendants argue that the request is overblown and unjustified and should be overruled in its entirety on that basis. They also challenge certain specifics of the requested fees.

More recently, Timothy Novell, one of the attorneys for defendants (and the one who had carried the laboring oar with respect to the financial discovery and related issues), moved to withdraw. In December 2022, just before Mr. Novell filed his motion

JA000137

to withdraw, another attorney from the same firm advised the Court during a hearing that Mr. Novell had made erroneous statements to the Court.  The Court told counsel to put this in writing.  Defense counsel's submission, filed on December 29, 2022, reported that Mr. Novell had falsely stated to the Court (in a May 23, 2022 filing and a May 24, 2022 hearing) that the reason certain Nussbaum tax returns had not been produced was that counsel had not received readable electronic versions.  Defense counsel reported that in fact, Mr. Novell had received fully readable copies of the tax returns as early as March 15, 2022.  *See* Dkt. no. 312.

## Discussion

### A.    Monetary sanctions

The Court begins with plaintiff's request for monetary sanctions.  Plaintiff seeks sanctions under Federal Rule of Civil Procedure 37(b)(2)(C), which states that a court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure [to comply with a court order]c, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C); *see* Pl.'s Submission in Further Support of Monetary Sanction at 2 (citing the Rule).

The defendants violated the orders of the Court in several respects, as detailed earlier.  In particular, they failed to produce documents responsive to plaintiff's document requests that the Court enforced, which required further enforcement efforts by plaintiff and by the Court.  In addition, they failed to appear for their March 31 depositions without justification.  There is no question that plaintiff is entitled to an award of fees and costs under Rule 37.

7

JA000138

A party entitled to fees and costs under Rule 37 "should be made whole—should be as well off as if the opponent had respected his legal rights in the first place." *Rickels v. City of S. Bend*, 33 F.3d 785, 787 (7th Cir. 1994).  But a court may impose only the attorney's fees and costs that the party would not have paid for but for the wrongdoing.  *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017).  And, equally significantly, Rule 37 by its terms permits recovery only of *reasonable* fees and expenses.

As indicated, plaintiff seeks to recover $238,005 in attorney's fees and $1,460.05 in expenses.  From a 30,000-foot level, this appears quite excessive.  At rates of $750 for plaintiff's lead counsel and $570-$588 for plaintiff's other counsel, the total represents around 400 hours of attorney time.[1]  The fee request covers a period of about four months, from mid-March through mid-July 2022.  That's about seventeen weeks, or a little over eighty workdays if holidays aren't included.  The attorney time claimed thus averages out to something like five hours per day for every day during the relevant period.

To be sure, plaintiff was put to significant extra work due to defendants' noncompliance and unjustified delays in compliance.  He had to file repeated requests and participate in several court hearings to secure compliance.  And as materials trickled in, plaintiff kept finding out about previously-undisclosed responsive materials, requiring further efforts to obtain production—which was hardly ever forthcoming without some coercion.  But, in the Court's view, the amount of fees claimed is significantly

---

[1]  The Court cannot find in plaintiff's submission a total of the hours claimed for each attorney, or even the total number of hours claimed, and it did not do a detailed calculation on its own.  Thus the approximation in the text.

JA000139

beyond the *reasonable* fees occasioned by defendants' noncompliance with court

orders.  It is worth noting that although plaintiff's counsel had to prepare a number of

separate filings and participate in several hearings, these all involved a common or

overlapping set of points.  The wheel didn't have to be reinvited with each filing; most of

what was required for court filings and hearings involved building on previous

submissions and discussions.

Plaintiff has broken down his fee request into a series of topics.  The Court

addresses each in turn.

1.     Plaintiff claims 20.9 hours of attorney time—$12,452—for the twelve-page

motion for sanctions he filed on March 25, 2022.  The filing of the motion was caused by

defendants' noncompliance with the Court's March 1 order, but the total time claimed

(translating to $1,000 per page) is not reasonably shifted to defendants given the

subject matter involved.  The Court reduces this amount by one-half, to <u>$6,226</u>.

Plaintiff's reply brief on this same motion, which is nine pages long, results in a request

for $15,965 in attorney's fees (about $1,700 per page), representing over twenty-seven

hours in attorney time.  This, too, is unreasonably excessive.  The Court reduces this

amount by two-thirds, to <u>$5,321</u>.

2.     Plaintiff claims $36,552 (seventy-two attorney hours) for preparation for

the Nussbaums' March 31 depositions, for which they did not appear.  The Court

disagrees with defendants' contention that this should not be compensated at all.  The

depositions were ordered by the Court, and the time plaintiff reasonably spent on

preparation was almost entirely wasted due to defendants' failure to appear.  But the

time claimed for preparation is excessive by quite a bit.  For two one-hour depositions,

JA000140

plaintiff seeks a total of *seventy-two hours* of preparation time.  The Court understands that time would be needed to hone the questioning given the court-imposed time limitation, but seventy-two hours is absurdly excessive.  The Court will allow ten hours of this time, at attorney Hailey's $588 rate, for a total of $5,880.

3.     A total of 14.6 hours of time, or $8,575, is claimed for plaintiff's April 1 sanctions motion regarding the defendants' non-appearance for their depositions.  That's outlandish; this was a simple matter to describe and bring to the Court's attention (and the motion was filed just one day after the non-appearance).   The Court reduces this amount by three-fourths, to $2,143.

4.     Plaintiff unreasonably seeks $3,874 in fees—which translates to 6.4 hours of attorney time—for a May 2, 2022 two-page notice updating the Court on discovery.  That's excessive; nothing anywhere close to that was reasonably required.  The Court reduces this by two-thirds, to $1,291.  The Court also reduces by two-thirds the amount claimed ($2,278) for a two-page filing on May 16 regarding the non-production of the trust documents.  The reduced amount is $759.

5.     Plaintiff requests a total of a bit over $42,000 in fees for the May 13, 2022 joint status report ($23,632) and his May 23, 2022 supplement to that report ($18,883).  These filings covered a significant amount of territory (the May 13 report was twenty pages long and the May 23 report was seventeen), but they largely raked over old ground and covered relatively straightforward points that had come up during the ongoing proceedings.  It appears that just short of thirty-six hours are charged for the May 23 supplement and that thirty-seven hours are charged for the May 13 report.  The Court reduces the attorney's fees for these by two-thirds, to $14,171.

10

Defendants contend that no fees should be imposed for these reports. The Court disagrees. The May 13 status report amounted to a request to (again) compel production of the financial records as ordered by the Court. As for the May 23 status report, defendants argue the fees should not be shifted because the report involved questions regarding production of trust-related records. But it is quite clear at this point (and plainly was known to defendants all along, given their knowledge of the trust arrangement) that documents involving the trust amount to financial records of the defendants that were encompassed by the Court's March 2022 production order. Among other things, the trust appears to have been funded at least to some extent by payments from defendant Revolution (from which Barry Nussbaum apparently has taken little or no salary or draw); the trust apparently finances some reasonably significant part of Barry Nussbaum's living expenses; and Joshua Nussbaum is and has been a beneficiary. One cannot with a straight face characterize records about the trust as anything other than records regarding the defendants' assets and finances.

6.      The fees sought by plaintiff for preparation for and participation in several court hearings during this period are unreasonably excessive. This includes $8,111 sought for the April 15, 2022 telephonic hearing (just under fourteen hours' worth), which took just fifteen minutes; $9,927 for the May 18, 2022 telephonic hearing, which lasted about thirty minutes; and $4,590 for the May 24, 2022 video hearing. The Court cuts the fees for each of these by two-thirds, to $7,542.

