No. 23-2850

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

CHARLES CURRY, JR.,
doing business as GET DIESEL NUTRITION,

*Plaintiff-Appellee*,

v.

REVOLUTION LABORATORIES, LLC; JOSHUA NUSSBAUM;
AND BARRY NUSSBAUM,

*Defendant-Appellants.*

On Notice of Appeal from the
U.S. District Court for the Northern District of Illinois
Case No. 17-cv-2283
Hon. Matthew Kennelly, Judge Presiding

## BRIEF OF APPELLEE

MATTHEW J. OPPENHEIM
NICHOLAS C. HAILEY
JEFF KANE
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW
Washington, DC 20016
Tel: (202) 480-2999

*Counsel for Plaintiff-Appellee*

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2850

Short Caption: Curry v. Revolution Laboratories, LLC et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Charles Curry, d/b/a Get Diesel Nutrition

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Katten Munchin Rosenman LLP; Oppenheim + Zebrak, LLP

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

None

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1(c) 1 & 2:

N/A

Attorney's Signature: _____     Date: October 12, 2023

Attorney's Printed Name: Matthew Oppenheim

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☑     No ☐

Address: 4530 Wisconsin Ave NW, 5th Floor, Washington, DC 20016

Phone Number: (202) 450-3958     Fax Number: _____

E-Mail Address: matt@oandzlaw.com

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2850

Short Caption: Curry v. Revolution Laboratories, LLC et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Charles Curry, d/b/a Get Diesel Nutrition

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Katten Munchin Rosenman LLP; Oppenheim + Zebrak, LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _____    Date: October 13, 2023

Attorney's Printed Name: Nicholas Hailey

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 4530 Wisconsin Ave NW, 5th Floor, Washington, DC 20016

Phone Number: (202) 480-2174    Fax Number: _____

E-Mail Address: nick@oandzlaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2850

Short Caption: Curry v. Revolution Laboratories, LLC et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Charles Curry, d/b/a Get Diesel Nutrition

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Katten Munchin Rosenman LLP; Oppenheim + Zebrak, LLP

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and

None

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _____  Date: October 12, 2023

Attorney's Printed Name: Jeff Kane

Please indicate if you are **Counsel of Record** for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ✓

Address: 4530 Wisconsin Ave NW, 5th Floor, Washington, DC 20016

Phone Number: (202) 499-2940    Fax Number: _____

E-Mail Address: jkane@oandzlaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

Introduction..............................................................................................1

Jurisdictional Statement ......................................................................2

Statement of the Issues.........................................................................3

Statement of the Case ...........................................................................3

    A.    Plaintiff built a successful nutritional supplement business from scratch. .............................................................................. 3

    B.    Defendants stole the name and label design of Plaintiff's product. ........... 4

    C.    When notified of their infringement, Defendants decided to "let him sue us" rather than stop infringing. ................................... 6

    D.    The jury and the District Court found that Defendants willfully infringed Mr. Curry's trademark................................................ 8

Summary of Argument ...................................................................... 10

Argument ............................................................................................ 12

    I.    The District Court properly allowed Plaintiff's common-law infringement claim to be tried to the jury. ............................... 12

    II.    The District Court correctly held that the jury's punitive damages award is not grossly excessive. .......................................... 17

    A.    Defendants' factual arguments depend on an improper standard of review. ....................................................................... 18

    B.    Defendants' conduct was reprehensible under the first *Gore* guidepost. ...................................................................... 19

        1.    Defendants forfeited any challenge to four of the five reprehensibility factors. ................................................20

        2.    Factors 1 and 2: Defendants caused Plaintiff physical harm and were indifferent to the health and safety of others. ................22

        3.    Factor 3: Plaintiff was financially vulnerable. ............................24

        4.    Factors 4 and 5: Defendants engaged in repeated, intentional misconduct.................................................................25

    C.    Under the second *Gore* guidepost, the punitive damages award is reasonably related to the potential harm Defendants' conduct was likely to cause and to the harm that actually occurred. ........................... 29

        1.    The District Court correctly evaluated excessiveness on a per-Defendant basis, not on a collective basis. .................................29

        2.    The District Court correctly concluded that the punitive damages award bears a reasonable relation to the potential harm Defendants' conduct was likely to cause.................................32

3.  The District Court was correct to consider the infringing profits award in deciding that the punitive damages award is not grossly excessive. ..................................................................37

i.  Where a tortfeasor has profited from his wrongful conduct, higher punitive damages are needed to punish and deter. ............................ 37

ii.  The jury's award for damage to reputation and loss of goodwill does not capture the full scope of Plaintiff's harm........................................ 37

iii.  Defendants' infringing profits reasonably approximate the sales Plaintiff lost or could have lost............................................................. 40

iv.  Even if infringing profits are not included in the mathematical ratio, the punitive damages award is not grossly excessive. ........................ 41

v.  The infringing profits should not be confined to Illinois sales. .............. 43

4.  The Court should consider prejudgment interest on those infringing profits. ......................................................................................47

5.  The Court should consider Plaintiff's costs and attorneys' fees as part of the harm Defendants have caused Plaintiff. ................................48

D.  Under the third *Gore* guidepost, the punitive damages are consistent with civil penalties for comparable conduct. ............................ 49

**Conclusion** ...............................................................................................**51**

## <u>TABLE OF AUTHORITIES</u>

<u>C<small>ASES</small></u>

*Action Marine, Inc. v. Cont'l Carbon Inc.*,
   481 F.3d 1302 (11th Cir. 2007) ................................................................. 48

*Arroyo v. Volvo Grp. N. Am. LLC*,
   No. 12-cv-6859, 2022 WL 17960686 (N.D. Ill. Dec. 27, 2022) ................................. 47

*Avitia v. Metro. Club of Chi., Inc.*,
   49 F.3d 1219 (7th Cir. 1995) ................................................................... 13

*Back Drs. Ltd. v. Metro. Prop. & Cas. Ins. Co.*,
   637 F.3d 827 (7th Cir. 2011) ................................................................... 13

*Bert Co. v. Turk*,
   298 A.3d 44 (Pa. 2023) ......................................................................... 31

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) ........................................................................*passim*

*Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*,
   801 F.3d 347 (3d Cir. 2015) ................................................................... 32

*Brewer v. Wal-Mart Stores, Inc.*,
   87 F.3d 203 (7th Cir. 1996) .................................................................... 14

*Brighton Collectibles v. Marc Chantal USA*,
   No. 06-cv-1584, 2009 WL 10674076 (S.D. Cal. Aug. 12, 2009) ......................... 50, 51

*Browning-Ferris Indus. of Vt., Inc., v. Kelco Disposal, Inc.*,
   492 U.S. 257 (1989) ............................................................................ 50

*Bullock v. Philip Morris USA, Inc.*,
   131 Cal. Rptr. 3d 382 (Cal. Ct. App. 2011) .................................................. 24

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*,
   494 U.S. 558 (1990) ............................................................................ 41

*Coker Equip. Co. v. Wittig*,
   366 F. App'x 729 (9th Cir. 2010) .............................................................. 48

*Cont'l Trend Res., Inc. v. OXY USA Inc.*,
   101 F.3d 634 (10th Cir. 1996) ................................................................. 43

*Cullen v. Saddler*,
   668 F. App'x 656 (7th Cir. 2016) .............................................................. 12

*Curry v. Revolution Lab'ys*,
   No. 23-mc-1939 (S.D. Cal. filed Nov. 7, 2023) ............................................... 42

*Decus, Inc. v. Heenan*,
   No. 16-cv-5849, 2018 WL 1596880 (E.D. Pa. Apr. 2, 2018) ................................. 24

*Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*,
  418 F.3d 820 (8th Cir. 2005) ................................................................. 24

*Eden Elec., Ltd. v. Amana Co.*,
  370 F.3d 824 (8th Cir. 2004) ................................................................. 24

*Ennin v. CNH Indus. Am., LLC*,
  878 F.3d 590 (7th Cir. 2017) ................................................................. 30

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
  980 F.3d 1117 (7th Cir. 2020) ......................................................... 25, 38

*Est. of Moreland v. Dieter*,
  395 F.3d 747 (7th Cir. 2005) ................................................................. 18

*Ewing v. 1645 W. Farragut LLC*,
  90 F.4th 876 (7th Cir. 2004) ................................................................. 21

*Fednav Int'l Ltd. v. Cont'l Ins. Co.*,
  624 F.3d 834 (7th Cir. 2010) ................................................................. 44

*Firestone Fin. Corp. v. Meyer*,
  796 F.3d 822 (7th Cir. 2015) ................................................................. 30

*Garnes v. Fleming Landfill, Inc.*,
  413 S.E.2d 897 (W. Va. 1991). .............................................................. 33

*Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*,
  874 F.2d 431 (7th Cir. 1989) ................................................................. 48

*Hamlin v. Hampton Lumber Mills, Inc.*,
  246 P.3d 1121 (Ore. 2011) ............................................................. 42, 47

*Henry v. Hulett*,
  969 F.3d 769 (7th Cir. 2020) ................................................................. 46

*Horizon Health Corp. v. Acadia Healthcare Co.*,
  520 S.W.3d 848 (Tex. 2017) ................................................................. 31

*JCB, Inc. v. Union Planters Bank, NA*,
  539 F.3d 862 (8th Cir. 2008) ................................................................. 24

*Kasang v. Grzesik*,
  No. 1–16–3100, 2018 WL 1631351 (Ill. Ct. App. March 30, 2018) ......................... 48

*Kemezy v. Peters*,
  79 F.3d 33 (7th Cir. 1996) ................................................................... 43

*King v. GEICO Indem. Co.*,
  712 F. App'x 649 (9th Cir. 2010); .......................................................... 48

*Kirkpatrick v. Strosberg*,
  894 N.E.2d 781 (Ill. Ct. App. 2008). ....................................................... 48

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*,
  735 F.3d 735 (7th Cir. 2013) ................................................................ 39

*Lexington Furn. Indus., Inc. v. Lexington Co.*,
  No. 19-cv-6239, 2022 WL 13848274 (S.D.N.Y. Oct. 24, 2022) ................................ 38

*Mathias v. Accor Econ. Lodging, Inc.*,
  347 F.3d 672 (7th Cir. 2003) ............................................................ 37, 42

*May v. Chrysler Grp., LLC*,
  716 F.3d 963 (7th Cir. 2013) ................................................................ 18

*Milligan v. Bd. of Trustees of S. Ill. Univ.*,
  686 F.3d 378 (7th Cir. 2012) ............................................................ 21, 44

*Mkt. Am., Inc. v. Rossi*,
  238 F.3d 413 (4th Cir. Nov. 2000) .......................................................... 47

*N. Contracting, Inc. v. Illinois*,
  473 F.3d 715 (7th Cir. 2007) ................................................................ 21

*Nickerson v. Stonebridge Life Ins. Co.*,
  371 P.3d 242 (Cal. 2016) ................................................................... 48

*Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*,
  754 F.2d 738 (7th Cir. 1985) ................................................................ 39

*Pac. Mut. Life Ins. Co. v. Haslip*,
  499 U.S. 1 (1991) .......................................................................... 32

*Planned Parenthood v. Am. Coal. of Life Activists*,
  422 F.3d 949 (9th Cir. 2005) ................................................................ 31

*Puffer v. Allstate Ins. Co.*,
  675 F.3d 709 (7th Cir. 2012) ............................................................ 21, 44

