In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 23-2850

CHARLES CURRY, JR., doing business as GET DIESEL NUTRITION,

*Plaintiff-Appellee,*

*v.*

REVOLUTION LABORATORIES, LLC, et al.,

*Defendant-Appellants.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-02283 — **Matthew F. Kennelly**, *Judge.*

_____

ARGUED SEPTEMBER 12, 2024 — DECIDED DECEMBER 19, 2024

_____

Before HAMILTON, SCUDDER, and LEE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Charles Curry, Jr., is a former competitive powerlifter and body builder. Today, he is an entrepreneur and small-business owner. In 2002, Curry started a nutritional supplements business called Get Diesel Nutrition, eponymous with his bodybuilding nickname, "Chuck Diesel." He began selling a testosterone-boosting supplement called "Diesel Test" in 2005. The product name Diesel Test is the subject of this lawsuit.

Defendant Revolution Laboratories is a limited liability company that sells nutritional supplements and apparel, including one supplement also called "Diesel Test." Defendants Joshua and Barry Nussbaum are Revolution's president and chief executive officer, respectively.

Acting without a lawyer, Curry filed this lawsuit against Revolution and the Nussbaums in 2017. Curry had not registered his trademark, but that did not prevent him from asserting trademark claims under the federal Lanham Act and Illinois common law. Curry later obtained counsel, and the case proceeded to a jury trial in May 2023, resulting in a verdict for Curry. The jury awarded $2,500 in actual damages for loss of goodwill and reputation and $500,000 as disgorgement of Revolution's profits from the infringement. The jury also awarded Curry $300,000 in punitive damages against each of Joshua, Barry, and Revolution, for a total punitive damage award of $900,000. The district court later ruled that disgorgement of profits under the Lanham Act, 15 U.S.C. § 1117(a), is an equitable remedy for the judge to decide, and recalculated the appropriate profits award to be $547,095.44.

Defendants raise two challenges on appeal. They assert first that the district court improperly allowed Curry's punitive damages request to go to the jury, and second that the punitive damage awards were excessive in violation of the Fourteenth Amendment's due process clause. We affirm.[1]

---

[1] A hidden but perhaps academic issue here is whether the Fifth or Fourteenth Amendment's Due Process Clause applies to a state-law punitive damage award in federal court. Compare *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 838 (7th Cir. 2013) (applying Fourteenth Amendment to federal-law punitive damage award), with *Motorola Solutions, Inc. v. Hytera*

I.  *Facts and Procedural History*

We begin with the conduct at issue in this case because the constitutionality of the punitive damage awards depends in large part on the defendants' conduct. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) ("[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.") (alteration in original), quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996).

A.  *Plaintiff's "Diesel Test"*

Curry began powerlifting and body building while he served in the Air Force. He started creating nutritional supplements while engaged in competitive weightlifting competitions to "figure out what I could take to improve my performance or recovery" without running afoul of the Olympic banned-substance list. When he returned from deployment in the Middle East, Curry sold his home and used the proceeds to start Get Diesel Nutrition. In 2005, he began selling Diesel Test, an "herbal test booster" designed to help users "naturally produce more testosterone."

Curry testified that he spent hundreds of thousands of dollars advertising Diesel Test online, in weightlifting magazines, and through competition and athlete sponsorships. He sold the supplement through retailers, including eBay and

---

*Comms. Corp.*, 108 F.4th 458, 495 (7th Cir. 2024) (applying Fifth Amendment to federal-law punitive damage award), and *Epic Systems Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1140 (7th Cir. 2020) (applying Fourteenth Amendment to state-law punitive damage award). The parties have not argued there is any difference relevant here, so we say no more.

Amazon. He also testified that Diesel Test had amounted to roughly 75% of his overall sales since 2008.

Curry also testified that customers associated the Get Diesel brand with him, personally. Purchasers could call, text, or email him directly with questions about the product, and "[e]veryone knew about the Get Diesel name." Curry testified that he "invested a lot of money and time" in building the company's reputation and developing product design, marketing, and packaging. He saw his products as an "extension" of himself, and was "proud that I put out something" about which he continued to receive texts and emails.

B. *Defendants' "Diesel Test"*

Defendants Joshua and Barry Nussbaum founded Revolution in 2012. Joshua became president of Revolution and took over day-to-day operations in 2015. Barry was Revolution's CEO. While he was less involved in everyday management, he was involved in "some" big decisions for the company and, according to Joshua's trial testimony, gave advice on Revolution's Diesel Test product.

Around October 2016, Revolution took an existing product called "Rev Test," relabeled it as "Diesel Test," and began selling the product under that name. Joshua was personally involved in creating Revolution's Diesel Test, including proposing the name to Revolution's management team. Joshua testified that, prior to selling Diesel Test, he ran searches for the name on Google, Amazon, and a website called "Trademarks 411." The purpose of these searches was to see if the name was trademarked and to avoid "wast[ing] money creating a product that somebody else is already using." Finding

nothing registered, Revolution began to sell its Diesel Test on its company website (revlabs.com), Amazon, eBay, and other retail websites. It also registered a new website, diesel-testbooster-red.com, although Joshua later testified that Revolution never sold any Diesel Test through that website.

C.  *The Infringement and Plaintiff's Cease-and-Desist Requests*

In 2016, Revolution began promoting its Diesel Test product using free trials and other inducements. Some of these marketing tactics—including automatically adding additional products to online orders—upset customers, who complained.[2] Other customers colorfully explained to Revolution that its products were not as effective as advertised.[3]

Some of Revolution's customers mistakenly complained to Curry rather than Revolution. Curry testified that he

---

[2] It appears that Revolution charged for those automatically-added products. This, understandably, upset consumers. One complaint said: "Hello Customer Service. I was Trying to complete my order for one bottle of Diesel Test, when I see your website ADDED a bottle of 'MRX' to my order. I DO NOT WANT AND DID NOT ORDER MRX. Now please send me Diesel Test for $4.95 and REMOVE THE ORDER AND CHARGE FOR MRX, IMMEDIATELY, OR I WILL FILE A COMPLAINT ABOUT YOUR COMPANY WITH ILLINOIS ATTORNEY GENERAL, LISA MADIGAN. Thank you."