7.      The Court declines to include in the sanctions award $5,814 in fees claimed in relation to Barry Nussbaum's request to appear remotely for his deposition due his health condition and $4,057 for the June 1, 2022 hearing on that motion. This

JA000142

time was not occasioned by the defendants' noncompliance with any court orders.

8.    Plaintiff seeks $3,293 (5.6 hours) for a June 8 status report—plaintiff's part of the report was a little under six pages—and $4,677 for preparation for and participation in a June 10 status hearing that took fifteen minutes.  Reasonable time for these matters is compensable because the report (and thus the hearing) amounted to a further effort to compel production of documents sought by the Court.  The amount claimed for the report is reasonable, but the amounts claimed for the hearing is unreasonably excessive.  The Court reduces the latter amount by two-thirds (to $1,559). The revised total is $4,852.

9.    Plaintiff filed on June 24, 2022 a memorandum in further support of his sanctions motion that also addressed defendants' claims that, by then, they had complied.  The filing of this memorandum, which contained fifteen pages of text, was reasonably caused by defendants' noncompliance with the Court's orders, but the amount claimed, 49.6 hours for a total of $30,466, is unreasonably high.  The Court reduces this by two-thirds, to $10,155.

10.    For similar reasons, the Court reduces by two-thirds the amounts claimed in connection with a relatively brief June 30, 2022 hearing ($2,587); a July 1, 2022 notice regarding ongoing noncompliance or delayed compliance ($1,125); and a July 13, 2022 telephonic hearing, which took about 20 minutes ($4,900).  The reduced amount is $2,870.

11.    For the period from mid-March through the end of June 2022, a total of fifty-six hours of time ($32,402) is claimed for communication with defendants' counsel regarding compliance issues and reviewing correspondence and submissions by

JA000143

defendants.  Some of this actually amounts to deposition preparation time that

defendants elsewhere represented they were not seeking (Kane entry of 6.3 hours and

Hailey entry of 2.9 hours on 6/12/2022; Hailey entry of 3.9 hours and Kane entry of 0.4

hours on 6/13/2022); a lot of it actually relates date-wise to filings for which the Court

has already reduced the claimed amount to a reasonable sum for the preparation of

those filings; and some of it is occasioned by inter-attorney consultation among the

three attorneys representing Curry.  Some of this consultation is reasonably necessary,

but it's not reasonable to shift all of it to defendants.  This time is reduced by three-

fourths, to $8,100.

12.    Finally, the Court addresses the submissions plaintiff made in July and

August 2022 to quantify the requested monetary sanctions award.  The Court has

reviewed those submissions extensively in connection with the present ruling.  The

primary items are plaintiff's ten-page submission in further support of monetary

sanctions filed on June 22, 2022 and his fifteen-page reply brief filed on August 7, 2022.

These were significant submissions ordered by the Court and caused by defendants'

noncompliance with Court orders.  But the Court can reasonably infer from its extensive

review of the billing already discussed that the total time and effort charged for these

would likely be in line with the amounts charged for earlier submissions, each of which

the Court has found unreasonably excessive and has reduced accordingly.  The Court

sees no useful purpose in going through, or requiring counsel to go through, the time

and effort that would be required to brief the appropriate amount recoverable for these

submissions.  The Court will allow a total of $12,000 for these filings.  This amounts to

about twenty hours of attorney time at the rates of the lawyers who appear to be the

JA000144

principal drafters of plaintiff's written submissions.

13.    The total amount of attorney's fees the Court will award in favor of plaintiff and against defendants is $81,310.  Defendants have not challenged the requested out-of-pocket costs, so the Court awards the requested costs in their entirety—$1,460.  The total monetary sanction is $82,770.  These sanctions are imposed jointly and severally against each of the defendants.  On a couple of relatively discrete points, it appears that some of the delay was due to attorney Novell, and it is at least possible that defendants' non-production, delayed production, and failures to appear resulted from consultation with counsel.  On that, defendants and their counsel are free to address among themselves who ultimately should be responsible for what.[2]  That should not be plaintiff's problem.  The monetary sanctions are payable to plaintiff in full no later than twenty-one days after the date this decision is issued.

**B.    Preclusive and inferential sanctions**

As the Court has previously indicated, it will address plaintiff's request for preclusive and inferential sanctions at a point closer to trial.  In this regard, plaintiff is directed to file by January 27, 2023 a submission of not more than five pages describing any remaining documents covered by the Court's production orders that plaintiff believes defendants still have not produced.  Defendants are directed to file by February 3, 2023 a response of not more than five pages.

---

[2] The Court reserves the possibility, in connection with attorney Novell's motion to withdraw, of making Mr. Novell jointly and severally liable for some part of the fee award associated with his alleged misrepresentations to the Court or otherwise sanctioning him.

14

JA000145

**C.     Novell motion to withdraw**

Before addressing Mr. Novell's motion to withdraw, the Court needs to consider the contentions made by his (now former) law firm regarding certain representations Mr. Novell made to the Court.  Mr. Novell may file a response to the law firm's submission by no later than January 20, 2023.  The Court will deal with the motion to withdraw and any sanctions or proceedings resulting from Mr. Novell's claimed misconduct after that.

**Conclusion**

For the reasons described above, the Court grants plaintiff's motion(s) for sanctions and imposes a monetary sanction of $82,770 in favor of plaintiff against defendants, jointly and severally.  The monetary sanction must be paid in full by no later than February 13, 2023, and defendants are to file a notice of compliance by no later than February 14, 2023.  In addition, plaintiff is directed to file by January 27, 2023 a submission of not more than five pages identifying any remaining documents covered by the Court's production orders that plaintiff believes defendants still have not produced.  Defendants are directed to file by February 3, 2023 a response of not more than five pages.  Attorney Timothy Novell's motion to withdraw is taken under advisement.  Mr. Novell may file a response to his former law firm's December 29, 2022 submission by no later than January 30, 2023.  Finally, the Court's order to show cause relating to contempt has been adequately dealt with by the present order and other previous orders and is therefore withdrawn without prejudice.

Date:  January 23, 2023

_____
MATTHEW F. KENNELLY
United States District Judge

JA000146

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    CHARLES CURRY                      )   Docket No. 17 C 2283
      Doing business as                 )
 4    Get Diesel Nutrition,             )
                                        )
 5                      Plaintiff,      )
                                        )   Chicago, Illinois
 6              vs.                     )   May 22, 2023
                                        )   2:20 o'clock p.m.
 7    REVOLUTION LABORATORIES, LLC, et  )
      al.,                              )
 8                                      )
                        Defendants.     )
 9
                   TRIAL TRANSCRIPT OF PROCEEDINGS
10      BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
                            VOLUME 5-B
11
      APPEARANCES:
12

13    For the Plaintiff:      OPPENHEIM + ZEBRAK, LLP
                              BY:   MR. MATTHEW OPPENHEIM
14                                  MR. NICHOLAS COOPER HAILEY
                                    MR. JEFFREY KANE
15                            4530 Wisconsin Avenue, NW, 5th Floor
                              Washington, DC 20016
16                            (202) 480-2174

17

18
      For the Defendants:     ARONBERG GOLDGEHN DAVIS & GARMISA
19                            BY:   MR. MATTHEW L. DE PRETER
                                    MS. CHIDINMA AHUKANNA
20                            330 N. Wabash Ave, Suite 1700
                              Chicago, IL 60611
21                            312-755-3161