*Quicken Loans, Inc. v. Brown*,
  737 S.E.2d 640 (W. Va. 2012) ........................................................... 48, 49

*Raffel Sys., LLC v. Man Wah Holdings LTD, Inc.*,
  No. 18-cv-1765, 2023 WL 3375853 (E.D. Wis. May 11, 2023) ................................. 51

*Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
  272 F.3d 1335 (Fed. Cir. 2001) ............................................................. 38

*Rozumalski v. W.F. Baird & Assocs., Ltd.*,
  937 F.3d 919 (7th Cir. 2019) ................................................................ 44

*Saccameno v. U.S. Bank Nat'l Ass'n*,
  943 F.3d 1071 (7th Cir. 2019); .................................................... 18, 32, 41, 42

*Sands, Taylor & Wood v. Quaker Oats Co.*,
  34 F.3d 1340 (7th Cir. 1994) ................................................................ 39

*Schandelmeier–Bartels v. Chi. Park. Dist.*,
    634 F.3d 372 (7th Cir. 2011) ................................................................. 18

*Schobert v. Ill. Dep't of Transp.*,
    304 F.3d 725 (7th Cir. 2002) ................................................................. 45

*Sommerfield v. Knasiak*,
    967 F.3d 617 (7th Cir. 2020) ........................................................... 19, 20

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ................................................................... *passim*

*Staub v. Proctor Hosp.*,
    421 F. App'x 647 (7th Cir. 2011) ............................................................ 47

*Synnott v. Burgermeister*,
    No. 22-1104, 2024 WL 108784 (7th Cir. Jan. 10, 2024) ..................... 19, 20, 22, 42

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
    No. 15-cv-211, 2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021) ......................... 38

*Tiffany & Co. v. Costco Wholesale Corp.*,
    274 F. Supp.3d 216 (S.D.N.Y. 2017) ........................................................ 51

*Tiffany & Co. v. Costco Wholesale Corp.*,
    No. 13-cv-1041, 2019 WL 120765 (S.D.N.Y. Jan. 7, 2019) ........................... 38

*Trustmark Life Ins. Co. v. Univ. of Chi. Hosps.*,
    207 F.3d 876 (7th Cir. 2000) ................................................................. 48

*TXO Prod. Corp. v. All. Res. Corp.*,
    509 U.S. 443 (1993) ................................................................... *passim*

*U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*,
    55 F.3d 1276 (7th Cir. 1995) ........................................................... 31, 37

*U.S. E.E.O.C. v. AutoZone, Inc.*,
    707 F.3d 824 (7th Cir. 2013) ................................................................. 18

*United States v. Farris*,
    532 F.3d 615 (7th Cir. 2008) ................................................................. 30

*Wi-LAN USA, Inc. v. Ericsson, Inc.*,
    675 F. App'x 984 (Fed. Cir. 2017) .......................................................... 17

*Williams v. First Advantage LNS Screening Sols., Inc.*,
    947 F.3d 735 (11th Cir. 2020) ............................................................... 22

*Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*,
    399 F.3d 224 (3d Cir. 2005) ................................................................. 48

## S<small>TATUTES</small>

15 U.S.C. § 1114(a) .......................................................................... 50

15 U.S.C. § 1117(a) ............................................................ 39, 48, 49

15 U.S.C. § 1117(b) .................................................................. 50

15 U.S.C. § 1117(c)(2) ............................................................. 50

815 Ill. Comp. Stat. § 510/3 .................................................... 48

<u>Rules</u>

Fed. R. Civ. P. 54(c) ................................................................ 13

**APPELLEE'S STATEMENT**
**CONCERNING ORAL ARGUMENT**

Federal Rule of Appellate Procedure 34(a)(2)(C) provides that oral argument is not necessary where "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument." Here, the Court can decide this appeal by applying well-established law to clear facts, all of which are addressed fully in the parties' briefs and in the District Court's decisions. Oral argument, therefore, is not necessary in this case.

## <u>INTRODUCTION</u>

Defendants used the name of Plaintiff's most successful product, ignored Plaintiff's repeated cease-and-desist requests, decided to "let him sue us," and made more than half a million dollars in infringing profits. Perhaps worse, they used Plaintiff's trademark in a way that had the potential to destroy his business. They encouraged customers to sign up for a "free trial" of the infringing product then charged customers for the "free" bottle, they charged customers for products customers never ordered, posted fake reviews on Amazon, and relabeled and sold expired product. The jury and the District Court each found that Defendants had willfully infringed Plaintiff's trademark, and the District Court upheld the jury's well-founded award of punitive damages.

The two grounds on which Defendants seek to overturn the judgment against them are substantively wrong and procedurally deficient.

First, Defendants violate a fundamental principle of appellate review: they present the facts in the light most favorable to the losing party, not in the light most favorable to the jury's verdict. Again and again, Defendants attempt to support their arguments with the facts as Defendants argued them at trial, *not* the facts as the District Court found them (when it decided several issues in the case itself, rather than giving those issues to the jury) and as the jury found them. Viewed consistently with the record and with the appropriate standard of review, those facts easily establish that the jury's verdict should be affirmed.

Second, Defendants have forfeited three of their primary arguments by failing to raise those arguments in the District Court. As this Court has held time and again,

1

this Court does not consider arguments raised for the first time on appeal.

Third, Defendants' attack on the jury's punitive damages award misunderstand the law and contradict the record. Defendants argue that they were prejudiced when the District Court allowed Plaintiff to seek punitive damages on his common-law infringement claim. But Defendants' own statements and conduct in the District Court make clear that they suffered no prejudice, and instead invented this story at the eleventh hour to avoid punitive damages.

Finally, the District Court correctly considered the potential harm that Defendants' conduct was likely to cause, and the jury's infringing profits award in deciding whether the punitive damage award is grossly excessive. Supreme Court and Seventh Circuit precedent (as well as the jury instructions in this case) make clear that the District Court was correct to consider the potential harm from Defendants' conduct. And infringing profits are key to a punitive damages award; an infringer who has profited significantly from his infringement needs a larger punishment to deter him from further infringement. Caselaw likewise shows that prejudgment interest, attorneys' fees, and costs all should be considered in the punitive damages ratio.

The jury's award of $300,000 in punitive damages against each of three Defendants, for a total of $900,000, is not grossly excessive. This Court should affirm.

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is complete and correct, except that Appellee does not have sufficient information to confirm the statements about the Nussbaum Family Trust on pp. 2–5 of Defendants' brief. None of that discussion,

2

however, affects this Court's jurisdiction.

## STATEMENT OF THE ISSUES

1. Whether Defendants were prejudiced by the District Court's decision to allow Plaintiff's common-law trademark infringement claim to be tried to a jury.

2. Whether the District Court, in deciding whether the jury's punitive damages award was grossly excessive, should have ignored the potential harm that Defendants' conduct was likely to cause, the profits that Defendants made from their infringement, prejudgment interest, attorneys' fees, and costs.

## STATEMENT OF THE CASE

Throughout their brief, Defendants repeatedly make factual claims that the District Court and/or the jury explicitly rejected. Defendants' legal contentions present the facts in the light most favorable to Defendants themselves, the opposite of the correct standard on appeal, Part II.A, *infra*. The real facts—those consistent with the District Court's findings and the appropriate standard of review—tell a much different story.

### A.  Plaintiff built a successful nutritional supplement business from scratch.

Plaintiff Charles Curry is an accomplished athlete who has won numerous weightlifting competitions. Trial Tr. Vol.1B 224:20–225:5 (Dkt.458).[1] While serving in the U.S. Air Force and deployed to the Middle East, Mr. Curry began researching and developing combinations of herbs and other natural substances that would aid his weightlifting and were free of steroids and other banned substances. *Id.* at 225:9–

---

[1] "Dkt." refers to the District Court docket.

15. Mr. Curry eventually turned this pursuit into a business, forming his own nutritional supplement company in 2002. *Id.* at 222:25–226:5. Mr. Curry's nickname at the time was "Chuck Diesel," a reference to the barrels of diesel fuel that often surrounded him on his Air Force base. 226:22–227:11. He eventually named his company "Get Diesel Nutrition." *Id.*

Through consistent efforts over several years, Mr. Curry built Get Diesel Nutrition into a successful small business. Mr. Curry testified that in the twenty years since he formed the company, he has sold over $2 million worth of product. Trial Tr. Vol.1B 232:4–9 (Dkt.458). Approximately 75–80% of those sales came from a testosterone booster that Mr. Curry named "Diesel Test." Trial Tr. Vol.1B 236:7–10 (Dkt.458). Mr. Curry testified that from 2015–2019 (the period surrounding and including the infringement period), sales of his flagship Diesel Test product were approximately $871,274. Trial Tr. Vol.1B 302:11–303:20 (Dkt.458). Diesel Test won numerous awards and both Diesel Test and Mr. Curry were widely recognized in the weightlifting community. *Id.* at 240:3–22; PX-20 (Dkt.427-16).

Mr. Curry operates his business by himself. Trial Tr. Vol.1B 287:6–15 (Dkt.458). For much of the company's life, he managed the business while also working for the Air Force and, later, the Department of Veterans Affairs. *Id.* at 243:7–244:1.

### B.    Defendants stole the name and label design of Plaintiff's product.

In 2016, the Defendants in this case—the nutritional supplement company Revolution Laboratories and its two founders, Barry Nussbaum and Joshua

Nussbaum—began selling another testosterone booster. Defendants chose to call the product "Diesel Test," the same name as Mr. Curry's product, and to give it a near-identical label design. *See* S.A.42. Contrary to Defendants' contention at trial (which they urge again on appeal), this was no accident. As the District Court explained, "the jury reasonably could have agreed with Curry that the similarities between his mark and the defendants were too significant to be a coincidence and that the defendants intentionally copied Curry's mark." S.A.42.

Defendants began selling their infringing Diesel Test product in October 2016. S.A.3. But Defendants didn't just use Mr. Curry's trademark; they used it to sell their product in an outrageous and unethical manner. For example, Defendants offered a "free trial" of their copycat Diesel Test, sending a customer a supposedly "free" bottle of the infringing product, then charging the customer for that "free" bottle and automatically signing the customer up for a perpetual monthly subscription if the customer didn't cancel within fourteen days. Trial Tr. Vol.2B 507:7–508:10 (Dkt.459); Trial Tr. Vol.3B 791:25–792:10, 800:24–801:6 (Dkt.460). When a customer ordered a bottle of Diesel Test through Defendants' website, Defendants would automatically add (and charge the customer for) an order of one of their other products. PX-38 (Dkt.427-28). Defendants and their employees posted fake reviews of their products on Amazon. Trial Tr. Vol.3B 817:20–819:7 (Dkt.460). They told customers that their Diesel Test was a new formula when it wasn't, that the formula had certain physiological effects when it didn't, and that product users had experienced certain benefits when they hadn't. Trial Tr. 804:1–807:5, PX-9 (Dkt.427-7). And Defendants

relabeled and resold expired product. Trial Tr. Vol.3-B 821:20–822:7 (Dkt.460).

Unsurprisingly, these abusive business practices earned Defendants a lot of outraged customers. *See, e.g.*, PX-57 (Dkt.427-33) (customer calling Defendants "thieves"); PX-38 (Dkt.427-28) (customer demanding a refund because he never ordered the product for which he was charged); *id.* (customer: "I was Trying to complete my order for one bottle of Diesel Test, when I see your website ADDED a bottle of "MRX" to my order.. I DO NOT WANT AND DID NOT ORDER MRX . . . REMOVE THE ORDER AND CHARGE FOR MRX, IMMEDIATELY, OR I WILL FILE A COMPLAINT ABOUT YOUR COMPANY WITH ILLINOIS ATTORNEY GENERAL, LISA MADIGAN.") (emphasis in original).