[3] Another complaint read in part: "YOU'RE SELLING SUGAR PILLS!!! YOUR PILLS ARE GARBAGE!! YOU TRICK PEOPLE WITH YOUR 14 DAY MONEY BACK SCAM! HAD YOU PRINTED CLEARLY THAT A CUSTOMER ONLY HAS 14 DAYS TO SEE IF YOUR S*** WORKS, I WOULD HAVE SENT YOUR FAKE PILLS BACK!! I PLAN ON TELLING EVERYONE ON FACEBOOK I KNOW, WHAT A S****Y PRODUCT YOU'RE SELLING!! I WILL GET MY $89.00 WORTH OUT OF YOU! F*****G THIEVES!!! HAVE A GREAT DAY ***HOLES!! Regards, …."

received around thirty such emails between November 2016 and January 2017. After researching why he was receiving these emails about promotional tactics he was not using, Curry learned that another entity—Revolution—was selling a different product called Diesel Test.

Curry then sent Revolution three separate cease-and-desist messages. The first was via Facebook on November 13, 2016. It said that Revolution was "responsible for Trademark Infringement" and needed to "stop the sell, distribution and promotion of that 'Diesel Test' product asap …." A Revolution employee responded, asking Curry to submit additional information to its support email address. Curry did not respond on Facebook but sent an email to the support address on November 15, 2016, saying that he had used the "Diesel trademark and brand name since 2002" and again instructing Revolution to "stop the production, distribution, and sale of any item using the 'Diesel Test' mark immediately." Revolution did not respond.

At trial, Joshua and Barry testified that they thought these initial messages from Curry were scams. Joshua nonetheless forwarded the email to Barry and two other Revolution employees later in the day on November 15, 2016, saying:

> FYI guys. Does anybody have any information if Jeff checked the trademarks on these? Russ can you please do a search and see if "diesel test" is available for trademark or if this guy is telling the truth. I personally vote we let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run.

Barry testified that he agreed with Joshua that Revolution should ignore Curry's cease-and-desist demands and let him sue the company. Another Revolution employee then ran a search for the trademark and learned that it was available for purchase. Someone else responded to the email chain asking whether Revolution should purchase the mark, and Barry responded "Yesssssssssss." Joshua—with Barry's approval—applied to register the Diesel Test trademark on November 28, 2016.

Joshua and Barry testified that they took other steps to investigate Curry's trademark claim. Joshua told the jury that he again searched Google and Trademarks 411 and spoke with distributors to determine whether they were aware of a non-Revolution Diesel Test. Barry testified that he personally searched Amazon for Curry's Diesel Test but did not find anything. Barry also convened an office meeting to discuss Curry's claim and issued several follow-up instructions. He dispatched multiple employees to search for Diesel Test's trademark registration, one to call distributors, one to call "affiliate marketer networks," and one to search online sales platforms for evidence of Curry's Diesel Test. Barry testified that he ultimately concluded that Curry's claim was "BS."

Curry followed up on his cease-and-desist demands on November 18, 2016. He again received no response. Curry then filed a complaint with Amazon in February 2017 claiming that Revolution's Diesel Test was a counterfeit version of his Diesel Test. Amazon notified Revolution that there had been a complaint regarding the authenticity of its product. Revolution did not contest the complaint, and Amazon removed Revolution's Diesel Test listing from the sales platform. But Revolution continued to sell its Diesel Test

on other platforms. It stopped marketing Diesel Test in 2017 but continued selling the remaining product until at least early 2018, and possibly until 2020.

D. *The Lawsuit*

Curry filed this lawsuit without counsel in March 2017. In August of that year, the district court dismissed the complaint for lack of personal jurisdiction. *Curry v. Revolution Laboratories, LLC*, No. 17-cv-2283, 2017 WL 3520955, at *5 (N.D. Ill. Aug. 15, 2017). On appeal, we recruited counsel for Curry and reversed. *Curry v. Revolution Laboratories, LLC*, 949 F.3d 385, 402–03 (7th Cir. 2020). On remand, Curry retained counsel.

As relevant to this appeal, Curry's complaint asserted violations of the Illinois Consumer Fraud and Deceptive Practices Act (ICFA) (Count I), the federal Lanham Act (Count III), and Illinois common-law trademark infringement (Count V). The complaint sought punitive damages pursuant to the ICFA and injunctive relief under Illinois common law. It did not ask expressly for punitive damages under Illinois common law.

On December 22, 2020, defendants stipulated to Revolution's liability under the Lanham Act and Illinois common law. The stipulation explicitly reserved questions regarding Revolution's liability under the ICFA, Joshua and Barry's personal liability as to all counts, and all available damages. On January 26, 2022, the district court entered summary judgment for defendants on Curry's ICFA claim.

The federal Lanham Act and Illinois common-law claims proceeded to a five-day jury trial in May 2023. The jury found for Curry. It awarded him $2,500 in actual damages resulting from loss of goodwill and reputation and $500,000 as

disgorgement of Revolution's profits. The jury also imposed a total of $900,000 in punitive damages, $300,000 each against Joshua, Barry, and Revolution. After trial, the district court ruled that disgorgement of profits under the Lanham Act, see 15 U.S.C. § 1117(a), is an equitable remedy, not a legal one, and exercised its judgment to increase the disgorgement award to $547,095.44. The court also denied defendants' motion to reduce the jury's punitive damages award, finding that the ratio between defendants' profits award of roughly $550,000 and the punitive damage awards of $300,000 per defendant was less than 1:1 per defendant and therefore "easily permissible" under the Constitution. *Curry v. Revolution Laboratories, LLC*, 2023 WL 5509337, at *17 (N.D. Ill. Aug. 25, 2023), quoting *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004).