22

23    Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Suite 2102
                              Chicago, Illinois  60604
25                            (312) 435-5639
```

JA000147

1    All right.  I'm going to read the verdict into the
2  record.
3    Under the trademark infringement claims, question
4  number one, do you find the individual defendants are also
5  liable?  It's checked yes as to both Joshua Nussbaum and Barry
6  Nussbaum.
7    Question number two, do you find the trademark
8  infringement was willful?  It's checked yes as to all three
9  defendants, Revolution, Joshua Nussbaum, Barry Nussbaum.
10    Question three, what amounts of monetary relief do
11  you award?  Actual damages, $2,500.  Defendants' profits,
12  $500,000.
13    Number four, if you determine that punitive damages
14  are appropriate as to one or more defendants, what amounts do
15  you award?  The amount is $300,000 for each of the three
16  defendants, Revolution, Joshua Nussbaum, and Barry Nussbaum.
17    ACPA claim, question one, do you find that Revolution
18  is liable for violating the ACPA for any additional domains?
19  No.
20    Question two, do you find the individual defendants
21  are liable for violating the ACPA?  Checked yes for Joshua
22  Nussbaum, no for Barry Nussbaum.
23    On the list of websites, the only ones that are
24  checked off yes is Revolution, which was already checked off,
25  and Joshua Nussbaum for the first listed name, which is

Case: 23-2850    Document: 24    Filed: 02/06/2024    Pages: 165

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Bracco Diagnostics, Inc. v. Amersham Health, Inc.,
D.N.J.,  June 5, 2009

2008 WL 4279812

Only the Westlaw citation is currently available.

United States District Court, D. Oregon.

ADIDAS AMERICA, INC. and
Adidas–Solomon AG, Plaintiffs,

v.

PAYLESS SHOESOURCE, INC., Defendant.

No. CV 01–1655–KI.
|
Sept. 12, 2008.

**Attorneys and Law Firms**

Stephen M. Feldman, Thomas R. Johnson, Perkins Coie, LLP, Portland, OR, Jerre B. Swann, R. Charles Henn, Jr., William H. Brewster, Kilpatrick Stockton, LLP, Atlanta, GA, for Plaintiffs.

Craig D. Bachman, Kenneth R. Davis, II, Milo Petranovich, Lane Powell, PC, William B. Crow, Schwabe Williamson & Wyatt, PC, Portland, OR, Bridget A. Short, William R. Hansen, Lathrop & Gage, LC, New York, NY, David V. Clark, Gerald M. Kraai, R. Cameron Garrison, Travis W. McCallon, William A. Rudy, Lathrop & Gage, LC, Kansas City, MO, Michael G. Martin, Michael J. Roche, Phillip S. Lorenzo, Lathrop and Gage L.C., Denver, CO, John J. Shaeffer, Spillane Shaeffer Aronoff Bandlow LLP, Los Angeles, OR for Defendants.

**Opinion**

KING, Judge:

**\*1** Following a three-week trial, a jury returned a verdict in favor of plaintiffs adidas-America, Inc. and adidas-Salomon AG (collectively, "adidas") on its claims against Payless Shoesource, Inc. ("Payless") for trademark and trade dress [1] infringement, dilution, and related federal and state law claims based on Payless' sale of footwear bearing two or four stripes. In addition, the jury found that Payless acted willfully and maliciously, or in wanton and reckless disregard of adidas' trademark and trade dress rights. The jury determined adidas was entitled to: (1) actual damages in the form of a 7.78 percent royalty, totaling $30.6 million; (2) a $137 million accounting of Payless' profits; and (3) punitive damages of $137 million. [2]

[1]    For the sake of brevity, at times I will refer to the trademark and trade dress together as "marks."

[2]    The exact figures are $30,610,179 for a reasonable royalty, $137,003,578 in Payless' profits, and $137,003,578 in punitive damages.

Before the court are: (1) Payless' Motion for Judgment as a Matter of Law on adidas' Damage Claims or, in the Alternative, for New Trial or Remittitur (# 863); (2) Payless' Motion for Judgment as a Matter of Law or a New Trial (I) Due to Plaintiff's Failure to Prove the Fact of Actual Damage, and (ii) on the Issue of Willfulness (# 866); (3) Payless' Motion for Judgment as a Matter of Law on adidas' Liability Claims or in the Alternative, for New Trial (# 868); and (4) Payless' Supplemental Motion for New Trial (# 901). For the following reasons, I deny each of the motions for judgment as a matter of law and/or new trial, conditioned on adidas' acceptance of a remittitur of the punitive damages, and I reduce the award of Payless' profits.

## LEGAL STANDARDS

I. *Rule 50(b)-Judgment as a Matter of Law*

Under Federal Rule of Civil Procedure 50(b), the court may set aside the jury's verdict in favor of adidas, and enter judgment as a matter of law in favor of Payless, if there is "no legally sufficient evidentiary basis for a reasonable jury to find" for adidas on an issue or claim. "Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the non-moving party, allows only one reasonable conclusion and that conclusion is contrary to that reached by the jury." *Mockler v. Multnomah County,* 140 F.3d 808, 815 n. 8 (9th Cir.1998).

A motion for judgment as a matter of law must be denied, and the jury's verdict must be upheld, if the verdict is supported by substantial evidence. *Johnson v. Paradise Valley Unified School Dist.,* 251 F.3d 1222, 1227 (9th Cir.), *cert. denied,* 534 U.S. 1055 (2001). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* When evaluating a motion for judgment as a matter of law under Rule 50, "the court must draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 150 (2000); *see also Johnson,* 251 F.3d at 1227 ("although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

## II. *Rule 59–New Trial*

**\*2** Even if the verdict is supported by substantial evidence, the court may grant a motion for a new trial under Federal Rule of Civil Procedure 59 "if the verdict is contrary to the clear weight of the evidence, is based on evidence which is false, or to prevent a miscarriage ofjustice." *Silver Sage Partners v. City of Desert Hot Springs,* 251 F.3d 814, 819 (9th Cir.2001); *see also Molski v.. M.J. Cable, Inc.,* 481 F.3d 724, 729 (9th Cir.2007) ( "Historically recognized grounds [for a new trial under Rule 59] include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the moving party.") (internal quotation and citation omitted). A new trial is warranted on the basis of an incorrect evidentiary ruling only "if the ruling substantially prejudiced a party." *United States v. 99.66 Acres of Land,* 970 F.2d 651, 658 (9th Cir.1992).

When a motion for new trial is based on insufficiency of evidence, a "stringent standard applies" and a new trial may be granted "only if the verdict is against the great weight of evidence or it is quite clear that the jury has reached a seriously erroneous result." *Digidyne Corp. v. Data Gen. Corp.,* 734 F.2d 1336, 1347 (9th Cir.1984) (internal quotation and citation omitted), *cert. denied,* 473 U.S. 908 (1985). The "district court may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners,* 251 F.3d at 819. Rather, the "trial court must have a firm conviction that the jury has made a mistake." *Landes Constr. Co., Inc. v. Royal Bank of Canada,* 833 F.2d 1365, 1372 (9th Cir.1987). When evaluating a motion for new trial under Rule 59, the court may weigh the evidence, evaluate the credibility of the witnesses, and is not required to view the evidence from the perspective most favorable to the prevailing party. *United States v. Kellington,* 217 F.3d 1084, 1095 (9th Cir.2000).

## III. *Remittitur*

Remittitur is available to correct excessive verdicts. *Pershing Park Villas v. United Pacific Ins.,* 219 F.3d 895, 905 (9th Cir.2000). Generally, a court "must uphold the jury's finding of the amount of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork." *Los Angeles Mem'l Coliseum Comm'n v. NFL,* 791 F.2d 1356, 1360 (9th Cir.1986), *cert. denied,* 484 U.S. 826 (1987). A trial court reviewing a damages award attacked as excessive must consider the evidence of damages in a light most favorable to the prevailing party. *Seymour v. Summa Vista Cinema, Inc.,* 809 F.2d 1385, 1387 (9th Cir.), *opinion amended on other grounds,* 817 F.2d 609 (9th Cir.1987). If the court concludes that a damages award is excessive, it may either grant the defendant's motion for a new trial, or deny the motion, conditioned upon the prevailing party's acceptance of a remittitur. *Silver Sage Partners,* 251 F.3d at 818. A trial court granting a motion for remittitur does not substitute its judgment for that of the jury, but instead reduces the judgment to the maximum amount sustainable by the proof. *D & A Redi–Mix v. Sierra Redi–Mix & Contracting Co.,* 692 F.2d 1245, 1249 (9th Cir.1982).