Mr. Curry had garnered a sterling reputation for his product; in contrast, Defendants seemed intent on using the goodwill of the "Diesel Test" name, for short-term gain, but undermining its long-term value.

### C. When notified of their infringement, Defendants decided to "let him sue us" rather than stop infringing.

Almost immediately after Defendants began selling the infringing Diesel Test product, Mr. Curry discovered Defendants' infringement when he started receiving angry messages from *Defendants'* customers. These customers had purchased the infringing product from Defendants, but mistakenly believed they had purchased it from Mr. Curry. The customers expressed outrage and worse, writing things like, "Stay away from this company all together. Watch out for these scumbags," "Stop charging my bank account immediately, or I'm pressing charges for this scam," "I didn't order anything at all," "Which scumbag in your organization decides to charge

my credit card?", and "I will ruin you now on Facebook." Trial Tr. Vol.5A 1124:11–1125:9 (Dkt.462). Receiving these mistaken messages, Mr. Curry saw the possibility that Defendants could destroy the product he had built into an award-winning, nationally recognized brand.

In November 2016, just a month after Defendants began selling their infringing product, Mr. Curry sent three cease-and-desist communications to Defendants. PX-4 (Dkt.427-4), PX-23 (427-18), PX-24 (427-20).

Defendants claimed at trial (and claim again on appeal) that in response to these notices, they conducted an extensive search to determine whether Mr. Curry's claim of trademark infringement was legitimate. Br.15–17.[2] But the District Court and the jury rejected this version of events, finding instead that Defendants willfully violated Mr. Curry's trademark rights. S.A.9–10, 53 (District Court holding, "[Defendants] emphasize their searches that informed their claimed good-faith belief that Curry did not have any trademark rights. But, as noted above, the defendants did not produce any evidence of these searches aside from their testimony. The Court, like the jury, finds the testimony on this point to lack credibility."). Instead, Defendants decided to continue selling the infringing product, despite Mr. Curry's trademark and his cease-and-desist letters. S.A.42.

Joshua Nussbaum wrote to his colleagues immediately after receiving Mr. Curry's cease-and-desist notices, saying, "I personally vote we *let him sue us* to get through the remainder of our labels and then change the name to DZL Test on our

---

[2] "Br." refers to Appellants' opening brief.

next run." PX-1 (Dkt.427-1) (emphasis added). Barry Nussbaum agreed with his son. Trial Tr. Vol.3A 644:11–14 (Dkt.460). As the District Court explained: "This suggests that the defendants had already decided they would continue selling their infringing product regardless of the outcome of any searches performed." S.A.53.

When Defendants continued selling their infringing product despite Mr. Curry's cease-and-desist requests, Mr. Curry reported Defendants' infringement to Amazon. S.A.14, 42. Amazon, in turn, banned Defendants' product from its website. S.A.42, 53–54. But Defendants continued selling the infringing product through other channels. S.A.14.

Even after Mr. Curry filed this lawsuit in March 2017, Defendants continued their infringement. S.A.14. Defendants admitted at trial that they continued selling the infringing Diesel Test until at least 2018; Mr. Curry testified that he observed the infringing product being advertised on a website as late as May 2020, and the jury found Revolution and Joshua Nussbaum liable for violating Anti-Cybersquatting Consumer Protection Act ("ACPA") with respect to that very website, S.A.14, 22, 64. Joshua Nussbaum admitted at trial that Defendants stopped selling Diesel Test not out of respect for Mr. Curry's trademark, but because Mr. Curry had sued them and the product was no longer profitable. Trial Tr. Vol.2B 482:16–23 (Dkt.459).

### D. The jury and the District Court found that Defendants willfully infringed Mr. Curry's trademark.

Mr. Curry filed this lawsuit *pro se* in the Northern District of Illinois in 2017, asserting trademark claims under the Lanham Act and under Illinois common law. J.A.13–18. As relevant here, he also brought claims under the Illinois Consumer

Fraud Act and the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"). J.A.11–13. After the District Court ruled on the parties' summary judgment motions, the Court allowed discovery into the Nussbaums' personal finances, which the District Court held was relevant to the issue of punitive damages under Plaintiff's common-law trademark claim. J.A.109. That discovery generated substantial litigation. *See* J.A.98–99, 102–109.

The case was tried to a jury over five days in May 2023. S.A.9. The jury found that all three Defendants willfully infringed Plaintiff's trademark under the Lanham Act and Illinois common law, and that Revolution and Joshua Nussbaum violated the ACPA. The jury awarded $2,500 in damages for loss of goodwill and harm to reputation, $500,000 in infringing profits, $300,000 in punitive damages severally against each Defendant (for a total of $900,000 in punitive damages), and $1,000 for the ACPA violation. S.A.21–22. After trial, the Court decided Plaintiff's IUDTPA claim because that claim sought only equitable relief plus attorneys' fees and costs. S.A.49–54. In so doing, the Court made its own determination that all three Defendants willfully infringed Mr. Curry's trademark. S.A.54.

Defendants make much of the fact that at trial, Mr. Curry did not offer documentation of his own sales. That Mr. Curry did not offer such evidence is hardly surprising; he did not seek damages for his own lost sales. Instead, he sought Defendants' infringing profits. S.A.28. But Mr. Curry did testify that from 2015–2019 (the period surrounding and including the infringement period), his sales of Diesel Test were approximately $871,274. Trial Tr. Vol.1B 302:11–303:20 (Dkt.458). On

9

appeal, that testimony is to be viewed in the light most favorable to Mr. Curry. Part II.A, *infra*.

Both sides filed post-trial motions to alter the judgment. S.A.10. Among other rulings, the District Court denied Defendants' motion to set aside the punitive damages, or to find that the punitive damages were excessive. S.A.41–46. The District Court held that a claim for infringing profits did not give rise to a right to a jury trial. S.A.25. The Court then made its own determination of infringing profits, increasing the award from $500,000 to $547.095.44. S.A.34. The Court likewise granted Plaintiff prejudgment interest and entered a permanent injunction. S.A.57, 62.

## SUMMARY OF ARGUMENT

**I.** Defendants' contention that they were prejudiced by the District Court's decision to allow Plaintiff's common-law infringement claim to be tried to a jury misunderstands the law and contradicts the factual record. Defendants argue that they stipulated to liability on this claim under the misapprehension that Plaintiff did not seek punitive damages for it. But the law is clear that a plaintiff need not list in his complaint every form of relief he seeks, and Defendants' belated assertion that they did not know there was a claim for punitive damages, even if real, does not constitute prejudice. In any event, Plaintiff, the District Court, and Defendants themselves repeatedly recognized that Plaintiff sought punitive damages in connection with this claim. Further, the parties engaged in months of highly contested financial discovery premised on Plaintiff's punitive damages claim, and Defendants never once disputed the availability of punitive damages.

**II.** The District Court correctly held that the jury's punitive damages award is

not grossly excessive. Defendants' contrary arguments are wrong.

First, Defendants re-argue their version of the facts that the jury and the District Court rejected at trial. On appeal, the facts must be viewed in the light most favorable to the jury's verdict. Part II.A.

Second, Defendants' conduct was reprehensible (the first guidepost courts consider in evaluating punitive damages awards). Courts examine five factors to determine reprehensibility. Defendants have forfeited any argument as to four of those factors. And all five factors support the award of punitive damages here: Defendants' conduct caused physical harm and demonstrated an indifference to the health and safety of others; Plaintiff was financially vulnerable; and Defendants engaged in repeated, intentional conduct. Part II.B.

Third, the punitive damages award is reasonably related to the potential harm Defendants' conduct was likely to cause, and to the harm that actually occurred (the second guidepost). Punitive damages are evaluated on a per-defendant basis. Thus, the relevant number is the $300,000 awarded against each Defendant, not the $900,000 awarded collectively against all Defendants. Part II.C.1. Further, Defendants' outrageous conduct had the potential to cause significant harm to Mr. Curry. That potential harm easily surpasses the $300,000 in punitive damages. Part II.C.2. Moreover, the infringing profits Defendants reaped from their infringement are a key indication both of the amount needed to punish and deter Defendants, and of the harm inflicted on Mr. Curry. The Court was right to consider those infringing profits. Part II.C.3. The Court likewise should consider the prejudgment interest on

those infringing profits, as well as Mr. Curry's attorneys' fees and costs, as harm to
Mr. Curry. Part II.C4–5.

Fourth, the punitive damages award is consistent with the penalties provided
for in the Lanham Act, as well as punitive damages awarded in other cases. Part II.D.

## ARGUMENT

### I.     The District Court properly allowed Plaintiff's common-law infringement claim to be tried to the jury.

The District Court did not abuse its discretion by allowing the jury to hear
Plaintiff's common-law infringement claim. Defendants argue that because Plaintiff's
complaint did not request punitive damages with respect to his common-law
infringement claim, the District Court should have limited Plaintiff to injunctive
relief only for that claim, and thus should have tried that claim to the District Court
rather than to the jury. Br.53–58. Defendants concede that "[t]he standard of review
is whether the district court abused its discretion." Br.54.

Defendants concede that a plaintiff need not list in his complaint every form of
relief he seeks. Br.53. Rather, as Defendants also concede, a district court will
preclude a plaintiff from pursuing a form of relief not mentioned in his complaint only
if allowing the plaintiff to pursue that relief would unfairly prejudice the defendant.
Br.53 (citing *Cullen*, 668 F. App'x at 658). Defendants argue that they were prejudiced
because they stipulated to Revolution's liability (though not to the individual
Nussbaum Defendants' liability, J.A.100 ¶ 2) under an incorrect belief that because
Plaintiff's complaint did not seek punitive damages, that relief would not be available.

Br.55. As the District Court correctly found, Defendants were not prejudiced. S.A.7–8.

First, as Defendants acknowledge, Br.53, a plaintiff is not limited to the relief requested in his complaint. FED. R. CIV. P. 54(c) ("[A] final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); *Back Drs. Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 831 (7th Cir. 2011); *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1226 (7th Cir. 1995) ("A plaintiff is not required to itemize his damages claims in his complaint. On the contrary, the rules entitle him to a judgment that grants him the relief to which he is entitled even if the complaint failed to ask for that relief."). If Defendants stipulated to Revolution's liability believing that Plaintiff was limited to the relief sought in his Complaint, they simply misunderstood the relevant law and the legal effect of the stipulation. A party's own mistake of law cannot create unfair prejudice. The District Court correctly concluded that "the defendants can't force their unilateral and unexpressed intention or belief retroactively on the plaintiff . . . ." S.A.8, at 9:2–5.