II. *Analysis*

Defendants argue on appeal that the district court erred by allowing Curry to make his punitive damages request to the jury. They also argue that the punitive damage awards were unconstitutionally excessive in violation of the Fourteenth Amendment. We conclude that the district court did not abuse its discretion in managing the case so as to allow Curry to present his punitive damage request to a jury. We also take this opportunity to clarify some of our case law on the due process limits on punitive damages, in particular agreeing with the district court that the appropriate analytic "ratio" should be calculated on a per-defendant basis and that disgorged profits may be added to compensatory damages in calculating such a ratio.

A.  *Plaintiff's Demand for Punitive Damages*

First, we address whether the district court appropriately allowed Curry to present his punitive damage demand to the jury. Defendants paint this as a dispute over whether the district court's decision to allow the jury to hear Curry's punitive damages demand at all was an abuse of discretion under Federal Rule of Civil Procedure 39(a)(2). That rule allows a court to take a claim away from a jury when it concludes that "there is no federal right to a jury trial." But there is no question that Curry had a federal right to a jury trial on his punitive damages demand. The Seventh Amendment preserves the right of trial by jury in "suits at common law, where the value in controversy shall exceed twenty dollars." As a general rule, "a claim for damages … [is] a suit at common law within the meaning of the Seventh Amendment." *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 649–50 (7th Cir. 2002); see also *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1204 (10th Cir. 2012) ("[P]laintiffs have a Seventh Amendment right to a jury trial when they seek punitive damages."), citing *Curtis v. Loether*, 415 U.S. 189, 196 (1974) (finding Seventh Amendment right to jury trial under statute now codified as 42 U.S.C. § 3613 and stating "the relief sought here—actual and punitive damages—is the traditional form of relief offered in the courts of law."). Defendants do not argue that Curry did not have a right to a jury trial on his punitive damages claim.

The real question is whether the district court abused its discretion in allowing Curry to seek punitive damages at all because his complaint did not ask expressly for punitive damages on the Illinois common-law claim. That question is governed here by Federal Rule of Civil Procedure 54(c), which

provides that a final judgment, other than a default judgment, "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." The district court invoked Rule 54(c) when ruling that Curry could present his punitive damages demand to the jury, showing that the real question is the availability of relief, not the identity of the proper trier of fact.

We have explained generally that Rule 54(c) leaves "no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved." *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 559 (7th Cir. 1986) (internal quotation marks omitted), quoting *United States v. Marin*, 651 F.2d 24, 31 (1st Cir. 1981). But a party "may not be 'entitled' to relief if its conduct … has improperly and substantially prejudiced the other party." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424 (1975). A substantial increase in the defendant's possible liability "can constitute specific prejudice barring additional relief under Rule 54(c)." *Kaszuk*, 791 F.2d at 559, quoting *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716–17 (4th Cir. 1983); see also *Brewer v. Wal-Mart Stores, Inc.*, 87 F.3d 203, 207 (7th Cir. 1996) (district court abused discretion by allowing jury to impose punitive damages when plaintiff "first raised the punitive damage issue after the close of evidence."). We review a district court's determination under Rule 54(c) for abuse of discretion. *Old Republic Ins. Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077, 1080 (7th Cir. 1998).

Defendants argue that the district court abused its discretion by allowing Curry to seek punitive damages from the jury because, they claim, they were unaware that Curry

was seeking punitive damages under Illinois common law, and they stipulated to Revolution's liability under that count. Defendants rely on *Cullen v. Saddler*, 668 F. App'x 656 (7th Cir. 2016), as their primary authority for this argument. In addition to being non-precedential, *Cullen* is easily distinguishable—and the differences highlight why defendants were not unfairly prejudiced here.

In *Cullen*, the plaintiff brought a pro se complaint against prison officials for violating his First Amendment rights by requiring him to participate in a religious substance-abuse program. *Id.* at 657. His complaint sought $350 in damages and an injunction. The district court granted summary judgment for Cullen on liability and proceeded to consider damages. At that point, for the first time, Cullen asserted that his relief should include more than $2 million in punitive damages. The district court denied his request to seek additional relief under Rule 54(c). We affirmed, noting that Cullen "pleaded in his amended complaint and swore under oath in five separate interrogatory responses that he sought only $350 in compensatory damages." *Id.* at 658. We emphasized: "Only *after* the parties had completed discovery, litigating this suit as a low-stakes dispute, and the district court had ruled against the defendants on liability did Cullen seek over $2 million in punitive damages—a more than 5,000-fold increase in requested relief." *Id.*

This case is unlike the non-precedential *Cullen* for three reasons. First, Curry's complaint expressly sought punitive damages, giving defendants ample notice that this was not a low-stakes dispute. Second, unlike Cullen, Curry did not swear under oath that he sought only a modest amount in compensatory damages. As the district court explained here,

nothing in the record "amounts to a disavowal of punitive damages on the state law trademark claim."

Finally, and perhaps most important, Curry made it clear that he was seeking punitive damages on the basis of Illinois common law well before the close of discovery. Defendants stipulated to Revolution's liability under Illinois common law on December 22, 2020. At that time, they were still on notice that Curry was seeking punitive damages on the ICFA claim. More than a year later, when the district court granted summary judgment on that count on January 26, 2022, defendants might have believed (briefly) that they were off the hook for punitive damages. But further litigation on discovery disputes quickly showed that punitive damages were still at issue, albeit on the common-law claim. Just a few weeks later, on February 14, 2022, Curry moved to compel production of information regarding defendants' net worth. That motion argued that "the Nussbaums' financial information is … directly relevant to deciding the amount of punitive damages *on Plaintiff's common law trademark infringement claim*." Dkt. 197-1 at 8 (emphasis added, footnote omitted). Curry's motion also cited cases from this circuit confirming that punitive damages are available under Illinois common law of unfair competition. *Id.* at 8 n.10, citing *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 919 (7th Cir. 2007).