## DISCUSSION

## I. *Juror Misconduct*

**\*3** At the outset, Payless moves for new trial based on alleged juror misconduct. Approximately three weeks after the jury returned its verdict, the court received a letter from Juror X requesting clarification of the "definition of the trial being over," because she "understood from [the court's] instructions that we weren't to actively engage on the Internet ... in regard to the case until the trial was over." Tr. of May 27, 2008 Tel. Conf. at 4:6–13 (quoting letter). Juror X wanted to know, "[w]as that on Thursday, when everyone rested, or was it on Monday, after the verdict was read and we were excused as jurors?" *Id.* at 4:13–15.

On May 27, 2008, the court held a telephone conference to read Juror X's letter to the parties. During the telephone conference, Payless' counsel revealed that Juror X had contacted him by email on May 20, 2008 to ask if Payless was appealing the verdict. Payless' counsel indicated that he also spoke with Juror X by phone for about twenty minutes. He answered some very general questions Juror X had about

the appeal. Payless' counsel asked if any outside influences or extraneous information found its way into the deliberations. Juror X was quite certain everybody followed the rules.

On May 28, 2008, the court held an evidentiary hearing with Juror X. She explained that she wrote to the court because she was concerned that another juror may have violated the court's instructions regarding out-of-court investigation:

> JUROR X: There was a conversation on Friday morning, when all the jurors were together. When we went in and we had all the instructions, I started to read through, and other conversations were going on.
>
> One juror said something—and, again, I can't recall verbatim, because I was overhearing. What I overheard was something about going online last night or the night before, and—and then there was something else said, but it wasn't necessarily about adidas or Payless. It was about appeals.
>
> ....
>
> ... The comment was made, "Well, the verdict will be appealed anyway."
>
> And then there was—the juror said something about a Ninth—I don't know if it was District or Circuit or something about court.
>
> There was another juror, I think, who asked something about "Well, are there a lot of verdicts overturned?"
>
> At that point, I don't think I caught everything, because my brain went to "What did the judge say?" or "Does this matter? Does it mean anything?"
>
> ....
>
> Then based on that, I was kind of testing the waters, and I said, "Oh, well, I thought we couldn't do anything until after we were all gone. If I had known we could have gone online last night, I would have gone online last night."
>
> And nobody responded.

Tr. of May 28, 2008 Hr'g at 5:6–6:12.

In a response to the court's questions, Juror X stated:

> And then another juror asked and said, "Are—are a lot of verdicts overturned?"

And the other juror said, "Not that many," and then kind of talked a little bit about—I can't remember verbatim, but just a little about the process or where it goes, like to the Supreme Court or something.

> **\*4** ....

THE COURT: Do you remember anything being said by this juror who went online or any of the other jurors about getting information from the outside and relaying it to the other jurors? The person that went online, did they say anything that had anything to do with the facts of this case?

JUROR X: No, no.

*Id.* at 8:11–9:2.

At the conclusion of the May 28 evidentiary hearing, Juror X identified Juror Y as the juror who spoke about going online.

On June 4, 2008, the court interviewed Juror Y: [3]

[3]     The court did not inform Juror Y of the reason for the interview until the court began questioning him.

THE COURT: And tell me, did you do any looking up of material on the Internet and then discuss it with the jury?

> JUROR Y: No, didn't. Did discuss things, prior knowledge, you know, years before, from just searching the Internet, about appeals and jury judgments and awards.
>
> THE COURT: Okay. Well, why don't you tell me—okay. What you're saying, then, is you didn't look up anything specifically during this trial?
>
> JUROR Y: No, sir.
>
> THE COURT: Before or after?
>
> JUROR Y: No.

Tr. of June 4, 2008 Hr'g at 4:7–19.

Juror Y explained, "I remember people were talking about award judgments, awarding—that wanted large amounts. They were getting real large, 7, 800 million. And I just said, from looking up, from what I've seen before, if you get a real excessive amount, you're just going to be shoved out." *Id.* at 5:8–13.

Juror Y repeatedly denied doing any research on the internet during the trial or during the deliberations. He remembers the entire conversation in the jury room taking a minute or less.

Payless contends that the testimony of Jurors X and Y establish that the jury was exposed to extrinsic evidence obtained from the Internet during deliberations. Payless argues that there is a "reasonable possibility" that this extrinsic evidence affected the verdict and therefore, Payless is entitled to a new trial under Federal Rule of Civil Procedure 59. I disagree.

### A. *Legal Standards Governing Juror Misconduct*

There are two types of juror-misconduct cases. *United States v. Rosenthal,* 454 F.3d 943, 949 (9th Cir.2006) (citing *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.,* 206 F.3d 900, 906 (9th Cir.), *cert. denied,* 531 U.S. 919 (2000)). The first type is extraneous [4] evidence cases which "involve not only the introduction of 'evidence' per se but the submission of extraneous information (e.g., a file or dictionary) to the jury." *Id.* (internal quotation omitted). The party seeking a new trial must show by a preponderance of evidence that the jury was exposed to extrinsic evidence. *United States v. Caro–Quinero,* 769 F.Supp. 1564, 1574 (C.D.Cal.1991), aff'd, 42 F.3d 1403 (1994). In an extraneous evidence case, the court grants a new trial "if there is a reasonable possibility that the material could have affected the verdict." *Rosenthal,* 454 F.3d at 949 (internal quotation omitted). The party opposing a new trial has the burden to demonstrate the absence of prejudice. *Id.*

[4]     Also known as extrinsic evidence.

**\*5** The second type of case involves ex parte contacts with a juror that "do not include the imparting of any information that might bear on the case." *Id.* (internal quotation omitted). Ex parte contacts "do not pertain to any fact in controversy or any law applicable to the case." *Id.* (internal quotation omitted). In an ex parte contacts case, the court must hold a fair hearing if it finds a reasonable possibility of prejudice. Unless the ex parte contact is inherently coercive, the movant is not entitled to a new trial without demonstrating actual prejudice. *Id.*

### B. *Analysis*

The initial issue is whether the information from Juror Y is extraneous evidence or an ex parte contact. Information

about appeals arguably pertains to the law applicable to the case. It is similar to the extraneous evidence in *Rosenthal,* in which a juror asked an attorney friend if she had to follow the judge's instructions. Neither of these juror discussions directly concerned the substantive law in the case, but did concern procedural matters. *Id.* at 950. Thus, I will use the reasonable possibility standard and adidas must demonstrate the absence of prejudice. First, Payless must prove that the jury was exposed to extrinsic evidence.

I conclude that Payless has not met its burden of proving by a preponderance of evidence that Juror Y improperly exposed the jury to extrinsic evidence obtained from the Internet during deliberations. Juror Y unequivocally and repeatedly denied engaging in any outside research during the trial. He stated that his comments regarding appeals and reversal of excessive verdicts were based on his general knowledge and prior searches on the Internet. In contrast, Juror X was unable to definitively state what she overheard Juror Y say in the jury room. Juror X's vague recollections of what she thought she overheard Juror Y say about searching the Internet more than three weeks after the jury returned its verdict are not sufficient to establish by a preponderance of evidence that Juror Y did, in fact, violate the court's instructions or introduce extrinsic evidence obtained from the Internet during deliberations.