Second, Plaintiff, the District Court, and even Defendants themselves each recognized in writing and at hearings at multiple points during this case that Plaintiff was seeking punitive damages on his common-law infringement claim. Plaintiff stated in February 2022 that the financial discovery he was pursuing was "relevant to deciding the amount of punitive damages on Plaintiff's common law trademark infringement claim." J.A.103. On February 22, 2022, *Defendants* acknowledged that Plaintiff sought "Punitive Damages for Illinois Common-law Trademark

Infringement." J.A.105. Then the District Court recognized as much in March 2022, stating that financial discovery was "relevant on the question of punitive damages on the state law claim." J.A.109, at 8:3–4.[3] Indeed, the Court reiterated that statement several times over the ensuing months. *See, e.g.*, J.A.112, at 4:23–5:1; J.A.115–16, at 3:25–4:5; J.A.127, at 222:3–5. In August 2022, Plaintiff explicitly stated in the Final Pretrial Order that he sought punitive damages. Dkt.280, at 4. And on September 7, 2022, Defendants themselves stated that "[t]he overall profitability [of Revolution] does go to [punitive] damages." J.A.129–30, at 44:21–45:4. Defendants thus had fair notice that Plaintiff intended to seek punitive damages on his common-law infringement claim. This forecloses any claim of prejudice *See Brewer v. Wal-Mart Stores, Inc.*, 87 F.3d 203, 207 (7th Cir. 1996).

Third, Defendants fought tooth-and-nail to resist punitive damages discovery, but *never* claimed that punitive damages were unavailable. In March 2022, the District Court ordered discovery concerning Defendants' net worth, explaining that Defendants' financial condition was relevant to punitive damages for the common-law infringement claim. J.A.109; Dkt.202. Due to what the District Court described as Defendants' "dilatory" and "obstructive tactics," J.A.133; Dkt.282, that discovery took over a year to complete, necessitating thirteen orders from the District Court, seven hearings, at least eighteen filings from Plaintiff, and emails too numerous to count. Dkt.451, at 11. Defendants seemed to do everything they could to evade this

---

[3] By this point, the Court had granted summary judgment to Defendants on the Consumer Fraud Act claim, Dkt.195, at 16–17, leaving common-law infringement as the only claim for which punitive damages were available.

discovery and conceal their assets, including failing to produce their own tax returns, refusing to produce documents concerning their family trust, and removing Joshua Nussbaum as the Managing Trustee of the family trust. Dkt.205, at 2, Dkt.219, at 5–8, Dkt.284, at 4. So egregious was Defendants' obstruction that the District Court sanctioned Defendants or their counsel for discovery violations *twice*, J.A.118, 146, and ordered them to reimburse Mr. Curry for $103,568 in attorneys' fees and costs, *see* J.A.120–21, 146. The District Judge repeatedly admonished Defendants' counsel for their misrepresentations during this discovery, including for telling the Court a "flat-out, bald-faced lie," Dkt.261, at 15:11–16:1, and remarked that "[Defendants] are basically just thumbing their nose at me," Dkt.263, at 4:9–11. Yet through all of this, Defendants never suggested that they believed punitive damages were unavailable. It was not until December 2022 (when the punitive damages discovery was largely complete, J.A.133) that Defendants first raised this issue. Dkt.302-2, at 25, 94. If Defendants truly had entered into the stipulation believing punitive damages were unavailable, they surely would have raised that issue much sooner.

Fourth, the context in which Defendant raised this argument calls into question its factual veracity. Defendants first argued that punitive damages should not be available in December 2022 in an objection to Plaintiff's jury instruction on punitive damages. Defendants made no mention of any belief that the stipulation precluded Plaintiff from pursuing punitive damages; they claimed only that Plaintiff should not be allowed to seek punitive damages on his common-law infringement claim because his Complaint did not request punitive damages on that claim.

Dkt.302-2, at 25, 94. Only *after* Plaintiff correctly pointed out that he could seek relief not included in his complaint so long as Defendants are not unfairly prejudiced, Dkt.302-2, at 26–27, did Defendants offer (in a subsequent filing) their story about their belief at the time of the stipulation. Dkt.305, at 5. This sequence of events raises serious doubts about Defendants' factual claims.

Fifth, Defendants' arguments that they were prejudiced are unconvincing. Plaintiff did not waive his right to seek punitive damages on its his common-law infringement claim by entering into the stipulation. Br.55. The District Court correctly concluded that "[t]here's no agreement or stipulation, expressly or impliedly, giving up a recovery of punitive damages . . . ." S.A.8, at 9:1–2. Nor did Plaintiff waive this right at any other time. Defendants feebly point to a footnote in a discovery motion from November 2020 in which Plaintiff stated that he was seeking punitive damages in connection with his Illinois Consumer Fraud Act claim. Br.55 (citing Dkt.147-1, at 5 n.6). But Plaintiff repeatedly made clear that he was seeking punitive damages, without limiting those damages to his CFA claim.[4] The statement Defendants cite does not relinquish Plaintiff's right to recover punitive damages for his common-law infringement claim. The District Court found, "I don't see anything in the materials cited by [D]efendants that amounts to a disavowal of punitive

---

[4] *See, e.g.*, J.A.91 (Plaintiff stating, in September 2020, that "Plaintiff also intends to seek punitive damages," without limiting such damages to any one claim); J.A.94 (same); J.A.97 (Plaintiff stating that Defendants' "total assets, debts, and net worth are directly relevant to . . . punitive damages.").

damages on the state law trademark infringement claim." S.A.7, at 8:18–20. That holding is correct; it is not within driving distance of an abuse of discretion.

Finally, Defendants rely only on attorney argument in briefs to establish their belief at the time of the stipulation. Defendants have never provided even an attorney declaration, much less an affidavit from Defendants themselves, swearing to Defendants' understanding when they entered into the stipulation. A factual assertion such as this cannot rest on attorney argument alone. *Topia Tech., Inc. v. Dropbox Inc.*, No. 23-cv-00062, 2023 WL 3437823, at *6 (N.D. Cal. May 12, 2023) (finding attorney argument, without supporting evidence, insufficient to establish a claim of prejudice); *Wi-LAN USA, Inc. v. Ericsson, Inc.*, 675 F. App'x 984, 991 (Fed. Cir. 2017) ("[A]ttorney argument [is] not record evidence, and relying on these bare assertions [i]s improper.").

## II.     The District Court correctly held that the jury's punitive damages award is not grossly excessive.

A jury may impose punitive damages to further a state's legitimate interests in punishing and deterring a tortfeasor's conduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). The Due Process Clause of the Fourteenth Amendment[5] prohibits a punitive damages award only where such an award is "grossly excessive." *Id.* at 586 ("Only when an award can fairly be categorized as grossly excessive in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.") (quoting *TXO Prod. Corp. v. All. Res.*

---

[5] Defendants do not argue that Illinois law provides an independent basis for reversal; they limit their arguments to the Due Process Clause.

*Corp.*, 509 U.S. 443, 456 (1993) (plurality opinion)). To determine whether an award of punitive damages is "grossly excessive," courts consider three guideposts: "the degree of reprehensibility of the [defendant's conduct]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 575.

### A.    Defendants' factual arguments depend on an improper standard of review.

In reviewing a punitive damages award for excessiveness, this Court construes the underlying facts in the light most favorable to Plaintiff, and then determines *de novo* whether those facts, so construed, show the jury's award to be grossly excessive.

This Court must view the underlying *facts* in the light most favorable to the jury's verdict. *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013) ("[On appeal, the Court] construe[s] the facts strictly in favor of the party that prevailed at trial. That includes drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe." (internal citations and quotation marks omitted) (quoting *Schandelmeier–Bartels v. Chi. Park. Dist.*, 634 F.3d 372, 376 (7th Cir. 2011)); *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1082 (7th Cir. 2019); *Est. of Moreland v. Dieter*, 395 F.3d 747, 756 (7th Cir. 2005). The question this Court reviews *de novo* is only whether those facts, viewed in the light most favorable to the jury's verdict, indicate that the punitive damages award is grossly excessive. *U.S. E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 838 (7th Cir. 2013).

For example, in *Synnott v. Burgermeister*, No. 22-1104, 2024 WL 108784 (7th Cir. Jan. 10, 2024), the defendant argued that the punitive damages were constitutionally excessive. *Id.* at *1. This Court viewed the underlying *facts* in the light most favorable to the jury's verdict, *id.* ("We view the facts in the light most favorable to Synnott, the prevailing party at trial,"), then decided *de novo* whether those facts indicated that the award was constitutionally excessive, i*d.* at *1–2. This comports with the general deference to jury verdicts. *Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020) ("We do not lightly set aside jury verdicts . . . .").

Defendants are thus wrong that this Court's review is entirely *de novo*. Br.27–28. Throughout their brief, however, Defendants either misstate the record outright or view the facts in the light most favorable to *Defendants*, without ever arguing that the District Court's factual findings are clearly erroneous. Those factual issues are more settled than usual here. In addition to the jury's verdict, the District Court made numerous findings of fact when it decided the IUDTPA claim and decided the amount of infringing profits. S.A.49–54, 22–38. Defendants cannot rely on a version of the "facts" that the jury and the District Court specifically rejected when they found that Defendants willfully infringed Plaintiff's trademark, Dkt.377, and willfully violated IUDTPA, S.A.54, respectively.

Viewed under the correct standard, the facts clearly establish that the punitive damages award is not grossly excessive.

## B. Defendants' conduct was reprehensible under the first *Gore* guidepost.

The first guidepost considers "the degree of reprehensibility" of the defendant's

conduct. *Gore*, 517 U.S. at 575. This guidepost is "the most important indicium of the reasonableness of a punitive damages award." *Sommerfield*, 967 F.3d at 623 (quoting *Gore*, 517 U.S. at 575). The Supreme Court has identified five characteristics that can render an award constitutionally permissible: (1) "the harm caused was physical as opposed to economic;" (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;" (3) "the target of the conduct had financial vulnerability;" (4) "the conduct involved repeated actions or was an isolated incident;" or (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). This Court recently held that "all five factors must be absent to render a punitive award suspect." *Synnott*, 2024 WL 108784, at *2 (citing *State Farm*, 538 U.S. at 419) (affirming jury finding of reprehensibility when two of five factors were present).

Here, Defendants have forfeited any argument as to four of the five factors by failing to raise those arguments in the District Court. In any event, all five factors support the award of punitive damages.

1. *Defendants forfeited any challenge to four of the five reprehensibility factors.*

Defendants did not even list, much less address, *any* of the five reprehensibility factors in either of their two briefs on this topic in the District Court. Dkt.385, at 9; Dkt.400, at 4–7. As the District Court explained, "[t]he defendants do not expressly address *any* of the five factors the Seventh Circuit has instructed courts to consider on the first guidepost." S.A.43–44 (emphasis added). Instead, the Defendants "assert that they 'inadvertently ran afoul of another's trademark,' which is 'not a

reprehensible act,' and they note in passing that their infringement did not cause any physical injury." S.A.43–44 (quoting Dkt.385, at 9). The District Court found that, even if these references indirectly addressed two of the five factors—presumably the first (physical harm) and the fifth (intentional conduct)—Defendants failed entirely to address the remaining three factors. S.A.43–44 ("For the remaining three factors, the defendants do not contest that each factor weighs in favor of the jury's punitive damages award.").

By failing to address the second, third, and fourth reprehensibility factors in the District Court, Defendants forfeited any argument that these factors favor them. "It is a well-established rule that arguments not raised to the district court are waived on appeal." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). This Court has applied that principle and found forfeiture where a party failed to address all the elements of a multifactor test. *N. Contracting, Inc. v. Illinois*, 473 F.3d 715, 720 (7th Cir. 2007); *Ewing v. 1645 W. Farragut LLC*, 90 F.4th 876, 887–88 (7th Cir. 2024).

Moreover, because Defendants addressed the first factor only "in passing," S.A.36, they have forfeited any argument as to that factor as well. *Puffer*, 675 F.3d at 718 ("[E]ven arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law.").