Defendants responded on February 22, 2022 with an extensive discussion of why in their view Barry and Joshua's personal finances were not relevant to calculating punitive damages for Illinois common-law trademark infringement. Dkt. 199 at 6. That brief argued that Illinois law generally disfavors punitive damages and that Curry was seeking "a

new theory of damages that is based on facts not in his Complaint." The district court granted Curry's motion to compel, explaining that "defendants' finances are relevant on the question of punitive damages on the state law claim" and that "[t]he conduct is what forms the basis for a punitive damages award." This discovery litigation shows that defendants knew that Curry was seeking punitive damages under Illinois common law well before trial—and well before their objection filed on December 6, 2022.[4]

Revolution's earlier stipulated liability to the Illinois common-law claim does not constitute unfair prejudice for three additional reasons. First, defendants explicitly reserved the right to dispute Joshua and Barry's common-law liability

---

[4] This conclusion is also supported by additional events. On May 18, 2022, the district court held a status hearing at which it asked counsel: "What exactly is there that will go to trial? What claims against whom on damages—on liability only, on damages only, what?" Dkt. 260 at 3. After Curry's counsel told the court that he would be seeking punitive damages, the court asked whether those punitive damages would potentially apply to both the trademark and the counterfeiting claims. The lawyer responded: "The punitive damages would be on the common law trademark infringement claim." *Id.* at 4. When the court then asked defendants' counsel whether Curry's statement about the triable issues was correct, he said that he "dealt solely with financial discovery" and could not "speak to the trademark claims." *Id.* at 5. This exchange further rebuts defendants' argument that Curry's claim of punitive damages amounted to an eleventh-hour amendment of the complaint that they could not have foreseen. Several other post-summary judgment docket entries also referred to punitive damages, although they did not specify the cause of action. See, e.g., dkt. 216 at 4–5 (district court noting on April 15, 2022 that punitive damages discovery was underway); dkt. 280 at 4 (Curry's proposed pretrial order, submitted on August 22, 2022, noting that he sought punitive damages); dkt. 467 at 20 (Curry's counsel told district court he was seeking punitive damages).

and "the amount of damages as to all Counts." Additionally, to impose punitive damages, the jury still had to make an additional "willful and malicious" or "reckless disregard" finding, as to which defendants did not stipulate. Finally, defendants litigated discovery issues related to punitive damages, showing lack of unfair surprise.

Defendants were not blindsided unfairly by a substantial increase in their potential liability, so the district court did not abuse its discretion in concluding that Curry was entitled to seek punitive damages under Illinois common law, even though he did not demand that relief in his pleadings. See *Soltys v. Costello*, 520 F.3d 737, 742 (7th Cir. 2008) (questioning whether plaintiffs needed to amend their complaint to seek punitive damages and noting: "Rule 54(c) contemplates an award of punitive damages if the party deserves such relief— whether or not a claim for punitive damages appears in the complaint."); see also *Back Doctors Ltd. v. Metropolitan Property & Casualty Ins. Co.*, 637 F.3d 827, 830–31 (7th Cir. 2011) (vacating order remanding to state court under Class Action Fairness Act; amount in controversy may include legally available punitive damages even if lead plaintiff has not asked for them in pleadings).

B.  *The Due Process Challenge to the Punitive Damage Awards*

Defendants next argue that the jury's punitive damage awards were unconstitutionally excessive. We disagree. Before explaining our holding, though, we reiterate that "the Constitution is not the most relevant limit to a federal court when assessing punitive damages, as it comes into play 'only after the assessment has been tested against statutory and common-law principles.'" *Saccameno v. U.S. Bank N.A.*, 943 F.3d 1071, 1086 (7th Cir. 2019), quoting *Perez v. Z Frank*

*Oldsmobile, Inc.*, 223 F.3d 617, 625 (7th Cir. 2000). Defendants do not argue that any source of law other than the federal Constitution restrains the punitive damage awards here, though, so we address only the federal due process issue.[5]

The Supreme Court has explained that the Due Process Clause of the Fourteenth Amendment imposes constitutional limits on the power of states to award punitive damages in civil cases. *Gore*, 517 U.S. at 568. Punitive damages, unlike compensatory damages, are "retributive in nature and seek to deter wrongful acts in the first place." *Saccameno*, 943 F.3d at 1086, citing *Campbell*, 538 U.S. at 416. States retain "considerable flexibility in determining the level of punitive damages that they will allow," but constitutional fairness requires that a party receive fair notice of "the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 568 (first quotation); at 574 (second quotation). Because civil defendants subject to punitive damages do not receive the "protections applicable in a criminal proceeding," courts conduct rigorous reviews of juries' punitive damages awards. *Campbell*, 538 U.S. at 417. That review is de novo. *Motorola Solutions, Inc. v. Hytera Comms. Corp.*, 108 F.4th 458, 495 (7th Cir. 2024), quoting *Estate of Moreland v. Dieter*, 395 F.3d 747, 756 (7th Cir. 2005), quoting in turn *Campbell*, 538 U.S. at 418.

The Supreme Court has instructed us to consider three guideposts when assessing the constitutionality of a punitive damage award: (1) the "degree of reprehensibility" of the

---

[5] Defendants say that "Illinois courts analyze the same factors" as courts assessing federal due process limits on punitive damages, Def. Br. at 28, but do not argue that Illinois law serves as an independent basis for reversal or requires any different or additional analysis.

defendant's misconduct; (2) the "disparity between the harm or potential harm" suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damage award and "the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 575. We have explained that when punitive damage awards based on state common-law claims do not come with "precise, reasoned legislative judgment[s]," such awards are subject to "more exacting *Gore* review." *Motorola*, 108 F.4th at 498–99.