Moreover, Juror Y's comments regarding the likelihood of appeal and cautioning against an excessive verdict simply do not constitute the type of extrinsic information the Federal Rules of Evidence seek to prohibit. In examining a claim of a juror misconduct, a court must determine whether the allegedly extrinsic materials are, in fact, improper extrinsic materials, or are "merely the kind of common knowledge, which most jurors are presumed to possess." *Fields v. Brown,* 503 F.3d 755, 779 (9th Cir.2007) (citation omitted), *cert. denied,* 128 S.Ct. 1875 (2008); *see also Hard v. Burlington Northern Railroad Co.,* 870 F.2d 1454, 1461 (9th Cir.1989) ("The type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings, and bias that every jury carries into the jury room.");

*Gotemeyer v. Hickman,* 393 F.3d 871, 878–79 (9th Cir.2004) (distinguishing between extrinsic evidence and "a juror sharing her own experiences [as a physician] with her colleagues on the jury"), *cert. denied,* 546 U.S. 880 (2005). Indeed, "[j]urors must rely on their past personal experiences when hearing a trial and deliberating on a verdict." *Price*

*v. Kramer,* 200 F.3d 1237, 1255 (9th Cir.), *cert. denied,* 531 U.S. 816 (2000).

**\*6** Here, Juror Y's statements regarding the likelihood of appeal and reversal of excessive damages awards are exactly the kind of general knowledge, opinion, and belief that jurors are allowed to possess and bring to the table during jury deliberations. The general population is aware that cases can be appealed and that excessive verdicts are sometimes overturned. Payless was entitled to an "impartial jury, not an ignorant one," *Grotemeyer,* 393 F.3d at 879, and Juror Y's comments regarding the likelihood of appeal and/or reversal of an excessive verdict "merely confirmed what any reasonable juror already knew." *United States v. Bagnariol,* 665 F.2d 877, 888 (9th Cir.1981), *cert. denied,* 456 U.S. 962 (1982). As adidas points out, it would be virtually impossible to seat a jury with citizens who have absolutely no knowledge of the appeals process. Juror Y's general comments about potential for appeal do not fall within the realm of impermissible extraneous evidence that Rule 606 was intended to remedy.

Even if I were persuaded that Juror Y's statements were impermissible extrinsic information (which I am not), there is no reasonable possibility that Juror Y's general statements about the likelihood of appeal and the reversal of excessive verdicts could have affected the jury verdict. The Ninth Circuit instructs the trial court to consider the following factors in determining whether there is a reasonable possibility that extrinsic evidence affected the verdict: (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict. *Estrada v. Scribner,* 512 F.3d 1227, 1238 (9th Cir.), *cert. denied,* 128 S.Ct. 2973 (2008). Generally, a court will not order a new trial unless the juror misconduct "relates directly to a material aspect of the case," and there is a "direct and rational connection" between the extrinsic information and the verdict. *Bagnariol,* 665 F.2d at 1575.

Applying these factors here, there is no reasonable possibility that Juror Y's general statements about the likelihood of appeal and the reversal of excessive verdicts could have affected the jury verdict. The testimony of Juror Y and Juror X indicate that only a few members of the jury heard the comments. Any discussion that followed took less than one minute. Further, both Jurors Y and X indicated that Juror Y made the comments at the very beginning of the jury's two-day deliberation. There is no indication that anyone discussed the issue again. Finally, the possibility of appeal was peripheral to the issues that were before the jury and did not directly relate to any material fact or substantive law applicable to the case. These factors indicate that there is no reasonable possibility of prejudice. adidas met its burden that Payless suffered no prejudice. Accordingly, Payless' motion for new trial based on juror misconduct is denied.

## II. *Likelihood of Confusion*

**\*7** Payless argues that the evidence presented by adidas to establish a likelihood of confusion was insufficient to support the jury's verdict for five reasons: (1) the court erred in admitting Dr. Ford's likelihood of confusion analysis because Dr. Ford did not survey all of the accused shoes, and his analysis was based, in part, on the evaluation of third-party shoes; (2) adidas failed to introduce any evidence as to 107 of the 268 accused shoe lots which were not included in Dr. Ford's analysis so it would be improper for the jury to extrapolate evidence about the surveyed shoes to the shoes not included in the survey; (3) no reasonable jury could find actionable similarity between the so-called "Category A" lots and adidas Three–Stripe Mark or the Superstar Trade Dress because the shoes bear little, if any, resemblance to any specific adidas shoe; (4) adidas presented no evidence that the alleged post-sale confusion of consumers actually affected a later purchasing decision; and (5) adidas failed to present evidence that Payless' actions affected any purchasing decisions and thus, the evidence cannot support a finding of initial-interest confusion.

This court has ruled three times that Dr. Ford's likelihood of confusion survey evidence was admissible as evidence of actual confusion. *See* Dec. 21, 2007 Opinion and Order, at 11, 37; Pre–Trial Conference Tr. at 60:24–61:3; and Trial Tr. at 1695:5–12 (denying Payless' Rule 50 motion). Payless offers no compelling rationale or authority for upsetting those rulings now.

After considering Payless' other four arguments, the court concludes that sufficient evidence supports the jury's finding of likelihood of confusion. Payless' arguments focus almost exclusively on a single factor in the likelihood of confusion analysis (*i.e.,* actual confusion) and ignore the other relevant factors. In determining whether the accused Payless shoes

were likely to cause consumer confusion, the jury was charged with considering not just evidence of actual confusion—that is, Dr. Ford's likelihood of confusion surveys —but with weighing: (1) the similarity of the marks; (2) the relatedness of the parties' goods; (3) the similarity of trade or marketing channels; (4) the strength of the plaintiff's marks; (5) defendant's intent; (6) evidence of actual confusion; (7) the degree of care exercised by the average purchaser; and (8) the likelihood of expansion into other markets. *AMF v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979). Payless' arguments are not persuasive.

III. *Dilution*

Payless argues that the Trademark Dilution Revision Act ("TDRA") and its predecessor, the Federal Dilution Trademark Act, both require adidas to prove that Payless used two or four stripes on shoes *as its own trademark.* As such, Payless contends that adidas' dilution claims fail as a matter of law because adidas acknowledges (and this court has found) that Payless uses stripes "merely for decoration and *not* as a brand or trademark." adidas' Mem. in Supp. of Mot. for Partial Summ. J. (# 552) at 19; Dec. 21, 2007 Opinion and Order (# 662) at 62–64. I disagree.

**\*8** Payless' argument that its subjective intent to use stripes as mere decoration, rather than as a trademark, controls whether its use of stripes falls within the scope of the TDRA is supported by neither the case law nor the policy underlying federal dilution law. The TDRA provides, in relevant part, that "the owner of a famous mark ... shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of *a mark* or trade name in commerce that is likely to cause dilution ... of the famous mark." *15 U.S.C. § 1125(c)(1)* (emphasis added).

Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services of the owner of the famous mark such that the strong identification value of the owner's trademark whittles away or is gradually attenuated as a result of its use by another." *Horphag Research Ltd. v. Garcia,* 475 F.3d 1029, 1035 (9th Cir.2007) (internal quotation marks omitted; emphasis added).

As adidas notes, I have rejected Payless' present argument more than once. I agree with adidas that the important issue is whether consumers perceive Payless' use of two

and four stripes as a trademark so that the value of the mark to adidas is diluted. This can occur even if Payless does not put a nickel into promoting the stripes as its own trademark. Although *Horphag* does not address the issue directly, Payless' argument is undercut by *Horphag* because the court found that the famous mark was diluted by the competitor, even though the competitor did not use the famous mark as its own mark. *Id.* at 1033–37.

I am unconvinced by Payless' argument and decline to change my prior rulings.