Defendants cannot take refuge in the fact that they raised in the District Court the general issue of reprehensibility. "[R]aising an issue in general terms is not sufficient to preserve specific arguments that were not previously presented." *Id.*; *see also Milligan v. Bd. of Trustees of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012).

Defendants thus have forfeited any argument as to four of the five factors. As all five factors must be absent to render a punitive damages award suspect, *Synnott*, 2024 WL 108784, at *2, Defendants' forfeiture effectively concedes that Defendants' conduct was reprehensible.

But even if the Court does not find these arguments forfeited, all five factors favor Plaintiff.

2. *Factors 1 and 2: Defendants caused Plaintiff physical harm and were indifferent to the health and safety of others.*

The first reprehensibility factor considers whether the harm to the plaintiff was physical or economic. *State Farm*, 538 U.S. at 419. Emotional harm can qualify as physical harm. *Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 751 (11th Cir. 2020) (holding that emotional harm supports a reprehensibility finding, and citing cases). Such emotional harm is present here. Defendants' intentional infringement of Mr. Curry's trademark, combined with the nefarious use that Defendants made of that trademark, caused Mr. Curry emotional and psychological damage. Mr. Curry explained how his products were "an extension of [himself]," how "upset" and "shocked" he was when he discovered Defendants' infringement, that Defendants' misconduct caused him to lose his passion for his business, and that he could no longer bear to even go on his company website "because it was just so much negative information on there." Trial Tr. Vol.1B, 245:5–6, 249:8–9, 274:25–275:6, 276:9–21. Further, the customers who contacted Mr. Curry, mistakenly believing they had purchased the infringing product from him, threatened to cause him physical harm and to press charges against him, exacerbating the

22

emotional harm Mr. Curry suffered. PX-21 (Dkt.421-17).

Defendants' misconduct likewise reflected an indifference to the health or safety of others, the second reprehensibility factor. As noted, Defendants' infringement led to threats of physical violence against Mr. Curry. PX-21, at 429 (Dkt.421-17). Defendants relabeled and sold expired product, which their own employee admitted caused "safety risks." Trial Tr. Vol.3-B 821:20–822:7 (Dkt.460). Defendants told customers that their infringing Diesel Test product had certain physiological effects when in fact there was no evidence that it did, and claimed that users of the product had experienced certain benefits when in fact they hadn't. Trial Tr. 804:1–807:5, PX-9 (Dkt.427-7). These facts must be viewed in the light most favorable to Mr. Curry. Part II.A, *supra*.

Defendants' brief devotes all of one paragraph to the first two reprehensibility factors combined, offering only the conclusory contention that these factors are "undisputed." Br. 29. Plaintiff certainly does dispute these factors, and did so in the District Court as well, Dkt.399, at 8–9.

Moreover, a commercial wrong generating primarily economic injury can be sufficiently reprehensible to warrant punitive damages. *Gore*, 517 U.S. at 576 ("To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct . . . or when the target is financially vulnerable, can warrant a substantial penalty."). In particular, courts have found economic harm to be sufficient where the tort was not "accidental or inadvertent," and where the defendant acted with "callous disregard" for the plaintiff's rights. *JCB, Inc. v. Union*

*Planters Bank, NA*, 539 F.3d 862, 875–76 (8th Cir. 2008) (quoting first *Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824, 828 (8th Cir. 2004); and then *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 840 (8th Cir. 2005)) (collecting cases). As both the District Court and the jury found, Defendants willfully infringed Plaintiff's trademark, fully aware that they were infringing Plaintiff's rights. S.A.33–35, 44–46. This is sufficient to satisfy the first two factors.

### 3. Factor 3: Plaintiff was financially vulnerable.

Under the third reprehensibility factor, courts acknowledge that where a plaintiff's financial condition made him "more vulnerable to the defendant's wrongful conduct or exacerbated the harm," the defendant's conduct is more likely to be reprehensible. *Bullock v. Philip Morris USA, Inc.*, 131 Cal. Rptr. 3d 382, 396 (Cal. Ct. App. 2011). This factor likewise favors Plaintiff. Mr. Curry did not own a large business with multiple employees; he built and ran his business alone. Trial Tr. Vol.1B 287:6–24 (Dkt.458). *See Decus, Inc. v. Heenan*, No. 16-cv-5849, 2018 WL 1596880, at *10 (E.D. Pa. Apr. 2, 2018) (small size of plaintiff's business found to indicate financial vulnerability). Mr. Curry testified that his total sales over the life of his business (more than twenty years) were around $2 million. Trial Tr. Vol.1B 232:4–9 (Dkt.458). Further, Mr. Curry testified that he used only very high-quality ingredients, which were sometimes unavailable or too expensive for him to afford. Trial Tr. Vol.2A 335:24–336:24 (Dkt.459). As a result, he often faced supply chain issues that forced him to reduce his product offerings. Sometimes his product would be unavailable for months at a time. Trial Tr. Vol.2A 335:24–336:24 (Dkt.459).

The jury likewise heard testimony that Mr. Curry is not a wealthy man. He got the money to start his business by selling his house while deployed overseas with the U.S. Air Force. Trial Tr. Vol.1B 226:5–9 (Dkt.458). While starting and running his nutritional supplements business, he served in the military and worked for the U.S. Department of Veterans Affairs. *Id.* at 222:15–223:3 (Dkt.458). Defendants argue that Mr. Curry's sales increased during the infringement period. Br.31. But this argument goes to the measure of damages, not to Mr. Curry's financial vulnerability. This factor thus favors Plaintiff.

> 4. *Factors 4 and 5: Defendants engaged in repeated, intentional misconduct.*

The fourth and fifth reprehensibility factors consider whether "the conduct involved repeated actions or was an isolated incident" and whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419. As the Supreme Court has explained, "Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Gore*, 517 U.S. at 576–77. Accordingly, this Court has recognized that, where a defendant persists in the same course of tortious conduct against the plaintiff, knowing his conduct violates the law, this factor weighs in favor of the plaintiff. *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1141 (7th Cir. 2020).

The evidence overwhelmingly shows that Defendants repeatedly infringed despite knowledge of Mr. Curry's trademark. First, the facts viewed in the light most

favorable to Mr. Curry establish that Defendants deliberately copied Mr. Curry's mark from the beginning. Defendants chose an identical name and near-identical label design for their infringing product. S.A.42. The District Court thus "concluded . . . that the evidence supports that [Defendants'] infringement was not a mere accident." S.A.44. The District Court explained: "[T]he jury reasonably could have agreed with Curry that the similarities between his mark and the defendants['] were too significant to be a coincidence and that the defendants intentionally copied Curry's mark." S.A.42. Defendants' factual contention that they inadvertently chose the same name as Curry's product, Br.42, fails on appeal.

Second, Mr. Curry sent multiple cease-and-desist communications to Defendants within a month of Defendants' first sale of the infringing product. S.A.12. Defendants chose to continue selling the infringing product anyway, affirmatively deciding to "let him sue us." S.A.13. Defendants likewise continued selling the infringing product after Amazon banned their product as counterfeit, S.A.42, 53–54, and for months (likely years) after Mr. Curry filed the instant lawsuit, S.A.14.

Both the District Court and the jury rejected Defendants' baseless argument that they continued selling the infringing product out of a "good faith" belief "that Mr. Curry's notice was a scam," based on supposedly extensive searches they performed for evidence of his product after they received his cease-and-desist notices. Br.32–35. Both the District Court and the jury found instead that Defendants willfully violated Mr. Curry's trademark rights, finding that "defendants did not produce any evidence of these searches aside from their testimony" and finding "[Defendants'] testimony on

this point to lack credibility." S.A.9–10, 53. The Court and jury rejected Defendants'
version of events for good reason. Defendants conceded that their purportedly
extensive searches did not include the basic steps of searching for Mr. Curry's product
name on Amazon or clicking on the links to Mr. Curry's products that his notices
included. Trial Tr. Vol.3A 638:15–23. As the District Court explained, "[t]his suggests
that the defendants had already decided they would continue selling their infringing
product regardless of the outcome of any searches performed." S.A.53. The District
Court and jury likewise rejected Barry and Joshua Nussbaum's contention that they
believed Mr. Curry hadn't "shown the existence of any trademark rights." Br.33.
Instead, the District Court and the jury found that Defendants willfully infringed
Plaintiff's trademark rights.

That Defendants stipulated to Revolution's liability does not show Defendants'
good faith. Defendants point to their stipulation to Revolution's liability as evidence
that they admitted their "mistake" once they received evidence of Plaintiff's
trademark in discovery. Br.33–34, 36. But Defendants do not explain what
information about Plaintiff's trademark was provided to them in discovery that they
could not have seen on their own before choosing the name Diesel Test, or after
receiving Plaintiff's cease-and-desist communications, or from reviewing the
information and links contained in those cease-and-desist communications. To the
contrary, Defendants contended below that the discovery Mr. Curry provided did not
prove that Plaintiff was operating a legitimate business. Dkt.444, at 4. Moreover,
after all Defendants stipulated to Revolution's liability (not to the individual

27

Defendants' liability, J.A.100), Defendants spent much of the remainder of the case trying to renege on that stipulation. Defendants took the baseless position that they should be allowed to argue that they did not infringe Plaintiff's trademark, Dkt.289, and that the stipulation did not concede that Plaintiff had trademark rights in any particular geographic region. Dkt.296, at 7. At trial, Barry Nussbaum denied ever entering into the stipulation, falsely claiming that only Revolution Laboratories did so. Trial Tr. Vol.3A 641:6–17 (Dkt.460). Ultimately, the stipulation was no more than an attempt to shift liability from the Nussbaums themselves to an LLC that the Nussbaums subsequently drained of assets, Trial Tr. Vol. 2B 495:22–496:2 (Dkt.459). It is not a reflection of good faith.

The District Court also properly rejected Defendants' claim that they showed good faith when they "voluntarily stopped marketing Diesel Test in 2017 and stopped selling Diesel Test products in 2018, all while this case was dismissed and on appeal." Br.36. Instead, the District Court found that "evidence at trial showed that the defendants *did* continue selling Diesel Test during at least part of that time." S.A.40. Plaintiff testified to finding advertisements of the infringing Diesel Test product as late as 2020. S.A.14, 58–59. And Defendants testified that they stopped selling Diesel Test, not out of respect for Mr. Curry's trademark, but because Mr. Curry had sued them and the product was no longer profitable. Trial Tr. Vol.2B 482:16–23 (Dkt.459). On appeal, these facts are viewed in the light most favorable to Mr. Curry, not to Defendants. Part II.A, *supra*.

Defendants' deliberate and repeated misconduct was not limited to their

infringement. After receiving Mr. Curry's cease-and-desist notice notifying them of Mr. Curry's common-law trademark, Defendants filed an opposition to Mr. Curry's application to register the "Diesel Test" mark, and filed an application to register the mark themselves, S.A.13, 61. Despite stipulating that Revolution infringed Mr. Curry's mark, S.A.11, Defendants refused to withdraw their opposition until this Court ordered them to do as part of a permanent injunction in 2023. S.A.61.

The record thus amply demonstrates that Defendants knowingly and intentionally infringed Mr. Curry's trademark in a repeated course of conduct over several years. There can be no doubt that factors four and five are satisfied.