     1. *Reprehensibility*

"The first and most important guidepost is the reprehensibility of the defendant's conduct …." *Saccameno*, 943 F.3d at 1086. We judge reprehensibility by considering whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419, citing *Gore,* 517 U.S. at 576–77. The presence of just one of these factors "weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

The first factor—whether the harm was physical or economic—weighs in favor of defendants. As in *Motorola* and *Epic Systems Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1141 (7th Cir. 2020), which both involved stolen trade secrets,

this case is about intellectual property and economic harm. As we explained in *Saccameno*: "The first factor is intended to draw a line—however hard to police—between physical injuries and those that are essentially economic, even if those economic injuries cause distress." 943 F.3d at 1086–87. We also rejected the argument that economic injuries that "cause distress" qualify as "physical harm" under *Gore* (except perhaps in extreme circumstances). *Id.* at 1087, citing *McGinnis v. American Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1288–89 (11th Cir. 2018) (finding factor met because plaintiff's depression caused projectile vomiting, and she told defendant that its conduct was causing undue stress). Curry's testimony that Revolution's use of the Diesel Test mark shocked and upset him does not rise to that level. The second factor—whether the defendants acted with "reckless disregard to the health or safety of others"—favors defendants for the same reason.

The third factor, financial vulnerability, favors plaintiff Curry. The relevant fact here is the parties' relative ability to weather financial turmoil. At the time of the infringement, Revolution was a well-capitalized and apparently successful business with more than 50 employees and more than 30 products in circulation. The jury could reasonably find that Revolution was prepared to take a financial hit for its wrongdoing. Joshua admitted as much when he suggested that Revolution's management "let him sue us to get through the remainder of our labels and then change the name to DZL Test on our next run." Curry, on the other hand, sold his house to start Get Diesel Nutrition, and he worked a second job as an information technology professional to earn a more stable income. He did not have the assistance of counsel for his cease-and-desist demands, and he originally filed this

lawsuit pro se. This lack of legal sophistication appears to have contributed to Revolution's willingness to risk a lawsuit.

This conclusion on the third factor is consistent with our decision in *Saccameno*. There, we found that a loan servicing company's "deliberately indifferent" conduct—erroneously calculating and seeking to collect a debt from a borrower who had recently gone through bankruptcy—supported an award of punitive damages. 943 F.3d at 1081 & 1085. On the financial vulnerability factor, we explained: "We have not required intentional exploitation to find that this factor weighs in favor of punitive damages." *Id.* at 1087, citing *Green v. Howser*, 942 F.3d 772, 781–82 (7th Cir. 2019); *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 839 (7th Cir. 2013). We also noted that the creditor's behavior would have been "both different and less reprehensible had Saccameno not recently come out of bankruptcy." *Saccameno*, 943 F.3d at 1087.

The same principles apply in this case. The evidence did not prove conclusively that Revolution intentionally exploited Curry's financial vulnerability, but it did not need to. It is sufficient to note that Revolution's conduct—promoting an infringing product and refusing to stop selling under the infringing name despite repeated cease-and-desist demands, including one from Amazon—would have been "different and less reprehensible," *id.*, if Curry had been a sophisticated commercial actor. This financial imbalance provides some support for the awards of punitive damages. See *Willow Inn, Inc. v. Public Service Mut. Ins. Co.*, 399 F.3d 224, 232 (3d Cir. 2005) (finding financial vulnerability when insurance company exploited "modest family-run business" by withholding claim payments); *International Union of Operating Eng'rs, Loc. 150 v. Lowe Excavating Co.*, 870 N.E.2d 303, 314–15 (Ill. 2006)

(no financial vulnerability when plaintiff was a 16-person company and failed to submit evidence of financial struggle).

The fourth factor—whether the conduct involved repeated actions or was an isolated incident—also favors Curry. After Revolution received Curry's cease-and-desist demands, it continued to sell its Diesel Test, deciding to "let him sue" so it could continue to sell its already-labeled inventory. Defendants' claim that they thought Curry's letters were scams is undermined by two additional facts. First, Joshua's email expressly acknowledged the possibility of a lawsuit and expressed a desire to continue selling the allegedly infringing product despite that possibility. Second, Amazon notified Revolution that its product had been flagged as a counterfeit. It then gave Revolution an opportunity to dispute that designation. Revolution declined to do so, and Amazon accordingly removed its online listing for Revolution's Diesel Test.

Amazon is not judge and jury on trademark infringement, but in deciding on punitive damages, the jury could treat its actions as a clear warning to Revolution of a serious problem. Revolution nonetheless chose to continue selling its infringing product through other channels. The jury could reasonably find that Revolution's infringing actions were repeated, not isolated. See *Epic Systems*, 980 F.3d at 1136 (when reviewing a due process challenge to punitive damages, "we view the facts and evidence in the light most favorable to … the litigant who prevailed before the jury.") (internal alterations omitted), quoting *Valdivia v. Township High Sch. Dist. 214*, 942 F.3d 395, 396 (7th Cir. 2019).

The fifth factor cuts the same way, for the same reasons. While the evidence does not show that the harm resulted from

any malice towards Curry, it also was no "mere accident." *Campbell*, 538 U.S. at 419. Revolution's original product development and initial sales might have involved a good-faith mistake about Curry's trademark, but the jury could reasonably find that good faith went out the window after Curry's repeated cease-and-desist notices, Revolution's acknowledgment of those messages, and its decision to continue selling the infringing product.[6]

Seeking to rehabilitate its appearance of good faith, Revolution argues that it voluntarily stopped selling Diesel Test once it realized its mistake. But that assertion is belied by evidence in the record that Revolution continued to sell Diesel Test until 2020, three years after the initial lawsuit was filed. That evidence, while contested, is plausible, and we take the facts in the light most favorable to the jury's verdict. *Sommerfield v. Knasiak*, 967 F.3d 617, 619 (7th Cir. 2020). The jury was entitled to view defendants as serial infringers whose word could not be trusted.