IV. *Fact of Actual Harm*

At trial, adidas did not present evidence of lost sales. Instead, adidas proffered evidence that Payless' infringement damaged the distinctiveness, perceived quality, positive consumer associations, and consumer loyalty that adidas built up in its Three–Stripe Mark and Superstar Trade Dress. Payless contends that adidas' "speculative" and "hypothetical" expert opinion testimony regarding brand devaluation theory was not sufficient to prove that adidas suffered actual harm as a result of Payless' infringement. As such, Payless contends that it is entitled to judgment as a matter of law on adidas' damages claims.

adidas' loss of the ability to control its reputation for quality is a legally cognizable form of injury. *Yale Electric Corp v. Robertson,* 26 F.2d 972, 974 (2d Cir.1928). Judge Learned Hand described the loss of control over reputation as follows:

> [I]t has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use....

**\*9** *Id.* The Ninth Circuit starts with the basic premise that a "plaintiff must prove both the fact and the amount of damage." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1407 (9th Cir.) (quoting 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 30.27 at 511 (2d ed.1984)), *cert. denied,* 510 U.S. 815 (1993). The Circuit puts a twist on this, however:

> Other jurisdictions have made a distinction between the elements necessary to establish a legal basis for liability from those required for proof of damages. Although we recognize this distinction, [n]evertheless, an inability to show actual damages does not alone preclude a recovery under section 1117. In so holding, we express a distinct preference for those opinions permitting relief based on the totality of the circumstances. *See Burger King Corp.,* 855 F.2d at 781 (plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits)....

*Id.* at 1410–11 (internal quotation and citation omitted). In *Southland Sod Farms,* the Ninth Circuit elaborated on its decision in *Lindy Pen:*

> Moreover, although the Ninth Circuit in *Harper House* stated that "actual evidence of some injury resulting from the deception is an essential element" in a suit for damages under § 43(a), *id.,* a more recent decision holds that "an inability to show actual damages does not alone preclude recovery under section 1117." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1411 (9th Cir.1993) (quoting *Bandag, Inc. v. Bolser's Tire Stores,* 750 F.2d 903, 919 (Fed.Cir.1984)). Under *Lindy Pen,* the preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances.

*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1146 (9th Cir.1997).

adidas relied primarily on two experts, Dr. Joachimsthaler and Dr. Pham, to provide evidence of the harm suffered by its marks. Payless first raised its current argument in motions in limine based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993), to prevent the experts from testifying. Now that I have heard the entire testimony of the two experts, I am no more persuaded by Payless' argument than I was prior to trial. There is no requirement that these experts quantify the harm suffered by the brand. And the fact that the brand is very strong does not mean that it was not harmed by the infringement. The jury accepted the expert testimony, as it was entitled to do. No error was committed.

### V. *Willfulness*

Payless argues that the jury's finding of willfulness and the resulting award of profits must be vacated because: (1) the court barred Payless from informing the jury that Magistrate Judge Jelderks and District Court Judge Haggerty both found that the parties' 1994 Settlement Agreement allowed Payless to continue selling shoes with two and four parallel straight-edged stripes like the ones at issue; (2) Judge Jelderks' and Judge Haggerty's rulings preclude a finding of willfulness during the three-year period when those rulings were in effect (*i.e.,* prior to the Ninth Circuit's reversal); and (3) the jury's finding of willfulness lacks support as to any of the 112 so-called "Category A" lots, which adidas did not accuse of imitating any specific shoes. Because the jury's finding of willfulness is unsupported by the record, Payless argues, the jury's award of profits and punitive damages must be vacated.

**\*10** Contrary to Payless' argument, the court did not preclude Payless from eliciting testimony or introducing evidence or argument that Payless relied on the rulings of Magistrate Judge Jelderks and District Court Judge Haggerty that the 1994 Settlement Agreement insulated Payless from any liability premised solely on the use of two or four straight-edged stripes. Although the court did preclude Payless from introducing those summary judgment opinions as exhibits, the court specifically allowed Payless to argue and introduce evidence that Payless believed, based on the 1994 Settlement Agreement and Judges Jelderks' and Haggerty's interpretations of that agreement, that it could sell shoes bearing two or four straight-edged stripes. *See* Pre–Trial Conference Tr. at 47:1–48:15 (allowing evidence and argument "relevant to ... Payless' intent, that it honestly believed that the '94 agreement allowed use of straight-edged stripes, ... I am going to allow Payless to bring in factors ...

to determine the strength of adidas' trademark and Payless' intent. It will come in for those general purposes. But Payless will have to pose the issues in the proper context, with a proper foundation."); *see also* Trial Tr. at 883:9–12 ("Payless can argue the agreement as it affects its intent. So I think the jury needs to know that the settlement agreement evidence relates solely to intent and is not a bar."). Payless fails to cite any portion of the record in which it attempted to proffer (and the court explicitly excluded) evidence of Payless' good faith reliance on the 1994 Settlement Agreement or the court's prior rulings interpreting that agreement. [5] If Payless had made an offer of proof, any misunderstanding as to the extent of my ruling would have been corrected. As such, Payless' motion for new trial based on purportedly erroneous evidentiary rulings is without merit.

[5]     In its motion, Payless cites only one specific ruling, in which the court granted in part adidas' motion in limine to exclude evidence inconsistent with the court's December 21, 2007 Opinion and Order. That ruling did not extend to Judges Jelderks' and Haggerty's previous rulings and the court made clear that evidence related to the 1994 Settlement Agreement was admissible to the extent that it was relevant to Payless' intent. Trial Tr. at 47:22–49:5. Payless cites two other portions of the trial record: (1) a passage at the end of Vanessa Backman's cross-examination; and (2) a short discussion of Payless' annual reports, which contained a description of the legal proceedings. In neither instance did Payless indicate that it wanted to elicit testimony or proffer evidence regarding Payless' intent, or its reliance on Judges Jelderks' or Haggerty's rulings.

I am unpersuaded by Payless' argument concerning the Category A shoes. With 268 lots of shoes, adidas had to allocate its trial time and presumably spent the most time on the closest copies. After much discussion and consideration, however, I had the jury make a separate decision on whether each lot of shoes was infringing. The jury ruled for adidas in 267 of the 268 lots, indicating to me that the jury took its role seriously and considered each lot separately, as I instructed it to do. The Category A shoes are no reason to disturb the jury's wilfulness decision or to grant a new trial.

As noted by adidas in its brief, the jury was presented with evidence from many sources on which it could base

the willfulness determination, including internal Payless communications which refer to Payless shoes as adidas shoes.

Finally, I will consider Payless' argument concerning its right to rely on Judge Jelderks' and Judge Haggerty's rulings during the three years prior to the Ninth Circuit reversal when I consider the damages awards.

VI. *Damages*