**C.** **Under the second *Gore* guidepost, the punitive damages award is reasonably related to the potential harm Defendants' conduct was likely to cause and to the harm that actually occurred.**

Under the second *Gore* guidepost, courts consider "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *Gore*, 517 U.S. at 581 (quoting *TXO*, 509 U.S. at 460) (emphasis omitted). That guidepost is satisfied here.

> *1. The District Court correctly evaluated excessiveness on a per-Defendant basis, not on a collective basis.*

Defendants' argument on this guidepost fails at the very first step: they use the wrong number for punitive damages. The jury awarded $300,000 in punitive damages separately against each of three Defendants. S.A.21–22. But Defendants compare Plaintiff's harm to the $900,000 awarded against the Defendants

*collectively.* Defendants' argument is both forfeited and wrong.

First, as the District Court held, Defendants forfeited this argument. Plaintiff argued in his post-trial briefing that the relevant comparison was $300,000, not $900,000. Dkt.399, at 10. Defendants failed to address that argument in their reply brief. Dkt.400, at 4–7. Where a party fails to oppose an argument in the district court, the party forfeits any opposition to that argument not only at the district court, but also at the court of appeals. *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) ("Failure to respond to an argument generally results in waiver, and failure to present an argument to the district court usually means we will not address it on appeal."); *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008).

Defendants cannot rescue their argument by claiming they are challenging "the legal theory upon which the district court based its decision." Br.48 n.15 (citing *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015)). Here, the only basis the District Court cited was Defendants' forfeiture; the District Court did not offer a legal theory for examining punitive damages on a per-defendant basis. S.A.44–45. In *Firestone*, in contrast, the district court had not relied on forfeiture, it had substantively addressed the argument in question. 796 F.3d at 826. Here, Defendants ask this Court to review "an issue not considered by the district court." *Id.* That is improper, as *Firestone* itself notes. *Id.*

In addition to being forfeited, Defendants' argument is wrong. Courts consider whether a punitive damages award is excessive on a per-defendant basis, not on a collective basis. *Planned Parenthood v. Am. Coal. of Life Activists*, 422 F.3d 949, 960–

62 (9th Cir. 2005); *Bert Co. v. Turk*, 298 A.3d 44, 70–73 (Pa. 2023); *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 878 (Tex. 2017). This makes sense. Any case could have variation in the reprehensibility of defendants' conduct, each defendant's net worth, or the harm caused by each defendant. And in all cases, each defendant has his own individual Due Process rights; an award against one defendant does not violate the Due Process rights of another. *Turk*, 298 A.3d at 73.

Defendants support their argument with just one case, *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276 (7th Cir. 1995). Br.48. But Defendants overlook the dispositive details of that case. There, the jury awarded $50,000 in compensatory damages, plus $250,000 in punitive damages severally against each of two defendants. *Id.* at 1279. The district court reduced the punitive damages award to $75,000 per defendant due to a statutory cap of $200,000 on total damages across all defendants. *Id.* The Court of Appeals then determined that one defendant should be dismissed. *Id.* at 1282. Thus, when the Court of Appeals considered excessiveness, it considered $150,000 in punitive damages, *id.* at 1287, which was the maximum amount that could be awarded against the remaining defendant. The Court of Appeals left it to the district court to determine whether the remaining defendant should pay the entire $150,000 in punitive damages, or only the $75,000 that the district court previously charged to it. *Id.* This made good sense, since the jury had awarded $250,000 in punitive damages against that defendant. The *AIC Securities* court never considered the question here: whether a court should evaluate excessiveness as to each defendant individually or against all defendants collectively

when a jury awards punitive damages *separately* against multiple defendants. The appropriate number to compare to potential and actual harm is thus $300,000, not $900,000.

> 2. *The District Court correctly concluded that the punitive damages award bears a reasonable relation to the potential harm Defendants' conduct was likely to cause.*

Supreme Court and Circuit precedent make clear that the $300,000 in punitive damages must be compared to "the harm *or potential harm* suffered by" the plaintiff. *Gore*, 517 U.S. at 575 (emphasis added). A reviewing court thus considers not just the harm that the defendants' conduct actually caused, but also the potential harm that the defendant's conduct was likely to cause. *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991) (considering "whether there is a reasonable relationship between the punitive damages award and the harm *likely to result from the defendant's conduct* as well as the harm that actually has occurred" (emphasis added)); *Saccameno*, 943 F.3d at 1088 ("[T]he ratio should not be confined to actual harm, but also can consider potential harm.").

Including potential harm in the ratio makes good sense. It allows for the possibility that actual damages were minimized by the plaintiff's resilience or by good luck. The punishment the state is allowed to exert on the defendant should depend in part on what damage was likely to result from their conduct, even if the actual damage that resulted was less. *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 365 & n.4 (3d Cir. 2015). The Supreme Court offers this example:

> "[A] man wildly fires a gun into a crowd. By sheer chance, no one is injured and the only damage is to a $10 pair of glasses. A jury reasonably could find only $10 in compensatory damages, but thousands of dollars

in punitive damages to teach a duty of care. We would allow a jury to impose substantial punitive damages in order to discourage future bad acts."

*TXO*, 509 U.S. at 459–60 (quoting *Garnes v. Fleming Landfill, Inc.*, 413 S.E.2d 897, 902 (W. Va. 1991)).

Along the same lines, potential harm includes the harm that the defendant's conduct could have created had the defendant's tort not been discovered and mitigated by the plaintiff. For example, in *TXO*, a plurality of the Supreme Court upheld a punitive damages award that was "526 times greater than the actual damages awarded by the jury," 509 U.S. at 453, by comparing "the difference between [the punitive damages] and the harm to the victim that *would have ensued if the tortious plan had succeeded*," *Gore*, 517 U.S. at 581 (emphasis added) (discussing *TXO*, 509 U.S. at 460).

Consistent with this authority, the District Court properly instructed the jury that it could consider potential harm in determining punitive damages, and to ensure that the punitive damages were "reasonable and in proportion to the actual and potential harm suffered by Mr. Curry." Trial Tr. Vol.5A 1112:6–17 (Dkt.462). Notably, Defendants did not object to this instruction at trial. Trial Tr. Vol.4B 1069:20–1075:23 (Dkt.461).

In this case, the potential harm likely to result from Defendants' conduct was substantial. Defendants' conduct had the potential to ruin the successful product and business that Mr. Curry spent years building. Defendants sold a product with a name identical to Mr. Curry's product and continued selling it for years. S.A.11, 42. But Defendants didn't merely use Curry's trademark; they used his trademark to sell

their product in a manner that was likely to destroy the mark's reputation. Defendants offered "free trials," sending a supposedly free bottle of the infringing Diesel Test to the customer. But if the customer didn't cancel the "trial" after fourteen days, Defendants would sign the customer up to purchase a new bottle every month in perpetuity, charging the customer for both a new bottle and the "free" bottle they previously ordered. Trial Tr. Vol.2B 507:7–508:10 (Dkt.459); Trial Tr. Vol.3B 791:25–792:10, 800:24–801:6 (Dkt.460). When a customer ordered a bottle of Diesel Test, Defendants would automatically add (and charge the customer for) an order of another of Defendants' products. PX-38 (Dkt.427-28). Defendants and their employees posted fake reviews of their products on Amazon. Trial Tr. Vol.3B 817:20–819:7 (Dkt.460). Defendants told customers that their Diesel Test was a new formula when it wasn't, that the formula had certain physiological effects when there was no evidence that it did, and that users of the product had experienced certain benefits when they hadn't. Trial Tr. 804:1–807:5, PX-9 (Dkt.427-7). And they relabeled and sold product that had expired. Trial Tr. Vol.3-B 821:20–822:7 (Dkt.460).

Defendants' abusive business practices outraged customers. One customer wrote, "You trick people with your 14 day money back scam! I plan on telling everyone on Facebook I know what a [expletive] product you're selling . . . [expletive] thieves!!!" PX-57 (Dkt.427-33). Others wrote, "[I] really did not what this product ! just the Dieseltest product" and "I did not order this product. I only ordered diesel." PX-38 (Dkt.427-28).

Indeed, for their infringing Diesel Test product alone, Defendants had $97,798

of customer "chargebacks," *i.e.*, instances where purchasers contested the charges with their credit card companies, in addition to $292,991.90 in returns. Dkt.432-2; Trial Tr. Vol.1B 242:16–21 (Dkt.458). In contrast, Mr. Curry testified that he had approximately *two* chargebacks in twenty years of operating his business. Trial Tr. Vol.1B 242:9–10 (Dkt.458).

Likewise, Mr. Curry received over fifty complaints from irate customers who mistakenly believed Mr. Curry had sold them the infringing product. Trial Tr. Vol.5A 1124:11–14 (Dkt.462). These customers wrote things like, "Stay away from this company all together. Watch out for these scumbags," "Stop charging my bank account immediately, or I'm pressing charges for this scam," "I didn't order anything at all," "Which scumbag in your organization decides to charge my credit card?", and "I will ruin you now on Facebook." Trial Tr. Vol.5A 1124:20–1125:9 (Dkt.462). Defendants' conduct thus had the potential to ruin the business Mr. Curry had spent more than a decade building.

Given the success of Mr. Curry's business before Defendants' infringement, Defendants' conduct had the potential to cause Mr. Curry hundreds of thousands of dollars of damage, if not more. Mr. Curry testified that since 2002, his company has sold over $2 million in product. Trial Tr. Vol.1B 232:4–9 (Dkt.458). Since 2008, Diesel Test made up 75–80% of the company's sales. *Id.* at 236:7–10. From 2015–2019 alone,

his total sales of all products were $871,274. *Id.* at 302:11–303:20. Applying the 75–80% number above means that $650,000–700,000 of those sales were Diesel Test.[6]

Consequently, as the District Court found, $300,000 in punitive damages was not grossly excessive given the potential harm from Defendants' conduct. S.A.45. Further, as the District Court found, Defendants' $547,095.44 in infringing profits reasonably approximated the potential harm Curry might have suffered. "Because the defendants' profits award stems from considerations of unjust enrichment and deterrence, the Court concludes that it is properly included as potential harm in the ratio." S.A.45 (internal citation omitted).

Defendants concede that "the ratio should not be confined to actual harm, but also can consider potential harm." Br.39. But Defendants never meaningfully address the District Court's contention that the infringing profits award represents potential harm to Plaintiff. S.A.45. The closest they come is acknowledging that one of the cases the District Court cites, *TXO*, 509 U.S. at 460–61, affirmed an award of punitive damages based on potential harm, but they argue only *TXO* didn't involve a disgorgement remedy. Br.47–48. Defendants' silence on this point is deafening. Defendants' conduct had the potential to cause hundreds of thousands of damage to Mr. Curry. That fact alone is enough to sustain the jury's award.

---

[6] Defendants lament Mr. Curry's lack of documentation of his sales. But Mr. Curry testified to the amount of his sales. Mot. 9–11. That evidence must be considered in the light most favorable to Mr. Curry. Part II.A, *supra*.

> **3.** *The District Court was correct to consider the infringing profits award in deciding that the punitive damages award is not grossly excessive.*

Defendants suggest that in evaluating the disparity between the punitive damages and the harm or potential harm to Plaintiff, the District Court should have ignored Defendants' infringing profits. Br.39. Defendants are wrong.