Like the conduct at issue in *Saccameno* and *Epic Systems*, Revolution's conduct was not reprehensible "to an extreme degree." See *Epic Systems*, 980 F.3d at 1142, quoting *Saccameno*, 943 F.3d at 1088. It neither caused physical harm to Curry nor recklessly disregarded the physical safety of others. But Revolution continued to sell its Diesel Test for years after it

---

[6] In addition, the jury was not required to believe Revolution's defense that it actually undertook a trademark search in good faith. See *Curry v. Revolution Laboratories, LLC*, No. 17-cv-2283, 2023 WL 5509337, at *21 (N.D. Ill. Aug. 25, 2023) (expressing skepticism about defendants' claimed good-faith belief that Curry did not have trademark rights based on documentary evidence, including Joshua's "let him sue" email). The supposed searches were not documented.

was notified that it was violating Curry's trademark. It also directly acknowledged that Curry might sue and decided to "let him" so that it could sell the rest of its labeled Diesel Test product. The jury could reasonably treat this conduct as showing calculated disregard for Curry's property rights, and the jury was within its discretion to decide that it was worthy of punishment.

2.  *Ratio of Punitive to Compensatory Damages*

The second guidepost from *Gore* is "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." 517 U.S. at 575. The Supreme Court has provided guidance for assessing this "ratio" between harm suffered and punitive damages. First, "few awards exceeding a single-digit ratio 'to a significant degree' will satisfy due process." *Saccameno*, 943 F.3d at 1088, quoting *Campbell*, 538 U.S. at 425. We have used this guidance to reduce a punitive damage award with a 2:1 ratio to compensatory damages, *Epic Systems*, 980 F.3d at 1143–44, and have upheld an award with a ratio as high as 37:1 in an egregious case. *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 676–68 (7th Cir. 2003). Second, the ratio analysis is flexible and may allow for a higher ratio when compensatory damages are small. *Saccameno*, 943 F.3d at 1088, citing *Campbell*, 538 U.S. at 425. The *Mathias* case is a good example. We affirmed punitive damages of $186,000 per plaintiff where compensatory damages were only $5,000 per plaintiff. The defendant hotel in that case had repeatedly chosen to disregard extensive evidence that its hotel rooms were infested with bed bugs in "farcical proportions," leading to the plaintiffs' injuries, which included physical injuries. *Mathias*, 347 F.3d at 675.

a. *Per-Defendant or Aggregate?*

This case presents two issues about how to calculate the ratio. The first is whether the ratio should be calculated by looking at punitive damages on a per-defendant basis or in the aggregate. The difference is meaningful here: the ratio changes by a factor of three depending on whether the analysis looks at each of the three defendants or instead compares total punitive damages to total compensatory damages.

Due process challenges to punitive damage awards are properly evaluated on a per-defendant basis. First, approaching the punitive damage inquiry from a per-defendant standpoint is consistent with "the court's task of determining whether any or all of the *defendants* had their due process rights violated." *Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 960 (9th Cir. 2005) (emphasis in original) (calculating ratio for each defendant by comparing each individual punitive damage award to compensatory damages for which that defendant was jointly and severally liable).[7]

Each defendant possesses individual due process rights, and the punishment imposed on each defendant must be assessed individually. *Bert Co. v. Turk*, 298 A.3d 44, 71 (Pa. 2023) ("The per-defendant ratio assesses the individualized impact intended by the punitive damages awards, whereas the per-

---

[7] We need not address here the related question of how to analyze the punitive damage ratio in cases involving multiple plaintiffs. See *Planned Parenthood*, 422 F.3d at 960–63 (reducing and then affirming punitive damage awards in favor of different individual plaintiffs). Because Curry is the only plaintiff and defendants are jointly and severally liable for the compensatory damages and disgorgement awards, we treat them as equally culpable for the harm imposed.

judgment approach distorts the analysis by obscuring the due process rights of the individual defendants."); *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 874 (Tex. 2017) (same); see also *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (punitive damages, unlike compensatory damages, are "assessed separately against each defendant.").[8]

The aggregate approach "fails to allow for the possibility that the reprehensibility of individual defendants can … differ." *Planned Parenthood*, 422 F.3d at 960. The jury's verdict here ordered each of the three defendants to pay $300,000 in punitive damages. This approach shows that the jury "fixed the amount of the punitive damages award to each plaintiff from each defendant based on its assessment of each defendant's reprehensibility relative to other defendants and to each plaintiff." *Id.* The fact that the amount was the same for each defendant does not affect the due process issue. It signals only that the jury found that these defendants were similarly responsible for inflicting the harm that supported the punitive damage awards. The point is that this particularized calculation of punitive damages is no accident. We decline to adopt a rule that would limit the jury's ability to assess culpability individually. See *Saccameno*, 943 F.3d at 1088–89 (assessing whether actual damages denominator should be divided based on claim or aggregated, declining to resolve the issue conclusively, and affirming district court's

---

[8] The jury's verdict here assigned joint and several liability for the compensatory damage award and the disgorgement award. Those awards indicate collective liability rather than particularized assessments of inflicted damage. The ratio analysis might be different in a case where compensatory damage awards differentiated among multiple defendants' responsibilities.

decision to aggregate, explaining that it is ultimately "conduct and harm we must assess against the amount awarded").

Defendants cite *United States E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1287 (7th Cir. 1995), in support of their aggregation argument, but that case also counsels in favor of assessing the relevant ratio on a per-defendant basis. In *AIC*, the district court awarded $75,000 in punitive damages against each of two defendants—a corporation and an individual—after a jury awarded $50,000 in actual damages. *Id.* at 1279. We concluded that the individual defendant should have been dismissed from the case, so we remanded for the district court to decide "whether [the individual's] share of punitive damages should drop out or should instead be imposed on AIC." *Id.* at 1287. Our decision to remand reflects the principle that punitive damage awards are based on facts allowing for *individualized* assessments of culpability. We follow that principle here.