**\*11** Payless argues that the jury's $305 million damages award is flawed in numerous respects. First, Payless contends that the jury's $30.6 million "reasonable royalty" calculation is contrary to law, speculative, and arbitrary. Second, Payless argues the award of profits is contrary to law because the jury did not (and could not) find willfulness by clear and convincing evidence, and the award of profits plus a reasonable royalty constitutes an impermissible double recovery. Payless also argues the award of profits violates the Lanham Act's prohibition against damages as a penalty. Finally, Payless argues that the jury's award of punitive damages for violations of state law is fundamentally inequitable, violates the Due Process Clause, and violates clearly established principles of federalism. In light of these "fundamental flaws," Payless moves to vacate the jury's verdict or, in the alternative, to remit the award of damages to no greater than $19.7 million (*i.e.,* Payless' claimed profits) or remand for a new trial on the issue of damages.

Although I have carefully considered all of the parties' arguments, and given a great deal of thought to whether the jury's damages awards should stand, I will not address each point raised by the parties in detail. Instead, I will explain the reasons why I have decided to award the jury's figure of $30,610,179 as damages in the form of a reasonable royalty and use my discretion under the Lanham Act to reduce the award based on a disgorgement of profits to $19.7 million. I also deny Payless' motion for a new trial, conditioned on adidas accepting a remittitur of the punitive damages award to $15 million.

A. *Damages under the Lanham Act*
If trademark infringement is found under the Lanham Act, it provides recovery of the defendant's profits and any damages sustained by the plaintiff, subject to the principles of equity. 15 U.S.C. § 1117(a).

The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

*Id.*

Thus, the Lanham Act provides the court with considerable "discretion to fashion relief, including monetary relief, based on the totality of the circumstances." *Southland Sod Farms,* 108 F .3d at 1146; *see also Lindy Pen,* 982 F.2d at 1411 (affirming district court's denial of an accounting of profits and award of damages).

**\*12** Section 1117 does not give the court discretion to make a downward adjustment of actual damages. *Go Medical Industries Pty., Ltd. v. Inmed Corp.,* 471 F.3d 1264, 1274 (Fed.Cir.2006). "[I]t is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." *Playboy Enterprises, Inc. v. Baccarat Clothing Co ., Inc.,* 692 F.2d 1272, 1275 (9th Cir.1982).

In this case, I had the jury assess the profits and damages according to my instructions. It is now my job to determine if the jury verdict is equitable and comports with the law.

1. *Reasonable Royalty*

A reasonable royalty based on a hypothetical negotiation can be a measure of actual damages in a trademark infringement case. *Sands, Taylor & Wood v. Quaker Oats Co.,* 34 F.3d 1340, 1350 (7th Cir.1994) ("one measure of actual damages that, *if* ascertained with reasonable certainty, could be said to reflect the actual loss of [the trademark owner]—the cost of a reasonable royalty"); *Playboy Enterprises,* 692 F.2d at 1274–75 (concluding that the damages award based on the trademark owner's standard royalty rate was inadequate and awarding an accounting of defendant's profits).

adidas sought a reasonable royalty as a surrogate measure of damage to the marks, even though it concedes that it would not have licensed the marks to Payless. The evidence shows that the adidas marks are strong and grew stronger during the period in question. The evidence is of theoretical damage to the marks. There was no evidence of monetary loss to adidas in the nature of lost sales. The royalty figure awarded by the jury is consistent with royalties between adidas or Payless with third parties and also with royalties between third parties.

Although the jury's royalty award would have resulted in a loss to Payless at the current price point, this does not make the royalty unreasonable. " 'There is no rule that a royalty be no higher than the infringer's net profit margin.' " *Golight, Inc. v. Wal–Mart Stores, Inc.,* 355 F.3d 1327, 1338 (Fed.Cir.2004) (quoting *State Indus. Inc. v. Mor–Flo Indus., Inc.,* 883 F.2d 1573, 1580 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1022 (1990)) (in patent infringement case, court notes that what the infringer might have preferred to pay is not the test for damages).

In sum, the jury accepted adidas' calculations. The royalty award is supported by substantial evidence and is not against the clear weight of the evidence. I will allow it to stand.

2. *Profits*

A defendant's profits can only be disgorged to prevent unjust enrichment if the trademark infringement was willful. *Adray v. Adry–Mart, Inc.,* 76 F.3d 984, 988 (9th Cir.1995). Payless contends that it erred in failing to instruct the jury that it could only make a finding of willfulness under a clear and convincing standard. In a trademark case, *Gracie*

*v. Gracie,* 217 F.3d 1060, 1068–69 (9th Cir.2000), the court analyzed and approved a jury instruction on willfulness that did not refer to a clear and convincing standard. I am aware of 🚩*CollegeNET, Inc. v. XAP Corp.,* 483 F.Supp.2d 1058, 1065 (D.Or.2007), and its holding that a finding of willful misconduct under the Lanham Act must be supported by clear and convincing evidence. *CollegeNET* cites three cases for this proposition, without any analysis. I reviewed the cited cases, however, and do not believe that they provide convincing support for a requirement of a clear and convincing standard. Accordingly, I am not persuaded that the jury instruction was in error.

 **\*13** adidas was very aggressive in calculating Payless' profits. I conclude that the profits, as calculated by adidas' expert, were overstated and did not follow generally accepted accounting principles. I realize that under § 1117, Payless has the burden to prove all costs and deductions claimed. But after reflecting on Payless' expert's calculations, I do not think that Payless deducted any costs which did not actually contribute to the sale of the infringing shoes. 🚩*Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 516 (9th Cir.1985) (when calculating copyright infringer's profits, overhead costs should be deducted "only when the infringer can demonstrate that [the overhead expense] was of actual assistance in the production, distribution or sale of the infringing product.") (internal quotation omitted).

As one example, a royalty would have to be deducted as a direct expense of selling the shoes. The fact that adidas did not include a royalty in its calculation demonstrates the unreasonableness of its method.

After advocating for a figure of $208 million dollars in Payless' profits, the adidas expert admitted that a commonly used measure of profit would result in a $19 million dollar profit, a figure very close to that proffered by the Payless expert. I realize that adidas subtracted less overhead than normal to calculate profits for this disgorgement exercise, but the difference in the two amounts demonstrates the unreasonableness of the jury's award when I consider the equities.

I have also given a great deal of consideration to the jury's finding of willfulness. I firmly believe that the jury's finding of willfulness is correct given the evidence before it. But I am aware that the legal opinions of Judges Jelderks and Haggerty adopted Payless' interpretation of the 1994

settlement agreement until reversal by the Ninth Circuit three years later. During those three years, Payless did not commit willful infringement, although I note that Payless did not stop selling the shoes when adidas prevailed before the Ninth Circuit. Finally, there was substantial evidence of companies other than Payless selling two and four stripe shoes for years.

After considering all these factors, I conclude that the jury's verdict of just over $137 million is so high that it is punitive rather than compensatory, and thus violates the Lanham Act. In my discretion under the Lanham Act, I find that an adequate recovery of defendant's profits is $19.7 million.

   B. *Punitive damages*
The jury's verdict of $137,003,578 in punitive damages is based on adidas' common-law claims for trademark and trade dress infringement and statutory claims for unfair and deceptive trade practices under the acts of numerous states.

Payless contends that only five of the states allow punitive damages for the statutory claims under a clear and convincing standard, as instructed here with respect to the state claims, and that some of those states cap punitive damages unless special procedures are followed. Because the jury awarded punitive damages in the same amount as Payless' profits, Payless argues that the jury awarded punitive damages based on sales in all 50 states. Thus, Payless claims the amount of punitive damages violates the Constitution's principles of federalism because the award is punishing conduct taking place outside Oregon and in states which would not award punitive damages.