> **i.** <u>Where a tortfeasor has profited from his wrongful conduct, higher punitive damages are needed to punish and deter.</u>

Defendants' suggestion that the Court should exclude infringing profits from the punitives-to-harm ratio and thereby ignore it entirely, misunderstands the very nature and purpose of punitive damages. As the name suggests, punitive damages are intended to punish and deter. *Gore*, 517 U.S. at 568 (punitive damages serve the goal of "punishing unlawful conduct and deterring its repetition"); *AIC Sec. Investigations*, 55 F.3d at 1287. Naturally, more lucrative torts require greater punishment to ensure deterrence. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003) ("'[T]he punishment should fit the crime' in the sense of being proportional to the wrongfulness of the defendant's action, though the principle is modified when . . . the crime is potentially lucrative . . . .").

Here, the tort was indeed lucrative to Defendants. The District Court found that Defendants made $547,095.44 from their infringement. S.A.34. Naturally, a defendant who made a half-million dollars from his tort requires a higher deterrent and punishment than a defendant who made nothing.

> **ii.** <u>The jury's award for damage to reputation and loss of goodwill does not capture the full scope of Plaintiff's harm.</u>

This Court has recognized that, where the compensatory portion of an award

may not reflect the full amount of the plaintiff's actual or potential harm, the district court may adjust the denominator of the punitives-to-harm ratio to account for that additional harm. *Epic Sys.*, 980 F.3d at 1142 (holding that "in some cases, the jury's compensatory-damages award does not reflect the plaintiff's quantifiable harm. Still, we may account for that harm in the harm-to-punitive-damages ratio"). Invoking that principle, in *Epic Systems* this Court included unjust enrichment damages in the denominator of the punitive-to-harm ratio. *Id.* at 1142–43. Because the appellant in *Epic Systems* did not argue that unjust enrichment damages should be excluded from the ratio, *id.* at 1143, the Seventh Circuit's inclusion of that amount is not binding precedent. But, as *Epic Systems* recognized, the Federal Circuit likewise has included unjust enrichment damages in the punitives-to-harm ratio. *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1350 (Fed. Cir. 2001) (upholding award of $50 million in punitive damages, $1 in compensatory damages, and $15 million in unjust enrichment damages), *vacated on other grounds*, 538 U.S. 974. Other courts have done the same. *Lexington Furniture Indus., Inc. v. Lexington Co.*, No. 19-cv-6239, 2022 WL 13848274, at *10 (S.D.N.Y. Oct. 24, 2022) ("There is also nothing about the nature of disgorgement damages that precludes them from serving as the premise for a punitive damage claim."); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15-cv-211, 2021 WL 1553926, at *10 (S.D.N.Y. Apr. 20, 2021) (including defendant's avoided costs in the denominator), *vacated on other grounds*, 68 F.4th 792 (2d Cir. 2023); *Tiffany & Co. v. Costco Wholesale Corp.*, No. 13-cv-1041, 2019 WL 120765, at *6 (S.D.N.Y. Jan. 7, 2019) (same).

Here, the "actual damages" the jury awarded do not capture the full scope of the harm to Plaintiff because those damages included only loss of goodwill and damage to reputation. Dkt.377. Mr. Curry did not seek to recover his lost sales, Trial Tr. 1108:22–24, instead seeking Defendants' infringing profits. This is neither surprising nor unusual. Lost sales are inherently difficult to calculate. *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013). Plaintiffs thus often seek to recover the infringer's profits instead. The jury's actual damages award therefore does not reflect the full scope of the harm Defendants inflicted on Mr. Curry.

By law, the infringing profits award itself cannot form part of that punishment. The Lanham Act specifically provides that an infringing profits award must be compensatory, not punitive. 15 U.S.C. § 1117(a) (any infringing profits award "shall constitute compensation and not a penalty"). Rather, the purpose of an infringing profits award is to ensure that the infringement is not profitable to the infringer. *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985). To the extent that an infringing profits award provides deterrence, that deterrence comes simply from ensuring that the infringement is not profitable. *See Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1347–48 (7th Cir. 1994).

Further, in this case, the infringing profits award clearly did not include a punitive component because the District Court awarded it after parsing Defendants' profit-and-loss statement line by line. S.A.29–34. There is no possibility that the jury included a punitive component in the infringing profits award.

Accordingly, when comparing the punitive damages to the harm Plaintiff suffered, to rely solely on the $2,500 actual damages award would vastly underestimate Plaintiff's harm.

### iii. Defendants' infringing profits reasonably approximate the sales Plaintiff lost or could have lost.

As explained above, the evidence supports the District Court's conclusion that Revolution's infringing profits approximate the *potential* harm Revolution's conduct could have caused Mr. Curry. Part II.C.2, *supra*. For the same reasons, the jury easily could have concluded that Mr. Curry's lost sales for the infringement period (which lasted from 2016 through at least 2018), were approximately equal to Defendants' profits of $547,095.44 (or equal to the $500,000 in profits that the jury awarded). Certainly, the jury could have concluded that Mr. Curry's lost sales equaled the $300,000 in punitive damages that the jury ordered each Defendant to pay.

Defendants' suggestion that Plaintiff is estopped from arguing that infringing profits are partly a proxy for Plaintiff's lost sales, Br.41 n.12, misstates the record in the District Court and confuses two areas of law: the right to a jury trial and punitive damages. To begin with, Plaintiff never argued that the Defendants' infringing profits could not serve as a proxy for Plaintiff's damages. Dkt.399, at 3; Dkt.401, at 8–9. Appellants do not cite any filing where Plaintiff took such a position. Br.41 n.12. Plaintiff argued below that the District Court should determine infringing profits because they are an equitable remedy for which there is no right to a jury trial. Dkt.389, at 2–3. To decide a plaintiff's entitlement to a jury trial, courts "compare the [plaintiff's] action to 18th-century actions brought in the courts of England," then

"examine the remedy sought and determine whether it is legal or equitable in nature." *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 565 (1990). That is a wholly different question from whether courts should consider infringing profits when deciding the punishment needed to deter the Defendant. Punishment is necessary and harm has occurred, whether the infringing profits were decided by a jury or a judge. Estoppel thus has no application here.[7]

> iv.  Even if infringing profits are not included in the mathematical ratio, the punitive damages award is not grossly excessive.

Courts emphasize that the mathematical ratio is not an end in itself; it is a tool to determine whether the punitive damages award is grossly excessive. *Gore*, 517 U.S. at 582–83; *Saccameno*, 943 F.3d at 1089 ("The disparity guidepost is not a mechanical rule. The court must calculate the ratio to frame its analysis, but the ratio itself does not decide whether the award is permissible."). Thus, even if this Court excludes infringing profits from the literal mathematical ratio, the Court still should consider infringing profits in deciding whether that ratio is appropriate. For example, if this Court were to leave out infringing profits, the ratio would be at most 120:1 ($300,000 in punitive damages compared to $2,500 in actual damages, ignoring prejudgment interest, attorneys' fees, and costs). But in evaluating that ratio, the Court should consider that the Defendants earned $547,095.44 from their infringement, at least some of which represents actual or potential harm to Mr. Curry.

Viewed with that context, a 120:1 ratio is not grossly excessive. Courts

---

[7] In any case, the District Court rejected the notion that the right to a jury trial depends on the basis a plaintiff offers for seeking infringing profits. S.A.25.

frequently uphold punitive damages awards with seemingly high ratios where the compensatory damages are small. *State Farm*, 538 U.S. at 410 (higher ratios "may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages"); *TXO*, 509 U.S. at 453 (upholding a ratio of 526:1 because the potential harm was substantial); *Mathias*, 347 F.3d at 676–78 (upholding a 37.2:1 ratio); *Hamlin v. Hampton Lumber Mills, Inc.*, 246 P.3d 1121, 1128 (Ore. 2011) (collecting cases); *Synnott*, 2024 WL 108784, at *2 ("[A] single-digit ratio . . . is not mandatory where the compensatory damages are low . . . .").

Two other features of this case render acceptable even the 120:1 ratio that Defendants offer. First, where the tortfeasor will be caught only some of the time, the punishment necessarily should be higher. *Mathias*, 347 F.3d at 677 ("If a tortfeasor is 'caught' only half the time he commits torts, then when he is caught he should be punished twice as heavily in order to make up for the times he gets away."); *Saccameno*, 943 F.3d at 1089. Trademark infringers like Defendants will be "caught" only some of the time. Few business owners can pursue Defendants as doggedly as Mr. Curry has, enduring seven years of litigation including a jury trial, two appeals to this Court, and a pending judgment collection action in California, *Curry v. Revolution Lab'ys*, No. 23-mc-1939 (S.D. Cal. filed Nov. 7, 2023). Because these Defendants can outlast most plaintiffs, a higher award is appropriate.

Second, Defendants' wealth justifies a larger punitive damages award. Courts and juries rightly consider a defendant's wealth in deciding the amount of punitive damages necessary to punish and deter. *Kemezy v. Peters*, 79 F.3d 33, 35 (7th Cir.

1996); *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641–42 (10th Cir. 1996)

("[W]ealth must remain relevant, because $50,000 may be awesome punishment for

an impecunious individual defendant but wholly insufficient to influence the behavior

of a prosperous corporation."). Here, the Nussbaums admitted that their family trust

holds some $35–38 million. Trial Tr. Vol.3A, 706:6–8. Though Defendants claimed

not to have access to this money, the record showed that the trust pays for Barry

Nussbaum's multimillion-dollar home, his car, and his personal expenses, and pays

him regular income. Trial Tr. Vol.3A 597:20–598:13, 704:19–705:2–18 (Dkt.460);

Trial Tr. Vol.4A 951:21–952:2 (Dkt.461). Indeed, in response to the Nussbaums'

argument that the trust's assets are not their assets, the District Judge asked, "Is

there a planet on which that arrangement would not be understood by a reasonable

being on that planet as something other than those are his assets?" Trial Tr. Vol.2B

580:18–581:6 (Dkt.469). Defendants' wealth likewise favors a higher award.

> v.   The infringing profits should not be confined to Illinois sales.

Defendants claim that when considering the relationship between the punitive

damages and the potential or actual harm, the Court should consider only those sales

that occurred in Illinois. Br.47 n.14. This argument is both forfeited and wrong.

Defendants forfeited this argument in two ways. First, Defendants never

argued to the District Court that it should consider only infringing profits from

Illinois sales when assessing excessiveness. Dkt.385, at 6–12, Dkt.400, at 4–7.

Defendants made the more general argument that infringing profits shouldn't be

included in the calculation, but not the specific argument that only infringing profits

from Illinois should be included in the calculation. That more specific argument is

forfeited. Arguments not presented to the trial court cannot be raised for the first time on appeal. *Puffer*, 675 F.3d at 718 ("It is a well-established rule that arguments not raised to the district court are waived on appeal."); *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010) ("[A] party who fails to adequately present an issue to the district court has waived the issue for purposes of appeal."). Relatedly, raising an issue in general terms does not allow a party to advance a more specific argument on appeal, where that specific argument was never presented to the district court. *Puffer*, 675 F.3d at 718 ("We have also recognized that raising an issue in general terms is not sufficient to preserve specific arguments that were not previously presented."); *accord Milligan*, 686 F.3d at 386 ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument . . . but also to a litigant's failure to advance a specific point in support of a general argument . . . ."); *Fednav*, 624 F.3d at 841 ("[A] party has waived the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue may have been before the district court in more general terms."); *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019).