### b. *Including Disgorgement?*

The next issue is whether "harm suffered" by the plaintiff—the denominator in the ratio—can include equitable relief, including disgorgement of wrongful profits, or whether the denominator is limited, as a matter of law, to compensatory damages. The issue matters here because the jury awarded Curry just $2,500 in compensatory damages. If the ratio did not include the $547,000 in disgorgement of wrongful profits, the ratio would be 120:1 for each of the $300,000 punitive damage awards, well beyond what would typically be considered constitutionally permissible. We see no reason to adopt defendants' proposed rule, which would rigidly and categorically exclude consideration of equitable relief as a matter of law when weighing the constitutionality of a

punitive damage award. We also conclude that the ratio in this case properly included the equitable disgorgement award.

Defendants note that the district court's disgorgement award was "an equitable remedy specifically provided by the Lanham Act," not based on Illinois common law. They assert that because Curry's disgorgement award is equitable, it "is not considered harm suffered by the mark owner and, therefore, cannot be used in assessing the punitive damages ratio." The argument depends on two mistaken assumptions: first, that equitable awards cannot reflect "harm suffered by the mark owner," and second, that if an award is not for "harm suffered," it may not be considered as part of the punitive damages calculation. We disagree with both assumptions.

As for the first, the fact that a remedy is deemed equitable rather than legal simply does not mean that it cannot reflect harm caused to a plaintiff. We acknowledged this in *Epic Systems*, where we compared a $140 million damage award—which was based on benefit to the defendant, not harm to the plaintiff—to a $280 million punitive damage award. 980 F.3d at 1143. We noted that if the plaintiff had suffered quantifiable economic harm, that harm was "significantly smaller" than the $140 million damage award, *id.,* but decided nonetheless to consider the $140 million damage award in calculating the ratio for two primary reasons. First, to be sure, the defendant in *Epic Systems* waived the argument that defendants make here. But second: "If we had to quantify [plaintiff's] harm to arrive at the appropriate ratio, applying the second due-process guidepost would pose a challenging task." *Id. Epic Systems* acknowledged that when courts are faced with the challenge of approximating actual damages, reliance on ill-

gotten gains can serve as a useful proxy, or at the very least as an indicator of how serious the wrongdoing was. See also *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1350–51 (Fed. Cir. 2001) (noting that unjust enrichment is not always only the return of a purchase price but can approximate value of unlawful conduct), vacated, 538 U.S. 974 (2003), on remand, *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366 (Fed. Cir. 2003) (reaffirming punitive damage award). Nothing about the Due Process Clauses in the Fifth or Fourteenth Amendments precludes courts from considering equitable awards when assessing punitive damages.

*Epic Systems* provides further support on this point. After concluding that the $140 million actual damages award (which was based on benefit to that defendant, not harm to that plaintiff) was the proper denominator for the ratio, we imposed a 1:1 ratio of punitive damages. *Epic Systems*, 980 F.3d at 1145. Applying defendants' argument in this case—that only *compensatory* damages may be considered in the denominator—would have made the ratio in that case much higher because the denominator would have been significantly smaller. This comparison helps show why considering non-punitive relief as a whole is the proper way to assess the constitutionality of a punitive damages award. The broader view helps compare the magnitude of the bad action to the magnitude of the punishment.[9]

---

[9] We do not address here a situation where punitive damages were based on a legal theory that would apply to only a portion of the non-punitive relief.

Defendants' second mistaken assumption is that only "harm suffered" may be used as the comparator in due process assessments of punitive damage awards. To start, the Supreme Court has "eschewed an approach that concentrates entirely on the relationship between actual and punitive damages." *TXO Prod. Corp. v. Alliance Resource Corp.*, 509 U.S. 443, 460 (1993). It is also appropriate to consider the "magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.* (emphasis in original); see also *Saccameno*, 943 F.3d at 1088 ("ratio should not be confined to actual harm, but can also consider potential harm"). Supreme Court precedent directly rejects defendants' assumption.

Defendants cite *Adidas America, Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 4279812 (D. Or. Sept. 12, 2008), for the principle that equitable relief may not be considered in evaluating a punitive damage award. In that case, Adidas sued Payless for various allegedly unfair trade practices. The jury returned a verdict in favor of Adidas, including $30.6 million in actual damages, a $137 million disgorgement award, and $137 million in punitive damages. *Id.* at *1. The district court—like the district court in this case—exercised its discretion under the Lanham Act to adjust the disgorgement award, in *Adidas* reducing it to $19.7 million. *Id.* at *13. In considering the constitutionality of the punitive damage award, the court cited *Gore* for the principle that it must consider "the disparity between the harm suffered by adidas and the punitive damages award," stated that the profits award was "not harm suffered by the mark owner," and accordingly

calculated the ratio based on only the compensatory damages award. *Id.* at *15.

We respectfully disagree with the *Adidas* court's exclusion of the disgorgement award for purposes of the due process analysis, at least as a general rule, apart from possible unique features of the *Adidas* case. As we explained above, *Saccameno* and *Epic Systems* clarify that the ratio guidepost seeks to compare the egregiousness of the conduct—represented by the punitive damage award—to the actual and potential real-world consequences of the defendants' actions. Those consequences can be approximated by compensatory damages, but as we explained in *Mathias*, considerations of punitive proportionality may change "when the probability of detection is very low (a familiar example is the heavy fines for littering) or the crime is potentially lucrative (as in the case of trafficking in illegal drugs)." 347 F.3d at 676. Compensatory damages will not always paint a full picture of the wrongfulness of the defendant's conduct.

So Supreme Court precedent and well-established principles of punitive proportionality teach that courts may consider equitable remedies in calculating the punitive damage ratio. But was it appropriate to do so in this case? We conclude that it was. Defendants make much of the fact that the district court explicitly instructed the jury not to include their profits in any potential damage award, arguing that it shows that their profits were unrelated to any harm to Curry. But the court also narrowly limited the types of actual damages that the jury could award, instructing it to consider only damage to Curry's reputation and related loss of goodwill, but not lost profits. This instruction ensured that the compensatory damage award would not reflect *any* of Curry's lost profits, and it

guarded against possible double-counting of those economic harms in the actual damages award and the disgorgement award. Judge Kennelly's strict limits on what the jury could consider in various damages calculations counsels in favor of using the disgorgement award in the ratio analysis to paint a more complete picture of Curry's harm and Revolution's wrongdoing.