 **\*14** adidas argues that the state common law claims support the punitive damages award because the harm is felt by adidas here, where it has its North American headquarters.

Payless bases its argument on 🚩*State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 421–22, 123 S.Ct. 1513 (2003) (internal citations omitted):

> A State cannot punish a defendant for conduct that may have been lawful where it occurred. Nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's

jurisdiction. Any proper adjudication of conduct that occurred outside Utah to other persons would require their inclusion, and, to those parties, the Utah courts, in the usual case, would need to apply the laws of their relevant jurisdiction.

I am not convinced this principle applies here. In *State Farm,* plaintiff's counsel introduced evidence of State Farm's business practices for over 20 years in numerous states, with most of the practices bearing no relation to the bad faith third-party automobile insurance claim underlying plaintiff's complaint against the insurer. *Id.* at 415. "The [Utah] courts awarded punitive damages to punish and deter conduct that bore no relation to the [plaintiffs'] harm." *Id.* at 422. In part because of extraterritoriality concerns, the Court reversed the jury's verdict of $145 million in punitive damages, which the trial court had reduced to $25 million. *Id.* at 429.

Here, the evidence concerned Payless' conduct while infringing adidas' marks. The jury was not shown evidence that Payless infringed marks owned by anyone other than adidas. Thus, the jury verdict is based on the harm that Payless inflicted on adidas. That fact distinguishes the case before me from *State Farm.*

Alternatively, Payless argues that the punitive damages award is grossly excessive and thus violates due process principles. adidas claims that clear and convincing evidence fully supports the award.

The Due Process Clause prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *State Farm,* 538 U.S. at 416. In reviewing a punitive damages award, a court must consider three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the

civil penalties authorized or imposed in comparable cases.

*Id.* at 418 (citing *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589 (1996)).

The degree of reprehensibility of defendant's conduct is the "most important indicium" of the reasonableness of a punitive damages award. The factors to be considered are whether (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, deceit, or mere accident. *Id.* at 419.

**\*15** Although the Court declined to establish a bright-line ratio which punitive damages cannot exceed, it noted that the jurisprudence has established that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* at 419. *See also Exxon Shipping Company v. Baker,* 554 U.S. 471, 128 S.Ct. 2605, 2633 (2008) (under maritime law, maximum award of punitive damages is equal to compensatory damages).

The first *Gore* guidepost is the degree of reprehensibility of Payless' conduct. The harm here is entirely economic. Thus, Payless did not show an indifference to the health or safety of others. Moreover, there was no evidence that adidas lost any sales because of the infringement. Based on my instructions, the jury awarded a reasonable royalty as a surrogate form of damages instead of trying to quantify the harm to the distinctiveness, perceived quality, positive consumer associations, and consumer loyalty that adidas had built up in its marks. There was no evidence that adidas had financial vulnerability or that it suffered financial problems because of the infringement. In fact, the evidence showed that the adidas brand strengthened during the period of infringement.

Case: 23-2850      Document: 24      Filed: 02/06/2024      Pages: 165

The fourth factor under the reprehensibility guidepost is whether the conduct is repeated or isolated. The jury found that 267 lots of Payless' shoes infringed the adidas marks. Thus, this factor weighs heavily in favor of a larger award.

The last factor is whether the conduct was intentional malice, trickery, deceit, or mere accident. I have dealt with this issue above when considering the jury's willfulness finding. This was no mere accident. But, again, I do note that Payless sold the infringing shoes for three years believing that Judges Jelderks' and Haggerty's opinions allowed the sales under the 1994 settlement agreement. This is balanced by the fact that Payless did not stop selling the shoes after the Ninth Circuit reversed those rulings.

The second *Gore* guidepost is the disparity between the harm suffered by adidas and the punitive damages award. The first issue is what numbers I must compare. The $30.6 million royalty figure was to compensate for harm suffered to the marks. Payless' profits, cut down by me to $19.7 million, is to prevent unjust enrichment. Although defendant's profits are part of the recovery allowed under the Lanham Act—to remove any financial incentive for infringement—they are not harm suffered by the mark owner. Thus, I conclude that I should compare the $30.6 million royalty figure with the $137 million dollar punitive damages award. The ratio between the two is 4.5 to 1. This single-digit ratio, on its own, does not offend the Due Process Clause. But the analysis is not limited to the simple arithmetic calculation. The Court has noted that if the compensatory damages are substantial, a lesser ratio, "perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."

*State Farm,* 538 U.S. at 425. I consider $30.6 million in compensatory damages to be substantial, particularly in light of the fact that adidas lost no sales and the damages are based on theoretical harm suffered to the adidas brand, something not easily quantified. This factor counsels reducing the punitive damages to $30.6 million, at the most.

**\*16** The parties both agree that the third *Gore* guidepost, civil penalties in comparable cases, does not apply because there are no statutory penalties for trademark infringement.

After considering the *Gore* guideposts, I have decided that even a 1 to 1 ratio between compensatory and punitive damages is too high. The main reasons are that there was no physical harm or disregard for a person's health or safety, there were no lost sales, adidas suffered no economic harm that jeopardized its business in any way, and, even though Payless acted willfully, it did not do so for the entire period addressed here. I realize that going below a 1 to 1 ratio is unusual but such awards have been approved if there is only economic harm. *See Motorola Credit Corp. v. Uzan,* 509 F .3d 74 (2nd Cir.2007) (following a court trial in a financial fraud case the trial court characterized as hard to imagine financial conduct more reprehensible, the appellate court affirmed the trial court's decision on remand to reduce the punitive damages to $1 billion from $2.1 billion, along with compensatory damages of $2.1 billion). After giving this much thought, I conclude that the punitive damages must be reduced to $15 million to comport with due process concerns. Accordingly, I deny Payless' motion for a new trial, conditioned on adidas accepting a remittitur of the punitive damages award to $15 million.

### CONCLUSION

Payless' Supplemental Motion for New Trial (# 901); Payless' Motion for Judgment as a Matter of Law or a New Trial (I) Due to Plaintiff's Failure to Prove the Fact of Actual Damage, and (ii) on the Issue of Willfulness (# 866); and Payless' Motion for Judgment as a Matter of Law on adidas' Liability Claims or in the Alternative, for New Trial (# 868) are denied. Payless' Motion for Judgment as a Matter of Law on adidas' Damage Claims or, in the Alternative, for New Trial or Remittitur (# 863) is granted as explained above.

adidas is awarded $30,610,179 as damages in the form of a reasonable royalty and $19.7 million in Payless' profits. I deny Payless' motion for a new trial, conditioned on adidas accepting a remittitur of the punitive damages award to $15 million.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4279812

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify on February 6, 2024, I electronically filed the Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Amy M. Gibson*

Matthew De Preter

Amy M. Gibson

Gary Hollander

Aronberg Goldgehn Davis & Garmisa

225 W. Washington, Suite 2800

Chicago, Illinois 60606

p: (312) 828-9600

f: (312) 828-9635

*Counsel for Appellants, Barry Nussbaum, Joshua Nussbaum* and *Revolution Laboratories, LLC*