Because Defendants raised only the general issue of whether infringing profits should be considered at the second *Gore* guidepost, not the specific argument that if infringing profits are considered they should be confined to Illinois sales, Defendants forfeited this more specific argument. The issue of whether infringing profits should be included in the punitive-damages-to-harm ratio was fully briefed by both sides below, Dkt.399, at 10–12; Dkt.400, at 4–7, as was the issue of whether punitive

damages were excessive, Dkt.385, at 9–10, 8–13; Dkt.399, at 8–13; Dkt.400, at 4–7.

Thus, this was not an instance of a district court ruling on a basis that neither side

had briefed. Instead, Defendants offer a new argument to support their umbrella

assertion below that punitive damages are excessive. This argument is forfeited.

Second, Defendants' new argument is merely a disguised plea for a jury

instruction that Defendants never requested. Defendants cast their argument as one

of excessiveness, arguing that the Court should include only Illinois conduct when

evaluating whether the punitive damages award is excessive. Br.47 n.14, 50. This

framing is too clever by half. For Defendants go on to request that the Court reduce

the punitive damages to an amount that reflects only the Defendants' Illinois conduct.

Br.47 n.14, 50. That is a request for a jury instruction limiting the punitive damages

to Illinois conduct. Defendants never pursued such an instruction in the District

Court, nor did they object to the jury instructions on this basis. Thus, this argument,

too, is forfeited. *Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 730 (7th Cir. 2002)

("[T]o preserve the objection, the party must state the same grounds when objecting

to the jury instruction as it does in its motion for a new trial or on appeal."). Where

an objection to a jury instruction is raised for the first time on appeal, this Court will

review the instruction only for plain error and will do that much only in rare

circumstances.

> [O]ur ability to review for plain error in civil cases is severely
> constricted . . . we typically will not entertain an argument raised
> for the first time on appeal, even for the limited purpose of
> ascertaining whether a plain error occurred. Plain error review is
> available in civil cases only in the rare situation where a party can
> demonstrate that: (1) exceptional circumstances exist; (2)

substantial rights are affected; and (3) a miscarriage of justice will
occur if plain error review is not applied.

*Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020). No such circumstances exist here.

Even if Defendants' argument were not forfeited, is wrong. While Defendants
compare the verdict in this case to the punitive damages award in *State Farm*, the
concerns the Supreme Court expressed there are not present here. In *State Farm*, the
punitive damages award punished the defendant for torts committed against victims
other than the plaintiff. 538 U.S. at 414–15, 420 (explaining that the lower court's
"opinion makes explicit that State Farm was being condemned for its nationwide
policies rather than for the conduct directed toward the Campbells"). Here, in
contrast, Defendants' misappropriation and reprehensible use of Mr. Curry's
trademark directly harmed Plaintiff.

Similarly, in *State Farm*, the punitive damages award punished the defendant
for conduct unrelated to the tort for which the plaintiff sued. 538 U.S. at 415, 422.
Here, in contrast, the wrongs Defendants committed all related to their infringement
of Mr. Curry's trademark. Likewise, the award in *State Farm* punished the defendant
for conduct that was legal in the state where it occurred. 538 U.S. at 421–22. Here,
Defendants infringement violated the Lanham Act nationwide.

Moreover, even if the Court looks past Defendants' forfeiture and agrees with
Defendants that the punitive damages should be confined to conduct occurring in
Illinois, the jury's award still is not grossly excessive. The jury heard testimony that
the Illinois sales of Diesel Test were 4.3% of their nationwide sales, or $88,245.68.
Trial Tr. Vol.2A 369:5–370:13 (Dkt.469); S.A.30; Trial Tr. Vol.4A 899:10–12

(Dkt.461). The record thus easily supports a calculation of Plaintiff's potential harm from infringing sales in Illinois of $88,245.68. This plus the $2,500 in actual damages yields a ratio of 3.3:1. As explained in Part II.C.3.iv, *supra*, this is an acceptable ratio. When one adds to that calculation the prejudgment interest, costs, and attorneys' fees, the ratio is easily permissible.

If the Court rejects all of these arguments, the only appropriate remedy is a new trial on damages, as a failure to instruct the jury that punitive damages must be confined to Illinois harm is not a harmless error. *Staub v. Proctor Hosp.*, 421 F. App'x 647, 648 (7th Cir. 2011) (holding that the test for whether the an erroneous jury instruction requires a new trial is whether the error was harmless). That Defendants have specifically stated they do not wish to hold a new trial, Br.26, is a further reason not to disturb the jury's verdict. *Mkt. Am., Inc. v. Rossi*, 238 F.3d 413, 2000 WL 1699830, at *4 (4th Cir. Nov. 14, 2000) (unpublished table decision) (declining to consider issue for which a new trial was the only remedy, reasoning that appellant did not seek a new trial and deciding the issue would constitute an "advisory opinion"); *Arroyo v. Volvo Grp. N. Am. LLC*, No. 12-cv-6859, 2022 WL 17960686, at *3 (N.D. Ill. Dec. 27, 2022) (Dow, J.) (declining to consider argument for which a new trial would be the only remedy when movant had not requested a new trial).

### 4. The Court should consider prejudgment interest on those infringing profits.

The Court likewise should consider the $201,723.65 in prejudgment interest on Defendants' infringing profits in the punitive damages ratio. *Hamlin*, 246 P.3d at 1128 (considering estimated prejudgment interest in a *Gore* analysis). For years,

Defendants received the benefit of the infringing profits they made from their infringement. *Trustmark Life Ins. Co. v. Univ. of Chi. Hosps.*, 207 F.3d 876, 885 (7th Cir. 2000) ("Pre-judgment interest is designed not only to fully compensate the victim, but also to prevent unjust enrichment."). Just as the infringing profits themselves are relevant in determining what amount of punishment is needed to deter the Defendant, the prejudgment interest likewise is relevant. Similarly, for years, Plaintiff has been deprived of the infringing profits to which the jury determined he was entitled. *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) ("Without [prejudgment interest], compensation of the plaintiff is incomplete and the defendant has an incentive to delay."). The lost use of those funds is a harm to Plaintiff properly considered in the punitive damages analysis.

> 5. *The Court should consider Plaintiff's costs and attorneys' fees as part of the harm Defendants have caused Plaintiff.*

Both the Lanham Act and the IUDTPA provide for an award of attorneys' fees to prevailing parties. 15 U.S.C. § 1117(a) (providing for fees and costs in exceptional circumstances); 815 Ill. Comp. Stat. § 510/3. Numerous federal and state courts have considered a plaintiff's attorneys' fees and costs as part of the plaintiff's harm when evaluating the ratio of punitive damages to harm.[8] This makes good sense. Attorneys'

---

[8] *See, e.g.*, *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 235–37 (3d Cir. 2005); *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007); *King v. GEICO Indem. Co.*, 712 F. App'x 649, 650 (9th Cir. 2010); *Coker Equip. Co. v. Wittig*, 366 F. App'x 729, 733 (9th Cir. 2010); *Kasang v. Grzesik*, No. 1-16-3100, 2018 WL 1631351, at *2, 13 (Ill. Ct. App. March 30, 2018); *Kirkpatrick v. Strosberg*, 894 N.E.2d 781, 794, 797 (Ill. Ct. App. 2008); *Nickerson v. Stonebridge Life Ins. Co.*, 371 P.3d 242, 244 (Cal. 2016); *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 665–67 (W. Va. 2012).

fees and costs awarded under state consumer protection statutes are generally compensatory in nature, intended to reimburse the plaintiff for expenses that otherwise would reduce his recovery. *Quicken Loans*, 737 S.E.2d at 665 (collecting cases). Attorneys' fees under the Lanham Act are similarly compensatory. The Lanham Act requires that any award of damages or profits "shall constitute compensation and not a penalty," and in the next sentence authorizes courts "in exceptional cases [to] award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The most coherent reading of the statute is that Congress envisioned fee awards under § 1117(a) as a form of compensation. As these awards are compensatory, *i.e.*, awarded to compensate plaintiffs for harm they suffered in bringing suit, they are properly considered in comparing the punitive damages award to Plaintiff's harm.

Here, the analysis is simpler than in other cases because, though Plaintiff's motions for attorneys' fees and costs currently are pending before the District Court, Dkts. 423, 422-1, Defendants have not objected to $16,295 of the costs Plaintiff requested. Dkt.443, at 1. Moreover, the District Court *already* ordered Defendants to reimburse Mr. Curry for $103,568 in attorneys' fees and costs that he incurred in connection with punitive-damages-related discovery. J.A.121, 146. Thus, $119,863 in Plaintiff's attorneys' fees and costs already are established. At the very least, the Court should consider these expenses when considering Plaintiff's harm.

### D.   Under the third *Gore* guidepost, the punitive damages are consistent with civil penalties for comparable conduct.

Finally, the third *Gore* guidepost considers "the punitive damages award and

the civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at 583. This guidepost, too, favors Mr. Curry.

Most importantly, in the analogous context of trademark infringement under 15 U.S.C. § 1114(a), the Lanham Act requires *trebling* of damages if the infringement is intentional. *Id.* § 1117(b). That trebling applies either to actual damages or infringing profits, whichever is greater. *Id.* ("[T]he court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater . . . if the violation consists of—(1) intentionally using a mark or designation . . . ."). This strongly suggests that a total award of up to three times the infringing profits would be appropriate here. *Brighton Collectibles v. Marc Chantal USA*, No. 06-cv-1584, 2009 WL 10674076, at *12 (S.D. Cal. Aug. 12, 2009). Similarly, the Lanham Act provides for statutory damages of up to $2,000,000 where, as here, the infringement is willful. 15 U.S.C. § 1117(c)(2). Here, the total award is $1,652,319.09. S.A.68. The award in this case is thus in line with what the Lanham Act provides. The Court should give considerable wight to these Lanham Act provisions. As the Supreme Court has instructed: "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.'" *Gore*, 517 U.S. at 583 (quoting *Browning-Ferris Indus. of Vt., Inc., v. Kelco Disposal, Inc.,* 492 U.S. 257, 301 (1989) (O'Connor, J., concurring)). Moreover, courts have upheld substantially higher punitive damages awards for

trademark and related claims.[9]

Tellingly, Defendants' brief fails to address these Lanham Act provisions, or any awards in comparable cases. Br.51–52. Instead, Defendant rehash their argument that infringing profits are punitive in nature. For the reasons explained in Part II.C.3, *supra*, this is incorrect.

## CONCLUSION

For all these reasons, this Court should affirm the District Court's judgment.

Dated: March 7, 2024

Respectfully submitted,

*/s/ Jeff Kane*
Matthew J. Oppenheim
Nicholas C. Hailey
Jeff Kane
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Tel: 202-480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jkane@oandzlaw.com

*Counsel for Plaintiff-Appellee*

---

[9] *See, e.g., Raffel Sys., LLC v. Man Wah Holdings LTD, Inc.*, No. 18-cv-1765, 2023 WL 3375853, at \*26 (E.D. Wis. May 11, 2023) ($2 million in punitive damages); *Tiffany & Co. v. Costco Wholesale Corp.*, 274 F. Supp.3d 216, 226 (S.D.N.Y. 2017) ($8.25 million in punitive damages), *vacated on other grounds*, 971 F.3d 74 (2d Cir. 2020); *Brighton*, 2009 WL 10674076, at \*12 ($3.6 million in punitive damages).

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME REQUIREMENT

This brief complies with the type-volume limits of Fed. R. App. P. 32, as modified by Circuit Rule 32. This brief uses 12-point, Century Schoolbook font and contains 13,782 words, according to the word processing system used to prepare it.

*/s/ Jeff Kane*
Jeff Kane