Several additional considerations help convince us that it is appropriate to look to the disgorgement award in this case. First, the Supreme Court has emphasized that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards …." *Gore*, 517 U.S. at 582. We outlined the reason above: reprehensible acts with a low detection rate or highly lucrative potential payouts that may result in small compensatory damages may support a higher ratio of punitive damages to deter future offenders. The small compensatory award here is (1) artificially deflated because it did not account for any of Curry's lost profits (which would be difficult to calculate) and (2) inadequate to deter future mark infringement—either by Revolution or by other companies dealing with less sophisticated small businesses.[10]

---

[10] Defendants argue that the disgorgement award should not be considered because it is not a proxy for Curry's damages. We need not address whether the profits calculation is an accurate proxy. First, the compensatory award here definitely fails to represent Curry's actual lost profits because they were explicitly excluded from that figure. Second, the profits award is relevant to the reprehensibility of defendants' infringing actions. Defendants argue that Curry should be estopped from arguing that the disgorgement award is a proxy for his damages because he argued that disgorgement was equitable in the district court, but this argument relies on a flawed view of the nature of equitable relief, as explained above.

Defendants say that using the disgorgement award to help affirm the punitive damage awards transformed the disgorgement award into a penalty, which would be contrary to the express terms of the Lanham Act. See 15 U.S.C. § 1117(a) (in fashioning relief under Lanham Act, court may "in its discretion enter judgment for such sum as the court shall find to be just" and which "shall constitute compensation and not a penalty"). We disagree. The district court calculated the appropriate profit disgorgement in a thorough and thoughtful opinion, explaining why certain profits were recoverable and why others were not. *Curry,* 2023 WL 5509337, at *8–*14. The court then assessed whether the punitive damage awards were proportional to the magnitude of the ill-gotten gains in the case. This analysis did not transform the disgorgement award into a penalty; it properly used the disgorgement award, which reflects the nature of the illegal conduct, as a basis for assessing the appropriate punitive damage awards.

Because equitable relief may be considered when calculating the ratio between punitive and actual damages, and because we may consider factors other than compensatory damages in that calculation, the district court did not err in concluding that the disgorgement award combined with the compensatory damage award was the appropriate denominator for due process purposes. The appropriate ratio is $300,000 in punitive damages per defendant compared against $549,595.44. As the district court explained, this ratio of less than 1:1 is "easily permissible." *Curry*, 2023 WL 5509337, at *17, quoting *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004).

Defendants' final argument, advanced in a footnote of their opening brief, is that the court should consider only defendants' Illinois sales in the punitive damage ratio. We decline the invitation to find a constitutional federalism elephant in that mousehole. This argument (which also was not made to the district court) is waived. See *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (recognizing that underdeveloped arguments and arguments not made to the district court are waived or forfeited). Additionally, defendants' waiver will not result in a miscarriage of justice for two reasons. *Campbell*, which defendants use as authority for their argument, found constitutional issues with imposing punitive damages resulting from (1) state-law violations committed against (2) out-of-state victims *other than the plaintiff*, including those in jurisdictions where the conduct may have been legal. See 538 U.S. at 420 ("The Utah Supreme Court's opinion makes explicit that State Farm was being condemned for its nationwide policies rather than for the conduct directed toward the Campbells."). Here, we have violations of a federal statute and state common law committed against one plaintiff. This case does not raise the same federalism issues because the remedy is based (at least in part) on a federal cause of action, and because Curry is the only victim of Revolution's misconduct. Curry did not need to file separate suits in all 50 states to vindicate his Lanham Act rights.

### 3.  *Comparable Civil Penalties*

The final *Gore* guidepost compares the punitive damage awards "and the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 575. This factor "allows courts to show 'substantial deference to legislative judgments

concerning appropriate sanctions for the conduct at issue.'" *AutoZone*, 707 F.3d at 840, quoting *Gore*, 517 U.S. at 583. The parties agree that the Lanham Act is the appropriate comparator.

Remedies for federal Lanham Act violations are set out in 15 U.S.C. § 1117. Subsection 1117(a) authorizes awards including defendants' profits and up to three times the amount of actual damages for violations of registered trademarks. That subsection specifies that such a remedy "shall constitute compensation and not a penalty." (Recall that Curry's trademark was not registered, but that difference does not undermine the comparison for constitutional purposes.) Section 1117(b)(1) authorizes imposition of treble damages or profits, whichever is greater, for intentional use of a counterfeit mark. And § 1117(c) authorizes up to $2 million in statutory damages for willful use of a counterfeit mark, "as the court considers just."

The parties dispute whether subsection 1117(a), (b), or (c) should guide our consideration here. The answer does not matter. All three authorize awards above what the jury and court awarded here. And the magnitude of the punitive damage awards in this case ($300,000 per defendant) is less than the district judge's disgorgement order of roughly $547,000, making them not disproportionate when compared to remedies under any of subsections (a), (b), and/or (c). This comparison indicates that the punitive damage awards were not out of bounds as compared to the penalties authorized in "comparable cases" arising under the Lanham Act.

Defendants argue that imposing punitive damages at all runs contrary to subsection (a), which does not authorize imposition of a penalty. The fact that a federal statute does not authorize imposition of a penalty is irrelevant to whether

punitive damages may be awarded under a separate state-law cause of action. The Lanham Act reveals a legislative insight into the gravity of the harm. As explained above, the awards here are at least roughly consistent with that guidance. The Illinois common-law awards therefore did not depart from "legislative judgments concerning appropriate sanctions for the conduct at issue." *Gore*, 517 U.S. at 583.

The judgment of the district court is AFFIRMED.